**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| 1 | MARY OFISI | : |
| 2 | Aaron Makau Ndivo | : CASE NO.:_____ |
| 3 | Adam Titus Wamai | : |
| 4 | Agnes Kubai | : |
| 5 | Agnes Wanjiku Ndungu | : |
| 6 | Aisha Kambenga | : |
| 7 | Alex Mbugua | : |
| 8 | Alex Munguti | : |
| 9 | Alexander Vrontamitis | : |
| 10 | Ali Hussein Ali | : |
| 11 | Alice Kiongo | : |
| 12 | Alice Maritim | : |
| 13 | Alice Mary Talbot | : |
| 14 | Alison Maffry | : |
| 15 | Allan Olao | : |
| 16 | Ally Mahundi | : |
| 17 | Amiri Mahundi | : |
| 18 | Anastasia Gianpoulos | : |
| 19 | Andrew Ofisi | : |
| 20 | Andrew Onono | : |
| 21 | Andrew Pussy | : |
| 22 | Angela Bonyo | : |
| 23 | Angela Mwongeli Mutiso | : |
| 24 | Angela Wamai | : |
| 25 | Anipha Mpoto | : |
| 26 | Ann Mbogo | : |
| 27 | Ann Ruguru | : |
| 28 | Ann Salamba | : |

| 29 | Ann Wairimu Kiarie | : | |
|----|---------------------|---|---|
| 30 | Annah Maritim | : | |
| 31 | Annah Wangechi | : | |
| 32 | Annastaciah Lucy Boulden | : | |
| 33 | Anne Adundo | : | |
| 34 | Anne Nganga Mwangi | : | |
| 35 | Anthony Kiarie | : | |
| 36 | Anthony Njoroge | : | |
| 37 | Aquilas Kalio | : | |
| 38 | Asha Kiluwa | : | |
| 39 | Asha Mahundi | : | |
| 40 | Audrey Pussy | : | |
| 41 | August Maffry | : | |
| 42 | Badawy Itati Ali | : | |
| 43 | Bakari Nyumbu | : | |
| 44 | Barbara Kiarie | : | |
| 45 | Barbara Muli | : | |
| 46 | Barbara Olao | : | |
| 47 | Barnabas Onyango | : | |
| 48 | Beatrice Amduso | : | |
| 49 | Beatrice Atinga | : | |
| 50 | Beatrice Bwaku | : | |
| 51 | Beatrice Martha Kithuva | : | |
| 52 | Belinda Akinyi Adika | : | |
| 53 | Belinda Chaka | : | |
| 54 | Belinda Maloba | : | |
| 55 | Belonce Murigi | : | |
| 56 | Benson Bwaku | : | |
| 57 | Benson Malusi Musyoka | : | |
| 58 | Benson Ndegwa | : | |
| 59 | Bernard Adundo | : | |

| | | |
|---|---|---|
| 60 | Bernard Macharia | : |
| 61 | Bernard Mutunga Kaswii | : |
| 62 | Bernard Onsongo | : |
| 63 | Bernice Ndeti | : |
| 64 | Beryl Shiumbe | : |
| 65 | Betty Kagai | : |
| 66 | Beverlyne Ndeda | : |
| 67 | Blasio Kubai | : |
| 68 | Boniface Chege | : |
| 69 | Brian Kubai | : |
| 70 | Bryan Omori | : |
| 71 | Caroline Karigi | : |
| 72 | Caroline Kasungo Mgali | : |
| 73 | Caroline Ngugi Kamau | : |
| 74 | Caroline Okech | : |
| 75 | Caroline Wanjiru Gichuru | : |
| 76 | Caroline Wanjuri Kamau | : |
| 77 | Catherine Gitau | : |
| 78 | Catherine Gitumbu Kamau | : |
| 79 | Catherine Kalio | : |
| 80 | Catherine Mwangi | : |
| 81 | Catherine Njeri Mwangi | : |
| 82 | Celestine Kubai | : |
| 83 | Charles Kabui | : |
| 84 | Charles Kagai | : |
| 85 | Charles Mungoma Olambo | : |
| 86 | Charles Mwaka Mulwa | : |
| 87 | Charles Mwangi Ndibui | : |
| 88 | Charles Mwirigi Nkanatha | : |
| 89 | Charles Ochola | : |
| 90 | Charles Olewe | : |

| 91  | Charles Opondo          | : |
| 92  | Christant Hiza          | : |
| 93  | Christine Kavai Busera   | : |
| 94  | Christine Mikali Kamau  | : |
| 95  | Christine Nabwire Bwaku | : |
| 96  | Christopher Ndiritu     | : |
| 97  | Civilier Mwaka          | : |
| 98  | Clara Owino             | : |
| 99  | Clifford Tarimo         | : |
| 100 | Collin Kubai            | : |
| 101 | Collins Aliviza         | : |
| 102 | Conceptor Orende        | : |
| 103 | Cornelius Kebungo       | : |
| 104 | Daniel Kiarie           | : |
| 105 | Daniel Kiongo Kamau     | : |
| 106 | Daniel Kuya             | : |
| 107 | Daniel Owiti Oloo       | : |
| 108 | David Kamau             | : |
| 109 | David Kiarie Kiburu     | : |
| 110 | David Ngugi             | : |
| 111 | Dawn Mulu               | : |
| 112 | Debora Gwaro            | : |
| 113 | Debra Mayaka            | : |
| 114 | Dennis Okatch           | : |
| 115 | Derrick Maloba          | : |
| 116 | Diana Kibodya           | : |
| 117 | Diana Macharia          | : |
| 118 | Diana Nyangara          | : |
| 119 | Diana Williams          | : |
| 120 | Dick Obworo Mayaka      | : |
| 121 | Dickson Lihanda         | : |

| 122 | Dixon Indiya | : |
| 123 | Dominic Musyoka Kithuva | : |
| 124 | Doreen Mayaka | : |
| 125 | Doreen Oport | : |
| 126 | Doreen Pussy | : |
| 127 | Dorine Bonyo | : |
| 128 | Duncan Nyoike Kamau | : |
| 129 | Edgar Maritim | : |
| 130 | Edith Njeri | : |
| 131 | Edmund Kiarie Kiburu | : |
| 132 | Edward Kung'u | : |
| 133 | Edward Mwae Muthama | : |
| 134 | Edwin Omori | : |
| 135 | Edwin Onsongo | : |
| 136 | Edwin Oyoo | : |
| 137 | Edwina Owuor | : |
| 138 | Elijah Bonyo Ochieng | : |
| 139 | Elizabeth Kiato | : |
| 140 | Elizabeth Maloba | : |
| 141 | Elizabeth Muli-Kibue | : |
| 142 | Elizabeth Nzaku | : |
| 143 | Elizabeth Okelo | : |
| 144 | Elizabeth Tarimo | : |
| 145 | Elly Musalia | : |
| 146 | Elsie Kagimbi | : |
| 147 | Elsie Pussy | : |
| 148 | Emily Minayo | : |
| 149 | Emma Mahundi | : |
| 150 | Emmanuel Gwaro | : |
| 151 | Emmanuel Minja | : |
| 152 | Emmanuel Musambayi Busera | : |

| | | |
|---|---|---|
| 153 | Emmily Bulimu | : |
| 154 | Enna Omolo | : |
| 155 | Enoch Onsongo | : |
| 156 | Enos Nzalwa | : |
| 157 | Ephantus Njagi Mbogo | : |
| 158 | Ephraim Onyango Bwaku | : |
| 159 | Erastus Ndeda | : |
| 160 | Eric Abur Onyango | : |
| 161 | Eric Mwaka | : |
| 162 | Ernest Gitau | : |
| 163 | Ester Nganga Mwangi | : |
| 164 | Eucabeth Gwaro | : |
| 165 | Evans Onsongo | : |
| 166 | Evitta Francis Kwimbere | : |
| 167 | Faith Kihato | : |
| 168 | Faith Maloba | : |
| 169 | Faith Murigi | : |
| 170 | Faith Mutindi | : |
| 171 | Faith Wanza Kamau | : |
| 172 | Felister Gitau | : |
| 173 | Felix Munguti | : |
| 174 | Felix Mwaka | : |
| 175 | Flavia Kiyanga | : |
| 176 | Florence Musalia | : |
| 177 | Florence Omori | : |
| 178 | Francis Kwimbere | : |
| 179 | Francis Maina Ndibui | : |
| 180 | Francis Mbogo Njung'e | : |
| 181 | Francis Ndungu Mbugua | : |
| 182 | Francis Ofisi | : |
| 183 | Francis Olewe Ochilo | : |

| 184 | Francis Watoro Maina | : |
|-----|----------------------|---|
| 185 | Franciso Kyalo | : |
| 186 | Frederick Kibodya | : |
| 187 | Frederick Kwimbere | : |
| 188 | Frederick Maloba | : |
| 189 | Frida Bulimu | : |
| 190 | Frida Yohan Mtitu | : |
| 191 | Fridah Makena | : |
| 192 | Gad Gideon Achola | : |
| 193 | Gaudens Thomas Kunambi | : |
| 194 | Geoffrey Kalio | : |
| 195 | Geoffrey Moses Namai | : |
| 196 | Geoffrey Tupper | : |
| 197 | George Magak Mimba | : |
| 198 | George Mwangi | : |
| 199 | George Onsongo | : |
| 200 | Gerald Bochart | : |
| 201 | Gerald Owino | : |
| 202 | Gideon Maritim | : |
| 203 | Gideon Ofisi | : |
| 204 | Gitonga Mwanike | : |
| 205 | Gladis Lihanda | : |
| 206 | Gladys Munani Musyoka | : |
| 207 | Gladys Onsongo | : |
| 208 | Godfrey Bulimu | : |
| 209 | Grace (Eunice) Onsongo | : |
| 210 | Grace Gicho | : |
| 211 | Grace Godia | : |
| 212 | Grace Kimani | : |
| 213 | Grace Kimata | : |
| 214 | Grace Makasi Paul | : |

| | | |
|---|---|---|
| 215 | Grace Wanjiru Waithira | : |
| 216 | Greg Owino | : |
| 217 | Hamida Idi | : |
| 218 | Hannah Ngenda Kamau | : |
| 219 | Hannah Wambui | : |
| 220 | Harriet Chore | : |
| 221 | Harrison Kimani | : |
| 222 | Hellen Maritim | : |
| 223 | Hellen Okelo | : |
| 224 | Henry Aliviza Shitiavai | : |
| 225 | Henry Bathazar Kessy | : |
| 226 | Hesbon Bulimu | : |
| 227 | Hesbon Lihanda | : |
| 228 | Hilario Ambrose Fernandes | : |
| 229 | Hindu Omari Idi | : |
| 230 | Hosiana Mbaga | : |
| 231 | Hudson Chore | : |
| 232 | Humphrey Aliviza | : |
| 233 | Humphrey Kiburu | : |
| 234 | Hussein Ramadhani | : |
| 235 | Immanuel Mdobilu | : |
| 236 | Inosensia Mpoto | : |
| 237 | Ireen Semo | : |
| 238 | Irene Khabuchi | : |
| 239 | Irene Kung'u | : |
| 240 | Irene Kwimbere | : |
| 241 | Isaac Kariuki Mbogo | : |
| 242 | Isidore Adundo | : |
| 243 | Jacinta Wahome | : |
| 244 | Jackline Achieng | : |
| 245 | Jackson Bulimu | : |

| 246 | Jackson Kithuva Musyoka | : |
| 247 | Jackson Ndungu | : |
| 248 | Jacob Gati | : |
| 249 | Jacqueline Aliviza | : |
| 250 | Jacqueline Kihato | : |
| 251 | Jael Oyoo | : |
| 252 | Jairus David Aura | : |
| 253 | James Chaka | : |
| 254 | James Mukabi | : |
| 255 | James Ndeda | : |
| 256 | Jamleck Gitau Ndungu | : |
| 257 | Janathan Okech | : |
| 258 | Jane Ikonye Kiarie | : |
| 259 | Jane Kamau | : |
| 260 | Jane Kathuka | : |
| 261 | Jane Khabuchi | : |
| 262 | Jane Mutua | : |
| 263 | Japeth Godia | : |
| 264 | Jeffrey Mbugua | : |
| 265 | Jennifer Njeri | : |
| 266 | Jennifer Wambui | : |
| 267 | Jerry Omori | : |
| 268 | Joab Amduso | : |
| 269 | Joan Adundo | : |
| 270 | Joan Kamau | : |
| 271 | Joan Kendi Nkanatha | : |
| 272 | Joanne Oport | : |
| 273 | Joash Okindo | : |
| 274 | Joel Gitumbu Kamau | : |
| 275 | John Kiswili | : |
| 276 | John Mdobilu | : |

| | | |
|---|---|---|
| 277 | John Muiru Ndungu | : |
| 278 | John Muriuki | : |
| 279 | John Ndibui | : |
| 280 | John Nduati | : |
| 281 | John Ngugi | : |
| 282 | John Ngure | : |
| 283 | John Ofisi | : |
| 284 | Jomo Matiko Boke | : |
| 285 | Jonathan Nduti | : |
| 286 | Joseph Abdallah | : |
| 287 | Joseph Gathunga | : |
| 288 | Joseph Ingosi | : |
| 289 | Joseph Kamau Kiongo | : |
| 290 | Joseph Kambo | : |
| 291 | Joseph Ndungu Waithira | : |
| 292 | Joseph Wahome | : |
| 293 | Joshua Mayunzu | : |
| 294 | Josiah Owuor | : |
| 295 | Josinda Katumba Kamau | : |
| 296 | Jotham Godia | : |
| 297 | Joyce Mutheu | : |
| 298 | Joyce Onyango | : |
| 299 | Joyce Thadei Lokoa | : |
| 300 | Judith Nandi Busera | : |
| 301 | Judy Aliviza | : |
| 302 | Judy Kiarie | : |
| 303 | Juliana Onyango | : |
| 304 | Juliet Olewe | : |
| 305 | Julius Nyamweno | : |
| 306 | Julius Nzivo | : |
| 307 | Julius Ogoro | : |

| 308 | Juma Mahundi | : |
| 309 | Juruha Musalia | : |
| 310 | Justin Amduso | : |
| 311 | Justina Mdobilu | : |
| 312 | Kaka Abubakar Iddi | : |
| 313 | Kamali Musyoka Kithuva | : |
| 314 | Katherine Mdobilu | : |
| 315 | Katherine Mwaka | : |
| 316 | Katimba Mohamed Selemani | : |
| 317 | Keeliy Musyoka | : |
| 318 | Kelesendhia Apondi Onyango | : |
| 319 | Kennedy Okelo | : |
| 320 | Kenneth Maloba | : |
| 321 | Kenneth Owino | : |
| 322 | Kimeu Nzioka Nganga | : |
| 323 | Kirumba W'mburu Mukuria | : |
| 324 | Laura Onono | : |
| 325 | Lawrence Ambrose Gitau | : |
| 326 | Leah Owino | : |
| 327 | Leilani Bower | : |
| 328 | Leonard Rajab Waithira | : |
| 329 | Leonard Shinenga | : |
| 330 | Leonidas Vrontamitis | : |
| 331 | Leslie Onono | : |
| 332 | Leslie Sambuli | : |
| 333 | Levina Minja | : |
| 334 | Levis Madahana Busera | : |
| 335 | Lewis Maloba | : |
| 336 | Lilian Kalio | : |
| 337 | Linda Oyanda | : |
| 338 | Livingstone Busera Madahana | : |

| | | |
|---|---|---|
| 339 | Lloyd Wamai | : |
| 340 | Loise Kuya | : |
| 341 | Lorna Kung'u | : |
| 342 | Lucy Chege | : |
| 343 | Lucy Gitau | : |
| 344 | Lucy Grace Onono | : |
| 345 | Lucy Kambo | : |
| 346 | Lucy Kiongo | : |
| 347 | Lucy Mwangi | : |
| 348 | Lucy Nyawida Karigi | : |
| 349 | Lukas Kimeu | : |
| 350 | Lydia Bulimu | : |
| 351 | Lydia Gwaro | : |
| 352 | Lydia Muriki Mayaka | : |
| 353 | Lydia Ndivo Makau | : |
| 354 | Lydia Nyaboka Otao Okindo | : |
| 355 | Lynette Oyanda | : |
| 356 | Magdaline Owiti | : |
| 357 | Mahamud Omari Idi | : |
| 358 | Majdoline Abdallah | : |
| 359 | Manzi Musyoka | : |
| 360 | Margaret Gitau | : |
| 361 | Margaret Maloba | : |
| 362 | Margaret Murigi | : |
| 363 | Margaret Mwangi Ndibui | : |
| 364 | Margaret Njoki Ngugi | : |
| 365 | Margaret Nzomo | : |
| 366 | Margaret Tarimo | : |
| 367 | Margaret Waithira Ndungu | : |
| 368 | Marini Karima | : |
| 369 | Marita Onyango | : |

| 370 | Marlon Maloba | : |
| 371 | Martin Karigi | : |
| 372 | Mary Bulimu | : |
| 373 | Mary Gitonga | : |
| 374 | Mary Meresiana Paul | : |
| 375 | Mary Mudeche | : |
| 376 | Mary Muiriri | : |
| 377 | Mary Munguti | : |
| 378 | Mary Muthoni Ndungu | : |
| 379 | Mary Ndambuki | : |
| 380 | Mary Nzisiva Samuel | : |
| 381 | Caroline Maffry | : |
| 382 | Mary Onsongo | : |
| 383 | Maryann Njoki Kiarie | : |
| 384 | Maureen Ndeda | : |
| 385 | Maurice Okatch Ogolla | : |
| 386 | Menelik Kwamia Makonnen | : |
| 387 | Merab Godia | : |
| 388 | Mercy Ndiritu | : |
| 389 | Mercy Wairumu Kamau | : |
| 390 | Mercy Wanjiru | : |
| 391 | Michael Ikonye Kiarie | : |
| 392 | Michael Kimeu | : |
| 393 | Michael Mwangi | : |
| 394 | Michael Ngigi Mworia | : |
| 395 | Michael Tsuma | : |
| 396 | Michael Ware | : |
| 397 | Milka Wangari Macharia | : |
| 398 | Millicent Bulimu | : |
| 399 | Milly Mikali Amduso | : |
| 400 | Mischeck Murigi | : |

| 401 | Misheck Mbogo | : | |
| 402 | Mohamed Abdallah Mnyolya | : | |
| 403 | Monica Wangari Munyori | : | |
| 404 | Monicah Kamau | : | |
| 405 | Monicah Opati | : | |
| 406 | Mordechai Thomas Onono | : | |
| 407 | Moses Kinyua | : | |
| 408 | Muraba Chaka | : | |
| 409 | Mwajabu Mahundi | : | |
| 410 | Mwajumba Mahundi | : | |
| 411 | Nafisa Malik | : | |
| 412 | Nancy Macharia | : | |
| 413 | Nancy Mbogo | : | |
| 414 | Nancy Mimba Magak | : | |
| 415 | Nephat Kimathi Mbogo | : | |
| 416 | Newton Kamau | : | |
| 417 | Ngugi Macharia | : | |
| 418 | Nicholas Mutiso | : | |
| 419 | Nickson Minja | : | |
| 420 | Nigeel Namai | : | |
| 421 | Norman Kagai | : | |
| 422 | Nuri Hamisi Sultani | : | |
| 423 | Nyangoro Mayaka | : | |
| 424 | Omar Idi | : | |
| 425 | Omar Zubari Omar | : | |
| 426 | Onael Mdobilu | : | |
| 427 | Pankaj Patel | : | |
| 428 | Patrick Nyette | : | |
| 429 | Patrick Okech | : | |
| 430 | Paul Ngugi | : | |
| 431 | Paul Onyango | : | |

