**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MARY OFISI, *et al.*,

                               Plaintiffs,

            -against-

BNP PARIBAS S.A., *et al.*,

                               Defendants.

Civil No. 1:15-Civ-2010-JDB

Hon. John D. Bates

## NOTICE OF DEFENDANT BNP PARIBAS S.A'S MOTION TO DISMISS THE COMPLAINT

Defendant BNP Paribas S.A. ("BNPP"), by and through its undersigned counsel, respectfully moves for dismissal of the Complaint, dated November 17, 2015, pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction and Fed. R. Civ. P. 12(b)(6) for failure to state a claim.  In support of this motion, BNPP submits the accompanying Memorandum of Law of Defendant BNP Paribas S.A in Support of Its Motion to Dismiss the Complaint, dated January 29, 2016, and the Declaration of Alexis Collins, dated January 29, 2016, and the accompanying exhibits.

Dated:  January 29, 2016
        Washington, D.C.

Respectfully Submitted,

CLEARY GOTTLIEB STEEN &
HAMILTON LLP

/s/ Alexis Collins
Alexis Collins (D.C. Bar # 474599)
2000 Pennsylvania Avenue, N.W.
Washington, D.C.  20006-1801
Telephone:  (202) 974-1519
Facsimile:   (202) 974-1999
Email: alcollins@cgsh.com
*Counsel for BNP Paribas, S.A.*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARY OFISI, *et al.*,

                Plaintiffs,

      -against-

BNP PARIBAS S.A., *et al.*,

                Defendants.

Civil No. 1:15-Civ-2010-JDB

Hon. John D. Bates

## MEMORANDUM OF LAW OF DEFENDANT BNP PARIBAS S.A.
## IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT

CLEARY GOTTLIEB STEEN & HAMILTON LLP
2000 Pennsylvania Avenue, N.W.
Washington, D.C. 20006-1801
(202) 974-1500

One Liberty Plaza
New York, New York 10006
(212) 225-2000

Attorneys for Defendant BNP Paribas S.A.

January 29, 2016

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT ............................................................................... 1

THE ALLEGATIONS OF THE COMPLAINT .......................................................... 4

LEGAL STANDARD ............................................................................................ 8

ARGUMENT ...................................................................................................... 9

    I.     THE COMPLAINT IS TIME-BARRED ............................................... 9

    II.    THE COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION OVER THE ATA AND ATS CLAIMS BECAUSE THE COMPLAINT FAILS TO PLEAD PLAINTIFFS' NATIONALITIES ..................................... 11

    III.   THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE ATA ........... 12

         A.    The Complaint Fails Plausibly To Allege That BNPP's Actions Proximately Caused The Attacks ............................................. 13

             1.    The Complaint Must Plausibly Plead That BNPP's Actions Proximately Caused The Attacks ................................... 13

             2.    The Provision Of Financial Services To A State Sponsor Of Terrorism Cannot Support Liability Without A Plausible Allegation That Funds Provided To The State Sponsor Actually Were Transferred To Terrorists And Aided In Perpetrating The Terrorist Act ............................................................... 14

             3.    The Complaint Fails To Satisfy Section 2333's Proximate Causation Requirement .............................................. 20

         B.    Section 2333 Does Not Permit Secondary Liability Claims .................... 26

         C.    The Complaint Fails To State A Claim Under Section 2332d Because BNPP Is Not A "United States Person" .................................... 30

         D.    The Complaint Cannot Assert A Claim Under Section 2339C Of The ATA Because That Provision Was Enacted After The Attacks ........ 31

    IV.   THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE ATS ........... 31

         A.    The Complaint Does Not Plead A Violation Of The Law Of Nations ............................................................................... 32

1.      The Attacks Do Not Qualify As Violations Of The Law Of
        Nations .......................................................................................34

2.      The Complaint Does Not Plead The Requirements For Aiding
        And Abetting Liability Under The Law Of Nations....................36

3.      Family Members Of Victims Of The Attacks Cannot Assert
        Claims Under The ATS...............................................................38

V.    THE COMPLAINT FAILS TO STATE COMMON LAW CLAIMS FOR
      CONSPIRACY AND AIDING AND ABETTING.............................................38

      A.    The Court Cannot Assert Subject Matter Jurisdiction Over The
            Purported Common Law Claims Asserted By Non-U.S. Citizen
            Plaintiffs ....................................................................................39

      B.    There Is No Common Law Claim For Civil Conspiracy To Violate
            U.S. Sanctions ...........................................................................39

      C.    There Is No Common Law Claim For Civil Aiding And Abetting
            Material Support For Terrorism ...............................................39

VI.   THE COMPLAINT FAILS TO STATE A CLAIM FOR FRAUDULENT
      CONVEYANCE .....................................................................................40

CONCLUSION......................................................................................................42

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Abecassis v. Wyatt*,
    7 F. Supp. 3d 668 (S.D. Tex. 2014)....................................................... 27

*Abecassis v. Wyatt*,
    785 F. Supp. 2d 614 (S.D. Tex. 2011)................................................. 30

*Abur v. Republic of Sudan*,
    437 F. Supp. 2d 166 (D.D.C. 2006)....................................................... 39

*Acosta Orellana v. CropLife Int'l*,
    711 F. Supp. 2d 81 (D.D.C. 2010) ....................................................... 29, 40

*Al-Aulaqi v. Obama*,
    727 F. Supp. 2d 1 (D.D.C. 2010) ....................................................... 8, 11, 38

*Alexander v. Sandoval*,
    532 U.S. 275 (2001) ............................................................................ 25

*Ali Shafi v. Palestinian Auth.*,
    642 F.3d 1088 (D.C. Cir. 2011) .......................................................... 35

*Am. Bank & Trust Co. v. Bond Int'l Ltd.*,
    464 F. Supp. 2d 1123 (N.D. Okla. 2006)............................................. 25

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006) ........................................................................... passim

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................... passim

*Atherton v. D.C. Office of Mayor*,
    567 F.3d 672 (D.C. Cir. 2009) ............................................................ 8

*Bakeir v. Capital City Mortg. Corp.*,
    926 F. Supp. 2d 320 (D.D.C. 2013)..................................................... 11

*Balintulo v. Ford Motor Co.*,
    796 F.3d 160 (2d. Cir. 2015)............................................................... 32

*Bank of Am., N.A. v. F.D.I.C.*,
    908 F. Supp. 2d 60 (D.D.C. 2012) ...................................................... passim

*BCCI Holdings (Luxembourg), S.A. v. Khalil*,
    214 F.3d 168 (D.C. Cir. 2000) ............................................................ 13

*Biton v. Palestinian Interim Self-Gov't Auth.*,
    310 F. Supp. 2d 172 (D.D.C. 2004)....................................................................... 11

*Blackwell v. SecTek, Inc.*,
    61 F. Supp. 3d 149 (D.D.C. 2014) ........................................................................ 9

*Boim v. Holy Land Found. for Relief & Dev.*,
    549 F.3d 685 (7th Cir. 2008)..................................................................... passim

*Boim v. Quranic Literacy Inst. & Holy Land Found. For Relief & Dev.*,
    291 F.3d 1000 (7th Cir. 2002)............................................................................... 27

*Burnett v. Al Baraka Inv. & Dev. Corp.*,
    274 F. Supp. 2d 86 (D.D.C. 2003) ........................................................... passim

*Carmichael v. United Techs. Corp.*,
    835 F.2d 109 (5th Cir. 1988)................................................................................. 37

*Carroll v. Fremont Inv. & Loan*,
    636 F. Supp. 2d 41 (D.D.C. 2009) ...................................................................... 40

*Cent. Bank of Denver v. First Interstate Bank of Denver*,
    511 U.S. 164 (1994) .................................................................................. passim

*Corley v. United States*,
    556 U.S. 303 (2009) .............................................................................................. 31

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000) .............................................................................................. 31

*Daimler AG v. Bauman*,
    134 S. Ct. 746 (2014)............................................................................................. 31

*Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*,
    135 F.3d 837 (2d Cir. 1998).................................................................................. 28

*Doe v. Exxon Mobil Corp.*,
    654 F.3d 11 (D.C. Cir. 2011) .................................................................. 32, 33, 36

*Doe v. Exxon Mobil Corp.*,
    No. 01-1357 (RCL), 2015 WL 5042118 (D.D.C. July 6, 2015) ...................... 32, 33, 36

*Doe v. Islamic Salvation Front*,
    257 F. Supp. 2d 115 (D.D.C. 2003)........................................................... 9, 34, 37

*Edmondson & Gallagher v. Alban Towers Tenants Ass'n*,
    48 F.3d 1260 (D.C. Cir. 1995) ............................................................................. 39

*Gill v. Arab Bank, PLC,*
    893 F. Supp. 2d 474 (E.D.N.Y. 2012) ................................................................... 28

*Glen v. Club Méditerranée SA,*
    365 F. Supp. 2d 1263 (S.D. Fla. 2005) ................................................................. 25

*Halberstam v. Welch,*
    705 F.2d 472 (D.C. Cir. 1983) ..........................................................................29, 39, 40

*Hamdan v. Rumsfeld,*
    548 U.S. 557 (2006) ........................................................................................... 37

*Holmes v. Secs. Inv'r Prot. Corp.,*
    503 U.S. 258 (1992) ...................................................................................... passim

*In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Deriv. Litig., v. Chiquita Brands Int'l, Inc.,*
    2015 WL 71562 (S.D. Fla. Jan. 6, 2015) ............................................................. 27

*In re Interbank Funding Corp. Sec. Litig.,*
    629 F.3d 213 (D.C. Cir. 2010) .............................................................................. 8

*In re S. Afr. Apartheid Litig.,*
    617 F. Supp. 2d 228 (S.D.N.Y. 2009) ................................................................. 37

*Kiobel v. Royal Dutch Petroleum Co.,*
    621 F.3d 111 (2d Cir. 2010), *aff'd,* 133 S. Ct. 1659 (2013) ................................. 32, 33

*Larson v. Northrop Corp.,*
    21 F.3d 1164 (D.C. Cir. 1994) .............................................................................. 10

*Levi v. Brown & Williamson Tobacco Corp.,*
    851 F. Supp. 2d 8 (D.D.C. 2012) .......................................................................... 10

*Lexmark Int'l. Inc. v. Control Components Inc.,*
    134 S. Ct. 1377 (2014)........................................................................................ 20

*Linde v. Arab Bank, PLC,*
    944 F. Supp. 2d 215 (E.D.N.Y. 2013) ................................................................. 26, 27

*Mastafa v. Austl. Wheat Bd.,*
    No. 07-CV-7955, 2008 WL 4378443 (S.D.N.Y. Sept. 25, 2008)........................... 37

*Mujica v. Occidental Petroleum Corp.,*
    381 F. Supp. 2d 1164 (C.D. Cal. 2005) ............................................................... 38

*Mwani v. Bin Ladin,*
    No. CIV A 99-125 CKK, 2006 WL 3422208 (D.D.C. Sept. 28, 2006) ................. 34, 35

*O'Neill v. Al Rajhi Bank (In re Terrorist Attacks on Sept. 11, 2001)*,
    714 F.3d 118 (2d Cir. 2013)................................................................. passim

*Peterson v. Islamic Republic of Iran*,
    2015 WL 731221 (S.D.N.Y. Feb. 20, 2015)........................................... 25

*Phillips v. Heine*,
    984 F.2d 489 (D.C. Cir. 1993) ............................................................. 10

*Prosecutor v. Furundzija*,
    Case No. IT-95-17/1, Trial Chamber Judgment (Dec. 10, 1998)............ 36

*Prosecutor v. Tadic*,
    Case No. IT-94-1-T, Opinion and Judgment, (May 7, 1997) ............... 35

*Prosecutor v. Tadic*,
    Case No. IT-94-1-A, Appeal Judgment (July 15, 1999)...................... 37-38

*Ratzlaf v. United States*,
    510 U.S. 135 (1994) ........................................................................... 14

*Roberts & Lloyd, Inc. v. Zyblut*,
    691 A.2d 635 (D.C. 1997) ................................................................... 41

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013)................................................................. passim

*Rothstein v. UBS AG*,
    772 F. Supp. 2d 511 (S.D.N.Y. 2011) ................................................. 23

*Schilling v. Rogers*,
    363 U.S. 666 (1960) ........................................................................... 25

*Siegel v. SEC*,
    592 F.3d 147 (D.C. Cir. 2010) ........................................................... 14, 24

*Sievarding v. U.S. Dep't of Justice*,
    693 F. Supp. 2d 93 (D.D.C. 2010) ..................................................... passim