| 432 | Paul Vrontamitis | : |
| 433 | Pauline Abdallah | : |
| 434 | Pauline Adundo | : |
| 435 | Pauline Kamau | : |
| 436 | Pauline Kamau Kiongo | : |
| 437 | Peninah Mucii | : |
| 438 | Peris Gitumbu | : |
| 439 | Peris Onsongo | : |
| 440 | Peter Kamau | : |
| 441 | Peter Kamau Kiongo | : |
| 442 | Peter Kunigo | : |
| 443 | Peter Kuya | : |
| 444 | Peter Macharia | : |
| 445 | Peter Mdobilu | : |
| 446 | Peter Mwaka | : |
| 447 | Peter Ngigi Mugo | : |
| 448 | Peter Ngugi | : |
| 449 | Petronila Munguti | : |
| 450 | Phaedra Vrontamitis | : |
| 451 | Phelister Okech | : |
| 452 | Philemon Oport | : |
| 453 | Phillip Kamau | : |
| 454 | Phoeba Ndegwa | : |
| 455 | Phoebe Kebungo | : |
| 456 | Pinina Onsongo | : |
| 457 | Polychep Odihambo | : |
| 458 | Prisca Owino | : |
| 459 | Priscila Okatch | : |
| 460 | Purity Mahonja | : |
| 461 | Rachael Mungasia Pussy | : |
| 462 | Rachel Oyanda Otieno | : |

| | | |
|---|---|---|
| 463 | Rael Ochola | : |
| 464 | Rael Opati | : |
| 465 | Ramadhani Mahundi | : |
| 466 | Rammy Rotich | : |
| 467 | Raphael Kivindyo | : |
| 468 | Raphael Peter Munguti | : |
| 469 | Rashid Katimba | : |
| 470 | Rashid Omar Idi | : |
| 471 | Rehana Malik | : |
| 472 | Reuben Nyaga Mbogo | : |
| 473 | Rispah Abdallah | : |
| 474 | Rispah Auma | : |
| 475 | Rodgers Bulimu | : |
| 476 | Ronald Okelo | : |
| 477 | Rose Nyette | : |
| 478 | Roselyne Ndeda | : |
| 479 | Rosemary Anyango Okatch | : |
| 480 | Rosemary Olewe | : |
| 481 | Rukia Wanjiru Ali | : |
| 482 | Ruth Gatwiri Mwirigi | : |
| 483 | Ruth Lihanda | : |
| 484 | Ruth Maritim | : |
| 485 | Ruth Nduta Kamau | : |
| 486 | Said Mahundi | : |
| 487 | Sajjad Gulamaji | : |
| 488 | Salima Ismail Rajabu | : |
| 489 | Sally Cecilia Mamboleo | : |
| 490 | Sally Oport | : |
| 491 | Salome Onsongo | : |
| 492 | Salome Ratemo | : |
| 493 | Sammy Mwangi | : |

| 494 | Sammy Ndungu Kiarie | : |
| 495 | Sammy Okere | : |
| 496 | Samson Ogolla Okatch | : |
| 497 | Samuel Adundo | : |
| 498 | Samuel Mbugua Ndungu | : |
| 499 | Samuel Odhiambo Oriaro | : |
| 500 | Samuel Pussy | : |
| 501 | Sani Kwimbere | : |
| 502 | Sarah Mbogo | : |
| 503 | Sarah Tikolo | : |
| 504 | Sedrick Nair | : |
| 505 | Selifah Opati | : |
| 506 | Selina Boke | : |
| 507 | Shaban Mahundi | : |
| 508 | Sharon Maloba | : |
| 509 | Sharone Maritim | : |
| 510 | Sheila Maritim | : |
| 511 | Simon Ngure | : |
| 512 | Solomon Mbugua | : |
| 513 | Stacy Chaka | : |
| 514 | Stanley Chaka | : |
| 515 | Stanley Kinyua Macharia | : |
| 516 | Stanley Ngugi | : |
| 517 | Stanley Nyoike | : |
| 518 | Stella Mbugua | : |
| 519 | Stephen Muli | : |
| 520 | Stephen Njuki Mbogo | : |
| 521 | Stephen Onono | : |
| 522 | Steve Kihato | : |
| 523 | Steven Karigi | : |
| 524 | Steven Maloba | : |

| | | |
|---|---|---|
| 525 | Susan Gitau | : |
| 526 | Syuindo Musyoka | : |
| 527 | Tabitha Kagai | : |
| 528 | Tabitha Kalio | : |
| 529 | Techonia Owiti | : |
| 530 | Theresa Adundo | : |
| 531 | Thomas Adundo | : |
| 532 | Tibruss Minja | : |
| 533 | Tilda Abur | : |
| 534 | Titus Kyalo Musyoka | : |
| 535 | Titus Wamai | : |
| 536 | Tobias Oyanda Otieno | : |
| 537 | Tony Kihato Irungu | : |
| 538 | Trusha Patel | : |
| 539 | Valentine Ndeda | : |
| 540 | Valerie Nair | : |
| 541 | Vallen Andeyo | : |
| 542 | Velma Bonyo | : |
| 543 | Vera Jean Oyanda | : |
| 544 | Victor Adeka | : |
| 545 | Victor Mpoto | : |
| 546 | Victor Watoro | : |
| 547 | Vincent Kamau Nyoike | : |
| 548 | Vincent Owuor | : |
| 549 | Violet Minja | : |
| 550 | Wallace Njorege Nyoike | : |
| 551 | Wambui Kung'u | : |
| 552 | Warren Owuor | : |
| 553 | Wellington Oluoma | : |
| 554 | Wendy Kagai | : |
| 555 | Wendy Olewe | : |

| 556 | William Maina | : |
| 557 | Winfred Maina | : |
| 558 | Winfred Wamai | : |
| 559 | Winnie Bonyo | : |
| 560 | Winnie Kimeu | : |
| 561 | Wycliffe Ochieng Bonyo | : |
| 562 | Wycliffe Okello Khabuchi | : |
| 563 | Yusuph Mahundi | : |
| 564 | Yvonne Oport | : |
| 565 | Zackaria Musalia Atinga | : |
| 566 | Zakayo Matiko | : |
| 567 | Zephania Mboge | : |
| | | : |
| | Plaintiffs, | : |
| | v. | : |
| | | : |
| | **BNP PARIBAS, S.A.** | : |
| | 12 Rue Chauchat, | : |
| | 75450 Paris, CEDEX 09, France | : |
| | And | |
| | **AL SHAMAL ISLAMIC BANK** | |
| | Al Shamal Islamic Bank Tower | |
| | El Sayed Abdurrahman Street | |
| | Eastern Khartoum Area | |
| | Khartoum, Sudan 10036 | |
| | Defendants. | |

## <u>COMPLAINT</u>

Plaintiffs, through undersigned counsel, respectfully bring this action against BNP Paribas, S.A. and Al Shamal Islamic Bank, and allege as follows:

1.      From at least November 1997 through in or around 2012 (hereinafter the

1

"Relevant Period"), Defendant BNP Paribas, S.A. ("BNPP"), the Republic of Sudan ("Sudan"),

the Central Bank of Sudan, other Sudanese financial institutions including Al Shamal Islamic

Bank ("Al Shamal"), and Al Qaeda, conspired with each other and others to defeat the economic

sanctions imposed by Executive Order of the President of the United States and administered and

enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"),

which were designed to deter, disrupt, and defeat acts of international terrorism.

2.      Access to the U.S. financial system allowed Sudan, Sudanese financial

institutions, and their agents to provide material support to Al Qaeda which it used to carry out

the August 7, 1998 bombing attacks on the U.S. Embassies in Kenya and Tanzania (hereinafter,

"the 1998 East African Embassy Attacks").

3.      By its own admission in connection with its criminal plea in federal court in New

York in 2014, BNPP commenced a fraudulent scheme and conspiracy with Sudan in November

1997 – corresponding precisely with the period during which Sudan was supporting and

facilitating Al Qaeda's attacks on the U.S. embassies in Kenya and Tanzania on August 7, 1998

(the "1998 East African Embassy Attacks").  Although BNPP did not share Al Qaeda's desire to

kill American citizens and citizens of their allies, that tragic result was still the foreseeable and

inevitable consequence of the bank's conduct.  The 1998 East African Embassy Attacks were

directly and proximately caused by BNPP's knowing and intentional participation in a

conspiracy to help Sudan and Sudanese financial institutions defeat U.S. economic sanctions

explicitly designed to stop Al Qaeda and other terrorist organizations.

4.      It is bedrock principle of American law that to be a member of a conspiracy, one

need not know all of the other participants in the conspiracy or share all of the same goals.  Co-

conspirators need only share a central unlawful aim—in this case, the defeat of U.S. economic

sanctions explicitly designed to prevent international terrorism—and act knowingly and intentionally to accomplish that purpose.  Co-conspirators are partners in crime and responsible for reasonably foreseeable actions of other parties in furtherance of the conspiracy.   Whereas Al Qaeda sought to defeat U.S. economic sanctions and gain access to the U.S. financial system to facilitate acts of terrorism, BNPP sought to defeat those same sanctions in order to enrich itself.  Nevertheless, the result was the same—hundreds of Americans and their allies lost their lives or were grievously injured in the 1998 East African Embassy Attacks.   Thus, BNPP for its part bears responsibility for that tragic outcome.

5.       On November 3, 1997, U.S. President William J. Clinton, invoking the authority, *inter alia*, of the International Emergency Economic Powers Act ("IEEPA"), Title 50, United States Code, Section 1701 et seq., issued Executive Order 13067, which declared a national emergency with respect to the policies and actions of the Government of Sudan, "including continued support for international terrorism."

6.       A goal jointly pursued by Al Qaeda and Sudan was to undermine and end the comprehensive embargo placed by the United States upon Sudan on November 3, 1997.  At the 2001 criminal trial of several of the East African Embassy bombing conspirators, the United States presented the statements of a co-conspirator who explained that one of the reasons for the attack upon the U.S. Embassy in Nairobi, Kenya was "that there were embassy personnel in Nairobi who were responsible for work in the Country of Sudan."     Included among other claimed "justifications" for mass-murder, Al Qaeda justified the bombings as a means "to cease the campaign for the annihilation and humiliation that are being waged by the United States against the a number of Islamic peoples under the titles of blockades or economic sanctions."

7.       Al-Qaeda and Sudan selected Nairobi, in part, to strike back at the U.S. for the

actions taken against Sudan.  It was from its Kenyan embassy where the U.S. Government took

diplomatic actions against Sudan after being forced to move from Sudan for the safety of its

Embassy personnel.  One of the conspirators – Mohamed Rashed Daoud Al-'Owhali – explained

to FBI Agents questioning him that the East Embassy Bombings occurred, in part, in response to

U.S. pressure upon Sudan and the U.S.'s use of its Kenyan Embassy to carry out actions or

pressures upon Sudan.  A federal prosecutor in the Southern District of New York stated to a

federal jury in closing argument:

> "Al-'Owhali specifically told [FBI] Agent Gaudin – . . . that the American Embassy was targeted because the American Embassy in Nairobi covered the Sudan.  **You may remember that Usama Bin Laden in the March 1997 CNN interview talked about, he complained about the diplomatic pressure that America put on Sudan, and one of the things he specifically mentioned was that the Americans use their embassy from Sudan and moved it to Nairobi. That's what Al-'Owhali told Agent Gaudin was one of the reasons that the American Embassy was hit**."
>
> ***
>
> "I'm going to read from the transcript page 2020 with regard to Mr. al-'Owhali. This is the examination [or testimony] of Agent Gaudin: '**Q. Did Saleh say anything about why the embassy in Nairobi was targeted?**  A. Al-'Owhali explained to me that there were several reasons for picking -- explained to him through Saleh there were several reasons why the embassy in Nairobi was picked.  First, there was a large American presence at the U.S. Embassy in Nairobi; that the ambassador of the U.S. Embassy was a female and if the bomb resulted in her being killed, it would further the publicity for the bombing.  **Also, that there were embassy personnel in Nairobi who were responsible for work in the Country of Sudan.** . . .'"

Trial Transcript, United States v. Usama bin Laden et al., 98-cr-1023 (S.D.N.Y. May 2, 2001), at
5468-5469  (emphasis added); Trial Transcript, United States v. Usama bin Laden et al., 98-cr-
1023 (S.D.N.Y. May 9, 2001) at 6004 (emphasis added).

8.      The Sudanese sanctions, which BNP Paribas conspired to violate, were explicitly

part of al-Qaeda's stated claim of responsibility for the August 1998 bombings.  Federal

prosecutors at a 2010 criminal trial of a bombing conspirator presented evidence to the jury of al-

Qaeda's seven demands or aims of the August 1998 bombings, including the aim to defeat U.S.

economic sanctions then in effect:

> One: The evacuation of all American and western forces, including civilians from the lands of Muslims in general and from the Arabian peninsula in particular. . .
>
> …
>
> **Seven: To cease the campaign for the annihilation and humiliation that are being waged by the United States against a number of Islamic peoples under the titles of blockades or economic sanctions that has led to the deaths of hundreds of thousands and the hunger of millions of Muslims.** The Islamic Army for the Liberation of the Holy Places pledges to God that it will continue the fight until the demands of our blessed jihad are met . . ."

Trial Transcript, United States v. Ahmed Ghailani, No. 98-cr.-1023 (S.D.N.Y. Oct. 20, 2010), at 897.

9.     As BNPP admitted in the Statement of Facts in support of its guilty plea in federal court in New York in United States v. BNP Paribas, S.A, Case No. 14-cr-00460 (S.D.N.Y. July 9, 2014), throughout the Relevant Period, BNPP created and engaged in deceptive schemes and transactions designed to circumvent U.S. economic sanctions and conceal Sudanese transactions from U.S. authorities.

10.     In the immediate wake of this Executive Order, Sudan and Sudanese banks began requesting assistance from European banks to defeat the sanctions.  For example, on November 9, 1997, one of Credit Lyonnais (Suisse) S.A.'s Sudanese institutional clients "sent a Telex message to all of its correspondents (including [Credit Lyonnais]) informing the banks of the sanctions imposed against Sudan and requested its correspondents 'not to [] channel such transactions by intermediation of any U.S.A. bank, including banks domiciled in the U.S.A. territory, U.S.A. banks overseas branches and subsidiaries [or the] [a]ffiliates of[a] U.S.A. bank incorporated outside the United States.'"

11.     BNPP acted quickly in response to similar requests from Sudan and Sudanese banks.  As outlined below, and as admitted by BNPP in connection with its criminal guilty plea:

**In 1997, shortly after the imposition of U.S. sanctions against Sudan, BNPP Geneva agreed to become the sole correspondent bank in Europe for Sudanese Government Bank 1**, which, as noted above, was designated by OFAC as an SDN.  Sudanese Government Bank 1 [the Central Bank of Sudan] then directed all major commercial banks located in Sudan to use BNPP Geneva as their primary correspondent bank in Europe. As a result, all or nearly all major Sudanese banks had U.S. dollar accounts with BNPP Geneva.

12.     Thus, BNPP entered into an illegal scheme in November 1997 by which it provided concealed, fraudulent, and illegal access to the U.S. financial system for the Government of Sudan, its Central Bank, and all leading Sudanese banks – including Al Shamal which was used by, affiliated with, and invested in by Osama bin Laden and Al Qaeda.  Thus, BNPP knowingly and intentionally served to defeat the operation of the U.S. sanctions beginning in November 1997.  Co-conspirator Government of Sudan used Al Qaeda to strike against the U.S. sanctions just as it used BNPP, one with the sword and the second with the electronic byte.

13.     As stated by the United States Government at BNP Paribas' criminal sentencing, "**without BNP acting effectively as its US central banker, [the government of Sudan and entities tied to the government of Sudan] would not have had access to the US dollar markets**."  Indeed, between November 1997 and the 1998 East African Embassy Attacks, BNPP knowingly and intentionally acted as the "central banker" for Sudan, Sudanese financial institutions including Al Shamal, and by extension Al Qaeda.  Al Qaeda, in turn, relied on this material support in carrying out the 1998 East African Embassy Attacks.

14.     Critically, BNPP was fully aware of Sudan's role in assisting Al Qaeda **before** it agreed to participate in this conspiracy.  By way of example, BNPP: (1) was aware, at all times, of Sudan's active participation in conspiracies to murder U.S. citizens, including a conspiracy in 1993 with Al Qaeda affiliated actors to murder U.S. citizens and to destroy public facilities such as the United Nations Headquarters and the Offices of the Federal Bureau of Investigation in

New York City; (2) was aware, at all times, of Sudan's material support for Al Qaeda and affiliated terrorist organizations and Sudan's use of those terrorist organizations in Africa in 1995 to attack and attempt to murder a diplomatically protected Head of State and others; and (3) nevertheless, provided Sudan and Sudanese financial institutions with concealed, fraudulent, and illegal access to the U.S. financial system which assisted in concealing the activities of Sudan, Al Qaeda, and affiliated terrorist organizations from identification, detection, and disruption by law enforcement and intelligence community agencies of the U.S. Government and allied nations and which assisted in providing material support to Sudan's military and intelligence services, Al Qaeda, and affiliated terrorist organizations.

15.    In sum, the 1998 East African Embassy Attacks were the reasonably foreseeable consequence of BNPP's illegal activities and a reasonably foreseeable action in furtherance of the conspiracy to defeat the U.S. economic sanctions against Sudan.

16.    Another bedrock principle of American law is that those who provide knowing aid and assistance to persons committing federal crimes, with the intent to facilitate the crime, are themselves committing a crime, and are also liable for natural and foreseeable consequences of the underlying crime.  BNPP knew that Sudan supported a broad array of terrorist groups, including Al Qaeda, yet decided to become their sole correspondent bank in Europe, allowing it access to the U.S. financial market.  Terrorist attacks, including the 1998 East African Embassy Attacks, are the natural and foreseeable consequence of providing material and financial support to Sudan, a state sponsor of terrorism, and Sudanese financial institutions.

17.    Finally, in addition to facilitating this material support and intentionally concealing the financial transactions and activities of Sudan, the Central Bank of Sudan, Al

Shamal, and other financial institutions of Sudan, BNPP repeatedly and illegally transferred the funds required by American law to be held for the purpose of compensating U.S. victims of international terrorism.   Had BNPP acted lawfully, those funds would have been available to the victims of the 1998 East African Embassy Attacks to compensate them for their injuries and the murder of their family members.