*Smith ex rel. Smith v. Islamic Emirate of Afghanistan*,
    262 F. Supp. 2d 217 (S.D.N.Y. 2003) ................................................. 13

*Smith-Haynie v. District of Columbia*,
    155. F.3d 575 (D.C. Cir. 1998) ........................................................... 9

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004) ........................................................................... passim

*Tel-Oren v. Libyan Arab Republic,*
    726 F.2d 774 (D.C. Cir. 1984) ............................................................ 33

*Ungar v. Islamic Republic of Iran,*
    211 F. Supp. 2d 91 (D.D.C. 2002) ...................................................... 30, 40

*United States v. Chalmers,*
    474 F. Supp. 2d 555 (S.D.N.Y. 2007) ................................................ 30

*W. Wood Preservers Inst. v. McHugh,*
    292 F.R.D. 145 (D.D.C. 2013) ............................................................ 4

*Wultz v. Bank of China Ltd.,*
    942 F. Supp. 2d 452 (S.D.N.Y. 2013) ................................................ 27

*Wultz v. Islamic Republic of Iran,*
    755 F. Supp. 2d 1 (D.D.C. 2010) ........................................................ passim

## Federal Statutes

31 C.F.R. § 538.701 ................................................................................ 25

31 C.F.R. § 538.704 ................................................................................ 25

18 U.S.C. § 1116 .................................................................................... 35

18 U.S.C. § 1116(b)(4)(B) ...................................................................... 36

18 U.S.C. § 1964(c) ................................................................................ 15

18 U.S.C. § 2332d ................................................................................... passim

18 U.S.C. § 2332d(b)(2) .......................................................................... 30

18 U.S.C. § 2332d(b)(2)(C) ..................................................................... 30

18 U.S.C. § 2332g(c)(1) ........................................................................... 29

18 U.S.C. § 2333 ..................................................................................... passim

18 U.S.C. § 2333(a) ................................................................................ passim

18 U.S.C. § 2335 ..................................................................................... 9

18 U.S.C. § 2339A .............................................................................. 7, 12, 33

18 U.S.C. § 2339C ................................................................................. passim

18 U.S.C. § 2339D ................................................................................. 29

28 U.S.C. § 1332....................................................................................................... 39

28 U.S.C. § 1350....................................................................................................... passim

50 U.S.C. § 1705....................................................................................................... 25

Federal Rule of Civil Procedure 9(b)...................................................................... 10

Federal Rule of Civil Procedure 12(b)(1).......................................................... 1, 11, 42

Federal Rule of Civil Procedure 12(b)(6).......................................................... 1, 13, 42

Suppression of the Financing of Terrorism Convention Implementation Act of 2001, Public Law 107-197, 116 Stat. 721 (June 25, 2002)...................................... 31

## State Statutes

D.C. Code § 28-3101 ................................................................................................ 41

D.C. Code § 28-3104 ................................................................................................ 1, 42

D.C. Code § 28-3108 ................................................................................................ 41

D.C. Code § 28-3109(1) ........................................................................................... 9

## Other Authorities

136 Cong. Rec. 7592 (1990)..................................................................................... 40

Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, including Diplomatic Agents, Dec. 14, 1973, 1035 U.N.T.S. 167 (entered into force Feb. 20, 1977)................................................. 35

Ben Protess & Jessica Silver-Greenberg, *BNP Paribas Admits Guilt and Agrees to Pay $8.9 Billion Fine to U.S.*, N.Y. TIMES, June 30, 2014, *available at* http://dealbook.nytimes.com/2014/06/30/bnp-paribas-pleads-guilty-in-sanctions-case/ 10

Danielle Douglas, *France's BNP Paribas to Pay $8.9 Billion to U.S. for Sanctions Violations*, WASH. POST, June 30, 2014, *available at* https://www.washingtonpost.com/business/economy/frances-bnp-paribas-to-pay-89-billio n-to-us-for-money-laundering/2014/06/30/6d99d174-fc76-11e3-b1f4-8e77c632c07b_stor y.html. ................................................................................................................. 10

Devlin Barrett, Christopher M. Matthews & Andrew R. Johnson, *BNP Paribas Draws Record Fine for 'Tour de Fraud'*, WALL ST. J., June 30, 2014, *available at* http://www.wsj.com/articles/bnp-to-pay-at-least-2-billion-to-ny-regulator-in-sanctions-settlement-1404141181...................................................................................... 10

H.R. Rep. No. 102-1040, 5 (1992)........................................................................... 40

Statute of the International Criminal Tribunal for the Prosecution of Persons Responsible for Genocide and Other Serious Violations of International Humanitarian Law Committed in the Territory of Rwanda and Rwandan Citizens Responsible for Genocide and Other Such Violations Committed in the Territory of Neighboring States, Between 1 January 1994 and 31 December 1994, S.C. Res. 955 (Nov. 8, 1994).................................  34

Vienna Convention on Diplomatic Relations, Apr. 18, 1961...........................................  35, 36

Defendant BNP Paribas S.A. ("BNPP") respectfully moves, under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), to dismiss Plaintiffs' Complaint (the "Complaint" or "Compl.").

## PRELIMINARY STATEMENT

The August 7, 1998 attacks on the U.S. embassies in Kenya and Tanzania (the "Attacks") were abhorrent.  But BNPP is not responsible for the Attacks.  It did not commit any acts of terrorism and it did not support any terrorists.

What matters for purposes of this motion is that the Complaint does not contain any plausible allegations that BNPP is responsible for the Attacks.  Instead, the Complaint makes broad allegations of a purported conspiracy among BNPP, Sudan and Sudanese banks to process U.S. dollar-denominated transactions for Sudan, and then leaps from that contention to alleging that BNPP knowingly provided material support for the Attacks.  In support of that effort, the Complaint stretches federal and District of Columbia law beyond their bounds and purports to state non-existent common law claims (Counts I and II) and claims under the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS") (Counts III and IV), the civil provision of the Anti-Terrorism Act (the "ATA"), 18 U.S.C. § 2333 (Counts V and VI), and local fraudulent conveyance law (Count VIII).[1]  But as shown below, the Complaint fails to state a viable claim for several critical reasons.

First, as a threshold matter, all of the claims alleged are time-barred.  The Attacks occurred more than 17 years ago, well outside the applicable statutes of limitations, and the Complaint does not properly plead any grounds for tolling the limitations periods.

---

[1] This claim is presumably brought under the District of Columbia's Uniform Fraudulent Transfer Act ("D.C. UFTA"), D.C. Code § 28-3104.

Second, the Court lacks subject matter jurisdiction over the ATA and ATS claims because Plaintiffs have not pled their nationalities, and thus they have not properly alleged this Court's jurisdiction under the ATA (which may only be invoked by U.S. citizens) or the ATS (which may only be invoked by non-U.S. citizens).

Third, the Complaint fails to state a claim for relief under the ATA.  The Complaint fails to plausibly allege that BNPP proximately caused Plaintiffs' injuries, as the ATA requires.  In prior ATA cases based on allegations of an indirect causal connection between a bank's transactions and a terrorist act that are similar to the causal allegations here, courts have uniformly dismissed complaints for failure to state a claim as a matter of law, and the same result should follow here.  The Complaint also fails to state an ATA claim on the independent basis that the conspiracy and aiding and abetting theories of secondary liability on which the Complaint relies are not cognizable under the ATA.  Further, the Complaint fails to state an ATA claim under Section 2332d (Count VI) because that provision, which applies only to U.S. persons, does not apply to BNPP, or under Section 2339C (Count V), because that statute was enacted after the Attacks occurred and does not apply retroactively.

Fourth, the Court should dismiss the claims asserted by non-U.S. citizen Plaintiffs under the ATS that BNPP is secondarily liable for the Attacks, which are based on the same inadequate allegations as the ATA claims.  In order for the Court to assert subject matter jurisdiction under the ATS, the Complaint must allege that BNPP violated universally recognized principles of the law of nations.  However, it does not allege a primary violation of the law of nations because, as abhorrent as the Attacks were, it is well-settled that such acts of terrorism are not violations of international law norms that are cognizable under the ATS.  Without a well-pled allegation of any primary violation of the law of nations, the Court does not have subject matter jurisdiction

under the ATS over Plaintiffs' claim that BNPP is secondarily liable for aiding and abetting the Attacks.  Moreover, the Complaint does not plead the requirements for aiding and abetting liability under the law of nations.  In addition, claims by family members who were not physically injured in the Attacks are not cognizable under the law of nations.

Fifth, the Court should dismiss Counts I and II of the Complaint, which purport to assert two non-existent common law claims, labeled "civil conspiracy to violate and defeat United States policies and sanctions against Sudan" and "civil aiding and abetting the material support of al Qaeda."  Compl. ¶ 226-254.  These claims fail because there is no private right of action based on violations of U.S. sanctions.  Likewise, no claim for "material support" of terrorism exists under the common law and independently of the ATA, let alone a claim for aiding and abetting "material support."

Sixth, the Complaint's claim for fraudulent conveyance—based on the implausible premise that, if BNPP had reported Sudan-related transactions to the U.S. government, Sudan nonetheless would have continued to transfer billions of dollars over the course of more than seven years, knowing that such transfers would be blocked by the U.S. government, and that such funds would be available for future judgment creditors of Sudan—fails for multiple reasons.  Under the D.C. UFTA, no claim can be made against a third party, such as BNPP, that processes transactions but never holds any beneficial interest in the property at issue.  Further, the Complaint does not allege an actual transfer, but only that funds were moved between accounts having the same owner.  Finally, there are no plausible allegations that BNPP engaged in any transactions with actual intent to defraud judgment creditors.

The Court should therefore dismiss the Complaint in its entirety against BNPP.

### THE ALLEGATIONS OF THE COMPLAINT

The Complaint is premised on an alleged conspiracy among BNPP, Sudan, Sudanese financial institutions and al Qaeda.  It contends that the conspiracy sought "to defeat the economic sanctions imposed by" the United States by providing "[a]ccess to the U.S. financial system" to "Sudan, Sudanese financial institutions, and their agents" who, in turn, "provide[d] material support to Al Qaeda which it used to carry out" the Attacks.  Compl. ¶¶ 1-2.  The Complaint concedes, however, that BNPP "did not share Al Qaeda's desire to kill American citizens and citizens of their allies." *Id.* ¶ 3.

The allegations in the Complaint concerning BNPP's conduct are largely drawn from BNPP's June 2014 guilty plea and related civil settlements with federal and state banking regulators addressing violations of U.S. sanctions that prohibit certain financial transactions with designated countries and Specially Designated Nationals ("SDNs") (collectively, the "June 2014 Agreements"). *See, e.g., id.* ¶¶ 9, 11-12, 106-108, 119.[2]  Based on the detailed factual statements that are part of the June 2014 Agreements, the Complaint alleges that BNPP conspired with Sudanese banks to "evade and defeat" sanctions against Sudan by "conceal[ing] and hid[ing] the ownership, control, and interest of the Sudanese government and Sudanese banks . . . to the . . . U.S. financial markets and to avoid blocking of Sudanese funds within the United States." *Id.* ¶ 108.

---

[2] These documents, all effective June 30, 2014, are attached to the Declaration of Alexis Collins, dated January 29, 2016 ("Collins Decl."): (Ex. A) Department of Justice and District Attorney for the County of New York Plea Agreement Statement of Facts ("SOF"); (Ex. B) New York State Department of Financial Services Consent Order ("DFS Consent Order"); (Ex. C) Office of Foreign Assets Control Settlement Agreement; and (Ex. D) the Federal Reserve System Cease and Desist Order.  The Court may properly consider the contents of the June 2014 Agreements because the Complaint relies upon them in support of its primary substantive allegations regarding BNPP's conduct, and quotes from and discusses them extensively. *See, e.g.,* Compl. ¶¶ 73-99; s*ee also W. Wood Preservers Inst. v. McHugh*, 292 F.R.D. 145, 149 (D.D.C. 2013) ("[I]t is well established that in ruling on a motion to dismiss, '[t]he Court may consider . . . documents upon which the plaintiff's complaint necessarily relies. . . .'" (citations omitted)).