## PARTIES

### A.   <u>BNP Paribas</u>

18.     BNPP is a French multinational bank, incorporated under the laws of France, and headquartered in Paris, France.  It is one of the ten largest banks in the world as measured by total assets.   During the Relevant Period, BNPP has operated affiliates, branch offices and subsidiaries throughout the United States employing over 16,000 individuals in North America. On July 9, 2014, BNPP pleaded guilty in U.S. federal court to knowingly and willfully providing, distributing and administering financial benefits, money and financial services to designated state sponsors of terrorism, including Sudan, and specially designated nationals ("SDN").

19.     During the Relevant Period, BNPP has operated and maintained subsidiaries, affiliates and branches in many countries throughout the world, including United States branch offices in New York and Washington, D.C., and a subsidiary based in Geneva, Switzerland, incorporated as BNPP Paribas (Suisse) S.A. ("BNPP Geneva").

20.     BNPP has significant operations and multiple locations in New York, New York, including its North American headquarters located at 787 Seventh Avenue, Floor 33, New York, New York 10019 ("BNPP New York").   Throughout the Relevant Period, BNPP New York processed numerous dollar-denominated transactions on behalf of the Government of Sudan and

Sudanese SDNs.

21.     During the Relevant Period, BNPP also has maintained operations in Washington, D.C.  On January 16, 2007, BNPP opened a Private Wealth Management branch in Washington, D.C. located at 1050 Connecticut Avenue, N.W., Suite 1000, Washington, D.C. 20036.  This office has focused on servicing non-U.S. high-net worth individuals.  In  a public release, the chairman of BNP Paribas Investment Services explained that the D.C. branch  "will allow us to add service to a number of European clients who use the Nation's capital as their hub in the US."

22.     BNPP also has maintained significant operations in Geneva, Switzerland ("BNPP Geneva") with its main office located at Place de Holland 2, 1204 Geneva, Switzerland.  In 1997, shortly after the imposition of U.S. sanctions against Sudan, BNPP Geneva agreed to become the sole correspondent bank in Europe for a Sudanese bank designated by the United States as a Specially Designated National,  identified in the U.S. District Court for the Southern District of New York Statement of Facts as "Government Bank 1."  Sudanese Government Bank 1 "then directed all major commercial banks located in Sudan to use BNPP Geneva as their primary correspondent bank in Europe."  SDNY Statement of Facts, paragraph 19.

23.     The United States designated the Bank of Sudan, also known as the Central bank of Sudan, as an SDN with the signing of Executive Order 13067 on November 4, 1997.  Plaintiffs have reason to believe that Government Bank 1 refers to the Bank of Sudan, based on the its status as an SDN and authority to direct all major commercial banks located in Sudan.

24.     As a result, all or nearly all major Sudanese banks had U.S. dollar accounts with BNPP Geneva.  In addition to processing U.S. dollar transactions, by or in 2000, BNPP Geneva also developed a business in letters of credit for the Sudanese banks.  Due to its role in financing Sudan' s export of oil, BNPP Geneva took on a central role in Sudan's foreign commerce market.

By 2006, letters of credit managed by BNPP Geneva represented approximately a quarter of all exports and a fifth of all imports for Sudan. Over 90% of these letters of credit were denominated in U.S. dollars. In addition, the deposits of Sudanese Government Bank 1 at BNPP Geneva represented about 50% of Sudan's foreign currency assets during this time period. SDNY Statement of Facts at ¶ 19.

**B.**   **Al Shamal Islamic Bank**

25.    Defendant Al Shamal is a Sudanese bank established in Khartoum, Sudan in 1983. Al Shamal started operations on January 2, 1990, in part with a capital contribution of at least $50 million by Osama bin Laden ("bin Laden"). Al Shamal knowingly and intentionally provided financial services to Al Qaeda including maintaining and servicing Al Qaeda bank accounts.

26.    During the Relevant period, Al Shamal held a correspondent bank account at United European Bank, a subsidiary of BNPP. BNPP and/or United European Bank continued its facilitation of Al Shamal transactions even after public reporting of its ties to Al Qaeda following the 1998 East African Embassy Attacks.

27.    At a September 2001 Congressional hearing following the attacks on 9/11, Senator Carl Levin publicly and specifically noted that Osama Bin Laden and Al Qaeda operatives used Al Shamal in the years leading to the 1998 East African Embassy Attacks. Following that very public congressional testimony, it is unclear how much longer BNP Paribas, United European Bank, or their subsidiaries or "satellites" assisted Al Shamal in evading the U.S. sanctions against Sudan.

28.    Al Shamal Islamic Bank is the quintessential example of how the Sudanese government cooperated with Bin Laden and provided the organization with logistical help

10

leading up to and beyond the 1998 East African Embassy Attacks.  As the Honorable John Bates

found in connection with prior civil litigation against Sudan in connection with the 1998 East

African Embassy Attacks:

> **Bin Laden and Al Qaeda also invested in Sudanese banks.**  This access to the formal banking system was useful for 'laundering money and facilitating other financial transactions that stabilized and ultimately enlarged bin Laden's presence in the Sudan.'  **For example, Bin Laden invested $50 million in the Sudan's Al Shamal Islamic Bank, and these funds were used to finance Al Qaeda operations.**  Al Shamal Islamic Bank was known for financing terrorist operations, **and bin Laden remained a leading investor of the bank long after he was expelled from the Sudan**.

**C.**     **Plaintiffs**

29.     Lead plaintiff Mary Ofisi was an employee of the United States Government and

was severely injured in the August 1998 terrorist attack on the United States Embassy in Nairobi,

Kenya.  Mrs. Ofisi in a Kenyan national who worked 24 years for the U.S. Government before

retiring on May 3, 2013.  She was working at the time of the August 1998 attack as a voucher

examiner in the Finance Department at the U.S. Embassy in Kenya.  She suffered severe injuries,

including to her eyes which required multiple surgeries immediately following the attack and in

1999, as well as emotional distress from witnessing the brutal murder of her colleagues and close

friends.  Mrs. Ofisi is a judgment creditor of Sudan.

30.     Contemporaneous press reports detailed Mrs. Ofisi's harrowing experience during

and immediately following the 1998 East African Embassy Attacks:

> During the nine-hour flight to receive treatment for severe facial injuries suffered in the bombing of the U.S. Embassy in Nairobi, Kenya, Mary Ofisi's enduring thought was: "The Lord saved my life."
>
> Others in her office at the embassy's financial management center weren't so lucky.  Far from the chaos and destruction of Friday's blast, Ofisi remembered her colleagues "Most of them are not alive," she said.
> . . .
> At the hospital, Ofisi told reporters that she heard the blasts from her desk: a loud boom,

then two more that were not as loud. "I don't know exactly what happened.  But after that, when I found myself, I was down."

"I don't know exactly what happened. But after that, when I found myself, I was down," said Ofisi, 46.  She recalled hearing screams in the distance, but none nearby.

"That's when I knew that I was alone," she said.  It wasn't long, she said, before an American she couldn't identify found her and led her out of the building, then rushed back inside to look for more survivors.

31.     Each of the other named plaintiffs are either United States citizens or foreign national employees or contractors of the United States Government who were killed or injured in the 1998 East African Embassy Attacks, or their immediate family members

32.     On July 25, 2014, Plaintiffs obtained a Final Judgment against Sudan for their injuries and damages caused by that Government and others who were responsible for supporting, funding, and otherwise carrying out the 1998 East African Embassy Attacks. Plaintiffs were awarded compensatory damages and punitive damages to deter the Sudan and others from engaging, participating in, and facilitating acts of international terrorism.

33.     Plaintiffs suffered legally cognizable harm when they, or their family members, were killed or injured at the hands of Al Qaeda during the 1998 East African Embassy Attacks. These attacks were the proximate and foreseeable result of BNPP and Al Shamal's illegal conspiracy with Sudan, other Sudanese financial institutions and Al Qaeda to defeat U.S. sanctions.  Additionally, because of BNPP's failure to block funds or prevent the transfer of funds in which Sudan and Sudanese SDNs had an interest, they have been prevented from recovering Sudanese assets for the satisfaction of their judgments.

**JURISDICTION AND VENUE**

34.     This Court has subject matter jurisdiction over this action pursuant to the Alien Tort Statute, 28 U.S.C. §1350; the Anti-Terrorism Act, 18 U.S.C. §§ 2332, 2333 and 2334;

federal question jurisdiction, 28 U.S.C. § 1331; and diversity jurisdiction, 28 U.S.C. § 1332(a)(2).  The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.  This Court also has supplemental jurisdiction over this action pursuant to 28 U.S.C. § 1367.

35.     The Alien Tort Statute, 28 U.S.C. §1350 provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."

36.     The Anti-Terrorism Act, 18 U.S.C § 2333 ("ATA") provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs may sue thereof in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees."

37.     Pursuant to 18 U.S.C. § 2334(a) any civil action under the ATA "may be instituted in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent.  Process in such a civil action may be served in any district where the defendant resides, is found, or has an agent."

38.     Venue is both proper and convenient in this District pursuant to 18 U.S.C. § 2334(a) as Plaintiff Caroline Maffry resides within the District of Columbia.  Venue is also appropriate pursuant to 18 U.S.C. §1391, because a substantial part of the actions and omissions giving rise to the claims herein complained of occurred within the District.

A.     **The Court Has Personal Jurisdiction Over Defendant BNPP**

39.     BNPP is subject to personal jurisdiction in the District of Columbia pursuant to 18 U.S.C. § 2334(a), Fed. R. Civ. P. 4(k)(1)(c), and Fed. R. Civ. P. 4(k)(2).  Personal jurisdiction is

also appropriate pursuant to D.C. Code Ann. § 13-423 as Plaintiffs' claim for relief arises from

BNPP's transaction of business in the District of Columbia.

40.     Plaintiffs' claims arise out of a common nucleus of operative facts stemming from

BNPP's actions and omissions in the District of Columbia and, therefore, the court may assert

personal jurisdiction over BNPP with respect to all claims.

41.     As described below, the U.S. Government, and the U.S. Department of Treasury

specifically, has numerous mechanisms to detect, deter, and prevent terrorism activity through

the monitoring and disruption of financial transactions by designated state sponsors of

international terrorism such as Sudan and SDNs.  Financial information, when not concealed and

falsified, offers a uniquely powerful source of intelligence and information about terrorism

networks and transnational threats to the national security of the U.S. and the safety of our

citizens and the citizens of the United States and its allies.

42.     As Stuart A. Levey, then Under Secretary for Terrorism and Financial

Intelligence of the U.S. Department of Treasury, explained in 2008:

> The guiding principle of the Treasury Department's approach is that these
> [terrorism and transnational] threats all have one thing in common: they rely on
> financial support networks. These networks are a key source of intelligence.
> Money trails don't lie; financial intelligence is uniquely reliable.
>
> . . .
>
> [T]errorist networks and organizations require real financing to survive. The
> support they require goes far beyond funding attacks. They need money to pay
> operatives, support their families, train, travel, and bribe officials.  When we
> restrict the flow of funds to terrorist groups or disrupt a link in their financing
> chain, they are forced to shift their focus from planning attacks to worrying about
> their financial viability.

43.     BNPP intentionally and knowingly defrauded the United States government,

including the United States Department of the Treasury, and its component offices and bureaus,

headquartered in the District of Columbia, by intentionally concealing its provision of financial

14

services to Sudan and Sudanese SDNs.  BNPP submitted and caused other financial institutions to submit false and misleading reports, in the forms noted below and others, to the U.S. Department of Treasury, Office of Foreign Assets Control, in Washington, D.C.

44.     By concealing, removing, omitting, or obscuring references to, or the interest or involvement of Sudan in the financial transactions with U.S. financial institutions, BNPP actively prevented the U.S. Department of the Treasury from effectively conducting financial intelligence investigations and from providing crucial information to law enforcement and intelligence community agencies of the U.S. Government and allied nations to deter, disrupt, and defeat acts of international terrorism.

45.     The United States Department of the Treasury, Office of Terrorism and Financial Intelligence ("TFI") marshals the Treasury Department's policy, enforcement, regulatory, and intelligence functions to sever the lines of financial support to international terrorists, Weapons of Mass Destruction ("WMD") proliferators, narcotics traffickers, money launderers, and other threats to our national security.  In addition to the Treasury Executive Office for Asset Forfeiture ("TEOAF"), which is the receipt account for the deposit of non-tax forfeitures, TFI is comprised of the Office of Terrorist Financing and Financial Crimes ("TFFC"), the Office of Foreign Assets Control ("OFAC"), the Office of Intelligence and Analysis ("OIA"), and the Financial Crimes Enforcement Network ("FinCEN").

46.     TFFC serves as the policy and international outreach apparatus for TFI.

47.     OFAC, which is located in Washington D.C., administers and enforces economic sanctions programs against countries, organizations, and individuals, such as terrorists and their supporters.  The sanctions can be either comprehensive or selective, using the blocking of assets and trade restrictions to accomplish foreign policy and national security goals established by the

President.  OFAC administers and enforces the sanctions initially imposed by President Clinton on November 3, 1997 and now set forth at Title 31 of the Code of Federal Regulations, Part 538.

48.    OFAC must rely upon financial institutions and other private actors to block or freeze subject assets.  OFAC may impose civil penalties on financial institutions that engage in transactions involving blocked property or prohibited transactions that financial institutions should have rejected.

49.    OFAC regulations set forth clear and unambiguous mandatory reporting and recordkeeping requirements for the reporting of all property and interests in property that have been blocked or rejected by financial institutions.

50.    OFAC regulations require financial institutions to file with OFAC reports of rejected or blocked transactions within ten (10) business days of rejecting instructions to execute payments or transfers involving underlying prohibited transaction, or within ten (10) business days from the date that property becomes blocked.  Under the Economic Sanctions Enforcement Guidelines, the late filing of these required reports may result in a civil monetary penalty in an amount up to $2,500, if filed within the first 30 days after the report is due, and a penalty in an amount up to $5,000 if filed more than 30 days after the report is due.  If the report relates to blocked assets, the penalty may include an additional $1,000 for every 30 days that the report is overdue, up to five years.

51.    OFAC regulations also require financial institutions to keep and maintain a full and accurate record of each blocked or rejected transaction, which must be made available for examination for the period of time that such property is blocked and for at least 5 years after the date such property is unblocked.  OFAC relies on the fact that these reports contain accurate information regarding transactions or attempted transactions on behalf of embargoed countries or

16

SDNs.  This information is critical to the U.S. Department of Treasury's efforts to identify and prevent terrorist activity.

52.     As OFAC explains in its online guidance titled "OFAC Regulations for the Financial Community":

> When it comes to OFAC's attention that an illicit transaction was processed through a U.S. bank, without being blocked or rejected, as appropriate, OFAC normally sends an administrative demand for information, called a '602 letter,' to the bank requesting an explanation of how the transaction was processed.

53.     OFAC is authorized to issue this administrative subpoena, or "602 letter," pursuant to 31 C.F.R. § 501.602.  Failure to comply with an OFAC subpoena may result in the imposition of civil penalties under section IV of the Economic Sanctions Enforcement Guidelines.  For example, on November 16, 2010, OFAC announced a $225,000 settlement with a company arising from its failure to provide documents responsive to an administrative subpoena issued by OFAC as part of its investigation into a potentially prohibited transaction. On August 25, 2011, OFAC announced civil penalties against a financial institution which included assessment of a financial penalty for the financial institution's failure to provide specified documents related to a specific wire transfer referencing "Khartoum."

54.     The Treasury Department's OIA is a member of the United States Intelligence Community. This office supports Treasury's leadership and serves as the lead United States agency for financial intelligence matters.

55.     FinCEN supports law enforcement investigative efforts and fosters interagency and global cooperation against domestic and international financial crimes.  FinCEN's mission, in part, is to safeguard the financial system from illicit use and combat money laundering and promote national security through the collection, analysis, and dissemination of financial intelligence and strategic use of financial authorities.

56.     FinCEN carries out its mission by receiving and maintaining financial transactions data, analyzing and disseminating that data for law enforcement purposes, and building global cooperation with counterpart organizations in other countries and with international bodies.

57.     FinCEN serves as the Financial Intelligence Unit ("FIU") for the United States and is one of more than 100 FIUs making up the Egmont Group, an international entity focused on information sharing and cooperation among FIUs. An FIU is a central, national agency responsible for receiving (and, as permitted, requesting), analyzing, and disseminating to the competent authorities disclosures of financial information concerning suspected proceeds of crime and potential financing of terrorism or required by national legislation or regulation in order to combat money laundering and terrorism financing.

58.     After the terrorist attacks on September 11, 2001, the United States Department of the Treasury initiated the Terrorist Finance Tracking Program ("TFTP") to identify, track, and pursue terrorists – such as Al Qaeda – and their networks. The U.S. Treasury Department is uniquely positioned to track terrorist money flows and assist in broader U.S. Government efforts to uncover terrorist cells and map terrorist networks here at home and around the world.

59.     These U.S. Treasury Department efforts have not only disrupted terrorist networks, they have saved lives.

60.     As part of its vital national security mission, the U.S. Treasury Department may issue subpoenas to the Society for Worldwide Interbank Financial Telecommunication ("SWIFT") – a Belgium-based association or company with U.S. offices that operates a worldwide messaging system used to transmit financial transaction information – seeking information on suspected international terrorists or their networks.  Under the terms of the

18

subpoenas, the U.S. Government may only review information as part of specific terrorism investigations.

61.     According to the Department of Treasury, TFTP "is exactly the kind of program that Americans want and expect from their government to prevent further terrorist attacks" and "there is no doubt that America and our allies are safer today because of this program."  In its final "report card," the 9/11 Commission's Public Discourse Project awarded the government-wide effort to combat terrorist financing a high grade, citing the government's "significant strides in using terrorism finance as an intelligence tool."

62.     Thus, by concealing, removing, omitting, or obscuring references to, or the interest or involvement of Sudan in the financial transactions with U.S. financial institutions, BNPP was able to circumvent all of the U.S. Department of the Treasury's mandatory reporting and recordkeeping requirements, administrative subpoena power, and other investigative and reporting programs. These are all crucial to effectively conduct financial intelligence investigations which protect U.S. Government employees and citizens and the employees and citizens of allied nations from acts of terrorism.   Had BNPP acted lawfully, the mechanisms described above would have assisted the U.S. Government and allied nations detect, disrupt, and prevent the 1998 East African Embassy Attacks, and would have ensured that Sudanese funds were properly blocked and available to the victims of these terrorist attacks.

### B.     The Court Has Personal Jurisdiction Over Defendant Al Shamal

63.     Al Shamal is subject to personal jurisdiction in the District of Columbia pursuant to 18 U.S.C. § 2334(a), Fed. R. Civ. P. 4(k)(2) and D.C. Code Ann. § 13-423(a)(1).  At the time of the 1998 East African Embassy Attacks, Al Shamal maintained continuous and systematic contacts with the United States through correspondent banks and shareholder relationships in the

United States.   Through at least 2001, Al Shamal held correspondent bank accounts at Arab American Bank, American Express Bank and Citibank.