The Complaint also contains allegations about BNPP's conduct during the limited time period between the imposition of U.S. sanctions on Sudan in November 1997 and the date of the Attacks, August 7, 1998, the only time during which Plaintiffs could even theoretically allege that BNPP engaged in transactions that proximately caused the Attacks.  But Plaintiffs have not done so; their allegations regarding that period are entirely conclusory, and rely solely on admissions in the June 2014 Agreements regarding the initial establishment of certain banking relationships between BNP Paribas (Suisse) S.A. ("BNPP Geneva") and Sudanese banks, and not any specifically pled transactions.  *See, e.g.*, Compl. ¶¶ 11-14, 22, 87, 107-108, 177, 195; SOF ¶¶ 19 (BNPP Geneva became sole correspondent bank in Europe for Sudanese Government Bank 1), 23 (BNPP Geneva "began its relationship with many" of the "satellite banks" to "help disguise" transactions with Sudanese banks); DFS Consent Order ¶¶ 16 (same as SOF ¶ 23), 26 (same as SOF ¶ 19).  Critically, none of these conclusory allegations identifies a basis for the Complaint's essential assertion that BNPP engaged in transactions with Sudan or Sudanese banks during this period that funded the Attacks.  Nothing in any of the June 2014 Agreements or any of the related documents that itemize the facts underlying BNPP's sanctions violations connects BNPP to any terrorist, any terrorist organization or any terrorist activity, or alleges that BNPP provided any support to or funds for any terrorist organization or terrorist activity, let alone for the Attacks.

In fact, as the June 2014 Agreements explicitly state, BNPP pled guilty to engaging in transactions that violated the sanctions against Sudan between 2002—four years after the Attacks, which occurred on August 7, 1998—and 2007.  *See* SOF ¶ 17.  Thus, the June 2014

Agreements do not support the Complaint's conclusory allegations that BNPP proximately caused the Attacks, which occurred four years earlier.[3]

The Complaint alleges that the Sudanese government sponsored terrorist groups and that Sudan was named a State Sponsor of Terrorism by the U.S. Department of State in 1993. Compl. ¶¶ 80-82, 126-153.  However, the Complaint contains no plausible non-conclusory allegations as to how the Sudanese government purportedly financed terrorist groups, but rather contains only conclusory assertions, such as that Sudan provided "financial and banking services for [al Qaeda's] terrorist network," *id.* ¶ 151.  The Complaint's only specific, plausible allegations regarding Sudan's support to terrorists largely concern the provision of safe harbor and other forms of military and logistical aid.  *See, e.g.*, *id.* ¶¶ 126-153 (alleging that, among other things, Sudan invited al Qaeda to move to Sudan, provided security for al Qaeda, and protected al Qaeda members from interference by immigration officials).

Critically, the Complaint does not identify a single banking transaction processed by BNPP that allegedly was part of Sudan's transfer of funds to any terrorist organization at any time, let alone before the Attacks.  Nor does the Complaint allege that the "financial and banking services" Sudan purportedly provided to al Qaeda were provided in U.S. dollars.  *See id.* ¶ 151.[4] And the Complaint lacks any well-pled allegations that, in processing U.S. dollar denominated

---

[3] The Complaint tries to obscure the absence of any specific factual allegations that connect BNPP to any terrorist organization or activity by highlighting BNPP Geneva's alleged relationship with Al Shamal Islamic Bank ("Al Shamal"), a Sudanese commercial bank, and conclusorily alleging, without identifying any factual basis, that "BNPP processed transaction [sic] on behalf of Al Shamal, the proceeds of which were delivered to Al Qaeda for operations, including for planning and perpetrating" the Attacks, Compl. ¶ 167.  This allegation is not only entirely conclusory, but also is implausible, in light of the Complaint's allegations that Osama Bin Laden invested in Al Shamal "and these funds were used to finance al Qaeda operations," *id.* ¶ 28; *see id.* ¶¶ 12, 82, 116, 158.

[4] The Complaint alleges that "[w]ith funds (in U.S. dollars) drawn from Al Shamal, Al Qaeda purchased several farms throughout Sudan." Compl. ¶ 127.  However, there is no allegation as to when this occurred or whether the dollars were cleared through BNPP.  Nor does the Complaint link this purchase to the Attacks.

transactions for Sudanese banks, BNPP transferred even one dollar for any segment of the Sudanese government that allegedly funded al Qaeda or Hezbollah, much less that BNPP processed transactions directly for al Qaeda or any other terrorist entity.

At bottom, the Complaint lacks any well-pled allegations sufficient to support the conclusion that BNPP's processing of U.S. dollar-denominated transactions for sanctioned Sudanese banks proximately caused the Attacks, which is an indispensable element of Plaintiffs' ATA claims. Instead, the Complaint contains several conclusory allegations that BNPP's violations of U.S. sanctions facilitated al Qaeda's perpetration of the Attacks, *id.* ¶¶ 1-3; in particular that the Attacks were "directly and proximately caused by BNPP's knowing and intentional participation in a conspiracy to help Sudan and Sudanese financial institutions defeat U.S. economic sanctions explicitly designed to stop Al Qaeda," *id.* ¶ 3; that al Qaeda relied on BNPP's banking services "in carrying out" the Attacks, *id.* ¶ 13; that if BNPP had fully complied with U.S. law, its cooperation would have "assisted the U.S. Government and allied nations detect, disrupt, and prevent the" Attacks, *id.* ¶ 62; and that the transactions BNPP facilitated on behalf of Sudanese banks "made it more likely for sponsors of terrorism and terrorist organizations, such as Sudan, Al Shamal and Al Qaeda to prosper," *id.* ¶ 231. None of these allegations states any facts that connect any of BNPP's U.S. dollar-clearing transactions to the Attacks, or indeed, to any terrorist organizations in Sudan or elsewhere.

Despite failing to make the non-conclusory factual allegations that are essential to asserting its claims, the Complaint nonetheless posits that BNPP participated in a conspiracy that (1) violated Sections 2339A , 2339C and 2332d of the ATA, thus entitling those of Plaintiffs who are U.S. citizens to damages under Section 2333, Compl. ¶¶ 293-318, (2) violated international law and the law of nations, thus entitling those of Plaintiffs who are not U.S.

citizens to damages under the ATS, *id.* ¶¶ 255-292, (3) engaged in a conspiracy with Sudan to aid and abet al Qaeda by violating U.S. sanctions under some unspecified principles of common law, *id.* ¶¶ 226-254, and (4) made fraudulent transfers that interfered with Plaintiffs' ability to collect on judgments against Sudan, *id.* ¶¶ 327-340. There are no well-pled facts that give rise to a legally cognizable claim under any of these theories.

**LEGAL STANDARD**

To survive a motion to dismiss, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also In re Interbank Funding Corp. Secs. Litig.*, 629 F.3d 213, 218 (D.C. Cir. 2010). *Iqbal*'s plausibility standard requires more than a "sheer possibility" that a defendant is liable, 556 U.S. at 678, and a complaint that "pleads facts that are merely consistent with a defendant's liability" falls short of showing plausible entitlement to relief, *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). Instead, to survive a dismissal motion, a complaint must set forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

In applying *Iqbal*, this Court employs a "'two-pronged approach,' under which [it] first identifies the factual allegations that are entitled to an assumption of truth and then determines 'whether they plausibly give rise to an entitlement to relief.'" *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 14 (D.D.C. 2010) (Bates, J.) (quoting *Iqbal*, 556 U.S. at 679). Under the first prong, "labels and conclusions," "formulaic recitation of the elements of a cause of action," "legal conclusion[s] couched as . . . factual allegation[s]" and "naked assertions devoid of further factual enhancement" all must be disregarded. *Sievarding v. U.S. Dep't of Justice*, 693 F. Supp. 2d 93, 99-100 (D.D.C. 2010) (Bates, J.) (internal quotations omitted). Under the second prong,

assessing the plausibility of a claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense," *Blackwell v. SecTek, Inc.*, 61 F. Supp. 3d 149, 155 (D.D.C. 2014) (Bates, J.) (quoting *Iqbal*, 556 U.S. at 679), and courts "need not accept inferences drawn by plaintiffs" if they are unsupported by the facts in the complaint, *Sievarding*, 693 F. Supp. 2d at 100 (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

Applying these standards to the Complaint requires its dismissal as against BNPP.

## ARGUMENT

## I.     THE COMPLAINT IS TIME-BARRED

The Complaint was filed on November 17, 2015, more than 17 years after the Attacks. Its claims, therefore, fall well outside of the ten-year statute of limitations period under the ATA, 18 U.S.C. § 2335, and the ATS, *see Doe v. Islamic Salvation Front*, 257 F. Supp. 2d 115, 118-19 (D.D.C. 2003).  Similarly, the Complaint does not allege a fraudulent transfer within the four-year limitations period under the D.C. UFTA.  D.C. Code § 28-3109(1) (A fraudulent conveyance claim is "extinguished" if it is not brought "within 4 years after the transfer was made or the obligation was incurred or, if later, within 1 year after the transfer or obligation was, or could reasonably have been discovered by the claimant."); *see also* Compl. ¶ 328 (alleging that "[f]rom 1997 through at least 2009 BNPP illegally processed and transferred at least $20 billion through the United States and U.S. financial institutions").

The Complaint suggests that Plaintiffs may seek to salvage their ATA and ATS claims by invoking the fraudulent concealment doctrine, Compl. ¶ 91, but the Complaint lacks the allegations needed to do so.  The "hurdle [to toll a statute] is high" and courts will only exercise this power in "extraordinary and carefully circumscribed instances."  *Smith-Haynie v. District of Columbia*, 155. F.3d 575, 579-80 (D.C. Cir. 1998).  To plead fraudulent concealment, Plaintiffs

bear the burden of proving "(1) that defendants engaged in a course of conduct designed to conceal evidence of their alleged wrong-doing and that (2) [Plaintiffs] were not on actual or constructive notice of that evidence, despite (3) their exercise of diligence." *Larson v. Northrop Corp.*, 21 F.3d 1164, 1172 (D.C. Cir. 1994). Further, a plaintiff must plead these elements "with particularity" to meet the requirements of Rule 9(b) of the Federal Rules of Civil Procedure, *id.* at 1173, including the specific "nature, content, time and place of the representations allegedly made," *Levi v. Brown & Williamson Tobacco Corp.*, 851 F. Supp. 2d 8, 12 (D.D.C. 2012). Plaintiffs' naked assertions that BNPP's "fraudulent concealment of its transactions" prevented them from becoming aware of BNPP's conduct, Compl. ¶ 91, are insufficient as a matter of law to satisfy their burden of pleading all of the elements of fraudulent concealment with particularity.

At a minimum, Plaintiffs knew or should have known all of the facts they allege concerning the purported conspiracy on which they ground their claims when the June 2014 Agreements were widely published on June 30, 2014. The agreements received extensive national and international press attention on that same day.[5] This lawsuit, however, was not filed until <u>more than 16 months later</u>, on November 17, 2015. The Complaint does not allege any reason, let alone a plausible particularized reason, for that protracted delay. *See Phillips v. Heine*, 984 F.2d 489, 492 (D.C. Cir. 1993) ("[T]olling does not bring about an automatic

---

[5] *See, e.g.*, Ben Protess & Jessica Silver-Greenberg, *BNP Paribas Admits Guilt and Agrees to Pay $8.9 Billion Fine to U.S.*, N.Y. TIMES, June 30, 2014, at B1, *available at* http://dealbook.nytimes.com/2014/06/30/bnp-paribas-pleads-guilty-in-sanctions-case/; Devlin Barrett, Christopher M. Matthews & Andrew R. Johnson, *BNP Paribas Draws Record Fine for 'Tour de Fraud'*, WALL ST. J., June 30, 2014, *available at* http://www.wsj.com/articles/bnp-to-pay-at-least-2-billion-to-ny-regulator-in-sanctions-settlement-1404141181; Danielle Douglas, *France's BNP Paribas to Pay $8.9 Billion to U.S. for Sanctions Violations*, WASH. POST, June 30, 2014, *available at* https://www.washingtonpost.com/business/economy/frances-bnp-paribas-to-pay-89-billion-to-us-for-money-laundering/2014/06/30/6d99d174-fc76-11e3-b1f4-8e77c632c07b_story.html.

extension of the statute of limitations by the length of the tolling period.  It gives the plaintiff extra time *only* if he needs it."); *Bakeir v. Capital City Mortg. Corp.*, 926 F. Supp. 2d 320, 335 (D.D.C. 2013) (once on notice, plaintiff must "move promptly and with reasonable diligence").

Nor was this action filed within one year of discovery of the transfers at issue, as the D.C. UFTA requires.

Accordingly, the Complaint is barred by the statute of limitations and must be dismissed.

## II.  THE COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION OVER THE ATA AND ATS CLAIMS BECAUSE THE COMPLAINT FAILS TO PLEAD PLAINTIFFS' NATIONALITIES

Under Federal Rule of Civil Procedure 12(b)(1), Plaintiffs "bear the burden of proving by a preponderance of the evidence that [the] [c]ourt has subject matter jurisdiction." *Biton v. Palestinian Interim Self-Gov't Auth.*, 310 F. Supp. 2d 172, 176 (D.D.C. 2004).  "[F]ailure to do so is fatal to the claim." *Bank of Am., N.A. v. F.D.I.C.*, 908 F. Supp. 2d 60, 78 (D.D.C. 2012).