64.     Al Shamal used the correspondent accounts of foreign banks such as BNPP and banks within the United States to gain access to the U.S. financial system.

65.     Al Shamal used a correspondent account in the United States to send money from bin Laden to Essam al Ridi, an Al Qaeda associate residing in Texas, for the purchase of a plane in the United States to be used by Al Qaeda.

66.     Al Shamal shareholders maintained significant United States operations, including Faisal Islamic Bank and DMI Trust.   Bin Laden himself remained a leading shareholder of Al Shamal as late as 2002.

67.     Al Shamal chairman Adel Abdul Jalil Batterjee ("Batterjee") established Benevolence International Foundation ("BIF") in the United States in 1992.   BIF was incorporated in Illinois as a non-profit organization on or around March 30, 1992.   BIF was used by bin Laden and Al Qaeda operatives to transfer money to bank accounts held at Al Shamal for the purpose of supporting Al Qaeda operations.

68.     On November 19, 2002, the United States Treasury Department designated BIF as a financier of terrorism under Executive Order 13224 for its material support of bin Laden and Al Qaeda.

69.     Al Shamal provided financial support and other forms of material support, including maintaining and servicing bank accounts for the facilitating weapons and military equipment, to bin Laden and Al Qaeda prior to, and after, the 1998 Embassy Bombing attacks. Al Shamal conducted or participated, directly or indirectly, in the conduct of Al Qaeda's affairs and participated in the operation or management of Al Qaeda's operation.

70.     As a direct and proximate result of Al Shamal's material support of Al Qaeda, bin Laden and Al Qaeda orchestrated the bombing of the U.S. Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania—not only to kill U.S. citizens and employees of the United States Government but also to cause emotional distress and sow terror in the United States.

71.     Al Shamal engaged in an ongoing conspiracy with Sudan and Al Qaeda to facilitate overt acts of terrorism against the United States in direct response to economic sanctions.

72.     By knowingly financing bin Laden and Al Qaeda, Al Shamal purposefully directed their activities at residents of the United States and Plaintiffs' claims arise out of Al Shamal's activities.

73.     Plaintiffs' claim for relief also directly arises out of Al Shamal's transaction of business in the District of Columbia.

74.     As previously described, BNPP, through its subsidiary United European Bank, was a correspondent bank for Al Shamal.  BNPP continued its facilitation of Al Shamal banking transactions even after it was fully aware that Al Qaeda was responsible for the 1998 Embassy Bombings.

75.     Al Shamal conspired with Sudan and BNPP to circumvent and defeat United States sanctions through financial fraud and money laundering.

76.     Al Shamal conspired with BNPP in omitting all reference to the bank or Sanctioned Entities in SWIFT payment messages sent to the United States.  The fraudulent cover payments and payment practices were made for the sole purpose of preventing financial institutions from appropriately reviewing and analyzing transactions.

77.     Al Shamal and BNPP defrauded OFAC in furtherance of its conspiracy to conceal

transactions with Sudan in order to avoid U.S. sanctions by, among other actions, submitting and/or causing to be submitted false and misleading reports to OFAC in Washington, D.C.

78.     OFAC relied on the fraudulent statements of the financial institutions that transactions were not being processed on behalf of Al Shamal, Sudan or its agents and instrumentalities.  The fraudulent statements to OFAC were the direct and proximate result of the conspiracy entered into between BNPP, Sudan, Sudanese financial institutions including Al Shamal, and Al Qaeda.

79.     Plaintiffs' claims arise out of a common nucleus of operative facts stemming from Al Shamal's actions and omissions in the District of Columbia and, therefore, the court may assert personal jurisdiction over Al Shamal with respect to all claims.

## BACKGROUND

### A.     Sudan Has Been Previously Adjudicated To Be Liable For Its Role In the 1998 East African Embassy Attacks

80.     In August 2008, Plaintiffs filed a lawsuit against the Republic of Sudan, the Islamic Republic of Iran, and various governmental agencies of Sudan and Iran under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A, seeking damages as a result of Sudan and Iran's material support of Al Qaeda which directly resulted in the 1998 East African Embassy Attacks.

81.     On November 28, 2011, following a three-day bench trial the court entered final judgment on liability in favor of the Plaintiffs.  In imposing liability upon the Government of Sudan, the Honorable U.S. District Judge John D. Bates found that the Republic of Sudan and its Ministry of the Interior "provided several kinds of material support to Al Qaeda **without which [Al Qaeda] could not have carried out the 1998 bombings.**"  Judge Bates found that the Government of Sudan "provided critical financial, military, and intelligence services that

facilitated and enabled Al Qaeda to strengthen its terrorist network and infiltrate nearby countries."  Furthermore, as specifically found by Judge Bates and presented at criminal trials by the United States in New York, "the Sudanese military and intelligence service coordinated with Al Qaeda operatives frequently, providing protection for Al Qaeda and sharing resources and information to coordinate attacks on their mutual enemies."

82.    In finding that the Government of Sudan supported, facilitated, and grew Al Qaeda's power to inflict terror and death, Judge Bates found that through the support of the Government of Sudan, Al Qaeda obtained the means to access and use the formal banking system.  Judge Bates found:

> Bin Laden and Al Qaeda also invested in Sudanese banks.  **This access to the formal banking system was useful for 'laundering money and facilitating other financial transactions that stabilized and ultimately enlarged bin Laden's presence in the Sudan.'**  For example, bin Laden invested $50 million in the Sudan's Al Shamal Islamic Bank, and these funds were used to finance Al Qaeda operations.  Al Shamal Islamic Bank was known for financing terrorist operations, and bin Laden remained a leading investor of the bank long after he was expelled from the Sudan.

83.    On July 25, 2014, Judge Bates ordered that Final Judgment be entered in favor of the Plaintiffs for their injuries and damages caused by the Government of Sudan and others who were responsible for supporting, funding, and otherwise carrying out" the bombings in Nairobi and Dar es Salaam.  Judge Bates ordered entry of Final Judgment for the 567 Plaintiffs in a total amount of $8,684,523,372.  Of that damages award, $4,342,261,686 constituted compensatory damages or damages to compensate the Plaintiffs for their injuries, and $4,342,261,686 constituted punitive damages to deter the Government of Sudan and others from engaging, participating, and facilitating acts of international terrorism.

84.    On July 28, 2014, the Final Judgments were certified in the District of Columbia and then also registered in the Southern District of New York.

85.     Thus, Plaintiffs are judgment creditors of the Government of Sudan and others as a result of the Final Award of Judgment and Damages entered by Judge Bates on July 25, 2014 in the United States District Court for the District of Columbia.

**B.     BNPP Has Pleaded Guilty To Providing Sudan and Sudanese Banks with Access to the U.S. Financial System**

86.     On July 9, 2014, BNP Paribas pleaded guilty in the Southern District of New York to conspiring to undertake billions of dollars of illegal transactions through the U.S. financial system on behalf of Sudan and its agents, in violation of the International Emergency Economic Powers Act ("IEEPA").  Although BNPP also pleaded guilty to assisting Iran and Cuba, its most egregious conduct, measured by dollar volume and role in undermining the U.S. embargo, involved its U.S. dollar transactions with Sudan.

87.     BNPP admitted that in 1997, shortly after the imposition of U.S. sanctions against Sudan, BNPP Geneva agreed to become the sole correspondent bank in Europe for the Central Bank of Sudan, which was a designated by OFAC as a SDN.  BNPP further admitted that all major commercial banks in Sudan were directed to use BNPP Geneva as their primary correspondent bank in Europe and all or nearly all major Sudanese banks had U.S. dollar accounts with BNPP Geneva.

88.     BNPP admitted that it took on a central role in Sudan's foreign commerce market and had a central role in providing Sudanese financial institutions access to the U.S. financial system, despite the fact that its employees recognized Sudan's role in supporting terrorism.

89.     BNPP admitted that one of its senior compliance officers reminded other high-level BNPP compliance and legal employees that certain Sudanese banks which BNPP dealt with play a pivotal role in the support of the Sudanese government which has hosted Osama Bin Laden.

90.     BNPP also admitted that during the period 2002-2009, it conspired with financial institutions owned by the Government of Sudan (i.e., the Central Bank of Sudan) and numerous other Sudanese banks and entities, including Al Shamal to structure, conduct, and conceal the movement of U.S. dollar transactions in excess of $20 billion, including transactions involving 18 Sudanese Specially Designated Nationals ("SDNs").

91.     As a result of Defendants' fraudulent concealment of its transactions in violation of United States law, Plaintiffs were not aware of Defendants' illegal actions and omissions until the Waiver of Indictment and Consent Preliminary Order of Forfeiture was publicly filed in this Court on July 9, 2014.

### C.     BNPP Is Subject to United States Laws and Regulations

92.     Any bank doing business in the United States through a branch or subsidiary must operate in full compliance with the provisions of any law of the United States or any State in which it is operating business.

93.     Although headquartered in France, BNPP conducts operations in the United States through various subsidiaries, branches, and representative offices including those within Washington D.C., and New York, New York.

94.     A branch, unlike a subsidiary bank, is not a separate legal entity under United States law; rather, it is a legal and operational extension of its parent foreign bank.  A branch may conduct a full range of banking activities, including trading and investment activities, accepting wholesale and foreign deposits, granting credit and acting as a fiduciary.

95.     The National Bank Act of 1864 established the Office of the Comptroller of the Currency ("OCC"), a bureau of the Treasury Department that charters, regulates, examines and supervises banks operating in the United States. The OCC supervises banks to ensure their

compliance with all laws and regulations – including those pertaining to anti-money laundering and anti-terror financing.

96.     In 1978 Congress passed the International Banking Act, [12 U.S.C. § 3101 et seq.,] which allowed foreign banks to establish U.S. branches or agencies with the approval of the Board of Governors of the Federal Reserve System and the OCC.

97.     Pursuant to 12 U.S.C. § 3106(a), in applying for a branch within the United States, BNPP agreed to conduct all operations in the United States in full compliance with provisions of any law of the United States or any State.

98.     BNPP's branches within the United States are also treated as United States persons for the purposes of compliance with OFAC regulations.  During the Relevant Period, BNPP's federal functional regulator was the Federal Reserve Bank, which audited the financial institution for compliance with federal anti-money laundering and anti-terrorism financing.

   D.   **BNPP Knowingly Violated United States Laws and Regulations In Providing State Sponsors of Terrorism With Access to the U.S. Financial System**

99.     During the Relevant Period, all financial institutions, whether based in the United States or abroad, were prohibited from exporting financial services from the United States to Sudan or causing financial services to be exported from the United States to Sudan.  BNPP pleaded guilty in Federal Court to transferring U.S. dollars to Sudan and intentionally omitting any reference in the payment messages to the origination and/or destination of these funds in order to avoid the transactions from being blocked.

100.    Thus, pursuant to United States law, BNPP was prohibited from participating in certain financial transactions involving persons, entities and countries subject to U.S. economic sanctions.

101.    IEEPA was enacted on October 28, 1977 and authorizes the President to regulate

commerce after declaring a national emergency in response to any unusual and extraordinary threat to the United States.  The purpose of the IEEPA was to advance foreign policy objectives and provide national security to the United States by providing the Department of Treasury and other federal agencies the ability to deter wrongful investment and to deter, disrupt, and defeat acts of international terrorism.

102.    The United States government has recognized that the cooperation of private firms and banking institutions is critically important in the success of an economic sanctions regime.  Economic sanctions are effective, as evidenced by their impact on the parties targeted by those sanctions:

> In the fall of 2007, the Central Bank of Sudan announced that, in light of U.S. sanctions, it would convert its foreign reserves from the U.S. dollar into other currencies, principally the euro, and would stop using the dollar in financial transactions. Citing the risk of blocked funds transfers and other disrupted transactions, the Governor of the Central Bank of Sudan further advised the GOS, the private sector, and Sudanese citizens against U.S. dollar transactions.

103.    Executive Order 13067 imposes an embargo with respect to Sudan and blocked all property, and interests in property, of the Government of Sudan in the United States or within the possession or control of persons within the United States.   It also prohibits, except to the extent provided in IEEPA, "the exportation or re-exportation, directly or indirectly, to Sudan of . . . services from the United States or by a United States person, wherever located." *Id*. at § 2(b). The November 3, 1997 Executive Order further prohibited "any transactions by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding . . . any of the prohibitions set forth" in the Executive Order. *Id*. at § 2(g).  Those prohibitions were subsequently set forth at Title 31 of the Code of Federal Regulations, Part 538 (Sudanese Sanctions Regulations) by OFAC.

104.    In October 2006, President Bush, pursuant to IEEPA, issued Executive Order

27

13412, which further strengthened the sanctions against Sudan.  Executive Order 13412 cited the

"continuation of the threat to the national security and foreign policy of the United States created

by certain policies and actions of the Government of Sudan that violate human rights, in

particular with respect to the conflict in Darfur, where the Government of Sudan exercises

administrative and legal authority and pervasive practical influence, and due to the threat to the

national security and foreign policy of the United States posed by the pervasive role played by

the Government of Sudan in the petroleum and petrochemical industries in Sudan"  Exec. Order

No. 13412 (Oct. 13, 2006).

105.    Under Executive Orders 13067 and 13412 and related and implementing

regulations promulgated by OFAC pursuant to IEEPA (31 C.F.R. § 538), it is unlawful to export

goods and services from the United States, including U.S. financial services, to Sudan without a

license from OFAC.   Under these Executive Orders and regulations, virtually all trade and

investment activities involving the U.S. financial system, including the processing of U.S. dollar

transactions through the United States, were prohibited.

106.    At all times during the Relevant Period, BNPP was aware of United States laws

and regulations requiring that transactions with clients from the Sudan were prohibited and all

Sudanese assets were required to be blocked.  As described by a BNPP employee in a January

2006 email:

> A practice exists which consists in omitting the Beneficiaries/Ordering party's
> contact information from [United States dollar] transactions regarding clients
> from countries that are under U.S. embargo: Sudan, Cuba, Iran. **This avoids
> putting BNPP NY in a position to uncover these transactions, to block them,
> and to submit reports to the regulator.**

107.    BNPP entered into a conspiracy with Sudan, banking institutions within Sudan,

including Al Shamal, and Al Qaeda, to oppose, counter, and defeat United States law through

unlawful means, including fraudulent financial transactions, violations of sanctions against Sudan:

> **Soon after the imposition of U.S. sanctions against Sudan in 1997,** BNPP Geneva established account relationships with unaffiliated regional banks ('Regional Banks') located in Africa, Europe and the middle East, eventually nine in all, some with no other business purpose than to clear payments for Sudanese client.  **The accounts with the Regional Banks were created and established to provide a means to circumvent U.S. sanctions.**

108.    The conspiracy was specifically designed to evade and defeat Executive Order 13067 which compelled the blocking of any Sudanese related funds passing through U.S. financial institutions or the United States.  The Government of Sudan and BNPP conspired to conceal and hide the ownership, control, and interest of the Sudanese government and Sudanese banks such as Al Shamal to enable Sudan access to the critically important U.S. financial markets and to avoid blocking of Sudanese funds within the United States:

> As the principal foreign ban for the Government of Sudan, **BNPP Geneva had an essential role in the Government of Sudan's financial stability.**  BNPP Geneva held accounts for a financial institution owned by the Government of Sudan **since 1997 for, amount other purposes, illicit U.S. dollar clearing**.

As a result of this conspiracy, the Government of Sudan and Al Qaeda had access to the U.S. financial system and material support to facilitate the 1998 East African Embassy Attacks as part of an alternative means to defeat the U.S. sanctions by fear and terror.

109.    As described above and to be shown further at trial, BNPP's deceptive scheme to evade and defeat U.S. economic sanctions and conceal the transfer of funds on behalf of Sudan and Sudanese SDNs (including through false and misleading reports submitted to OFAC in Washington, D.C.) frustrated the efforts of the U.S. Government, specifically the U.S. Department of the Treasury, to detect and disrupt Al Qaeda terrorist activities.  Thus, this fraudulent scheme was a direct and proximate cause of the 1998 East African Embassy Attacks.

110.    American dollars provided by BNPP to Sudanese banks, including Al Shamal, in knowing violation of the United States prohibition on financial transactions with state sponsors of terrorism provided capital to finance the 1998 bombing of the American Embassies in Kenya and Tanzania and critical banking services for Al Qaeda and Osama bin Laden.

111.    Without access to the world financial markets, Sudan would have suffered serious financial instability and would not have been able to provide material support and services to Al Qaeda, including, but not limited to, land for training and its headquarters, security against foreign intelligence services, and more generally safe haven.

112.    Prior to August 1998, the United States government lacked crucial financial information and knowledge of the financial transactions of Al Qaeda.

113.    As previously noted, he United States government relies upon financial information as a powerful source of intelligence and information about terrorism networks and transnational threats to the national security of the country, citizens and its employees.

114.    In 1997 and 1998, the United States through the Central Intelligence Agency, the Federal Bureau of Investigation ("FBI"), and other law enforcement and intelligence community agencies were attempting to identify and track the movements and finances of Al Qaeda, Osama bin Laden, and affiliated actors in order to prevent future attacks aimed at American citizens and employees.

115.    Before the August 1998 East African Embassy Attacks, the United States Ambassador to Sudan met with the Vice President of Sudan and expressed concerns about Al Qaeda's financing and use of Sudanese banks and demanded intelligence on Al Qaeda's finances and Sudanese cooperation to ensure the safety and security of United States citizens and employees.

116.    By 1997, Al Qaeda and bin Laden had opened accounts and invested millions of dollars in Sudanese banks, including but not limited to Al Shamal. This access to the formal banking system was useful and necessary for laundering money and facilitating other financial transactions that stabilized and ultimately enlarged bin Laden's presence in the Sudan.

117.    In 1997 and 1998, as a direct and proximate result of the lack of information about Al Qaeda's financing, U.S. law enforcement and intelligence officials were unable to inform U.S. Embassy officials of the unfolding plot by Sudan and Al Qaeda to attack the East African Embassies.

118.    On August 7, 1998, the United States Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania were devastated by simultaneous terrorist attacks and bombings that killed more than 224 people and injured thousands of innocent men, women and children, including the Plaintiffs.

### E.    **BNPP Engaged in A Pattern of Illegal and Obstructive Conduct Through 2012**

119.    BNPP has agreed in its June 2014 OFAC settlement that "[f]or a number of years, up to and including 2012, BNPP processed thousands of transactions to or through U.S. financial institutions that involved countries, entities, and/or individuals subject to the sanctions programs administered by OFAC."

120.    In the wake of BNPP's criminal guilty plea for this conduct, U.S. Department of Justice, Assistant Attorney General Leslie Caldwell highlighted the fact that BNPP's illegal conduct extended long after it was first identified and reported to senior executives at BNPP and continued during the course of the Department of Justice's investigation:

> BNPP admitted to helping individuals and entities associated with Sudan, Iran, and Cuba – all of whom are prohibited by law from accessing the U.S. financial system – to clear U.S. dollar transactions through U.S. banks.