The Complaint fails to allege subject matter jurisdiction under both the ATA and ATS because it does not allege Plaintiffs' respective nationalities.  Each statute vests jurisdiction in federal courts to hear cases brought only by plaintiffs who meet the statutes' nationality requirements.  In the absence of well-pled allegations that Plaintiffs meet those requirements, they have not established the Court's subject matter jurisdiction under the ATA or the ATS.

Specifically, the ATS requires that each plaintiff seeking to bring a claim under that statute must allege, among the other required elements, that he or she is "an alien." *Al-Aulaqi*, 727 F. Supp. 2d at 35 (citing 28 U.S.C. § 1350).  Conversely, the ATA requires that each plaintiff seeking to bring a claim thereunder must allege facts necessary to show that he or she is "a U.S. national or an estate, a survivor, or an heir of a U.S. national." *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 43 (D.D.C. 2010) (citing 18 U.S.C. § 2333(a)).  Although the

Complaint alleges that named Plaintiff Mary Ofisi is a Kenyan national, Compl. ¶ 29, it fails to specify the nationalities of the remaining 566 Plaintiffs, or to indicate which Plaintiffs bring claims under which statute. *See id.* ¶¶ 31-36. Because "federal courts are courts of limited jurisdiction and have subject matter jurisdiction only to the extent that it is conferred by statute or the Constitution," this Court must dismiss the ATA and ATS claims—apart from Mary Ofisi's ATS claim, which, as shown below, must be dismissed on other grounds—because Plaintiffs have failed, even as to the threshold matter of their nationality, to establish the Court's subject matter jurisdiction over those claims. *Bank of Am.*, 908 F. Supp. 2d at 78.

## III.   THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE ATA

The ATA is largely comprised of criminal prohibitions relating to terrorism, but Section 2333(a) of the ATA, which the Complaint invokes, creates a civil cause of action for U.S. nationals "injured . . . by reason of an act of international terrorism." As relevant here, Section 2333(a) requires that the Complaint properly plead several indispensable elements. First, the Complaint must plausibly allege that BNPP: (a) provided material support and resources while knowing that such support and resources were to be used in preparation for and in carrying out terrorist acts in violation of U.S. criminal law and/or that BNPP provided or collected funds with the intention or knowledge that such funds would be used for such terrorist acts, *see* 18 U.S.C. §§ 2333(a), 2339A, 2339C; Compl. Count V; or (b) is a United States person that engaged in a financial transaction with a government knowing or having reasonable cause to know that that country was designated under section 6(j) of the Export Administration Act, 18 U.S.C. § 2332d. Second—and critically for purposes of this motion, because the Complaint does not satisfy this element at all—the Complaint must plausibly allege that plaintiffs were injured "by reason of" BNPP's actions. This element requires plausible, non-conclusory allegations that BNPP's

actions proximately caused the Attacks.  *See* 18 U.S.C. § 2333(a); *Rothstein v. UBS AG*, 708 F.3d 82, 95 (2d Cir. 2013); *accord O'Neill v. Al Rajhi Bank (In re Terrorist Attacks on Sept. 11, 2001)*, 714 F.3d 118, 123-24 (2d Cir. 2013).  The Complaint's plausible, non-conclusory allegations, however, rely entirely on the June 2014 Agreements, which do <u>not</u> indicate that BNPP had <u>any</u> direct connection whatsoever with al Qaeda or any other terrorist organization. *See* SOF, Collins Decl. Ex. A.

The Complaint fails to state a claim under the ATA and should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) because it contains no well-pled allegations that BNPP proximately caused Plaintiffs' injuries, and it is premised on theories of secondary liability that are not cognizable under the ATA.  In addition, Count VI of the Complaint, which contends that BNPP violated Section 2332d, fails to state a claim because BNPP is not a U.S. person, as that statute requires, and Count V, which is based in part on a purported violation of Section 2339C, fails to state a claim because that statute was enacted after the Attacks occurred.[6]

### A.    The Complaint Fails Plausibly To Allege That BNPP's Actions Proximately Caused The Attacks

#### 1.    The Complaint Must Plausibly Plead That BNPP's Actions Proximately Caused The Attacks

Section 2333(a) requires that the Complaint plausibly allege that Plaintiffs' injuries occurred "by reason of" BNPP's purported material support to al Qaeda.  The phrase "by reason of," requires "a showing that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well."  *BCCI Holdings (Luxembourg), S.A. v. Khalil*, 214

---

[6] The Complaint also asserts a count for punitive damages.  Compl. ¶¶ 341-352.  Plaintiffs' ability to collect punitive damages is, of course, dependent on their ability to succeed on the merits of their claims. In any event, punitive damages are not available under the ATA.  *Smith ex rel. Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217, 240 (S.D.N.Y. 2003) ("To the extent that § 2333's treble-damages provision already provides a penalty, this Court is foreclosed from assessing additional punitive damages.").

F.3d 168, 173 (D.C. Cir. 2000) (quoting *Holmes v. Secs. Inv'r Prot. Corp.*, 503 U.S. 258 (1992));

*see also Ratzlaf v. United States*, 510 U.S. 135, 143 (1994) (It is a fundamental rule of statutory

construction that "a *single* formulation" of words applied across multiple federal statutes—here,

the phrase "by reason of" used in Section 2333, the federal RICO statute and the federal antitrust

laws—must be construed "the same way each time it is called into play").

Thus, the Complaint must properly plead that BNPP's actions "led directly to the

[Plaintiffs'] injuries."  *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) ("[T]he

central question [with respect to proximate cause] . . . is whether the alleged violation led

directly to the plaintiff's injuries."); *Siegel v. SEC*, 592 F.3d 147, 159 (D.C. Cir. 2010)

("[P]roximate causation . . . is normally understood to require a direct relation between conduct

alleged and injury asserted.") (internal quotations omitted) (citing *Holmes*, 503 U.S. at 258);

*Rothstein*, 708 F.3d at 91; *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 698 (7th

Cir. 2008) (en banc) ("*Boim III*") (defendants' direct provision of funds to Hamas satisfied

proximate cause because it "significantly enhanced the risk of terrorist acts [committed by

Hamas] and thus the probability that the plaintiff's decedent would be a victim"); *Burnett v. Al

Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 105 (D.D.C. 2003).  As shown below, the

Complaint fails to meet this requirement.

          **2.**       **The Provision Of Financial Services To A State Sponsor Of Terrorism Cannot Support Liability Without A Plausible Allegation That Funds Provided To The State Sponsor Actually Were Transferred To Terrorists And Aided In Perpetrating The Terrorist Act**

At most, the Complaint alleges only that BNPP provided <u>indirect</u> support to al Qaeda by

providing financial services to a state sponsor of terrorism, Sudan, and to Sudanese banks, which

in turn allegedly provided direct support to al Qaeda.[7]  Under the *Anza* standard, as well as under Second Circuit rulings that specifically address similar allegations of <u>indirect</u> support for terrorist acts under the ATA, the Complaint's allegations are therefore insufficient to establish the necessary proximate causal link between BNPP's actions and the Attacks under Section 2333. Pursuant to these precedents, the Complaint can satisfy the ATA's proximate causation requirement only by making plausible allegations that funds provided by BNPP <u>actually were transferred</u> to the perpetrators of the Attacks, or that those funds were otherwise a "but for" cause of the Attacks.  As shown below, because the Complaint contains no such well-pled allegations, it should be dismissed.

It is a fundamental principle of statutory construction that, when Congress borrows language from previous statutes, it is presumed to "know[] the interpretation federal courts had given the words earlier Congresses had used."  *Holmes*, 503 U.S. at 268.  Thus, as the Court ruled in *Holmes*—and later reaffirmed in *Anza*, 547 U.S. at 457—Congress's use of the phrase "by reason of" to describe the causation element of RICO's private right of action, 18 U.S.C. § 1964(c), "carried the intention to adopt the judicial gloss that avoided a simple literal interpretation."  503 U.S. at 268 (quotations omitted).  Rather, as the Court held, the phrase "by reason of" imports a proximate causation requirement as understood in federal common law, which demands "some direct relation between the injury asserted and the injurious conduct alleged."  *Id.*; *see id.* at 269 ("[T]he less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other,

---

[7] *See, e.g.*, Compl. ¶¶ 3 ("The 1998 East African Embassy Attacks were directly and proximately caused by BNPP's knowing and intentional participation in a conspiracy to help Sudan and Sudanese financial institutions defeat U.S. economic sanctions . . ."); 152 ("The support of Al Qaeda by the Sudanese government and its banking system was integral to the planning, implementation and success of the 1998 East African Embassy Attacks.").

independent, factors." (citation omitted)); *Anza*, 547 U.S. at 461.  Accordingly, Section 2333 requires that the Complaint allege causation consistent with the standard articulated in *Holmes* and *Anza*.

In *Rothstein*, the Second Circuit applied the reasoning of *Holmes* and *Anza* and rejected ATA claims based on precisely the same theory of <u>indirect</u> causation as the one on which the Complaint relies here, 708 F.3d at 97, and this Court should do the same.  Federal courts in the District of Columbia have not yet considered an ATA claim alleging the kind of indirect causation alleged here, and thus *Rothstein*'s analysis is instructive.

*Rothstein* involved ATA claims against UBS by victims of Hamas and Hezbollah bombings and rocket attacks, who alleged that UBS "facilitated" those attacks by directly "furnishing United States currency to Iran" in violation of U.S. sanctions.  *Id.* at 84-87, 93. Similarly to the Complaint here, the *Rothstein* complaint alleged that U.S. sanctions on Iran "made it difficult for Iran to obtain the large sums of cash dollars needed for the Hezbollah and Hamas operations," and that UBS "solved this problem for Iran by illegally providing Iran with hundreds of millions of dollars in cash," *id.* at 87, "kn[owing] full well that the cash dollars it was providing . . . would be used to cause and facilitate terrorist attacks by Iranian-sponsored terrorist organizations such as Hamas [and] Hezbollah," *id.* at 97.  The *Rothstein* complaint further alleged that "the ability of Hezbollah and Hamas to . . . carry out those attacks was substantially increased by those organizations' receipt of cash dollars from Iran."  *Id.* at 87.

The Second Circuit affirmed the dismissal of the complaint on the ground that it failed to plausibly allege that UBS's actions were the proximate cause of plaintiffs' injuries.  *Id.* at 95.  In words that apply equally here, the court squarely rejected the argument that a bank's violation of U.S. sanctions laws by engaging in financial transactions with a state sponsor of terrorism is a

sufficient basis to hold a bank "liable for injuries subsequently caused by a terrorist organization associated with that state." *Id.* at 96. The court noted that the plaintiffs' "contention that proximate cause is established because they were injured after [UBS] violated federal law" would result in strict liability under the ATA for any provider of U.S. currency to a state sponsor of terrorism. *Id.* As the Second Circuit concluded, "[i]f Congress had intended to impose strict liability" on the basis of violations of U.S. law, including sanctions regulations, "it would have found words more susceptible to that interpretation, rather than repeating the language it had used in other statutes to require a showing of proximate cause." *Id.*

Thus, despite the *Rothstein* complaint's assertion that Hamas and Hezbollah needed U.S. currency to fund their operations, that UBS had illegally provided Iran with hundreds of millions of dollars of such currency, and in so doing UBS knew that this currency would be used to fund terrorist attacks, *id.* at 85-87, 97—allegations that are substantively identical to the allegations here concerning BNPP's processing of U.S. dollar-denominated transactions for Sudan—the Second Circuit found that the plaintiffs had failed to satisfy Section 2333's proximate cause requirement for several reasons, including that:

- **UBS did not participate in the attacks:** "The Complaint does not allege that UBS was a participant in the terrorist attacks that injured plaintiffs." *Id.*

- **UBS did not provide banknotes directly to terrorists:** "[The Complaint] does not allege that UBS provided money to Hezbollah or Hamas. It does not allege that U.S. currency UBS transferred to Iran was given to Hezbollah or Hamas." *Id.*

- **UBS's alleged acts were not necessary to Iran's terrorism funding:** "[The Complaint] does not allege that if UBS had not transferred U.S. currency to Iran, Iran, with its billions of dollars in reserve, would not have funded the attacks in which plaintiffs were injured." *Id.*

- **Iran has legitimate uses for financial services:** "[T]he fact remains that Iran is a government, and as such it has many legitimate agencies, operations, and programs to fund." *Id.*

17

The Second Circuit concluded that, while "[t]he fact that the transfers were made to a state sponsor of terrorism of course made it more likely that the moneys would be used for terrorism than if the transfers were to a state that did not sponsor terrorism," these allegations were insufficient to "meet *Twombly*'s plausibility standard with respect to the need for a proximate causal relationship between the cash transferred by UBS to Iran and the terrorist attacks by Hezbollah and Hamas that injured plaintiffs." *Id.*

The Second Circuit's subsequent decision in *Al Rajhi*, 714 F.3d at 118, dismissing claims by victims of the September 11, 2001 attacks, reaffirmed the inadequacy as a matter of law of proximate cause allegations—such as those made here—that do not assert a direct connection between the defendant and the terrorist act that allegedly caused the plaintiff's injury.  In the respects pertinent here, *Al Rajhi* rejected, for failing to properly plead proximate causation, claims that several Saudi banks were liable for the September 11 attacks because they allegedly provided "financial support" and "'financial [and bank account] services'" to purported charities that in turn allegedly supported al Qaeda.  *Id.* at 123 (brackets in original) (citations omitted); *see id.* at 124 (finding that the complaint had not adequately pled that defendant banks participated in the September 11, 2001 attacks, provided money directly to al Qaeda, or that the money defendants allegedly donated to purported charities actually was transferred to al Qaeda and aided in attacks).