31

The majority of the illegal payments were made on behalf of entities in Sudan, which was subject to a U.S. embargo based on the Sudanese government's role in facilitating terrorism and committing human rights abuses.  . . . **In the case of Sudan, BNPP's conduct gave Sudan its only significant access to world financial markets, essentially helping to prop up a corrupt and repressive regime**.

BNPP's conduct represented a massive disregard for compliance, both with the law and with its own internal policies.  And these egregious violations of law occurred despite concerns expressed on more than one occasion by compliance officers, and even in written opinions by outside counsel.

Some compliance people at BNPP did raise objections to the conduct.  **For example, one senior compliance officer at BNPP wrote to other high-level compliance and legal employees reminding them that certain Sudanese banks with which BNPP dealt "play a pivotal part in the support of the Sudanese government which . . . has hosted Osama Bin Laden and refuses the United Nations intervention in Darfur.**"

. . .

And in a meeting of BNPP's top management, senior compliance personnel expressed concern about the bank's role in working with Sudanese sanctioned entities.  **At that meeting, the compliance team was given a very wrong message:  money speaks louder than compliance with the law**.

And unfortunately, rather than push back, the compliance personnel backed down, and continued to allow the illegal transactions.  An email summarizing that meeting explained management's thinking: "[t]he relationship with this body of counterparties (meaning the nine Arab banks) is a historical one and the commercial stakes are significant.  For these reasons, Compliance does not want to stand in the way of maintaining this activity . . . ."

All of these warnings went unheeded in favor of continued profits.  The "tone at the top" in BNPP was, frankly, not just unsupportive of compliance, but against it.  And, the company put its profit margins ahead of its business ethics.  **BNPP may now realize that elevating illegal profit streams over compliance with the law does not pay**.

. . .

Since it is difficult for me to publicly discuss some of the most positive results of cooperation, perhaps I can illustrate the point in reverse.  In the plea agreement with BNP Paribas, the department highlighted the bank's lack of cooperation with the government investigation as a crucial factor in the decision to require a guilty plea and record monetary penalties.

**Significantly, BNPP affirmatively hampered the department's ability to prosecute individual executives and employees for their criminal misconduct.**

F.      **BNPP's Activities Denied the Embassy Attack Victims Access to Funds to Satisfy Their Lawful Judgments**

121.    Congress and the Executive Branch have acted repeatedly to impose liability upon terrorist states and their agencies and to assist victims of terrorism in collecting their judgments. *E.g.*, 28 U.S.C. §§ 1605(a)(7) (adopted in 1996) and 1605 note ("Flatlow Amendment"); 28 U.S.C. § 1605A (adopted in 2008 to replace Section 1605(a)(7)).  "The 'terrorism exception' to the FSIA [Foreign Sovereign Immunities Act] was first enacted as part of the Mandatory Victim's Restitution Act of 1996, which was itself part of the larger Antiterrorism and Effective Death Penalty Act of 1996."

122.    Since then, Congress and the President have acted together to ensure that victims of terrorist acts aimed at the United States are able to recover, under law, from their attackers and supporting State sponsors of terror.  For instance, Congress enacted the Terrorism Risk Insurance Act ("TRIA") in 2002 which specifically allows victims of terrorism by State sponsors who obtain a judgment to attach blocked assets of the State sponsor of international terrorism.  Assets blocked under IEEPA sanctions are otherwise immune to attachment, execution or any other action by judgment or other creditors.  To create a one-of-a-kind exception, Congress enacted Section 201 of The Terrorism Risk Insurance Act of 2002 which provided that:

> Notwithstanding any other provision of law, . . .  in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

A terrorist party is defined to include State sponsors of international terrorism such as Sudan.

123.    TRIA was specifically intended to deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism by enabling them to satisfy their judgments through the attachment of blocked assets of terrorist parties.

124.    Through the Terrorism Risk Insurance Act and the 2008 National Defense Authorization Act, the U.S. Congress and President have acted to allow certain limited groups of persons such as Plaintiffs who are victims of an act of terrorism caused by a State sponsor of international terrorism to attach and execute against the funds of that foreign nation which have been blocked pursuant to IEEPA sanctions, such as imposed by President Clinton's November 1997 Executive Order against Sudan.

125.    Through their scheme to evade and defeat the blocking of Sudanese related financial transactions, the conspiracy of Government of Sudan and BNPP has deprived the Plaintiffs of their right and ability to obtain compensation for their damages suffered as a result of the 1998 terrorist attacks from Sudanese assets, which would have been blocked in the United States had BNPP followed the law.  Defendant's failure to block Sudanese assets and make those funds available under TRIA has prevented Plaintiffs from collecting on their judgments.

### G.    BNPP Was Fully Aware that Al Shamal and Sudan Were Providing Material Support to Al Qaeda Prior to the 1998 East African Embassy Attacks

126.    In late 1991, Al Qaeda established operations in Sudan at the request of Hassan al-Turabi, the head of the National Islamic Front ("NIF"), the only political party in Sudan, and Sudan's President Omar al-Bashir, who sent a letter invitation to bin Laden.  Mr. Bashir is currently a fugitive from justice.  The leadership of Sudan guaranteed Al Qaeda a base from which it could have access to the U.S. financial system and operate operate with impunity, with a minimum risk of foreign interference.  In return, Al Qaeda agreed to support the war in south Sudan against the Christian and animists, and to invest in the Sudanese economy.  Al Qaeda

settled in Sudan's capital city, Khartoum, in several offices, including a business office on McNimr Street with a two story guesthouse designed to house Al Qaeda operatives in transit.

127.    Osama Bin Laden built roads and other infrastructure for the Sudanese government with his construction company, al-Hijrah Construction and Development Ltd., and with the support of his Saudi Binladin Group. With funds (in U.S. dollars) drawn from Al Shamal, Al Qaeda purchased several farms throughout Sudan for the purpose of providing income from commercial enterprise and to provide space for training for Al Qaeda terrorists – including producing mock-ups to plan assassinations and test explosives.

128.    Sudan's open door policy for militant Islamic revolutionary groups and goal to foster worldwide Islamic revolution resulted in a meeting attended by senior leaders of virtually every anti-American jihadi terrorist organization which was held in Khartoum in April 1991 and known as the Popular Arab and Islamic Congress ("PAIC").  The participants voted a resolution pledging to work together to challenge and defy the tyrannical West.

129.    Sudan acted as the base for Al Qaeda terrorism throughout North, Central and East Africa, the Middle East and Europe. Al Qaeda operatives based in Sudan launched aggressive missions into a number of countries, including Morocco, Algeria, Tunisia, Libya, Uganda, Ethiopia and Yemen.

130.    Sudan's role as a critical state sponsor of terrorism was also well-known by the early 1990s, and certainly by November 1997.

131.    On August 12, 1993, the United States publicly designated the Government of Sudan as a State sponsor of international terrorism "which has repeatedly provided support for acts of international terrorism."  That designation was well-publicized to the international community in 1993.  The designation of Sudan as a State sponsor of international terrorism by

the United States has remained in effect for more than 20 years.

132.    In 1993, the State Department's Annual Report entitled "Global Patterns of Terrorism" for 1993 states:

> In August the Secretary of State placed Sudan on the list of state sponsors of terrorism.  Despite several warnings to cease supporting radical extremists, the Sudanese government continues to harbor international terrorist groups in Sudan. Through the National Islamic Front party which dominates the Sudanese government, Sudan maintained a disturbing relationship with a wide range of Islamic extremists.  The list includes the ANO, which is the Abu Nidal organization, the Palestinian HAMAS, the Palestinian Islamic Jihad, otherwise known as PIJ, Lebanese Hezbollah, and Egypt's al-Gama'a al-Islamiya.

133.    In 1993, Bin Laden ordered a key Al Qaeda operative to Nairobi to survey United States targets including the United States embassy. The operative Ali Mohammed traveled to Khartoum, Sudan and presented Bin laden with pictures of the Embassy as a potential target for an attack.

134.    The Sudanese intelligence service facilitated the transport of Al Qaeda operatives and funds from Sudan to a terrorist cell operating in Nairobi, Kenya.

135.    Sudanese intelligence officers provided security to Al Qaeda and Bin Laden and played an instrumental role in thwarting an assassination attempt on Bin Laden in 1994. Members of the Sudanese military were ordered to serve as personal guards for Bin Laden at his guesthouse in Sudan in the early to mid-1990's.

136.    From 1991 to 1996 bin Laden operated without any limitation inside Sudan, while under the protection of the Sudanese security forces.  This freedom of action gave bin Laden and the members of his organization a useful extra-legal status in the Sudan.

137.    Bin Laden and the Saudi Binladin Group financed the building of the airport at Port Sudan, as well as a major highway linking Khartoum to Port Sudan.

138.    The Sudanese government made available an airliner from Sudan Airways to

assist Al Qaeda in transporting weapons, including European and U.S. built missile launchers and anti-tank missiles.

139.    In February 1995, the United States Department of Justice publicly named the Government of Sudan – specifically Sudan's Mission to the United Nations – as an unindicted co-conspirator in a 1993  terrorist plot to bomb and destroy the United Nations Headquarters, the FBI New York Headquarters, the Lincoln and Holland Tunnels, and the George Washington Bridge in New York, New York.  In connection with the prosecution of that bombing plot, the United States also alleged and presented evidence of a Sudanese connection to the first World Trade Center bombing in February 1993.  In relation to that February 1993 bombing and murder of six individuals, a Sudanese national and defendant in the Landmarks bombing conspiracy – Siddig Ali provided one of the February 1993 World Trade Center bombing conspirators Mahmud Abouhalima with travel letters of introduction to various persons in Sudan to assist Abouhalima flee the United States immediately after the February 26, 1993 World Trade Center bombing.

140.    In June 1995, Sudanese intelligence officers provided key logistical support, including use of Sudan airways to transport resources and explosives to terrorist organizations involved in the attempted assassination of Egyptian President Hosni Mubarak.

141.    In September 1995, the Organization of African Unity ("OAU") publicly condemned the "terrorist assassination attempt" against the President of Egypt while he visited Ethiopia in June 1995 that resulted in the deaths of several Ethiopian security officers as they acted to thwart the attack.  The OAU "consider[ed] that attack as aimed not only at the Egyptian President and not only at the sovereignty, integrity and stability of Ethiopia, but also Africa as a whole."

142.     In January 1996, the Ethiopian government presented detailed factual evidence to the U.N. Security Council of the attempted bombing and murder of the Egyptian President led by the Government of Sudan, its leadership, and Al-Gama'a-Islamia, an Al Qaeda affiliated Egyptian based terror group led by Omar Abdel-Rahman, aka the Blind Sheikh.   The Blind Sheikh was convicted in 1995 in the Southern District of New York along with others for their participation with the Government of Sudan and others in the plot to bomb the U.N. Headquarters in New York City.

143.     On April 26, 1996, the United Nations Security Council unanimously sanctioned Sudan for its support, facilitation, and harboring of international terrorists, actions to destabilize the governments of its neighboring African nations, and its refusal to abide by the norms of international law.   The U.N. Security Council demanded that the Government of Sudan desist from "engaging in activities of assisting, supporting and facilitating terrorist activities and from giving shelter and sanctuary to terrorist elements."   Citing the "terrorist assassination attempt on the life of the President of the Arab Republic of Egypt" and the sheltering in Sudan of the suspects wanted in connection with the attempted assassination, the U.N. Security Council directed that all U.N. member States shall:

> (a) Significantly reduce the number and the level of the staff at Sudanese diplomatic missions and consular posts and restrict or control the movement within their territory of all such staff who remain;

> (b) Take steps to restrict the entry into or transit through their territory of members of the Government of Sudan, officials of that Government and members of the Sudanese armed forces;

The French and international press reported these sanctions and U.N. actions against Sudan.

144.     Sudanese intelligence officers provided hundreds of Sudanese passports and Sudanese citizenship to Al Qaeda allowing its members to travel through East Africa, Europe

and the Middle East.

145. When an Al Qaeda member or operative arrived in Khartoum airport, Sudanese intelligence would greet them and escort them around customs and immigration so their bags were not searched and their passports were not stamped. A passport stamp from Sudanese customs was important to avoid for an Al Qaeda operative because those with such passport stamps could come under suspicion of being involved in international terrorism.

146. The State Department's Annual Report entitled "Global Patterns of Terrorism" for 1991 states:

> In the past year Sudan has enhanced its relations with international terrorist groups, including the Abu Nidal Organization, ANO. Sudan has maintained ties with state sponsors of terrorism such as Libya and Iraq, has improved its relations with Iran. The National Islamic Front, NIF, under the leadership of Hassan al-Turabi, has intensified its domination of the government of Sudanese president, General Bashir, and has been the main advocate of closer relations with radical groups and their sponsors.

147. Sudanese intelligence officers rescued Al Qaeda operatives, including Saif al-Adel who was detained after detonating explosives near Port Sudan.

148. Al Qaeda operatives remained in Sudan after the departure of Usama Bin Laden from Sudan in 1996, as attested to by a declassified CIA report dated December 4, 1998.

149. Al Qaeda's dealings with the Sudanese intelligence service were directly approved by Bin Laden.

150. The Sudanese government failed to protect U.S. diplomatic personnel in Khartoum which resulted in the public closing of the U.S. Embassy in 1996 and the issuance of warnings to U.S. citizens residing or traveling to Sudan that their safety could be in danger.

151. The types of support Bin Laden and Al Qaeda received from Sudan fall into several categories: (1) harboring and providing sanctuary to terrorists and their operational and

logistical supply network; (2) the protection and support by Sudanese intelligence and military from foreign intelligence services and rival militants; (3) hundreds of Sudanese passports and (4) untrammeled and unregulated route of travel over the Sudan-Kenya border provided by the Sudanese intelligence service to allow for the passage of weapons and money to supply the Nairobi terrorist cell and (5) **providing financial and banking services for its terrorist network**.

152.    The support of Al Qaeda by the Sudanese government and its banking system was integral to the planning, implementation and success of the 1998 East African Embassy Attacks. Without the support of Sudanese intelligence, safe haven provided by the Sudanese government to base Al Qaeda's leadership, training of Al Qaeda operatives and other material support including the provision of passports, weapons and explosives, Al Qaeda would not have been able to build its terrorist cells in Kenya and Tanzania.

153.    The State Department's Annual Report entitled "Global Patterns of Terrorism" for 1998, published in April of 1999, states:

> Sudan continued to serve as a meeting place, safe haven, and training hub for a number of international terrorist groups, particularly Osama Bin Laden's Al Qaeda organization. The Sudanese government also condoned many of the objectionable actions of Iran, such as funneling assistance to terrorists and radical Islamic groups operating in and transitioning through Sudan.

**H.      Defendant Al Shamal Knowingly and Intentionally Provided Financial Services and Material Support To Al Qaeda**

154.    Al Shamal began operations in Sudan on January 2, 1990 and was capitalized, in part, with approximately $50 million from Osama bin Laden.  BNPP provided correspondent banking services to Al Shamal through its subsidiary, United European Bank.  In October 2001, a source confirmed to CNN Money that the United European Bank was still the correspondent

banker for Al Shamal.

155.    Upon Bin Laden's arrival in Sudan, the government opened its banking system to Al Qaeda. The Sudanese Banking system provided Bin Laden and Al Qaeda the means to launder money and facilitate financial transactions that stabilized and ultimately enlarged Bin Laden's presence in the Sudan.

156.    Al Shamal knowingly and intentionally provided financial services to Al Qaeda including maintaining and servicing Al Qaeda bank accounts.

157.    Bin Laden opened his first account in Al Shamal on or about March 30, 1992 on behalf of his company al-Hijrah and continued, from that point forward, to establish accounts at Al Shamal for Al Qaeda and his front companies including Wadi Al Aqiq, a holding company registered in Saudi Arabia.

158.    According to a 1996 State Department Report, "Bin Laden and wealthy National Islamic Front members capitalized Al Shamal in Khartoum. Bin Laden invested $50 million in the bank."

159.    In 1998, Governor Mutasim Abdul-Rahim, Secretary General of the National Congress Party in Khartoum, as well as a spokesman for, co-founder of and major shareholder in Al Shamal issued a statement promoting jihad urging "all those who are able to carry a gun to join the [military training] camps…Jihad has now become an obligation that comes before any other duty." Mohamad Osman, "Sudanese students enroll for controversial military service." AP Worldwide (June 6, 1998).

160.    Mohammed S. Mohammed, General Manager of Al Shamal, acknowledged in a September 2001 press release that bin Laden held two accounts in the bank.

161.    In September 2001, Senator Carl Levin testified before the Senate Committee on

Banking, Housing and Urban Affairs that evidence suggests that Bin-Laden "remains the leading shareholder" of Al Shamal and that he may still use the bank's facilities.

162.     Bin Laden's involvement in Al Shamal was confirmed by a 2002 Congressional Research Service Report:

> In 1991, bin Laden relocated to Sudan with the approval of Sudan National Islamic Front (NIF) leader Hasan al-Turabi. There, in concert with NIF leaders, [bin Laden] built a network of businesses, including an Islamic Bank (al Shamal), an import-export firm, and firms that exported agricultural products.

163.     Jamal Ahmed Al-Fadl ("Al-Fadl"), a former financial officer for bin Laden, testified that at least six Al Qaeda operatives held accounts in their own names at Al Shamal.

| | |
|---|---|
| Q. | While you were in Sudan, did you handle money for Osama bin Laden? |
| A. | Could you repeat the question. |
| Q. | Did you work on the finances for Al Qaeda while you were in the Sudan? |
| A. | Yes. |
| Q. | Did you know where the bank accounts of Osama bin Laden and Al Qaeda were? |
| A. | Yes. |
| Q. | Do you know whose names they were in? |
| A. | The bank account under Osama bin Laden in Bank Shaml [al Shamal Islamic Bank], Khartoum. |
| Q. | That was under Osama bin Laden's true name? |
| A. | Yes. |
| Q. | Were there accounts in other names? |
| A. | Yes. Afad Makkee got account also? |
| Q. | Afad Makkee, the account that he had under his name, do ou know what name that is? |
| A. | I remember Madani Sidi al Tayyib. |
| Q. | Do you know of any other persons who had Al Qaeda money in their accounts? |
| A. | Abu Rida al Suri. |
| Q. | Do you know his true name? |
| A. | Nidal. |
| Q. | Anyone else that you knew had Al Qaeda money in bank accounts in their name? |
| A. | Abu Hajer al Iraqi. |
| Q. | Do you know his true name? |
| A. | Mamdouh Salim. |
| Q. | Did you have any accounts in your name? |
| A. | Shared with Abu Fadhl. |

42

Q.      So you had accounts in your name that were shared with Abu Fadhl?
A.      Yes.
Q.      Do you recall anyone else that had bank accounts in their name for al Qaeda?
A.      Abdouh al Mukhlafi.