*Rothstein*'s and *Al Rajhi*'s distinction between permissible civil ATA claims based on direct causation and impermissible claims based on indirect causation is underscored by ATA rulings in this District.  *Wultz*, 755 F. Supp. 2d at 22, concerned allegations that defendant Bank of China ("BOC") transferred funds directly from Palestinian Islamic Jihad ("PIJ") operatives to an account BOC maintained for a PIJ agent.  Accordingly, the Court held that the complaint

18

adequately pled proximate causation because BOC "allegedly knew that it was providing financial services to an agent of the PIJ, and that the PIJ would use those funds for the sole purpose of engaging in terroristic violence against Jewish civilians in Israel." *Id.* at 53. The Court distinguished the facts in *Wultz* from those in *Rothstein* by observing that the *Wultz* complaint "alleged a flow of money *directly* into the coffers of the PIJ—an organization entirely devoted to terrorist activity, and thus one that is unlikely to use wired moneys for any other purpose." *Id.* at 22 (citations omitted).

The critical distinction between direct and indirect causation for purposes of pleading proximate cause under the ATA is illustrated even more clearly in *Burnett*, 274 F. Supp. 2d at 86. On the one hand, the Court found that the complaint stated a claim against Al-Haramain Islamic Foundation ("AHIF"), a charity alleged to have maintained a direct relationship with al Qaeda. *Id.* at 104-07 ("Any terrorist act, including the September 11 attacks, might have been the natural and probable consequence of [defendant's] knowingly and intentionally providing financial support to al Qaeda."). By contrast, the Court rejected as insufficiently pleading proximate causation the complaint's allegations that Al Rajhi Bank was the "primary bank for a number of charities" that purportedly supported terrorist organizations. *Id.* at 109.[8]

These precedents therefore demonstrate that, in an <u>indirect</u> causation case such as this one, a plaintiff cannot satisfy the ATA's proximate causation requirement were he or she fails to plausibly allege that funds provided by the defendant <u>actually were transferred</u> to the perpetrator of the attack, or that those funds were otherwise a "but for" cause of that attack.

---

[8] The Court permitted Al Rajhi Bank to serve plaintiffs with a Rule 12(e) request for a more definite statement and reserve its right to renewing its dismissal motion after receiving plaintiffs' response. 274 F. Supp. 2d at 110. The case was later transferred to the Southern District of New York and consolidated into *Al Rajhi*, 714 F.3d at 118, in which, as described above, the Second Circuit affirmed the district court's dismissal of the claims against the bank.

### 3.   The Complaint Fails To Satisfy Section 2333's Proximate Causation Requirement

Applying the proximate causation precedents described above to the Complaint here requires the Complaint's dismissal.  *See Lexmark Int'l. Inc. v. Control Components Inc.*, 134 S. Ct. 1377, 1398 n.6 (2014) (proximate cause "must be adequately alleged at the pleading stage in order for the case to proceed" (citation omitted)).  The Complaint lacks any allegations of any transfer, let alone one to a terrorist organization, during the relevant time period preceding the Attacks.  And the very gaps in causation that were otherwise dispositive in *Rothstein* and *Al Rajhi* are also present here.  In particular:

- **BNPP did not participate in the Attacks:**  As in *Rothstein*, there are no allegations here that BNPP participated "in the terrorist attacks that injured plaintiffs."  *Rothstein*, 708 F.3d at 97.

- **BNPP did not provide banking services directly to terrorists:**  As in *Rothstein*, there are no allegations that BNPP provided services directly to terrorist entities.  *See id.*  Nor are there plausible allegations that any of BNPP's dollar-clearing transactions were used to fund terrorist activity.  *Id.*

- **BNPP's actions were not necessary to any terrorism funding by Sudan:**  As in *Rothstein*, there are no non-conclusory allegations that, if BNPP had not provided dollar-clearing transactions for Sudanese banks, Sudan would not have been able to fund terrorist groups.  *See id.*

- **Sudan has legitimate uses for financial services:**  As in *Rothstein*, "[t]he fact remains that [Sudan] is a government, and as such it has many legitimate agencies, operations, and programs to fund."  *Id.*

Thus, as a matter of law, the Complaint does not plead a proximate causal relationship between BNPP's conduct and the Attacks.  BNPP's provision of banking services to a state sponsor of terrorism—which is the only conduct pled in non-conclusory terms—is too indirect to satisfy the proximate cause standard.  *See id.* at 96; *Al Rajhi*, 714 F.3d at 124.

Specifically, relying entirely on the June 2014 Agreements, the Complaint alleges that BNPP provided banking services to Sudanese national banks in violation of U.S. sanctions laws,

thereby facilitating these banks' access to the U.S. markets.[9]  But there is <u>nothing</u> in the June 2014 Agreements, which were the product of extensive investigations by multiple federal and state law enforcement agencies, criminal prosecutors and civil regulators, that indicates BNPP had <u>any</u> direct connection whatsoever with al Qaeda.  *See* SOF, Collins Decl. Ex. A.[10]  Moreover the Complaint fails to plausibly connect the services that BNPP provided to Sudanese banks to Sudan's alleged acts by which it provided financial support to al Qaeda, or to al Qaeda's purported use of Sudan's alleged support in perpetrating the Attacks.[11]

The Complaint also fails to plausibly allege that U.S. dollars from any transactions conducted by BNPP for Sudanese banks were "transferred to" the terrorist groups that committed the Attacks.  *Al Rajhi*, 714 F.3d at 124; *Rothstein*, 708 F.3d at 97.  The Complaint contains wholly conclusory allegations *implying* that proceeds from transactions processed by BNPP on behalf of Sudanese banks were transferred to al Qaeda.  *See, e.g.*, Compl. ¶ 167 ("Upon information and belief, BNPP processed transaction [sic] on behalf of Al Shamal, the proceeds of which were delivered to Al Qaeda for operations, including for planning and perpetrating the attacks on the East African U.S. Embassies.").  But there are <u>no facts</u> either alleged in the

---

[9] *See, e.g.*, Compl. ¶¶ 11 ("In 1997, . . . BNPP Geneva agreed to become the sole correspondent bank in Europe for . . . [the Central Bank of Sudan], [which] then directed all major commercial banks located in Sudan to use BNPP Geneva as their primary correspondent bank in Europe.  As a result all or nearly all major Sudanese banks had U.S. dollar accounts with BNPP Geneva."); 107 ("[I]n 1997, BNPP Geneva . . . established account relationships with unaffiliated regional banks . . . located in Africa, Europe and the [M]iddle East, eventually nine in all, some with no other business purpose than to clear payments for Sudanese client [sic].").

[10] To the contrary, at BNPP's sentencing for violating U.S. sanctions, an Assistant United States Attorney in charge of the prosecution of BNPP for those violations stated that, under federal terror victim restitution guidelines, the victims of the Attacks are <u>not</u> victims of the violations to which BNPP pled guilty "and cannot show that they were directly harmed by BNPP's conduct."  Transcript of Sentencing Hearing, *United States v. BNP Paribas, S.A.*, 14 Cr. 460 (LGS), May 1, 2015, at 9:19-21 ("BNPP Sentencing Hearing") (*see* Collins Decl. Ex. E).

[11] *See, e.g.*, Compl. ¶¶ 126-153 (detailing Sudan's alleged support of al Qaeda).

Complaint or recited in the June 2014 Agreements, on which the Complaint relies, upon which the Court could find this allegation to be plausible.  Instead, it is a "naked assertio[n] devoid of further factual enhancement," *Sievarding*, 693 F. Supp. at 99, 100, and does not satisfy the *Iqbal* pleading standard.

Indeed, as shown above, the Complaint does not allege <u>at all</u> that BNPP processed a single transaction in the narrow window of time between the onset of the U.S. sanctions against Sudan and the beginning of BNPP's relationships with Sudanese banks in November 1997, and the date of the Attacks, August 7, 1998, <u>the only time during which Plaintiffs could even theoretically allege that BNPP could have proximately caused the Attacks</u>.[12]

In addition, the Complaint's allegations that the transactions BNPP facilitated on behalf of Sudanese banks "made it more likely for sponsors of terrorism and terrorist organizations, such as Sudan, Al Shamal and Al Qaeda to prosper," Compl. ¶ 231, that BNPP's sanctions violations were "a direct and proximate cause" of the Attacks, *e.g.*, *id.* ¶¶ 109, 117, 237, 346, or that the Attacks were a "foreseeable" result of BNPP's sanctions violations, *id.* ¶¶ 3, 4, 15, 16, 33, 240, 250, are not only entirely conclusory, but also are precisely the same types of allegations that *Rothstein* rejected as too remote to establish proximate cause.  The *Rothstein* complaint alleged that it was "difficult for Iran to obtain the large sums of cash dollars needed for the Hizbollah and Hamas operations" due to U.S. trade sanctions on Iran; that the bank defendant in that case "solved this problem for Iran by illegally providing Iran with hundreds of millions of dollars in cash"; and that the defendant's provision of funds to Iran thus "substantially increased"

---

[12] At most, the Complaint alleges that BNPP "held accounts for a financial institution owned by the Government of Sudan since 1997 for, [among] other purposes, illicit U.S. dollar clearing."  *Id.* ¶ 108 (quoting DFS Consent Order ¶ 26).  Alleging that U.S. dollar clearing was the *purpose* of establishing these accounts does not adequately plead that any such transactions took place prior to the Attacks, let alone that any funds from any such transactions were transferred to the terrorist groups that committed the Attacks.

the ability of terrorist organizations funded by Iran to carry out the attacks.  708 F.3d at 87.  The Second Circuit rejected these allegations, holding that the fact that the defendant's transfer of funds to Iran made it "more likely that the moneys would be used for terrorism" was not sufficient to adequately plead proximate cause.  *Id.* at 97.  As with Iran, Sudan is a "government, and as such it has many legitimate agencies, operations, and programs to fund."  *Id.*

These allegations fail to establish proximate causation for the very same reasons that the Complaint's other allegations fail:  under settled ATA law, there is a material difference between, on the one hand, processing financial transactions involving a state sponsor of terrorism (or financial entities such as Al Shamal) and, on the other hand, providing funds to a designated Foreign Terrorist Organization ("FTO") that directly caused plaintiffs' injuries. *See Rothstein v. UBS AG*, 772 F. Supp. 2d 511, 516 (S.D.N.Y. 2011) ("[T]he Supreme Court's finding that FTOs are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct is specific to FTOs.  Such a finding does not necessarily, or even probably, apply to state sponsors of terrorism.").  Proximate causation can be established only as to the latter, and the Complaint fails to adequately plead that BNPP had any direct dealings with al Qaeda.  Moreover, the Complaint fails to plausibly plead that BNPP processed any dollar-clearing transactions for Al Shamal, or any other Sudanese financial entity, between November 1997 and August 1998, the only time frame relevant to Plaintiffs' ATA claims, or that any U.S. dollars resulting from such transactions were ultimately transferred to al Qaeda.

The Complaint also strains to plead proximate causation by attempting to recast its inadequate allegations of a proximate causal relationship between BNPP's transactions on behalf of Sudanese banks and the Attacks into a novel alternative theory of liability, but that

effort is fatally flawed as well.  In particular, Plaintiffs contend that BNPP's violations of

U.S. sanctions laws, including its failure to notify the U.S. Treasury Department of financial

transactions with Sudan and Sudanese SDNs, "frustrated the efforts of the U.S. Government .