164.    Wadi el-Hage ("El-Hage), former personal secretary for bin Laden convicted for his role in the bombings, also testified that bin Laden kept accounts at Al Shamal:

Q.      When you for Osama bin Laden in the Sudan, how much were you paid?
A.      $1,200 a month.
Q.      For how long did you work for him [Osama bin Laden]?
A.      Almost two years.
Q.      What Banks did you keep his money at?
Q.      Bank Al Shamar [Al Shamal].

165.    Al-Fadl transported cash payments from Al Qaeda to Abu Ali, an affiliated jihadist organizations in Jordan, through funds maintained at Al Shamal:

Q.      How did you carry the $100,000?
A.      In my bag with my clothes.
Q.      Do you recall what kind of bills the $100,000 was in?
A.      I remember they all hundred bill.
Q.      Sorry
A.      They all hundred bill.
Q.      They were all hundred dollar bills?
A.      Yes.
Q.      Who gave you the money?
A.      Abu Fadhl, he bring it from Shamal Bank [Al Shamal] and he bring it to me.
Q.      Abu Fadhl brought it from the Shamal Bank [Al Shamal]?
A.      Yes.
Q.      Is that a bank in the Sudan?
A.      Yes.

166.    Al Qaeda used Al Shamal for operational purposes including providing terrorists and operatives compensation and expenses from accounts held at the bank.

167.    Upon information and belief, BNPP processed transaction on behalf of Al Shamal, the proceeds of which were delivered to Al Qaeda for operations, including for planning and perpetrating the attacks on the East African U.S. Embassies.

168. During the planning of these 1998 East African Embassy Attacks, Al-Fadl received $250,000 from Al Shamal purchase a plane for Al Qaeda. The plane was used to coordinate Al Qaeda's efforts in preparation for the 1998 Embassy bombings, including flying bin Laden to a meeting in Teheran with the heads of the IRGC and Hizballah to plan the attacks on the embassies and arrange training for Al Qaeda operatives in Iran and Beka Valley, Lebanon.

169. Between 1990 and 2003, Yasin Al-Qadi a Saudi Arabian businessman and associate of Al Qaeda wired more than $22 million from bank accounts in Switzerland to Al Qaeda operatives. Al-Qadi transferred nearly half of these funds through Al Shamal.

170. On October 12, 2001, the United States designated Al-Qadi as a Specially Designated Global Terrorist pursuant E.O. 13224 because he funneled millions of dollars from Saudi businesses to bin Laden.

171. On December 21, 2004, the United States designated Adel Abdul Jalil Batterjee ("Batterjee") pursuant to E.O. 13224 as a Specially Designated Global Terrorist because of his provision of financial and material support to Al Qaeda and bin Laden. Batterjee was bin Laden's brother-in-law.

172. On December 23, 2004, the UN Security Council placed Batterjee on the Consolidated List of Individuals and Entities Associated with Al Qaeda and the Taliban, Established and Maintained by the UN Security Council's Al-Qaeda Sanctions Committee ("UNSCR 1267 List"). Once added to this list, all United Nations member states are required to freeze the assets and prevent the travel of listed individuals and to block the sale of arms and military equipment.

173. In announcing the 2004 designation of Batterjee as a Specially Designated Global

Terrorist, Stuart Levey, Undersecretary for the Treasury Department's Office of Terrorism and Foreign Intelligence described Batterjee as:

> [O]ne of the world's foremost terrorist financiers, who employed his private wealth and a network of charitable fronts to bankroll the murderous agenda of al Qaida. A worldwide asset freeze, including in his home country of Saudi Arabia, will deal a serious blow to this key terrorist facilitator.

174.    Batterjee was the appointed chairman of Al Shamal. He held that position as of at least 2002.

175.    Batterjee is the Chairmain of Al-Bir Saudi Organization, whose American branch, Benevolence International Foundation (BIF) held accounts at Al Shamal from 1991 until 2002. Batterjee used the Al Shamal accounts for the benefit and financing of Al Qaeda.

176.    In October 2002 Batterjee was named as an un-indicted co-conspirator in an indictment against bin Laden confidant Enaam Arnaout arising from the operation of Benevolence International Foundation ("BIF") as a racketeering enterprise and provision of material support to organizations, including Al-Qaeda, that are engaged in violent activities. Arnaout was sentenced on August 18, 2003 to more than 11 years in federal prison for defrauding donors. He pleaded guilty to a racketeering charge, admitting that he diverted thousands of dollars from his charity to support Islamic militants in Bosnia and Chechnya.

## I.    Defendants' Conspiracy to Finance Terrorism and Circumvent United States Economic Sanctions Against Sudan

177.    In 1997, shortly after the imposition of United States sanctions against Sudan, BNPP, through its branch in Geneva, agreed to become the sole correspondent bank in Europe for the Central Bank of Sudan, a bank specifically designated by OFAC as a Specially Designated National ("SDN").

178.    On November 9, 1997, the Central Bank of Sudan sent a Telefax to its

correspondent banks, including BNPP, regarding the sanctions imposed against Sudan by the United States. The Telefax requested BNPP "not to [] channel such transactions by intermediation of any U.S.A. bank, including banks domiciled in the U.S.A. territory, U.S.A. banks overseas branches and subsidiaries [or the] [a]ffiliates of [a] U.S.A. bank incorporated outside the United States."

179.    Sudan, through the Central Bank of Sudan, directed all major commercial banks located in Sudan, including Al Shamal, to use BNPP as their primary correspondent bank in Europe. As a result, Al Shamal and nearly all other major Sudanese banks maintained U.S. dollar accounts with BNPP.

180.    BNPP and/or its subsidiary United European Bank was a correspondent bank for Al Shamal from at least 1997.

181.    For just the period 2002 through and including 2009, BNPP knowingly, intentionally and willfully violated United States law providing over $20 billion American dollars to Sanctioned Entities, including the Government of Sudan Specially Designated Nationals ("SDNs").

182.    At the request and direction of Sudan, BNPP omitted any reference to the origination and/or destination of these funds in payment messages in order to avoid detection of the illegal transfer of funds to countries designated by the United States as state sponsors of terrorism.

183.    As BNP admitted in connection with its criminal guilty plea, that "[d]uring the course of [the bank's] illicit conduct, BNPP processed thousands of U.S. dollar denominated financial transactions with Sanctioned Entities, with a total value well in excess of $6 billion, including transactions involving 18 Sudanese SDNs, six of which were BNPP clients."

184.    Deposits by the Government of Sudan through its Central Bank at the Geneva Branch of BNPP alone came to represent about 50% of Sudan's foreign currency assets.

185.    During all relevant time periods, BNPP and its employees knew that Sudan was a state sponsor of terrorism and was funding, facilitating and directing terrorist attacks aimed at the United States and its citizens.

186.    The fact that Sudan was identified as a state sponsor of terrorism in 1993 was widely publicized throughout France and the United States. The reporting of Sudan's designation as a sponsor of terrorism included the following:

- August 17, 1993, the Agence France Presse, (AFP) an international news agency headquartered in Paris, France, published an article "U.S. to add Sudan to terrorist sponsor list."

- April 1, 1994, AFP published an article "US warns Sudan over human rights, terrorism"

- June 28, 1994, AFP published an article "Bashir reaffirms Sudan's Islamic option" noting that Western countries, headed by the United States, have cut all economic assistance to Sudan, charging human rights abuses and terrorism."

- September 16, 1994, AFP published an article "Sudan rejects US evidence of terrorist training within its borders" where the United States Ambassador in Sudan is quoted as saying that Sudan's actions "raise[] serious questions about Sudan's willingness to engage in a genuine dialogue on terrorism.

- February 1, 1996, AFP reported that the United States pulled diplomats out of Sudan following a vote of the United States in favor of a UN Resolution denouncing Sudan's support for terrorism.

- November 5, 1997, the Financial Times Mandate reported that the United States tightened sanctions against Sudan which included a ban on bank loans and seizure of Sudanese assets in the United States.

- November 6, 1997, Reuters reported that Sudan's central bank has cut banking links with United States establishments after Washington imposed economic sanctions on Sudan.

- December 9, 1997, Reuters reported that over $4.5 million of Sudanese assets had been seized by the United States as a result of sanctions.

187.    Throughout the Relevant Period, BNPP knew that Al Shamal maintained accounts and provided banking services to Al Qaeda.

188.    BNPP carried out billions of dollars' worth of transactions with Al Shamal and Sudan by deliberately modifying and omitting references to Sudan in the payment messages accompanying these transactions. Accordingly funds that would have otherwise been blocked when they entered the United States and thereby made available under TRIA for satisfaction of Plaintiffs judgments were permitted to pass through.

189.    BNPP frequently received instruction from the Sudanese Government and Sanctioned Entities not to mention Sudan or the names of the Sanctioned Entities in wire transfer messages through United States branches.

190.    BNPP employees were instructed that "due to the US embargo on Sudan, please [debit our U.S. dollar account] without mentioning our name in your payment order" and "transfer the sum of USD 900,000 . . . without mentioning our name repeat without mentioning our name under swift confirmation to US." *United States of America v. BNP Paribas, S.A.*, Southern District of New York, 14 CR 460, Statement of Facts ¶ 22.

191.    BNPP knowingly agreed to remove all mention of Sudan and any bank or entity operating in Sudan for the sole purpose of violating and avoiding the United States embargo.

192.    BNPP employees would mark transactions with a stamp "ATTENTION: US EMBARGO" so that there would be no confusion as to whether the names of the Sudanese entities would need to be removed. At times, BNPP front office employees directed BNPP back office employees processing transactions with Sudanese Sanctioned Entities to omit any reference to Sudan: "! Payment in $ to [French Bank 1] without mentioning Sudan to N.Y. !!!" *United States of America v. BNP Paribas, S.A.*, Southern District of New York, 14 CR 460,

48

Statement of Facts ¶ 22.

193.    BNPP's internal policy for processing U.S. dollar payments involving Sudan stated: "Do not list in any case the name of Sudanese entities on messages transmitted to American banks or to foreign banks installed in the U. S." *United States of America v. BNP Paribas, S.A.*, Southern District of New York, 14 CR 460, Statement of Facts ¶ 22.

194.    Defendants conspired with Sudan to process and move illicit transactions in the United States through the use of unaffiliated "satellite banks" allowing the conspirators to disguise the involvement of Sudanese banks, entities and organizations. As a direct and proximate result of Defendants' conduct, Al Qaeda and bin Laden were able to access billions of dollars' worth of U.S. dollar-based financial transactions in violation of United States law.

195.    BNPP began its relationship with many of these satellite banks shortly after the imposition of U.S. sanctions against Sudan in 1997, and the vast majority of the satellite banks' business with BNPP Geneva involved facilitating U.S. dollar payments for sanctioned Sudanese banks, including Al Shamal.

196.    BNPP Geneva utilized the satellite banks in a two-step process designed to enable BNPP's Sudanese clients, including Al Shamal, to evade U.S. sanctions. In the first step, a Sudanese bank seeking to move U.S. dollars out of Sudan transferred funds internally within BNPP Geneva to a BNPP Geneva account specifically maintained by a satellite bank to facilitate U.S. dollar transfers from Sudan. In the second step, the satellite bank transferred the money to the Sudanese bank's intended beneficiary through a U.S. bank without reference to the Sudanese bank.

197.    In order to further disguise the true nature of the satellite bank transactions, employees at BNPP Geneva frequently worked with the satellite banks to wait between one and

two days after the internal transfer before making transactions and clearing funds through the United States, artificially delinking the U.S. transfer of funds from the prior transfer involving the satellite banks so that financial institutions in the United States and U.S. authorities would be unable to link the payments to the involved Sanctioned Entity.

198.    BNPP employees internally proposed getting the satellite banks "accustom[ed] ... to spacing out the gap between covers they execute with their U.S. correspondents to the extent possible." Ultimately, BNPP Geneva successfully used the satellite bank structure to process thousands of U.S. dollar transactions, worth billions of dollars in total, for Sudanese entities, including Al Shamal, without having the transactions identified and blocked in the United States. *United States of America v. BNP Paribas, S.A.*, Southern District of New York, 14 CR 460, Statement of Facts ¶ 24.

199.    The use of satellite banks to facilitate U.S. dollar transactions with Sudanese Sanctioned Entities was widely known within BNPP. In 2004, a satellite bank requested BNPP "to open an account at BNP Paribas Genev[a] to be used mainly for the USD Transfers to and from Sudanese Banks." This e-mail was forwarded to another BNPP Geneva employee who recommended opening the account, as "the opening of this account fits in the framework of our activity in Sudan." Referencing this exchange, another BNPP Geneva employee commented that: "we have advised [this satellite bank] for a long time to open a VOSTRO account to facilitate the transactions which this institution has with countries with which we are also active." *United States of America v. BNP Paribas, S.A.*, Southern District of New York, 14 CR 460, Statement of Facts ¶ 25.

200.    BNPP's compliance personnel were also aware of BNPP' s use of satellite banks to process transactions with Sanctioned Entities. A 2005 compliance report described the scheme

as follows:

> The main activity of certain BNPP customers is to domicile cash flows in USD on our books on behalf of Sudanese banks. These arrangements were put in place in the context of the U.S. embargo against Sudan .... The accounts of these banks were therefore opened with the aim of "facilitating transfers of funds in USD for Sudanese banks." This comment was made on the account opening application forms of these banks. The funds in question were then transferred, on the same day, or at the latest D+l or 2 by the [satellite banks] to [U.S. correspondent banks].

*United States of America v. BNP Paribas, S.A.*, Southern District of New York, 14 CR 460, Statement of Facts ¶ 26.

201.    BNPP Geneva's methods of evading U.S. sanctions against Sudan -including the omission of references to Sudan from wire messages involving Sanctioned Entities and the use of satellite banks to process transactions for sanctioned Sudanese banks -were known to and condoned by senior compliance and business managers at BNPP.

202.    In 2003, a senior BNPP compliance officer conveyed to executives in Paris that BNPP Geneva was routinely employing a cover payment method that omitted the names of Sanctioned Entities from U.S. dollar payment messages to prevent the transactions from being discovered in the United States. The senior compliance officer observed that "in practice, in all kinds of ways, the headers of messages seem to have been amended in Geneva." *United States of America v. BNP Paribas, S.A.*, Southern District of New York, 14 CR 460, Statement of Facts ¶ 27.

203.    In 2004, the Federal Reserve Bank of New York ("FRB-NY") and the New York State Banking Department (now known as the New York State Department of Financial Services) ("DFS") identified systemic failures in BNPP's compliance with the Bank Secrecy Act, and specifically highlighted deficiencies in BNPP New York's monitoring of transactions with overseas clients, including the processing of U.S. dollar transactions for overseas clients. In

response to the regulatory inquiries, in September 2004, BNPP agreed to enter into a Memorandum of Understanding (the "MOU") with the FRB-NY and DFS that required, among other things, that BNPP New York improve its systems for compliance with bank secrecy and sanctions laws.

204.    Shortly after BNPP entered into the MOU, BNPP executives met in Geneva to discuss how "embargoes against sensitive countries (Sudan, Libya, Syria ... )" affected BNPP's business and operational issues. At that meeting, the executives decided to switch to an unaffiliated bank in the United States to process payments for countries subject to sanctions. Following that meeting, BNPP Geneva employees were instructed to have U.S. dollar payments involving Sanctioned Entities cleared through the unaffiliated bank instead of BNPP New York. *United States of America v. BNP Paribas, S.A.*, Southern District of New York, 14 CR 460, Statement of Facts ¶ 29.

205.    The decision to switch dollar clearing involving Sanctioned Entities to a new, unaffiliated bank was made for the purpose of decreasing BNPP New York's exposure to enforcement actions by U.S. authorities and to defraud OFAC and the  United States Treasury Department. As indicated in meeting minutes outlining the new policy for U.S. dollar payments involving sanctioned countries: "the cover payments are to be executed via [unaffiliated bank], such following problems BNP NY encountered with the U.S. authorities."  *United States of America v. BNP Paribas, S.A.*, Southern District of New York, 14 CR 460, Statement of Facts ¶ 30.

206.    From 2004 through 2009, the vast majority of BNPP's transactions involving Al Shamal and other Sudanese Entities were cleared through the new, unaffiliated bank using a payment method that concealed from the bank the involvement of Sanctioned Entities in the

transactions. Thus, as evidenced in a January 2006 email, "the problem" of clearing U.S. dollar transactions involving Sanctioned Entities was "in some ways shifted onto [US. Bank 1] Switzerland, which has the advantage of being a U.S. Bank. *United States of America v. BNP Paribas, S.A.*, Southern District of New York, 14 CR 460, Statement of Facts ¶ 30.

207.     Senior BNPP compliance and legal personnel repeatedly recognized BNPP's role in circumventing U.S. sanctions against Sudan, and yet allowed these transactions to continue in part because of their importance to BNPP's business relationships and "goodwill" in Sudan.

208.     In July 2005, a BNPP employee noted how high-level business managers at BNPP were aware of and supported the transactions involving Sudan: "the general management of CIB has encouraged us to follow this [the satellite bank] model . . . . The working of this whole mechanism is coordinated with CIB/ECEP Compliance. . . . I consider it most advisable to maintain these accounts which support our vision and our position regarding our goodwill in the Sudan." *United States of America v. BNP Paribas, S.A.*, Southern District of New York, 14 CR 460, Statement of Facts ¶ 31.

209.     In August 2005, a senior compliance officer at BNPP noted in an email: "As I understand it, we have a number of Arab Banks (nine identified) on our books that only carry out clearing transactions for Sudanese banks in dollars. . . . This practice effectively means that we are circumventing the US embargo on transactions in USD by Sudan." *United States of America v. BNP Paribas, S.A.*, Southern District of New York, 14 CR 460, Statement of Facts ¶ 32.

210.     In response to emails voicing concerns over Defendants relationship with Sudan ahigh-level employee explained that these transactions had the "full support" of management at BNPP:

> I see that certain questions are coming back to the surface on the way in which we are processing these transactions. I remember when you ... made me meet the

Minister of Finance of Sudan and the President of the [Sudanese Government Bank 1], it had been specified that all business activity -meaning in passing -the Minister and the President had shown themselves to be very satisfied -and it had received the full support of our General Management in Paris.

*United States of America v. BNP Paribas, S.A.*, Southern District of New York, 14 CR 460, Statement of Facts ¶ 32.

211.    In May 2006, BNPP received a legal opinion from a United States law firm which specifically warned BNPP that if the bank were to omit relevant identifying information in U.S. dollar payments sent to the United States, with the objective of avoiding U.S. economic sanctions, BNPP could be subjecting itself to various U.S. criminal laws.

212.    In March and June 2006, BNPP received two additional legal opinions which informed BNPP that (a) U.S. sanctions could apply to BNPP even when the transactions were processed by an unaffiliated bank instead of BNPP New York, and (b) U.S. authorities had become especially sensitive to the use of "cover payments" by foreign banks that omitted underlying descriptive details about the nature of transactions, and advised BNPP to "ensure that they have adequate procedures in place to guard against any abuses of cover payment messages that could cause their U.S. operations to engage in prohibited transactions under U.S. sanctions."