. . to detect and disrupt Al Qaeda terrorist activities . . . [and] this fraudulent scheme"—rather

than processing transactions for Sudanese banks—"was a direct and proximate cause of the

1998 East African Embassy Attacks."  Compl. ¶ 109; *see id.* ¶¶ 44, 62, 117.  But this

purported chain of proximate causation suffers from at least three defects, each of which

makes it unsustainable.

    First, it is built on multiple layers of impermissible speculation as to what might have

occurred—and how what might have occurred also might have had an impact on the Attacks—if

BNPP had notified the Treasury Department about BNPP's actions.  As with Plaintiffs' other

causal allegations, it is a "naked assertio[n] devoid of further factual enhancement," *Sievarding*,

693 F. Supp. at 99, 100, and does not satisfy the *Iqbal* pleading standard.

    Second, as shown above, *supra* at 5, the Complaint does not contain a single well-

pled allegation that identifies a single transaction between BNPP and Sudan or Sudanese

SDNs between the onset of U.S. sanctions against Sudan in November 1997 and the Attacks

in August 1998.  Accordingly, the Complaint does not identify any transactions about which

BNPP might have informed the Treasury Department before the Attacks, a step that,

according to Plaintiffs' speculation, might have had an impact on the Attacks.  *See Anza*,

5217 U.S. at 461 (proximate causation requires that "the alleged violation led directly to the

plaintiff's injuries."); *Siegel*, 592 F.3d at 159 ("[P]roximate causation . . . is normally

understood to require a direct relation between conduct alleged and injury asserted.")

(internal quotations omitted) (citing *Holmes*, 503 U.S. at 250)).

Third, if the Court were to allow Plaintiffs to satisfy the ATA's requirement that they plausibly plead a proximate causal relationship between BNPP's conduct and the Attacks based upon the speculation that the Attacks might have been detected and disrupted if BNPP had not violated U.S. sanctions, the effect would be to permit Plaintiffs to assert a private right of action for violations of U.S. sanctions, which would be contrary to settled law. Only the U.S. government can bring suit against individuals or entities that violate its economic sanctions, and here it has already done so, and has imposed significant penalties on BNPP for its violations. *See* Plea Agreement, *United States v. BNP Paribas, S.A.*, 14-CR-460 (S.D.N.Y. July 10, 2014). The federal laws and regulations establishing the U.S. sanctions regime against Sudan do not provide for a private right of action for violations of that regime. *See* 50 U.S.C. § 1705; 31 C.F.R. §§ 538.701, 538.704. Because courts cannot recognize an implied right of action where "a statute has not created [one]," *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001), courts have consistently ruled that there is no private right of action for violations of U.S. sanctions. *See Peterson v. Islamic Republic of Iran*, 2015 WL 731221, at *7 (S.D.N.Y. Feb. 20, 2015) (no private right of action for violating sanctions against Iran); *Glen v. Club Méditerranée SA*, 365 F. Supp. 2d 1263, 1272 (S.D. Fla. 2005) (no remedial right under The Trading With the Enemy Act ("TWEA")); *Am. Bank & Trust Co. v. Bond Int'l Ltd.*, 464 F. Supp. 2d 1123, 1127 (N.D. Okla. 2006) (same); *cf. Schilling v. Rogers*, 363 U.S. 666, 674 (1960) ("The point is that in [the TWEA] Congress was advertent to the role of courts, and an absence in any specific area of any kind of provision for judicial participation strongly indicates a legislative purpose that there be no such participation.").

The Court therefore should dismiss the Complaint's ATA claims for failure to plausibly allege proximate causation.

### B.      Section 2333 Does Not Permit Secondary Liability Claims

The Court also should dismiss the ATA claims on the independent ground that they are premised on theories of secondary liability that are not cognizable under Section 2333.  These claims are premised on theories of aiding and abetting and conspiracy, apparently in an attempt to mitigate its deficiencies in pleading proximate causation under the ATA.[13]  However, as all of the U.S. Courts of Appeals and the majority of the district courts that have addressed this question have repeatedly ruled, while Section 2333 permits civil claims against defendants that provide material support to terrorist organizations that commit acts of international terrorism, it does not permit the theories of secondary liability on which the Complaint relies here.

All of the U.S. Courts of Appeals that have addressed the issue of secondary liability under Section 2333 agree that there is no such liability.  *See Rothstein*, 708 F. 3d at 97-98; *Boim III*, 549 F.3d at 689.  In *Rothstein*, the Second Circuit held that, because Congress was "silent as to the permissibility of aiding and abetting liability" when drafting Section 2333, the statute does not permit a civil cause of action premised on an aiding-and-abetting theory of liability.  708 F.3d at 97-98; *accord Al Rajhi*, 714 F.3d at 123 (same); *Linde v. Arab Bank, PLC*, 944 F. Supp. 2d 215, 217 (E.D.N.Y. 2013) (same).  Likewise, the Seventh Circuit ruled that there is no

---

[13] *See, e.g.*, Compl. ¶¶ 295 ("The Conspiracy between Sudan, Al Shamal and BNPP allowed the transfer of billions of dollars of U.S. currency through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies.  Within and through this clandestine stream of U.S. dollars, the Conspiracy facilitated material support to Al Qaeda through the international financial system."); 299 ("Defendants knowingly aided and abetted acts of international terrorism by entering into a Conspiracy to: evade U.S. sanctions; minimize the transparency of Sudan's financial activities; and facilitate millions of dollars in payments to Al Qaeda through the international financial system, including but not limited to payments through Al Shamal Bank."); 308 ("Defendants violated the Anti-Terrorism Act by providing material support and financial services and conspiring to provide material support and funding to Sudan, Al Shamal, Bin Laden and Al Qaeda knowing that this material support would be used to finance the terrorist attacks against U.S. citizens and employees, such as the 1998 Embassy Bombings which caused the Plaintiffs to suffer death and serious physical and mental injury.").

secondary liability under Section 2333, noting that "statutory silence on the subject of secondary liability means there is none; and section 2333(a) authorizes awards of damages to private parties but does not mention aiders and abettors or other secondary actors."  *Boim III*, 549 F.3d at 689.[14] Numerous district courts that have considered the issue have agreed.  *See, e.g., Wultz v. Bank of China Ltd.*, 942 F. Supp. 2d 452, 455 (S.D.N.Y. 2013); *Linde*, 944 F. Supp. 2d at 217.[15]

In rejecting secondary liability under Section 2333, both *Rothstein* and *Boim III* properly applied the Supreme Court's decision in *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 185 (1994), which held that an "implicit congressional intent to impose . . . aiding and abetting liability in the Securities Exchange Act of 1934 could not plausibly be inferred from 'statutory silence.'"  The Supreme Court explained in *Central Bank* that since "Congress kn[ows] how to impose secondary liability when it [chooses] to do so," if "Congress intended to impose aiding and abetting liability, we presume it would have used the words 'aid' and 'abet' in the statutory text.  But it did not."  *Id.* at 176-77.  The Court's analysis rested solely on the plain text of the statute: "the text of the 1934 Act does not itself reach those who aid and

---

[14] In *Boim III*, the Seventh Circuit sitting *en banc* overruled an earlier panel decision, *Boim v. Quranic Literacy Inst. & Holy Land Found. For Relief & Dev.*, 291 F.3d 1000, 1019 (7th Cir. 2002) ("*Boim I*"), that had erroneously distinguished *Central Bank* as limited to statutes such as Section 10(b) that create only implied private rights of action.  *Boim III*, 549 F.3d at 689 ("[A]s the dissenting Justices in *Central Bank of Denver* had pointed out, the majority's holding was not limited to private actions.  It encompassed suits by the SEC, which section 10(b) authorizes expressly." (citation omitted)).

[15] The few contrary opinions of courts in this District are no longer good law.  The ruling in *Burnett* that there is secondary liability under Section 2333 relied on *Boim I*, which was subsequently overruled in *Boim III*.  *See* 274 F. Supp. 2d at 106-08.  The secondary liability claims in *Wultz* were summarily dismissed after the case was transferred to the Southern District of New York on the ground that recent case law had "categorically foreclosed" the argument that aiding and abetting liability was available under the ATA.  *Wultz v. Bank of China Ltd.*, 942 F. Supp. 2d 452, 455 (S.D.N.Y. 2013).  Likewise, courts in other districts have reversed earlier rulings permitting secondary liability under Section 2333 in light of the growing body of case law finding that such liability is not cognizable.  *See Abecassis v. Wyatt*, 7 F. Supp. 3d 668, 677 (S.D. Tex. 2014) (reconsidering an earlier ruling because "the court agree[d] with the holding in *Rothstein* and *Boim* [*III*] as it pertains to aiding and abetting liability"); *In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Deriv. Litig., v. Chiquita Brands Int'l, Inc.*, 2015 WL 71562, at *4 (S.D. Fla. Jan. 6, 2015) (same).

abet a § 10(b) violation . . . that conclusion resolves the case." *Cent. Bank*, 511 U.S. at 177; *see also Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837, 838, 841 (2d Cir. 1998) (*Central Bank* precludes conspiracy claims under Section 10(b)).

Applying the *Central Bank* standard here, there can be no secondary liability under Section 2333 because, as in *Central Bank*, "the statute itself resolves the case." *Central Bank*, 511 U.S. at 178.[16] The statutory text is "the starting point in every case involving construction of a statute," to which courts must adhere when considering "the scope of conduct" being prohibited. *Id.* at 173 (quotations omitted). Simply put, a plaintiff may not bring suit against a defendant for acts not prohibited by the text of the applicable statute. *Id.* Therefore, because Congress has not enacted a general civil liability aiding and abetting or conspiracy statute, in cases in which a statute that creates a private right of action is silent on secondary liability, "there is no general presumption" that such liability will exist. *Id.* at 182.

Section 2333 is silent as to secondary liability, and if Congress had intended to impose liability for aiding and abetting or for conspiracy, it would have done so. *See id.* at 177-78. As the *Rothstein* court noted, "[w]e doubt that Congress, having included in the ATA several express provisions with respect to aiding and abetting in connection with the criminal provisions, can have intended § 2333 to authorize civil liability for aiding and abetting through its silence." 708 F.3d at 97-98. Similarly, because Congress provided expressly for conspiracy liability in

---

[16] Although the Court in *Central Bank* discussed and dismissed arguments raised by the parties relating to congressional intent and the legislative history of Section 10(b), it emphasized that its holding rested on an analysis that stopped at the clear text of the statute. *See* 511 U.S. at 187-88 ("We find our role limited when the issue is the scope of conduct prohibited by the statute. That issue is our concern here, and we adhere to the statutory text in resolving it.") (citation omitted). Courts such as *Wultz*, 755 F. Supp. 2d at 55-57, which have relied on the ATA's legislative history in holding that secondary liability exists under Section 2333, have failed to properly end their inquiry with the clear text of the statute. *See Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 501 (E.D.N.Y. 2012) (criticizing such cases). Indeed, the legislative history of Section 2333 contains numerous assertions that are contrary to a plain reading of Section 2333. *Gill*, 893 F. Supp. 2d at 501.

certain sections of the ATA, there can be no such liability under Section 2333, which lacks such an express provision.  *Compare* § 2332g(c)(1) (providing criminal penalties for conspiring with an individual to violate the ATA provision prohibiting the production and possession of antiaircraft missile systems) *with* § 2339D (lacking any provision imposing liability for conspiracy to receive military-type training from a designated foreign terrorist organization).  In short, the express secondary liability provisions under certain sections of the ATA dictate the conclusion that the omission of such provisions in Section 2333 reflects a deliberate choice by Congress to exclude any such liability under Section 2333.  *See Central Bank*, 511 U.S. at 184 ("The fact that Congress chose to impose some forms of secondary liability, but not others, indicates a deliberate congressional choice with which the courts should not interfere.").