213.    BNPP continued to willfully process thousands of transactions with Sanctioned Entities through the United States after July 2006 while taking steps to hide the true nature of these transactions from both BNPP New York, other U.S. correspondent banks, and the United States Department of Treasury.

214.    BNPP continued to process transactions involving Sudanese Sanctioned Entities-despite being well aware that its conduct violated U.S. law -because the business was profitable and because BNPP did not want to risk its longstanding relationships with Sudanese clients.

215.    In November 2006, three BNPP Geneva employees drafted a memorandum that

explained: "the 'clearing' activity of DSD correspondents ... is of real significance in relation to our activity in Sudan… The fundamental importance of these [satellite bank] accounts lies in the fact that they allow us to receive incoming funds from Sudanese banks as cover for their commercial transactions on our books … Moreover … we maintain commercial relations with these [satellite] banks which offer significant commercial potential, not only in connection with Sudan." In February 2007, a senior BNPP Paris compliance officer specifically recognized the significance of the Sudanese business for BNPP Geneva:

> For many years, the Sudan has traditionally generated a major source of business for BNPP Geneva including transactions such as investment held on deposit. The existence of a dedicated desk for this region, GC8, for which the Sudan is one of the largest customers, relationships developed with directors of Sudanese financial institutions and traditional practices have over the years led to a major source of income, which is now recurring income.

216.    In May 2007, senior officials at OFAC met with executives of BNPP New York and expressed concern that BNPP's Geneva affiliate was conducting U.S. dollar business with Sudan in violation of U.S. sanctions. Shortly after this meeting, OFAC requested that BNPP conduct an internal investigation into transactions with Sudan initiated by BNPP Geneva that may have violated U.S. sanctions, and asked that BNPP report its findings to OFAC.

217.    BNPP at the direction and control of its clients Al Shamal and Sudan continued to make fraudulent misrepresentations and allow fraudulent reports to be submitted to OFAC in order to evade United States sanctions and allow Al Shamal and Sudan continued access to the United States financial market despite OFAC's concerns that BNPP was conducting business with Sudan,

218.    BNPP's willingness to engage in U.S. dollar transactions with Al Shamal and Sudan significantly undermined the U.S. embargo and provided  Al Shamal, Al Qaeda and bin Laden access to the U.S. financial system that they otherwise would not have had.

219.     In entering into a Consent Order and Stipulation with the New York Department of Financial Services, BNPP agreed that: (1) the account relationships with unaffiliated banks located in Africa, Europe and the Middle East were for no other business purpose than clearing payments for Sudanese clients; and (2) the accounts at the Regional Banks were created and established to provide a means to circumvent U.S. sanctions.

220.     BNPP fraudulently, recklessly and knowingly aided and abetted the Government of Sudan, Al Shamal, Al Qaeda and other Sanctioned Entities in their efforts to avoid United States embargoes and gain access to the United States financial markets in violation of United States law. As a result of Defendants' conspiracy and fraudulent actions and omissions Sudanese assets that were moving through the United States were not blocked in accordance with United States law. As a direct and proximate result of these actions and omissions, Plaintiffs could not recover on their judgments under TRIA.

221.     BNPP knew or should have known that financial assistance and material support provided to Sudan, as a state sponsor of terrorism, would further the terrorist actions and agenda of Sudan.

222.     BNPP knew or should have known that Al Shamal maintained accounts for bin Laden and Al Qaeda and that financial assistance and material support provided to Al Shamal would further the terrorist actions and agenda of Al Qaeda.

223.     Al Shamal knowingly and intentionally provided financial services to Al Qaeda, including maintaining and servicing Al Qaeda bank accounts, facilitating weapons and military equipment purchases for Al Qaeda.

224.     BNPP provided Al Shamal, Sudan and Al Qaeda with a banking structure that allowed Al Qaeda to move money throughout the world in a manner that would make it difficult

for the United States and law enforcement to discover the conspiracy.

225.    The conspiracy entered into between BNPP, Al Shamal and Sudan to circumvent Sudanese sanctions contributed to Al Qaeda's efforts in targeting United States employees and the United States government through the 1998 East African Embassy Attacks. The concealment and subterfuge of the sanctions scheme by BNPP and Sudan directly contributed to the ability of the bombing conspirators to avoid detection and disruption by the United States, intelligence agencies, and law enforcement prior to the Bombings.

## COUNT I
### CIVIL CONSPIRACY TO VIOLATE AND DEFEAT UNITED STATES POLICIES AND SANCTIONS AGAINST SUDAN
(Against All Defendants)

226.    Plaintiffs incorporate herein by reference the averments contained in all proceeding paragraphs.

227.    The conspiracy to evade and defeat United States sanctions and violate United States law continued throughout the Relevant Period, from at least 1997 until at least 2012.

228.    As previously outlined, the unlawful actions undertaken by Defendants to evade and defeat United States policies and sanctions allowed the Sudanese government, banks and entities to avoid the blocking of their funds within the United States as required by law.

229.    As a result of the conspiracy to bypass United States sanctions, Al Shamal was able to provide Al Qaeda direct access to the U.S. financial system. As such, Defendants' conspiracy provided Al Qaeda the ability to obtain the finances and material support to plan and conduct the 1998 Embassy Bombings.

230.    BNPP actively participated in the conspiracy by: (1) intentionally using cover payments in such a way as to conceal the involvement of Sanctioned Entities in U.S. dollar transactions; (2) structuring payments in highly complicated ways, with no legitimate business

purpose, to conceal the involvement of Sanctioned Entities in order to prevent the illicit transactions from being blocked when transmitted through the United States; (3) instructing other co-conspirator financial institutions not to mention the names of Sanctioned Entities in U.S. dollar payment messages sent to BNPP New York and other financial institutions in the United States; (4) agreeing not to mention their names in U.S. dollar payment messages sent to BNPP New York and other financial institutions in the United States; and (5) removing information identifying Sanctioned Entities from U.S. dollar payment messages in order to conceal the involvement of Sanctioned Entities from BNPP New York and other financial institutions in the United States.

231.    BNPP, a sophisticated international commercial actor, knew or should have known that its subterfuge, concealment and falsification of financial records made it more difficult for law enforcement to identify and disrupt wrongdoing and made it more likely for sponsors of terrorism and terrorist organizations, such as Sudan, Al Shamal and Al Qaeda to prosper.

232.    From at least November 1997, BNPP knew of Sudan's involvement in terrorism and willingness to fund terrorist organizations, including Al Qaeda, to attack innocent civilians in pursuit of its national policy of jihad.

233.    From at least November 1997, BNPP knew that Al Shamal maintained accounts and provided financial services to  Al Qaeda operatives.

234.    Al Shamal's chairman and primary shareholders, including bin Laden, were direct participants in terrorist attacks aimed at United States employees and citizens, including the Embassy Bombings. Al Shamal conspired with BNPP to allow Al Qaeda operatives continued access to money for terrorist operations.

235.    Al Qaeda agreed to undertake acts of violence against American interests, including the bombing of the United States Embassies in order to circumvent and defeat United States policy and sanctions

236.    BNPP, Al Shamal and Al Qaeda acted in concert and/or agreement with Sudan to further Sudan's common goal of illegally defeating United States sanctions prohibitions.

237.    As a direct and proximate result of the conspiracy to circumvent, oppose and defeat United States sanctions prohibitions, and through the direct financial and material support provided by Al Shamal and Sudan, Al Qaeda planned and implemented the 1998 East African Embassy Attacks resulting in the injury and death to Plaintiffs.

238.    As co-conspirators, BNPP and Al Shamal are civilly liable to Plaintiffs for the actions of Al Qaeda in the bombing of the United States Embassies as each of parties were acting in pursuit of the common conspiratorial scheme of circumventing and opposing United States policies and sanctions.

239.    BNPP was under a duty to report and cause other financial institutions to report timely, full, and accurate reports to the U.S. Department of Treasury in Washington, D.C.

240.    BNPP was under a duty of care to establish and enforce policies to prevent its and its subsidiary banks from joining with, and being used by, nations, entities, and individuals well-publicized and designated for their intentional and willful acts of terror against civilian populations and diplomatically protected persons that would foreseeably result in death, personal injury, and damages of the Plaintiffs.

241.    Among other means and actions, BNPP breached those duties by:

(a) Providing knowing assistance and services to transactions and customers which they had reason to know or knew were involved in terrorist activities or terrorist financing;

(b) Failing to report suspicious activities to the proper authorities;

(c) Failure to discontinue commercial relations and close and block accounts with customers who were known or suspected of engaging in terrorist activities or terrorist financing;

(d) Providing assistance to customers seeking to defraud and deceive law enforcement agencies and the U.S. Department of Treasury in Washington, D.C. through the submission of false, altered, incomplete, and misleading information;

(e) Engaging in financial transactions with the Government of Sudan, the Central Bank of Sudan, and Al Shamal Bank, entities known to direct or participate in terrorist activities or to finance terrorist groups; and

(f) Knowingly and intentionally violating and circumventing OFAC and Department of Treasury rules and regulations aimed at deterring, disrupting and defeating act of terrorism aimed at U.S. Government employees, U.S. citizens, and the citizens of allied nations.

242.    The breaches of those duties by BNPP were a proximate cause of the deaths, personal injuries, and damages suffered by the Plaintiffs.

WHEREFORE, Plaintiffs demand judgment in their favor against Defendants and demand damages in an amount to be determined by a jury, for damages arising out of wrongful death, assault and battery, survival, intentional infliction of emotional distress, loss of consortium, loss of solatium, and/or loss of services, plus interest from the date of the attack, costs, and punitive damages.

## COUNT II

### CIVIL AIDING AND ABETTING THE MATERIAL SUPPORT OF AL QAEDA
### (Against All Defendants)

243.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

244.    The fraudulent and illegal scheme to undermine, oppose, counter and defeat United States sanctions allowed Sudan and Sudanese financial institutions, including Al Shamal

to gain access to the U.S. financial system.

245.   The goal of the U.S. sanctions was to cut-off the financial assistance and force Al Qaeda from its safe haven in Sudan.

246.   BNPP at all relevant times knew that Sudan had become a safe haven for multiple terrorist groups, including Al Qaeda and that Sudan was a state sponsor of terrorism.

247.   BNPP at all relevant times knew that Sudan itself, as well as groups such as Al Qaeda, had carried out or attempted international terrorist attacks against targets from many countries, including U.N. buildings and other structures inside the United States

248.   BNPP ignored all red flags and provided Sudan with the critical banking services described above, which BNPP knew or should have known would materially benefit Al Qaeda.

249.   BNPP acted with extreme recklessness in assisting Sudan and Sudanese financial institutions, including Al Shamal, in their efforts to circumvent and defeat United States sanctions in order to provide access to the U.S. financial system.

250.   BNPP knew or should have known that the reasonably foreseeable outcome of providing financial assistance to Sudan, as a state sponsor of terrorism, and Sudanese financial institutions was terrorist attacks targeted at the United States government, including the 1998 East African Embassy Attacks.

251.   Al Shamal knew or should have known that the financial support provided to Al Qaeda would be used to plan, implement and conduct terrorist attacks against the United States government, including the 1998 East African Embassy Attacks.

252.   BNPP enabled Sudan and Al Shamal's financial and material support of Al Qaeda from at least November 9, 2007.

253.   Plaintiffs and their family members suffered death or serious physical and/or

emotional injuries as a result of the 1998 East African Embassy Attacks.

254.    As joint venturers, BNPP and Al Shamal are vicariously liable to Plaintiffs for the actions of Al Qaeda in the bombing of the United States Embassies as each of parties were acting in pursuit of the common criminal scheme of circumventing and opposing United States policies and sanctions.

WHEREFORE, Plaintiffs demand judgment in their favor against Defendants and demand damages in an amount to be determined by a jury, for damages arising out of wrongful death, assault and battery, survival, intentional infliction of emotional distress, loss of consortium, loss of solatium, and/or loss of services, plus interest from the date of the attack, costs, and punitive damages.

## COUNT III

### CONSPIRACY AND AIDING AND ABETTING CRIMES AGAINST HUMANITY AND INTENTIONAL INJURY TO OTHERS IN VIOLATION OF INTERNATIONAL LAW AND THE LAW OF NATIONS
### (Alien Tort Statute, 28 U.S.C. §1350)
### (Against All Defendants)

255.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

256.    Article I, section 8 of the Constitution of the United States gives the Congress the power to "define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." In 1789, Congress passed the Alien Tort Claims Act which provides: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of the nations or a treaty of the United States." 28 U.S.C.A. 1350.

257.    The 1998 Embassy bombings committed by Al Qaeda against Plaintiffs and other

United States employees constitute a crime against humanity in violation of the law of nations.

258.    Strong condemnation of crimes against humanity rests on a clear and definite norm of international law which is universally accepted by the civilized world. Charter of the International Military Tribunal, Aug. 8, 1945, art. 61, 59 Stat. 1546, 1547, E.A. S., No. 472, 82 U.N.T.S. 284; Statute of the ICTR, Art. 5; Statute of the ICTR, Art. 3; see also The Rome Statute, Art. 7.

259.    Crimes against humanity are likewise defined with a specificity sufficiently comparable to international law violations that were familiar when the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350, was enacted.  The core elements of a crime against humanity in violation of international law, as codified in the above sources and recognized in international law generally, are murder and other heinous acts against human life, physical welfare, and dignity that are undertaken as part of a widespread or systematic attack against a civilian population.  These crimes are punishable whether committed in peacetime or in war.

260.    The attack on the United States Embassies impinged the diplomatic mission of the United States and directly infringed on the rights of ambassadors, which was and has been a clear violation of the law of nations since the inception of the ATCA.

261.    The 1998 East African Embassy Attacks violated treaties to which the United States is a party including the Organization of American States Convention on Terrorism art. 1, Oct. 20, 1976, 27 U.S.T. 3949, T.I.A.S. No. 8413 and the U.N. Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, Including Diplomatic Agents preamble, Feb. 20, 1977, 28 U.S.T. 1975, T.I.A.S. No. 8532.

262.    The attacks on the United States Embassies were directed at the United States government, with the intention of harming this country and its employees and citizens.

263.     Al Qaeda stated in its claim of responsibility for the 1998 Embassy bombings that it had an "absolute determination to strike at American interests everywhere" until the United States "campaign for the annihilation and humiliation that are being waged by the United States against a number of Islamic peoples under the titles of blockades or economic sanctions that has led to the deaths of hundreds of thousands and the hunger of millions of Muslims."

264.     The 1998 East African Embassy Attacks required a high degree of careful planning, coordination, funding, and orchestration by Al Qaeda and others involving recruitment, incitement, the provision of explosives, training, training bases, safe haven, and the targeting of Plaintiffs and other United States citizens.

265.     Without the financial assistance provided by Sudan and Al Shamal, Al Qaeda could not have carried out the 1998 Embassy Bombings.

266.      BNPP knowingly conspired with Al Shamal, Sudan and Sudanese entities to bypass United States sanctions and allow Sudan to obtain American dollars in direct violation of United States law.

267.     The United States sanctions against Sudan were implemented for the sole purpose of cutting off financing to terrorist organizations such as Al Qaeda.

268.     At the time BNPP entered into the agreement with Sudan to become a correspondent bank for the Central Bank of Sudan and bypass United States sanctions, BNPP knew that Sudan was a state sponsor of terrorism and facilitated, financed and supported terrorist attacks aimed at American interests.

269.     At the time BNPP agreed to become the correspondent bank for Al Shamal and bypass United States sanctions, BNPP knew that Al Shamal provided material support and financial services to Al Qaeda.

270.    BNPP allowed billions of dollars to be funneled to Al Shamal and the Government of Sudan with actual knowledge and awareness that these same funds were raised and deposited for the purpose of supporting Al Qaeda's terrorist activities.

271.    Al Shamal maintained Al Qaeda accounts and processed financial transactions on behalf of Al Qaeda with full knowledge that the funds would be used to assist Al Qaeda in the financing, planning and implementation of terrorist attacks against U.S. citizens and employees.

272.    BNPP knew or should have known that the millions of dollars in illegal transfers to Al Shamal and Sudan were used to support, encourage, entice and make possible terrorist attacks including but not limited to the 1998 East African Embassy Attacks.

273.    Defendants aided and abetted, intentionally facilitated and/or reckless disregarded the planning, preparation and\or execution of the crimes against humanity by providing organized and systematic financial support to terrorist organizations which had a substantial effect on the perpetration of crimes against humanity, with knowledge that their actions would assist Al Qaeda in the commission of crimes against humanity.

274.    In financing and funding Al Shamal and Sudan with actual knowledge and awareness that the money would be used for the purpose of supporting terrorism, and specifically Al Qaeda, BNPP knowingly aided and abetted acts and omissions constituting crimes against humanity in violation of the law of nations, and caused Plaintiffs' damages.

275.    In directly financing and funding Bin Laden and Al Qaeda with knowledge that the money would be used for the purpose of supporting terrorism, Al Shamal knowingly aided and abetted acts and omissions constituting crimes against humanity in violation of the law of nations, and caused Plaintiffs' damages.

276.    Plaintiffs and their family members suffered death or serious physical and/or

65

mental injuries as a proximate result of Defendants' conduct.

WHEREFORE, Plaintiffs, who are aliens, demand judgment in their favor against Defendants and demand damages in an amount to be determined by a jury, for damages arising out of wrongful death, assault and battery, survival, intentional infliction of emotional distress, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, punitive damages and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again engaging in the finance and/or commission of crimes against humanity and other crimes against the people and employees of the United States.

## COUNT IV
### CONSPIRACY AND AIDING AND ABETTING ATTACKS UPON A FOREIGN EMBASSY AND DIPLOMATIC PROPERTY AND ATTACKS UPON UNITED STATES AMBASSADORS AND DIPLOMATS IN VIOLATION OF INTERNATIONAL LAW AND THE LAW OF NATIONS
### (Alien Tort Statute, 28 U.S.C. §1350)
### (Against All Defendants)

277.    Article I, section 8 of the Constitution of the United States gives the Congress the power to "define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." In 1789, Congress passed the Alien Tort Claims Act which provides: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of the nations or a treaty of the United States." 28 U.S.C.A. 1350.

278.    Infringement of the rights of ambassadors and diplomats and attacks upon foreign embassies have been recognized as criminal offenses against the law of nations since the enactment of the Alien Tort Statute in 1789.

279.    The attack on the United States Embassies impinged the diplomatic mission of the United States and directly infringed on the rights of ambassadors, which was and has been a

clear violation of the law of nations since the inception of the Alien Tort Statute.

280.    The 1998 East African Embassy Attacks constituted gross violations of the laws of nations and customary international law and violated treaties to which the United States is a party including the Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, including Diplomatic Agents, Dec. 14, 1973, 1035 U.N.T.S. 167 (entered into force Feb. 20, 1977).

281.    The Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, including Diplomatic Agents, Dec. 14, 1973, 1035 U.N.T.S. 167 (entered into force Feb. 20, 1977) makes it a crime to commit:

        a.    a murder, kidnapping or other attack upon the person or liberty of an internationally protected person;

        b.    a violent attack upon the official premises, the private accommodation or the means of transport of an internationally protected person likely to endanger his person or liberty; or

        c.    an act constituting participation as an accomplice in any such attack.