The Complaint here purports to plead the same kinds of secondary liability claims that were rejected in *Central Bank*, *Rothstein*, and *Boim III*.  Specifically, because the Complaint cannot allege that BNPP provided direct material support to al Qaeda, it instead attempts to plead that BNPP aided and abetted Sudanese banks' provision of material support to al Qaeda.  Likewise, the Complaint does not contend that BNPP directly funded the perpetrators of the Attacks, but rather that BNPP conspired with the Sudanese banks that purportedly funded those organizations.  *Central Bank* precludes Plaintiffs' contention: Section 2333 is silent on secondary liability, thus there is no secondary liability under the statute.  Because the Complaint is predicated solely on secondary liability theories under Section 2333, the Court must dismiss it.[17]

---

[17] Even if secondary liability were viable under the ATA, the Complaint still would need to be dismissed for failing to properly plead the requisite elements of such liability.  Aiding and abetting liability requires that "the defendant must knowingly and substantially assist the principal violation."  *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983).  The Complaint fails to allege both that BNPP knowingly supported the Embassy Attacks, and that the BNPP substantially assisted those who carried out the Attacks.  *See Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 110 (D.D.C. 2010) ("Simply stating that the [Defendants] generally provided aid to a third party, who in turn purportedly engaged in tortious

[*Continued on Next Page*]

### C.    The Complaint Fails To State A Claim Under Section 2332d Because BNPP Is Not A "United States Person"

Count VI of the Complaint, which alleges that BNPP violated 18 U.S.C. § 2332d, must be dismissed for the additional and independent reason that this statute applies only to United States persons, which BNPP is not.

In pertinent part, a "United States person" under Section 2332d includes any "(C) juridical person organized under the laws of the United States; or (D) any person in the United States."[18]  18 U.S.C. § 2332d(b)(2).  Although the Complaint contains a conclusory allegation that BNPP is "organized under the laws of the United States" under Section 2332d(b)(2)(C), Compl. ¶ 312, the Complaint acknowledges the incontrovertible fact that BNPP is "a French multinational bank, *incorporated under the laws of France*, and headquartered in Paris, France," *id.* ¶ 18 (emphasis added).

Nor does BNPP qualify as "any person in the United States" under subparagraph (D) of the definition, *see* Compl. ¶ 312, because that provision reaches only natural persons located within the territory of the United States.  *See Abecassis v. Wyatt*, 785 F. Supp. 2d 614, 648 (S.D. Tex. 2011); *United States v. Chalmers*, 474 F. Supp. 2d 555, 565 (S.D.N.Y. 2007).  The Supreme Court, in construing identical language with respect to sanctions against Burma, noted that this

---

activity, is not enough; rather, the plaintiffs are required to plead a link between the aid rendered and the principal violation (or violations) alleged.").

Similarly, a conspiracy claim requires "proof of a 'common and unlawful plan whose goals are known to all members.'"  *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 100 (D.D.C. 2002) (quoting *Hobson v. Wilson*, 737 F.2d 1, 55 (D.C. Cir. 1984).  Nowhere does the Complaint plausibly allege that BNPP shared a common goal with its purported co-conspirators to carry out the Attacks.  In fact, it acknowledges that "BNPP did not share Al Qaeda's desire to kill American citizens and citizens of their allies." Compl. ¶ 3.

[18] Subsections (A) and (B) refer to natural persons, namely U.S. citizens or nationals and permanent resident aliens.

prohibition does not apply to "foreign companies."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 379 (2000).  If, as Plaintiffs assert, subparagraph (D) also reached juridical persons, it would render subparagraph (C) wholly superfluous, because all companies organized under the laws of the United States are also, by definition, in the United States, as that is their place of incorporation.  *See, e.g.*, *Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014) (a company is located in its place of incorporation and principal place of business).[19]

In sum, Section 2332d does not apply to foreign corporations such as BNPP.

**D.    The Complaint Cannot Assert A Claim Under Section 2339C Of The ATA Because That Provision Was Enacted After The Attacks**

Furthermore, Count V's allegation regarding violation of Section 2339C should be dismissed because that provision was enacted well after the Attacks occurred, and cannot be applied retroactively.  *See* Suppression of the Financing of Terrorism Convention Implementation Act of 2001, Public Law 107-197, 116 Stat. 721 (June 25, 2002); *Boim III*, 549 F.3d at 691 (holding that, to state a Section 2333 claim predicated on a violation of 2339A, plaintiff must show that defendant provided material support "between the effective date of section 2339A and" plaintiff's injury).

Accordingly, the Court should dismiss Counts V and VI of the Complaint because they do not state a claim under the ATA.

**IV.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE ATS**

The ATS, which provides that the "district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of

---

[19] Such a result would contradict the well-established canon of statutory interpretation that requires courts to avoid redundancies and give effect to every provision in a statute.  *Corley v. United States*, 556 U.S. 303, 314 (2009) ("[O]ne of the most basic interpretive canons, [is] that [a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (quotations omitted)).

the United States," is strictly jurisdictional; it does not create any cause of action itself. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 714 (2004). Accordingly, the Court must first assess whether subject matter jurisdiction exists over these purported ATS claims. *Doe v. Exxon Mobil Corp.*, No. 01-1357 (RCL), 2015 WL 5042118, at *2 (D.D.C. July 6, 2015); *Balintulo v. Ford Motor Co.*, 796 F.3d 160, 165 (2d. Cir. 2015). The relevant jurisdictional inquiries include whether "(1) the complaint pleads a violation of the law of nations; . . . [(2)] customary international law recognizes [the asserted] liability [of the particular type of] defendant; and [(3)] the theory of liability alleged by plaintiffs (*i.e.*, aiding and abetting, conspiracy) is recognized by customary international law [or 'the law of nations']." *Balintulo*, 796 F.3d at 165-66 (quoting *Mastafa v. Chevron Corp.*, 770 F.3d 170, 179 (2d. Cir. 2014)) (alterations in original); *see Exxon Mobil Corp.*, 2015 WL 5042118, at *2. "[A] defect in any of these jurisdictional predicates [is] fatal to a plaintiff's claims," *Balintulo*, 796 F.3d at 166, and divests the court of subject matter jurisdiction.[20]

Here, the Complaint's purported ATS claims in Counts III and IV fail several aspects of this inquiry, and therefore the Court should dismiss them.

### A.    The Complaint Does Not Plead A Violation Of The Law Of Nations

The ATS was "enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time," corresponding to Blackstone's three primary offenses: "violation of safe conducts, infringement of the rights of ambassadors, and piracy." *Sosa*, 542 U.S. at 724. Although federal courts may recognize a limited number of new claims based on the present-day

---

[20] The Second Circuit has declined to recognize corporate liability under the ATS, *see Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 145 (2d Cir. 2010), *aff'd*, 133 S. Ct. 1659 (2013), but the D.C. Circuit currently recognizes such liability. *See Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 57 (D.C. Cir. 2011).

law of nations—in modern parlance, customary international law—they "should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted [in 1789]." *Id.* at 732; *see Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 781 (D.C. Cir. 1984) (Edwards, J., concurring) ("section 1350's reach" is limited to actions that "violate[] definable, universal, and obligatory [international] norms"); *Kiobel v. Royal Dutch Pet. Co.*, 621 F.3d 111, 118 (2d Cir. 2010) (cognizable tort must violate "specific and universally accepted rules that the nations of the world treat as binding in their dealings with one another").

The Complaint seeks to hold BNPP liable under the ATS for purported violations of the law of nations solely on a theory of secondary liability, premised on the allegation that BNPP aided and abetted the Attacks. *See, e.g.*, Compl. ¶¶ 266, 273-275, 284-285, 291. The Complaint alleges that BNPP helped Sudan and major Sudanese banks "to bypass United States sanctions and allow Sudan to obtain American dollars in direct violation of United States law," and thereby aided and abetted al Qaeda's perpetrating of the Attacks. *Id.* ¶¶ 266, 273, 291. This allegation that BNPP is secondarily liable under the ATS requires: (1) <u>first</u>, a well-pled allegation of a <u>primary</u> violation of the law of nations, specifically that Al Qaeda's perpetration of the Attacks, which the Complaint accuses BNPP of aiding and abetting, "represent[s] a violation of an international norm with at least as 'definite content and acceptance among civilized nations [as] the historical paradigms familiar' in 1789, *Sosa*, 542 U.S. at 732." *Exxon Mobil Corp.*, 654 F.3d at 30; *see also Exxon Mobil Corp.*, 2015 WL 5042118, at *4 (defendant could not be liable under the ATS for aiding and abetting forced disappearance because forced disappearance is not a violation of law of nations); and (2) <u>second</u>, that the Complaint pleads a

secondary violation of the law of nations, by pleading the requirements for aiding and abetting liability as a matter of customary international law.  For the reasons detailed below, the Complaint does not satisfy either of these requirements, and should be dismissed.

### 1.     The Attacks Do Not Qualify As Violations Of The Law Of Nations

As heinous as the Attacks were, acts of terrorism do not constitute violations of the law of nations because, even today, there is no universal norm against terrorism under customary international law, much less at the time of the Attacks, in 1998.  *See, e.g.*, *Al Rahji*, 714 F.3d at 125 ("Plaintiffs fail to . . . plead a violation of the ATS because no universal norm against 'terrorism' existed under customary international law . . . as of September 11, 2001.") (citing *inter alia Tel-Oren*, 726 F.2d at 795 (Edwards, J., concurring) ("I do not believe that under current law terrorist attacks amount to law of nations violations.") and *Mwani v. Bin Ladin*, No. CIV A 99-125 CKK, 2006 WL 3422208, at *3 n.2 (D.D.C. Sept. 28, 2006) ("The law is seemingly unsettled with respect to defining terrorism as a violation of the law of nations")).

Nor do the Attacks qualify as "crimes against humanity" as the Complaint alleges, Compl. ¶¶ 225-276, and as that term is understood under international law.  *See, e.g.*, *Islamic Salvation Front*, 257 F. Supp. 2d at 120-21 (allegations that "murder and threats committed by armed Islamic groups" amount to crimes against humanity "stretches the meaning of . . . crimes against humanity under the law of nations too far").  Authoritative international law sources define a crime against humanity as any of a list of enumerated acts "committed as part of a widespread or systematic attack against any civilian population on national, political, ethnic, racial or religious grounds."  *See, e.g.*, Statute of the International Criminal Tribunal for the Prosecution of Persons Responsible for Genocide and Other Serious Violations of International Humanitarian Law Committed in the Territory of Rwanda and Rwandan Citizens Responsible for Genocide and Other Such Violations Committed in the Territory of Neighboring States,

Between 1 January 1994 and 31 December 1994, S.C. Res. 955 (Nov. 8, 1994) ("ICTR Statute"). Moreover, "some form of discriminatory intent is inherent in the notion of crimes against humanity." *Prosecutor v. Tadic*, Case No. IT-94-1-T, Opinion and Judgment, ¶ 650 (May 7, 1997). Additionally, the scope of liability under the ATS is more limited for private actors than it is for state actors. *See, e.g.*, *Ali Shafi v. Palestinian Auth.*, 642 F.3d 1088, 1095 (D.C. Cir. 2011) (only "a handful of crimes" attribute individual responsibility under the law of nations). The Attacks here—individual events perpetrated by non-state actors, targeting a symbol of U.S. sovereignty rather than an identifiable group of persons, and claiming victims indiscriminately among those who had the misfortune to be present—do not qualify as crimes against humanity under customary international law.

Finally in this regard, and also contrary to the Complaint's allegations, the Attacks do not qualify as an "infringement of the rights of ambassadors." Compl. ¶¶ 277-92. Although this tort is one of the three original torts in Blackstone's Commentaries, *see Sosa*, 542 U.S. at 715; *Mwani v. Bin Ladin*, 2006 WL 3422208, at *4 (D.D.C. Sept. 28, 2006), the protections provided to ambassadors are only granted to "diplomatic agents," their families, and members of the administrative and technical staff of the embassy that are <u>not</u> nationals of the receiving state. Vienna Convention on Diplomatic Relations, Preamble, Apr. 18, 1961; *see also* Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, including Diplomatic Agents, Dec. 14, 1973, 1035 U.N.T.S. 167 (entered into force Feb. 20, 1977), Art. 1.1.(b) (an "internationally protected person" includes representatives or officials of the state and their families).[21] Here, Plaintiffs have not alleged that they have any diplomatic status, their

---

[21] This limitation is recognized in 18 U.S.C. § 1116, which provides federal jurisdiction over a homicide committed against "internationally protected persons." The statute does not define "internationally protected persons" to include all embassy employees, but rather only those U.S. government employees

[*Continued on Next Page*]

nationality or other facts that are necessary to establish that they are protected by the privileges and immunities granted by customary international law to embassy personnel.  Indeed, the embassy staff typically protected by customary international law would likely be U.S. citizens, who, under the plain language of the statute, may not bring claims under the ATS.  *See* Vienna Convention Art. 8.1 ("Members of the diplomatic staff of the mission should in principle be of the nationality of the sending State.").  Either the ATS Plaintiffs are not U.S. citizens (who would therefore not be entitled to diplomatic protection), or they are U.S. citizens who cannot bring an ATS claim at all.