282.    Al Qaeda attacked the U.S. Embassies in Kenya and Tanzania specifically intending to kill American diplomatic personnel and employees of the United States government.

283.    Without the financial assistance provided by Sudan and Al Shamal, Al Qaeda could not have carried out the 1998 Embassy Bombings.

284.    BNPP knowingly conspired with and aided and abetted Sudan and Sudanese financial institutions, including Al Shamal, in bypassing United States sanctions in order to allow Sudan access to the United States financial system.

285.    At the time that BNPP entered into the conspiracy with Sudan and Sudanese

financial institutions to bypass U.S. sanctions, BNPP knew or should have known that Sudan was a state sponsor of terrorism and had previously violated the law of nations and international law in financing attacks on internationally protected persons, diplomats and/or ambassadors.

286.   In June 1995, Sudanese intelligence officers provided key logistical support, including use of Sudan airways to transport resources and explosives to terrorist organizations involved in the attempted assassination of Egyptian President Hosni Mubarak.

287.   Sudan's involvement in the attempted assassination of President Mubarak, in violation of the Law of Nations and international law, was widely reported in France and the United States in 1995.

288.   BNPP allowed billions of dollars to be funneled to Al Shamal and Sudan with actual knowledge and awareness that these same funds were raised and deposited for the purpose of supporting attacks upon diplomats and ambassadors as well as terrorist attacks upon American interests.

289.   Al Shamal maintained Al Qaeda accounts and processed financial transactions on behalf of Al Qaeda with full knowledge that the funds would be used to assist Al Qaeda in the financing, planning and implementation of terrorist attacks against U.S. employees, including diplomats and ambassadors.

290.   BNPP knew or should have known that the millions of dollars in illegal transfers to Al Shamal and Sudan were used to support, encourage, entice and make possible terrorist attacks including but not limited to the 1998 East African Embassy Attacks.

291.   Defendants aided and abetted the execution of attacks upon the U.S. Embassy and United States diplomats constituting crimes in violation of the law of nations and international law.

292.    Plaintiffs and their family members suffered death or serious physical and/or emotional injuries as a proximate result of Defendants' conduct.

WHEREFORE, Plaintiffs, who are aliens, demand judgment in their favor against Defendants and demand damages in an amount to be determined by a jury, for damages arising out of wrongful death, assault and battery, survival, intentional infliction of emotional distress, loss of consortium, loss of solatium, and/or loss of services, plus interest from the date of the attack, costs, punitive damages and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again engaging in the finance and/or commission of crimes against humanity and other crimes against the people and employees of the United States.

<u>COUNT V</u>

**BNPP'S LIABILITY FOR COMMITTING ACTS OF INTERNATIONAL TERRORISM THROUGH THE PROVISION OF MATERIAL SUPPORT AND FINANCING OF TERRORISM IN VIOLATION OF 18 U.S.C. § 2339A and 18 U.S.C. § 2339C. (UNITED STATES CITIZENS)**

293.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

294.    Plaintiffs are nationals and citizens of the United States who were seriously injured or killed, or the heirs and survivors of those killed and injured, as a result of international terrorism financed, planned and perpetrated by Sudan and Al Qaeda.

295.    The Conspiracy between Sudan, Al Shamal and BNPP allowed the transfer of billions of dollars of U.S. currency through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies. Within and through this clandestine stream of U.S. dollars, the Conspiracy facilitated material support to Al Qaeda through the international financial system.

296.   BNPP knew or should have known that the U.S. dollars provided to Sudan in violation of United States law would be used to fund terrorist attacks against American citizens and employees.

297.   BNPP knew that the United States had formally designated Sudan as a State Sponsor of Terrorism and knew or was deliberately indifferent to the fact that inter alia Sudan used terrorist organizations, including Al Qaeda, as primary mechanisms to enable it to defeat and oppose United States policies and sanctions.

298.   The 1998 Embassy Bombings that injured Plaintiffs constituted violations of United States criminal law. These acts were supported directed and financed by Al Shamal and Sudan for the purpose of bypassing U.S. sanctions and intimidating and coercing United States citizens, employees, and nationals, including Plaintiffs.

299.   Defendants knowingly aided and abetted acts of international terrorism by entering into a Conspiracy to: evade U.S. sanctions; minimize the transparency of Sudan's financial activities; and facilitate millions of dollars in payments to Al Qaeda through the international financial system, including but not limited to payments through Al Shamal Bank. In doing so, BNPP was willing to, and did, commit numerous felonies under U.S. law to assist Sudan in concealing its financial activities and, in the course of doing so, violated 18 U.S.C. § 2339A by knowingly, or with deliberate indifference, providing material support to a State Sponsor of Terrorism and knowing or being deliberately indifferent to the fact that such material support could be used to prepare for or carry out violations of 18 U.S.C. §§ 2332(a), 2332(b), 2332(c), and/or 2332f.

300.   The 1998 Embassy Bombings were extreme and outrageous acts of terrorism and were committed with the intention to cause extreme physical pain and suffering to any and all

persons within close proximity of the attack and extreme emotional distress to the family members of those who were killed or injured by reasons of those acts.

301.     The acts of the terrorists in killing or attempting to kill United States employees and citizens were intended (a) to intimidate or coerce the civilian population of the United States, (b) to influence the policy of the United States government by intimidation or coercion, and (c) to affect the conduct of the government of the United States by mass destruction and murder.

302.     Defendants provided material support and resources to Al Shamal and Sudan and concealed and disguised the nature, location, source, and ownership of their material support and resources, knowing that they were to be used in preparation for, or in carrying out of international terrorism.

303.     Throughout the period in which BNPP provided financial and administrative services to Al Shamal and Sudan, BNPP knew or recklessly disregarded the fact that Al Shamal and Sudan played a major role in financing and supporting Bin Laden and Al Qaeda, which have committed criminal acts including suicide bombings intended to intimidate and coerce the civilian population and employees of the United States.

304.     BNPP is in violation of the Anti-Terrorism Act by providing material support and financial services to Sudan, Al Shamal and Al Qaeda which caused the Plaintiffs to suffer death and serious physical and mental injury.

305.     BNPP knew or intentionally or recklessly disregarded that Sudan was a designated state sponsor of terrorism. A State Sponsor of Terrorism designation is based on  section 6(j) of the Export Administration Act, section 40 of the Arms Export Control Act, and section 620A of the Foreign Assistance Act, which require a demonstrable reason to believe "that the government of that country has repeatedly provided support for acts of international

terrorism."

306.    BNPP knew or intentionally or recklessly disregarded that Al Shamal provided

banking services and financial transactions to terrorists engaged in planning, financing and

implementing terrorist attacks against the United States, including Al Qaeda and Bin Laden.

307.    BNPP knew that the financial and material support provided to Sudan were

unlawful and in violation of United States regulations, embargoes and Executive Orders.

308.    Defendants violated the Anti-Terrorism Act by providing material support and

financial services and conspiring to provide material support and funding to Sudan, Al Shamal,

Bin Laden and Al Qaeda knowing that this material support would be used to finance the

terrorist attacks against U.S. citizens and employees, such as the 1998 Embassy Bombings which

caused the Plaintiffs to suffer death and serious physical and mental injury.

309.    Defendants fraudulently and diligently concealed their material support of

terrorists, and thereby prevented Plaintiffs from seeking redress for their injuries.

WHEREFORE   Plaintiffs, who are U.S. nationals, demand three times the amount

necessary to compensate them for the damages suffered as a result of the Defendants' violations

of the Anti-Terrorism Act, plus interest, court costs, punitive damages, attorney fees, and such

other monetary and equitable relief as this Honorable Court deems appropriate.

## COUNT VI

### BNPP'S LIABILITY FOR CONDUCTING FINANCIAL TRANSACTIONS WITH A KNOWN STATE SPONSOR OF TERRORISM IN VIOLATION OF 18 U.S.C. § 2332d

310.    Plaintiffs incorporate herein by reference the averments contained in all preceding

paragraphs.

311.    Plaintiffs, are nationals and citizens of the United States who were seriously

injured or killed, or the heirs and survivors of those killed and injured, as a result of international

terrorism perpetrated by Sudan and Al Qaeda.

312.    BNPP is a judicial person organized under the laws of the United States pursuant to 18 U.S.C. § 2332d(b)(2)(C), and is also a person within the United States pursuant to 18 U.S.C. § 2332d(b)(2)(D).

313.    BNPP knew or had a reasonable cause to know that Sudan was designated as a country supporting international terrorism under Section 6(j) of the Export Administration Act of 1979.

314.    BNPP illegally and purposefully bypassed regulations and embargoes to allow Sudan access to the United States financial system and provide Sudan with billions of dollars that would have been blocked absent BNPP's fraud and conspiracy.  BNPP knew or recklessly disregarded the fact that Sudan would use those funds for the purpose of supporting international terrorists including Al Qaeda in terrorist attacks aimed at the United States and its citizens and employees.

315.    During the time that the Defendants provided its material support, Sudan was designated as a country supporting international terrorism under the Export Administration Act of 1979.

316.    Sudan used the funds generated through the illegal transactions with BNPP to fund Al Qaeda and the terrorists responsible for the 1998 Embassy Bombings.

317.    Defendants violated the Anti-Terrorism Act by engaging in illegal financial transactions with Sudan, knowing that Sudan was designated as a state sponsor of terrorism, and caused the Plaintiffs to suffer death and serious physical and mental injury.

318.    Defendants fraudulently and diligently concealed their illegal financial transactions with Sudan, and thereby prevented Plaintiffs from seeking redress for their injuries.

WHEREFORE   Plaintiffs, who are U.S. nationals, demand three times the amount necessary to compensate them for the damages suffered as a result of the Defendants' violations of the Anti-Terrorism Act, plus interest, court costs, punitive damages, attorney fees, and such other monetary and equitable relief as this Honorable Court deems appropriate.

## COUNT VII

**AL SHAMAL'S LIABILITY FOR COMMITTING ACTS OF INTERNATIONAL TERRORISM THROUGH THE PROVISION OF MATERIAL SUPPORT AND FINANCING OF TERRORISM IN VIOLATION OF 18 U.S.C. § 2339A and 18 U.S.C. § 2339C.**
**(UNITED STATES CITIZENS)**

319.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

320.    Al Shamal willfully and unlawfully provided financial services to Al Qaeda by collecting, receiving, transmitting and providing funds through accounts it maintained for Bin Laden and Al Qaeda with the knowledge that such funds would be used, in part, to facilitate acts of terrorism targeted at American citizens and employees.

321.    The Conspiracy between Sudan, Al Shamal and BNPP allowed the transfer of billions of dollars of U.S. currency through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies. Within and through this clandestine stream of U.S. dollars, the Conspiracy facilitated material support to Al Qaeda through the international financial system.

322.    Al Shamal knowingly provided financial services and material support to Al Qaeda knowing that Al Qaeda commits acts of terrorism aimed at American citizens and employees.

323.    The 1998 East African Embassy Attacks were extreme and outrageous acts of terrorism and were committed with the intention to cause extreme physical pain and suffering to

any and all persons within close proximity of the attack and extreme emotional distress to the family members of those who were killed or injured by reasons of those acts.

324.    The acts of the terrorists in killing or attempting to kill United States employees and citizens were intended (a) to intimidate or coerce the civilian population of the United States, (b) to influence the policy of the United States government by intimidation or coercion, and (c) to affect the conduct of the government of the United States by mass destruction and murder.

325.    Al Shamal violated the Anti-Terrorism Act by providing material support and financial services to Al Qaeda knowing that this material support would be used to finance the terrorist attacks against U.S. citizens and employees, such as the 1998 East African Embassy Attacks which caused the Plaintiffs to suffer death and serious physical and mental injury.

326.    Al Shamal's provision of material support and financial services to Al Qaeda caused the Plaintiffs to suffer death and serious physical and mental injury.

WHEREFORE   Plaintiffs, who are U.S. nationals, demand three times the amount necessary to compensate them for the damages suffered as a result of the Defendants' violations of the Anti-Terrorism Act, plus interest from the date of their injuries, court costs, punitive damages, attorney fees, and such other monetary and equitable relief as this Honorable Court deems appropriate.

## COUNT VIII

### FRAUDULENT CONVEYANCE
### (Against BNPP)

327.    Plaintiffs incorporate herein by reference the averments contained in all proceeding paragraphs.

328.    From 1997 through at least 2009 BNPP illegally processed and transferred at least $20 billion through the United States and U.S. financial institutions.

329.     The Sudanese assets should have been blocked by BNPP in the United States pursuant to Executive Order 13067 which held, in pertinent part:

330.     Except to the extent provided in section 203(b) of IEEPA (50 U.S.C. 1702(b)) and in regulations, orders, directives, or licenses that may be issued pursuant to this order, all property and interests in property of the Government of Sudan that are in the United States, that hereafter come within the United States, or that hereafter come within the possession or control of United States persons, including their overseas branches, are blocked."

331.     The regulations subsequently issued by OFAC to implement the President's 1997 blocking Order plainly prohibited any transfer, withdrawal, export, assignment, or dealing in the property or securities of the Government of Sudan.

332.     Plaintiffs as judgment creditors of Sudan and Iran may attach and execute against any previously blocked assets or funds of such designated State sponsors of terrorism pursuant to Section 201 of the Terrorism Risk Insurance Act (TRIA).

333.     Sudan is a designated State sponsor of international terrorism.   Following discovery of its role in the 1993 plot to bomb the United Nations Headquarters, the New York offices of the FBI, and the Holland and Lincoln tunnels in New York, the U.S. designated Sudan as a State sponsor of international terrorism, which has been in place continuously since 1993. A State Sponsor of Terrorism designation is based on  section 6(j) of the Export Administration Act, section 40 of the Arms Export Control Act, and section 620A of the Foreign Assistance Act, which require a demonstrable reason to believe "that the government of that country has repeatedly provided support for acts of international terrorism."

334.     As a terrorist party, any funds and assets of the Government of Sudan blocked pursuant to sanctions prohibitions are subject to attachment and execution by Plaintiffs.

335.   BNPP knowingly participated in an unlawful and fraudulent scheme to allow Sudan access to the financial markets by structuring payments in highly complicated ways, with no legitimate business purpose, to conceal the involvement of Sudan and prevent illicit transactions from being blocked when transmitted through the United States.

336.   BNPP directly benefitted from their participation in this unlawful conduct by charging and collecting fees in exchange for Sudanese business.

337.   BNPP's fraudulent actions and omissions permitted at least $20 billion dollars of Sudanese funds to pass through the United States. These funds would have been blocked pursuant to IEEPA and the November 1997 Sudanese sanctions but for the criminal and tortious conduct of BNPP.   While blocked, those funds would have remained the property of the Government of Sudan and, pursuant to the Terrorism Risk Insurance Act, subject to attachment and execution by the Plaintiffs.

338.   The actions of BNPP directly and irreparably have deprived Plaintiffs of their property interests in those blocked funds based on their final judgments against Sudan and thereby have inflicted pecuniary losses upon the Plaintiffs.

339.   As a direct and proximate result of BNPP's conspiracy and intentional concealing of Sudanese assets, Plaintiffs could not recover on their judgment.

340.   As a direct and proximate result of defendant's fraudulent conveyance with collection of the judgment, Plaintiffs are entitled to recover compensatory damages in the full amount of their underlying judgment and punitive damages for the criminal nature of BNPP's conduct as determined by the jury.

WHEREFORE, Plaintiffs demand judgment in their favor against Defendants in the full amount of their underlying judgment, plus interest, costs, and punitive damages.

## COUNT IX

### PUNITIVE DAMAGES
### (Against All Defendants)

341.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

342.    As set forth more fully above, BNPP knowingly, unlawfully, and willfully provided financial and material support to Al Shamal and Sudan, a state sponsor of terrorism.

343.    As set forth more fully above, Al Shamal knowingly, unlawfully, and willfully provided financial and material support to Al Qaeda.

344.    As set forth above, Sudan and Al Shamal conspired and agreed to provide material support and resources to Al Qaeda, and the bombers in furtherance of Al Qaeda's overall goal to kill or injure American citizens and other persons present or employed at the U.S. Embassies in Nairobi, Kenya, and in Dar es Salaam, Tanzania.

345.    At all relevant times, BNPP knew that Sudan and Al Shamal were financing terrorism aimed at United States employees and citizens.

346.    As a direct and proximate result of BNPP's fraud and conspiracy the government of Sudan was able to obtain millions of United States dollars used to further its terrorist agenda, including the material support of Bin Laden and Al Qaeda.

347.    The material support of BNPP and Sudan resulted in the August 7, 1998 Embassy attacks that killed, severely injured, and/or inflicted personal injuries upon the Plaintiffs and the Plaintiffs decedents.

348.    BNPP continued to provide Sudan and Al Shamal with access to the United States financial system until at least 2007 knowing that its actions were in direct violation of United States law.

78

349.    BNPP's acted with a willful disregard for the rights of Plaintiffs in allowing Sudan to obtain millions of dollars and in failing to block Sudanese assets.

350.    Al Shamal acted with a willful disregard for the rights of Plaintiffs in allowing Al Qaeda to obtain millions of dollars to be used to further Al Qaeda's terrorist activities aimed at the United States Government and its citizens and employees.

351.    Defendants' egregious conduct cannot be tolerated by a civilized society and deserves the harshest condemnation of our ordered legal system.

352.    As a result of the Defendants' conspiracy, Plaintiffs suffered damages as fully set forth in the paragraphs above which are incorporated herein by reference.

## JURY DEMAND

Plaintiffs demand trial by jury on all issues.

PLAINTIFFS, By Counsel

**Michael J. Miller, Esq. *(LEAD COUNSEL)**
DC Bar No. 397689
David J. Dickens, Esq.
DC Bar No. 1003499
The Miller Firm LLC
108 Railroad Avenue
Orange, VA 22960
Telephone: 540-672-4224

Gavriel Mairone, Esq.(to be admitted pro hac vice)
Bena Ochs, Esq. (to be admitted pro hac vice)
MM~Law LLC
980 North Michigan Ave., Suite 1400
Chicago, IL 60611
Telephone: 312-253-7444

Steven Perles, Esq. (D.C. Bar No. 326975)
Edward MacAllister, Esq. (D.C. Bar No. 494558)
Perles Law Firm, PC
1050 Connecticut Ave, NW
Suite 500
Washington, DC 20036
Telephone: 202-955-9055

William Wheeler, Esq. (to be admitted pro hac vice)
Jamie Franks, Esq. (to be admitted pro hac vice)
Wheeler & Franks
Post Office Box 681
Tupelo, MS 38802
Telephone: (662) 842-0380
Fax: (662) 842-7491

John Arthur Eaves, Jr., (to be admitted pro hac vice)
Eaves Law Firm
101 North State Street
Jackson, MS 39201
Telephone: (601) 355-7961
Fax: (601) 355-0530