### 2.     The Complaint Does Not Plead The Requirements For Aiding And Abetting Liability Under The Law Of Nations

The Complaint also fails to plead the international law requirements for aiding and abetting liability.  Under customary international law, aiding and abetting liability has two elements:  *actus reus* and *mens rea.  Exxon Mobil Corp.*, 654 F.3d at 34 (citing *Prosecutor v. Furundzija*, Case No. IT-95-17/1, Trial Chamber Judgment, ¶ 249 (Dec. 10, 1998)).  In the respects pertinent here, the *actus reus* must "consist[] of practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime."  *Id.* (citing *Furundzija*, ¶ 249).  Thus, akin to the proximate causation element of a civil ATA claim, the accused must substantially assist the international law violation through conduct that makes "a significant difference to the commission of the criminal act by the principal."  *Furundzija*, ¶ 233.  "In other words . . . there must be a 'link' or 'connection' between the aider and abettor's actions and the underlying crime."  *Exxon Mobil Corp.*, 2015 WL 5042118, at *9 (citation omitted); *see id.* ("[A]iding and abetting may only be found where assistance is provided to a criminal's

---

who are "entitled pursuant to international law to special protection against attack upon his person."  18 U.S.C. § 1116(b)(4)(B).

human rights abuses, not simply to the criminal him or herself.") (citing *In re S. Afr. Apartheid Litig.*, 617 F. Supp. 2d 228, 257 (S.D.N.Y. 2009)).

The Complaint's allegations do not meet this standard.  In particular, the Complaint does not plead any direct link between the aid allegedly rendered by BNPP to Sudanese banks and the Attacks, as is required to establish aiding and abetting liability under international law.  *See, e.g.*, *Islamic Salvation Front*, 257 F. Supp. at 121 (alleged links between defendant's conduct and acts committed by armed Islamic groups purportedly in violation of law of nations were "much too tenuous to support finding of [aiding and abetting] liability" under ATS); *Carmichael v. United Techs. Corp.*, 835 F.2d 109, 115 (5th Cir. 1988) (ATS aiding-and-abetting claim failed absent evidence demonstrating a "causal connection" between defendant's conduct and putative law of nations violation); *Mastafa v. Austl. Wheat Bd.*, No. 07-CV-7955, 2008 WL 4378443, at *4 (S.D.N.Y. Sept. 25, 2008) (dismissing claims against BNPP for allegedly aiding and abetting Saddam Hussein's human rights abuses based on the bank's provision of funds to the Hussein regime because "[i]t is not enough that a defendant provide substantial assistance to a tortfeasor; the substantial assistance must also advance the [tort's] commission." (quotations omitted)); *In re S. Afr. Apartheid Litig.*, 617 F. Supp. 2d at 265 (allegations that computer manufacturer aided and abetted cruel, inhuman and degrading treatment ("CIDT") were insufficient where "computers were not an essential element of CIDT or the means by which it was carried out").[22]

---

[22] Although the titles of Counts III and IV of the Complaint also refer to "conspiracy," the substance of their allegations is that BNPP aided and abetted violations of international law.  *See, e.g.*, Compl. ¶¶ 273, 291.  However, to the extent the Complaint alleges conspiracy as an alternate form of liability, that too would fail because international law does not recognize conspiracy liability in this context.  *See Hamdan v. Rumsfeld*, 548 U.S. 557, 610 (2006) ("[T]he only 'conspiracy' crimes that have been recognized by international war crimes tribunals (whose jurisdiction often extends beyond war crimes proper to crimes against humanity and crimes against the peace) are conspiracy to commit genocide and common plan to wage aggressive war.").  And to the extent any such concept exists under international law, BNPP's alleged conduct fails to meet the high standard for liability.  *See Prosecutor v. Tadic*, Case No. IT-94-1-

[*Continued on Next Page*]

### 3.     Family Members Of Victims Of The Attacks Cannot Assert Claims Under The ATS

The Complaint also alleges as part of its ATS counts that certain Plaintiffs are family members of victims of the Attacks who seek damages for emotional injuries.  Compl. ¶¶ 31, 33, 253, 276.  But these Plaintiffs' claims are not cognizable under the ATS because claims for intentional infliction of emotional distress ("IIED") "do not rise to the level of international torts that are 'sufficiently definite and accepted among civilized nations to qualify for the ATS jurisdictional grant.'"  *Al-Aulaqi*, 727 F. Supp. 2d at 37 (quoting *Ali Shafi v. Palestinian Auth.*, 686 F. Supp. 2d 23, 29 (D.D.C. 2010)).  "[T]here is not even domestic consensus as to whether a [family member] can recover for emotional injuries stemming from the death of [a close relative] much less universal agreement that such a tort is actionable."  *Id.* at 39.  Given the judicial recognition that claims for IIED are not cognizable under the ATS, courts have also rejected attempts to plead similar claims for emotional harm that "bear a strong resemblance to" IIED. *See, e.g.*, *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1183 (C.D. Cal. 2005) (declining to recognize claims for "cruel, inhuman, and degrading treatment" because they bear strong resemblance to IIED).

Accordingly, the Complaint's ATS claims must be dismissed for lack of jurisdiction.

## V.     THE COMPLAINT FAILS TO STATE COMMON LAW CLAIMS FOR CONSPIRACY AND AIDING AND ABETTING

The Court also should dismiss Count I and II of the Complaint, which purport to plead non-existent common law conspiracy and aiding and abetting claims.

---

A, Appeal Judgment, ¶¶ 188, 206 (July 15, 1999) (culpability through "participation in the realisation of a common design or purpose," requires the "intention to participate" in that common purpose – here, the perpetration of the Attacks).

## A.     The Court Cannot Assert Subject Matter Jurisdiction Over The Purported Common Law Claims Asserted By Non-U.S. Citizen Plaintiffs

As a threshold matter, and to the extent that the Court dismisses Plaintiffs' ATS claims, the Court lacks subject matter jurisdiction over the non-U.S. citizen Plaintiffs' claims for common law conspiracy and aiding and abetting, *see* Compl. ¶¶ 226-254, because the ATS is the only basis for federal question jurisdiction that is available to the non-U.S. citizen Plaintiffs. BNPP is not a U.S. citizen, and thus the non-U.S. citizen Plaintiffs cannot establish diversity jurisdiction under 28 U.S.C. § 1332 over their common law claims. *Abur v. Republic of Sudan*, 437 F. Supp. 2d 166, 169 n.4 (D.D.C. 2006) (Bates, J.) ("[T]here is no alien diversity jurisdiction"); *see also Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1263 (D.C. Cir. 1995) ("After the district court dismissed the federal claims . . . it abused its discretion by reaching the merits of the local-law claims.").

## B.     There Is No Common Law Claim For Civil Conspiracy To Violate U.S. Sanctions

In addition, the Court should dismiss Count I of the Complaint because it alleges that BNPP conspired to commit a non-existent tort.  "[L]iability for civil conspiracy depends on performance of some underlying tortious act, the conspiracy is not independently actionable." *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983).  The Complaint's contention that BNPP conspired to violate and defeat U.S. policies and sanctions against Sudan, Compl. ¶¶ 226-242, fails because, as shown above, there is no private right of action for sanctions violations.  *See supra* p. 25.

## C.     There Is No Common Law Claim For Civil Aiding And Abetting Material Support For Terrorism

Similarly, Count II, which alleges a purported common law claim of aiding and abetting Sudan's and Sudanese banks' material support of al Qaeda, *see* Compl. ¶¶ 243-254, also fails.

Like conspiracy, aiding and abetting is not an actionable tort, but rather is a means of establishing vicarious liability for an underlying tort. *Halberstam*, 705 F.2d at 479; *Carroll v. Fremont Inv. & Loan*, 636 F. Supp. 2d 41, 53 (D.D.C. 2009). But there is no underlying common law tort based on providing material support for terrorism. Rather, a claim for material support may only be brought pursuant to statute under the ATA.

Prior to the enactment of the ATA, there was generally no remedy for plaintiffs injured by acts of terrorism against parties that provided material support to the perpetrators. The ATA was designed to provide "a new civil legal cause of action" to fill a "gap in [Congress'] efforts to develop a comprehensive legal response to international terrorism." H.R. Rep. No. 102-1040, at *4-*5 (1992); *see also* 136 Cong. Rec. 7592 (1990) (ATA was enacted because "victims who turn to the common law . . . find it virtually impossible to pursue their claims" "against those who contribute to terrorist acts"). Because material support for terrorism is not cognizable under the common law, BNPP cannot be secondarily liable under the common law for aiding and abetting such support.[23]

Accordingly, the Court should dismiss Counts I and II of the Complaint.

## VI.   THE COMPLAINT FAILS TO STATE A CLAIM FOR FRAUDULENT CONVEYANCE

Finally, Count VIII of the Complaint, which purports to plead a fraudulent conveyance claim, fails to allege an actionable fraudulent transfer under any law. Assuming *arguendo* that Plaintiffs intend to invoke the D.C. UFTA, the Complaint must allege that BNPP is a "transferee" of the asset or "the person for whose benefit the transfer was made" in order to hold

---

[23] Again, even if such a tort did exist, Plaintiffs' failure to allege facts that establish proximate causation would require dismissal of this count. *See supra* III.A; *see also Ungar*, 211 F. Supp. 2d at 99 (no substantial assistance where material support cannot be linked to specific terror attack); *Acosta Orellana*, 711 F. Supp. 2d at 110 ("plaintiffs are required to plead a link between the aid rendered and the principal violation (or violations) alleged").

BNPP liable for the alleged fraudulent transfer.  D.C. Code § 28-3108.  A transfer is defined as a transaction that involves "disposing of, or parting with, an asset or an interest in an asset."  D.C. Code § 28-3101.  "In order to state a claim for an actual fraudulent transfer," the Complaint must allege facts showing a transfer of an asset was made "'with actual intent to hinder, delay, or defraud any creditor of the debtor.'"  *Bank of Am.*, 908 F. Supp. 2d at 87 (quoting D.C. Code § 28-3104) (citation omitted).

The Complaint fails to allege any of the required elements of the D.C. UFTA.  First, the Complaint alleges no facts showing that BNPP is a transferee or beneficiary of the transactions such that it could be held liable for a fraudulent transfer.  When a bank processes financial transactions for clients without obtaining ownership or control over the funds—as BNPP is alleged to have done here—it is a "nontransferee" that "may not be liable for aiding and abetting a fraudulent conveyance."  *Id.* at 89.  The Complaint's assertion that BNPP "directly profited" from Sudan's dollar clearing activities "by charging and collecting fees in exchange for Sudanese business," Compl. ¶ 336, is an insufficient basis to allege that BNPP was a transferee or beneficiary, s*ee Bank of Am.*, 908 F. Supp. 2d at 88-89, and the Complaint is otherwise devoid of any facts supporting an allegation that BNPP received any assets from Sudanese financial institutions that would make BNPP a transferee or beneficiary.  *See* Compl. ¶¶ 327-340.

Second, there is no allegation that Sudan or BNPP disposed of or parted with an interest in an asset, as is required to allege an actionable transfer, because, as the Complaint acknowledges, Sudanese funds merely "pass[ed] through the United States."  Compl. ¶ 337; c*f. Roberts & Lloyd, Inc. v. Zyblut*, 691 A.2d 635, 641 (D.C. 1997) (transfer of money between two bank accounts held by spouses as tenants in the entirety not a conveyance).

41

<u>Third</u>, the Complaint does not allege any facts indicating that BNPP's actions evidence an actual intent to make a fraudulent transfer.  *See* D.C. Code § 28-3104(b) (listing factors relevant to determining actual intent).  The Complaint's fraudulent conveyance claim must therefore be dismissed.

## CONCLUSION

For all of the foregoing reasons, the Court should dismiss the Complaint, as against BNPP, in its entirety with prejudice pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

Dated: January 29, 2016
         Washington, D.C.

                                        Respectfully submitted,

                                        CLEARY GOTTLIEB STEEN & HAMILTON LLP

                                        By: <u>/s/ Alexis Collins</u>
                                             Alexis Collins (D.C. Bar # 474599)
                                             2000 Pennsylvania Avenue, N.W.
                                             Washington, D.C. 20006
                                             (202) 974-1500
                                             alcollins@cgsh.com

                                             Jonathan I. Blackman (*pro hac vice*)
                                             Lawrence B. Friedman (*pro hac vice*)
                                             Carmine D. Boccuzzi, Jr. (*pro hac vice*)
                                             Avram E. Luft (*pro hac vice*)
                                             Mark S. Grube (*pro hac vice*)
                                             One Liberty Plaza
                                             New York, New York 10006
                                             (212) 225-2000

                                        Attorneys for Defendant BNP Paribas S.A.

42