# Exhibit B

NEW YORK STATE DEPARTMENT
OF FINANCIAL SERVICES
———————————————————————X
In the Matter of

                                        CONSENT ORDER UNDER
                                        NEW YORK BANKING LAW § 44

BNP PARIBAS, S.A.
New York Branch
———————————————————————X

The New York State Department of Financial Services ("the Department" or "DFS") and

BNP Paribas S.A., Paris, France ("BNP Paribas" or "BNPP" or the "Bank") stipulate that:

   **WHEREAS**, BNP Paribas is a foreign bank with complex operations and multiple

business lines and legal entities in many countries worldwide;

   **WHEREAS**, BNP Paribas conducts operations in the United States through various

subsidiaries and entities including its branch in New York, New York (the "New York Branch");

   **WHEREAS**, the Department is the licensing agency of the New York Branch, pursuant

to Article II of the New York Banking Law ("NYBL") and is responsible for its supervision and

regulation.

   **WHEREAS**, BNP Paribas is pleading guilty to a one-count information filed in the U.S.

District Court for the Southern District of New York on June 30, 2014, which accuses the Bank

of conspiracy to commit an offense against the United States in violation of Title 18, United

States Code, Section 371, by conspiring to violate the International Emergency Economic

Powers Act ("IEEPA"), codified at Title 50, United States Code, Section 1701 et seq., and

regulations issued thereunder, and the Trading with the Enemy Act ("TWEA"), codified at Title

50. United States Code Appendix. Section 1 et seq., and regulations issued thereunder.

**WHEREAS**, BNP Paribas is pleading guilty to one count of Falsifying Business Records in the First Degree, pursuant to New York Penal Law Section 175.10, and one count of Conspiracy in the Fifth Degree, pursuant to New York Penal Law Section 105.05(1).

**WHEREAS**, in connection with the federal and state charges listed above, BNP Paribas admitted certain facts and conduct, including:

- that BNPP developed and implemented policies and procedures for processing U.S. dollar-denominated transfers through the New York Branch and unaffiliated U.S. financial institutions in a manner that was designed to conceal relevant information regarding Sudan, Iran and Cuba that would permit the institutions and their regulators to determine whether the transactions were lawful and consistent with New York State and U.S. laws and regulations; and

- that BNPP's conduct allowed sanctioned countries and entities, including Specially Designated Nationals,[1] to access the U.S. financial system and engage in billions of dollars worth of U.S. dollar-based financial transactions, significantly undermining the U.S. sanctions and embargos.

**WHEREAS**, BNP Paribas' conduct violated U.S. national security and foreign policy and raised serious safety and soundness concerns for regulators, including the obstruction of governmental administration, failure to report crimes and misconduct, offering false instruments for filing, and falsifying business records.

**NOW, THEREFORE,** the parties agree to the following:

---

[1] A Specially Designated National ("SDN") appears on a list of individuals, groups, and entities subject to economic sanctions by the United States Treasury and the Office of Foreign Assets Control ("OFAC"). SDNs are individuals and companies, specifically designated as having their assets blocked from the U.S. financial system by virtue of being owned or controlled by, or acting for on behalf of, targeted countries, as well as individuals, groups, and entities, such as terrorists and narcotics traffickers, designated under sanctions programs that are not country-specific.

1.     From at least 2002 through 2012, BNP Paribas provided U.S. dollar clearing services on behalf of Sudanese, Iranian, and Cuban parties ("Sanctioned Parties") with a value of more than $190 billion which were settled through the New York Branch and other New York-based financial institutions.[2]

2.     The transactions with the Sanctioned Parties were identified during the Bank's internal review of its U.S. dollar transactions for the period of 2002-2009 (the "Review Period").

3.     In processing transactions on behalf of these Sanctioned Parties, BNP Paribas engaged in a systematic practice, as directed from high levels of the Bank's group management, of removing or omitting Sudanese, Iranian, or Cuban information from U.S. dollar-denominated payment messages that it sent through the New York Branch and other non-affiliated New York-based U.S. financial institutions to "guarantee the confidentially of the messages and to avoid their disclosure to any potential investigatory authorities."

4.     The Bank's written instructions included warnings to personnel and Sanctioned Parties such as the one contained in a *Memorandum to the Operations Center* that advised with respect to a Cuban transaction, "Attention Cuba: please do not mention Cuba on the [MT-] 202 [SWIFT Messages]."[3]

5.     From as early as 1995 through at least 2007 memoranda were circulated to the Bank's operations staff with the blanket directive for U.S. dollar denominated transactions

---

[2] U.S. dollar clearing is the process by which U.S. dollar-denominated payments between counterparties are made through a bank in the United States.

[3] The Society of Worldwide Interbank Financial Telecommunications ("SWIFT") is a vehicle through which banks exchange wire transfer messages with other financial institutions, including U.S. correspondent banks. SWIFT messages contain various informational fields.

involving Iran: "Do not stipulate in any case the name of Iranian entities on messages transmitted to American banks or to foreign banks installed in the U.S.A."

> 6.      In addition to the Bank's group-wide policy instructions, individual payment instructions for Sanctioned Parties contained admonitions to the Bank's staff to refrain from using identifying information.  For example, one payment message for a Sudanese party was stamped "URGENT," "ATTENTION EMBARGO" and cautioned, "! Transfer in $ without mentioning [Sudanese Bank] to the USA!!!"

### New York

> 7.      Compliance staff at the New York Branch operated knowing that they did not have adequate legal and compliance authority to ensure that activities conducted from BNP Paribas offices outside of the United States complied with New York and U.S. laws and regulations.  This practice was intentional.  In a January 2006 email addressing the question of whether or not the Bank's Energy, Commodities, Export & Project ("ECEP") group ran the risk of an allegation of circumventing the U.S. embargo, a BNPP employee described an "omission" procedure as follows: "A practice exists which consists in omitting the Beneficiaries/Ordering party's contact information for USD transactions regarding clients from countries that are under U.S. embargo: Sudan, Cuba, Iran.  This avoids putting BNPP NY in a position to uncover these transactions, to block them, and to submit reports to the regulator."

> 8.      Even the highest levels of the compliance division for the New York Branch recognized and accepted that amending, omitting and stripping was widespread among foreign banks transmitting funds through the U.S.  When a settlement with U.S regulators and Dutch bank ABN AMRO was announced for violations of U.S. sanctions law, the Head of Ethics

and Compliance North America wrote in an email to another employee, "the dirty little secret isn't so secret anymore, oui?"

9.     In response to an email from the compliance office of the New York Branch, which raised concerns about employing cover payments to make a transaction nontransparent, BNPP compliance officers in Paris discussed how best to deal with the matter. According to documents obtained by the U.S. Department of Justice, the Parisian compliance officers weighed the costs and benefits of deceiving the New York Branch as opposed to an unaffiliated U.S. bank:

> If [the New York head of ethics and compliance] only offers the choice between abandoning the [cover payments] for movement in favor of clientele or promising BNPP NY we do not wire transfer in USD concerning Cuba, Iran, Sudan or Syria, I only see the solution of going through another bank than BNPP NY for all transactions to these destinations.  The other, less gratifying alternatives are to stop working in USD in these zones or to disguise the reality with the no win situation between telling stories to BNPP NY or to [the unaffiliated U.S. bank].

### Sudan

10.     During the Review Period, BNP Paribas, through the Geneva branch of its Swiss subsidiary, BNP Paribas (Suisse) S.A. ("BNPP Geneva"), created deceptive schemes and transaction structures to conceal thousands of illegal Sudanese transactions from scrutiny by U.S. financial institutions, regulators and authorities.  These transactions were  valued at more than $20 billion dollars.

11.     BNPP Geneva developed deceptive policies, procedures and transaction structures in order to process U.S. dollar-denominated funds transfers through the New York Branch and other U.S. financial institutions for sanctioned Sudanese parties.

12.     In BNPP Geneva's back office, there was policy to strip, amend and omit elements of U.S. dollar payment messages that could serve to identify Sanctioned Parties, including most prominently, those related to Sudan.  An internal policy for processing U.S. dollar payments involving Sudan stated: "Do not list in any case the name of Sudanese entities on messages transmitted to American banks or to foreign banks installed in the U.S."

13.     This policy intentionally prevented U.S. institutions from performing required screening for the presence of Sanctioned Parties on U.S. dollar-denominated transactions and hid from U.S. regulators and authorities the participation of Sudanese entities in U.S. dollar-denominated transactions.

14.     Among these Sanctioned Parties were 18 Sudanese SDNs, of which six were clients of BNPP.  During the period used by the Justice Department to calculate the volume of Federal Violations, BNPP executed approximately $4 billion dollars in transactions for these SDNs.  For the most part, these transactions were processed for a financial institution owned by the Government of Sudan.  During the entire Review Period, there were over $6 billion dollars in transactions processed for SDNs.

15.     BNPP Geneva managed or financed billions of dollars worth of U.S. dollar-denominated letters of credit for Sudanese parties.  In order to transmit the payment messages associated with the letters of credit through New York financial institutions, BNPP Geneva stripped and omitted references to Sudan in the messages to prevent the transaction from being blocked in the U.S.  These transactions were designed to avoid the detection of sanctions violations by U.S. regulators.

16.     Soon after the imposition of U.S. sanctions against Sudan in 1997, BNPP Geneva established account relationships with unaffiliated regional banks ("Regional Banks")

located in Africa, Europe and the Middle East, eventually nine in all, some with no other business purpose than to clear payments for Sudanese clients.[4] The accounts with the Regional Banks were created and established to provide a means to circumvent U.S. sanctions.

17.     Specifically, BNPP Geneva utilized the Regional Banks in a two-step process designed to enable BNPP Geneva's Sudanese clients to evade U.S. sanctions.  In the first step, a Sudanese bank seeking to move U.S. dollars out of Sudan transferred funds internally within BNPP Geneva to a BNPP Geneva account specifically maintained by a Regional Bank to facilitate U.S. dollar transfers from Sudan.  In the second step, the Regional Bank transferred the money to the Sudanese bank's intended beneficiary through a U.S. bank without reference to the Sudanese bank.  As a result, it appeared to the U.S. bank that the transaction was coming from the Regional Bank rather than a Sudanese bank.

18.     A similar process enabled sanctioned Sudanese banks to receive U.S. dollars without being detected:  the originator of the transaction sent a wire transfer through the United States to the Regional Bank's account at BNPP Geneva without reference to Sudan, and the Regional Bank then transferred the money to the Sudanese bank via internal transfer at BNPP Geneva.  Moreover, in order to further disguise the true nature of the Regional Bank transactions, employees at BNPP Geneva frequently worked with the Regional Banks to wait between one and two days after the internal transfer before making a dollar-for-dollar, transaction-by-transaction, clearing of funds through the United States, delinking the U.S. transfer of funds from the prior transfer involving the Regional Banks so that financial institutions in the United States and U.S. authorities would be unable to link the payments to the involved Sanctioned Party.

---

[4] In the account opening documentation for these banks the following notation appeared: "As requested, we hereby confirm that we wish to open the account to facilitate transfers of funds for our mutual Sudanese customers."

19.    In fact, BNPP employees internally proposed to BNPP Geneva compliance staff that they should get the Regional Banks "accustom[ed]...to spacing out the gap between covers they execute with their U.S. correspondents to the extent possible." Ultimately, BNPP Geneva successfully used the Regional Bank structure, which had no business purpose other than to help BNPP's Sudanese clients evade the U.S. embargo, to process thousands of U.S. dollar transactions, worth billions of dollars in total.

20.    The use of Regional Banks to facilitate U.S. dollar transactions with Sudanese Sanctioned Parties was widely known within BNPP Geneva. For example, in a 2004 email to a BNPP Geneva front office employee, a Regional Bank requested "to open an account at BNP Paribas Genev[a] to be used mainly for the USD Transfers to and from Sudanese Banks." This email was forwarded to another BNPP Geneva front office employee who recommended opening the account, as "the opening of this account fits in the framework of our activity in Sudan." Referencing this exchange, another BNPP Geneva employee commented that: "we have advised [Regional Bank] for a long time to open a VOSTRO account to facilitate the transactions which this institution has with countries with which we are also active."

21.    BNPP compliance officers warned the BNPP business employees of their concerns regarding the Sudanese business. In an August 2005 email, a senior compliance officer warned, "[We] have a number of Arab Banks (nine identified) on our books that only carry out clearing transactions for Sudanese banks in dollars...This practice effectively means that we are circumventing the U.S. embargo on transactions in USD by Sudan." The BNPP business managers were more concerned with BNPP's "goodwill in the Sudan," and therefore the business continued despite the warnings from compliance officers.

22.     In September 2005, senior compliance officers at BNPP Geneva arranged
a meeting of BNPP executives "to express, to the highest level of the bank, the reservations of
the Swiss Compliance office concerning the transactions executed with and for Sudanese
customers."  The meeting was attended by several senior BNPP Paris and Geneva executives,
including BNPP's Chief Operating Officer ("COO") at the time.  At the meeting, the COO
dismissed the concerns of the compliance officials and requested that no minutes of the meeting
be taken.

23.     BNPP's compliance personnel continued to warn against BNPP's use of
Regional Banks to process transactions with Sanctioned Parties.  For example, a 2005
compliance report described the scheme as follows:

> The main activity of certain BNPP customers is to domicile cash
> flows in USD on our books on behalf of Sudanese banks.  These
> arrangements were put in place in the context of the U.S. embargo
> against Sudan...The accounts of these banks  were therefore opened
> with the aim of "facilitating transfers of funds in USD for
> Sudanese banks."  This comment was made on the account
> opening application forms of these banks.  The funds in question
> were then transferred, on the same day or at latest D+1 or 2 by the
> [Regional Banks] to [U.S. correspondent banks].

24.     Despite the warnings, BNPP's senior compliance personnel agreed to
continue the Sudanese business and rationalized the decision by stating that "the relationship
with this body of counterparties is a historical one and the commercial stakes are significant.  For
these reasons, Compliance does not want to stand in the way of maintaining this activity for
ECEP..."

25.     As a result of BNPP's conduct, the Government of Sudan and numerous
banks connected to the Government of Sudan, including SDNs, were able to access the U.S.

financial system and engage in billions of dollars' worth of U.S. dollar-based financial

transactions, significantly undermining the U.S. embargo.

26.    As the principal foreign bank for the Government of Sudan, BNPP Geneva

had an essential role in the Government of Sudan's financial stability.  BNPP Geneva held

accounts for a financial institution owned by the Government of Sudan since 1997 for, among

other purposes, illicit U.S. dollar clearing.

27.    Internal Bank memoranda regarding BNPP's Sudanese business that

discussed the political environment and the "crisis in Darfur" also discussed the economic

environment and the Sudanese oil industry's "financial dynamism."  In fact, many senior

executives at BNPP were well aware of the crisis in Darfur and the illicit role Sudan has played

in international issues of concern.  BNPP officials have described Darfur as a "humanitarian

catastrophe," and, while discussing the Sudanese business, noted that certain Sudanese banks

"play a pivotal part in the support of the Sudanese government which…has hosted Osama Bin

Laden and refuses the United Nations intervention in Darfur."

### Iran

28.    From at least 2002 through November 2012, several BNP Paribas

branches, including Paris, London, Geneva, Rome and Milan, developed and implemented

policies and procedures to systematically conceal at least $160 billion in U.S. dollar-

denominated payments on behalf of Iranian customers.  These transactions were processed by the

New York Branch and other New York-based financial intuitions by use of a cover payment

method.

29.    BNP Paribas used policy directives, such as those contained in the

February 2007 *Operating Application for Filtering of Transactions under the Group Policy on*

10

*Iran*, to ensure that SWIFT MT 202 cover payment messages meant to be processed through New York from BNPP reflected only the identity of the "**receiving** institution (and not the [ultimate] Iranian beneficiary institution!)" (emphasis in the original).

30.     By making these transactions nontransparent, BNPP rendered its New York Branch and other New York-based financial institutions incapable of making and maintaining records of any such U.S. dollar payment transaction that cleared through the institution, and accordingly prevented review of such records by regulators and authorities.  In this way, BNPP also rendered its New York Branch and other New York-based financial institutions helpless to detect payments that should have been rejected or blocked under U.S. law.

31.     Using its concealment practices, BNPP Paris was able to maintain its relationship with at least one Iranian-controlled petrochemical client ("Iranian Petrochemical Client") from 2006 through most of 2012, processing payments on its behalf in the amount of approximately one half billion U.S. dollars. [5]  These payments were made in connection with three letters of credit BNPP issued in 2006, 2008 and 2011.

32.     BNPP's "know your customer" ("KYC") documentation for Iranian Petrochemical Client demonstrated that while it was registered as a corporation in Dubai, it was wholly owned by an Iranian energy group based in Tehran, Iran, which was in turn fully controlled and owned by an Iranian citizen.

33.     In 2010, BNPP revealed to its regulators that it had commenced an internal investigation into its compliance with U.S. sanctions, pledging immediate remedial

---

[5] By November 2008 there was no legal method by which Iranian Petrochemical Client could have accessed the U.S. financial system; nevertheless, by covertly processing U.S. dollar transactions for it, BNPP facilitated Iranian Petrochemical Client's ability to trade in U.S. dollars through November 2012.  Consequently, all transactions between November 2008 and November 2012 were in direct violation of U.S. sanctions.

efforts and its full cooperation with U.S. and New York regulators and authorities. Nevertheless, the Bank continued to process U.S. dollar-denominated transactions on behalf of Iranian Petrochemical Client despite the warnings from two financial institutions that had rejected transactions for Iranian Petrochemical Client as prohibited.

### Cuba

34.     Beginning from at least as early as 2000 and continuing through 2010, BNPP participated in eight Cuban Credit Facilities that involved U.S. dollar clearing valued at more than $7 billion and that were not licensed by OFAC.  The Cuban Credit Facilities were managed out of BNPP Paris, and each facility processed hundreds (and in some cases thousands) of U.S. dollar transactions in violation of U.S. sanctions.  One such credit facility involved U.S. dollar loans for one of Cuba's largest state-owned commercial companies which was an SDN.

35.     BNPP was fully aware of the legal risks.  In a January 2006 internal email, one employee at BNPP Paris asked a BNP Paribas compliance officer, "when we lend money to the Cubans, the loans are generally made out in [d]ollars…[c]ould we be reprimanded, and if so, based on what?"  The compliance officer responded to that employee and others, including a senior manager at BNPP Paris:  "These processing transactions obliges us to obscure information regarding the USD (BNPP NY) Clearer, and it is a position which BNPP is not comfortable with, and which, of course, offers a risk to its image and, potentially, a risk for reprisals from US authorities if this behavior was discovered…"

36.     With a book-to-book, bank-to-bank scheme, BNPP Paris and its sanctioned Cuban clients obscured from regulators and authorities the access provided to the U.S. financial system.  In an April 2000 credit application for one of the Cuban Credit Facilities,

two BNPP Paris employees acknowledged in at least one case that the sole motivating factor for using these deceptive structures was the "[l]egal risk linked to the American embargo."

37.    BNPP Paris and its Cuban clients each held accounts at an unaffiliated French bank so that a transaction between a Cuban party's account and an account held at the same bank by BNPP Paris was recorded as a book-to-book funds transfer.  Such transactions created no evidence of BNPP's funds clearing in U.S. dollars for the Sanctioned Cuban Parties.  In a separate step, however, BNPP Paris transferred the U.S. dollars (cleared on its own behalf through its New York Branch or another New York-based financial institution).  They went from BNPP Paris' account at the unaffiliated French bank to a transit account held at BNPP's Paris branch in a bank-to-bank transfer.  Sometimes skipping the step of depositing U.S. dollar funds into the transit account, BNPP Paribas would either initially -- or within a brief period of time -- forward those funds to the Cuban Parties' accounts.

38.    For the most part, wire messages for the Cuban Credit Facilities that were processed through BNPP's New York Branch made no reference to Cuba or a Sanctioned Cuban Party.  BNPP Paris gave Cuban clients and other participants of the credit facilities clear instructions to refrain from doing so.  In one email communication, a BNPP Paris employee directed the representative of a Sanctioned Cuban Party to omit the name of a Cuban bank on a SWIFT payment message; otherwise, the BNPP Paris employee warned, "these[] funds risk to be stopped by United State[s] further to the embargo." Taking heed, the employee of the Sanctioned Cuban Party replied that he would indeed cancel the existing wire message, and execute one "following your instructions."

39.    When references to Cuba accidentally appeared in three payment instructions dispatched to the U.S., BNPP staff stripped references to Cuba and resubmitted

13

SWIFT messages to replace those that had been detected and blocked.  A replacement message, now void of any reference to Cuba was then sent by BNPP to an unaffiliated U.S. bank.

40.     The Bank structured resubmitted payments so that dollar amounts could not be matched and once again blocked in the U.S.  To ensure that their resubmissions were not detected by the U.S., BNPP Paris staff, on at least one occasion, combined the dollar amounts of three payments into just one stripped message, aggregating the total value of the original three in the resubmitted replacement message.  This prevented the possibility of matching the dollar-amount match to the three previously rejected messages.  The extent of the Bank's deception was demonstrated by one senior attorney at BNPP's Paris headquarters in early 2006: "[m]y concern comes from the fact that we cannot rule out that we would have to explain to OFAC that this is part of a long standing facility with Cuban entities. Could that trigger a retroactive investigation of all prior payments…?"

41.     In late 2006 and early 2007, BNPP Paris compliance personnel tried to persuade the Bank to convert the U.S. dollar Cuban Credit Facilities to another currency, such as Euros.  Nevertheless, some of the Cuban Credit Facilities remained denominated in U.S. dollars for several years, with one operating in U.S. dollars until 2010.  Senior employees at BNPP Paris, including the Bank's then-Group Head of ECEP, allowed these credit facilities to operate in U.S. dollars, in violation of U.S. law, due to BNPP's long relationships with the Cuban Parties and calculated costs to the Bank in attempting to convert their credit facilities to Euro-denominated loans.  In a memo issued at the end of 2009, one ECEP employee referenced an existing Cuban Party as a "historic client," a "major player in the Cuban economy," and a "strategic customer with whom we intend to arrange new financing secured by offshore flows."

14

42.     In January 2007, the head of compliance at BNPP Paris received a

memorandum entitled *Respect of Cuban Embargo*, acknowledging that BNPP had been

systematically bypassing the U.S. sanctions against Cuba by permitting Cuban Parties to borrow

U.S. dollars.  The memorandum concluded that "[t]otal transparency is not currently possible"

because "[c]hanging the payment currency during the process with a pool of participants would

be long and costly."  Just a few months later, a compliance officer at BNPP Paris sent a memo to

senior BNPP Paris compliance and ECEP personnel entitled *Compliance with the Cuba*

*embargo*.  The memo set forth two possibilities for dealing with a Cuban Credit Facility that was

still dollar denominated:  (1) "[s]et this facility aside from the official inventory with regard to

the US so long as it cannot be converted into Euros or another currency;" or (2) "[i]f Group

Compliance needs to be totally transparent with regard to the US authorities, the facility currency

will have to be modified...[T]his option would trigger off an onerous process of negotiations with

the banks and the borrowers, and ECEP will not have total control over the outcome: our

decision to be OFAC compliant is a minor concern for the other parties."  In the end, the memo

concluded, "[g]iven its marginal character, we suggest that this facility should be kept silent, it is

totally discreet and is reimbursed via internal wire transfers."

### Violations of the Banking Law and Regulations

43.     BNPP failed to maintain or make available at its New York Branch true

and accurate books, accounts and records reflecting all transactions and actions in violation of

Banking Law § 200-c.

44.     BNPP officers, directors, and employees made false entries in BNPP's

books, reports and statements and willfully omitted to make true entries of material particularly

pertaining to the U.S. dollar clearing business of BNPP at its New York Branch with the intent to

deceive the Superintendent and examiners of the Department and representatives of other U.S.

regulatory agencies who were lawfully appointed to examine BNPP's conditions and affairs at its

New York Branch in violation of Banking Law § 672.1.

45.     The Department's regulation, 3 NYCRR § 300.1, requires BNPP to submit

a report to the Superintendent immediately upon the discovery of fraud, dishonesty, making of

false entries and omission of true entries, and other misconduct, whether or not a criminal

offense, in which any BNPP employee was involved.  It knowingly failed to do so for several

years.

46.     In 2004, a joint examination by the Department's predecessor agency and

the Federal Reserve Bank of New York ("FRB-NY") identified systemic failures in BNPP's

compliance with Bank Secrecy Act and Anti-Money Laundering (BSA/AML) requirements.  Of

particular note were deficiencies in monitoring by BNPP's New York Branch of the Bank's

correspondent banking relationships with overseas clients, including its processing of U.S.

dollar-denominated transactions.  Based on the regulators' findings, BNPP voluntarily entered

into a Memorandum of Understanding, dated September 16, 2004 (the "2004 MOU"), with the

Department and the FRB-NY, vowing to remediate, among other things, BNPP's systems for

compliance with BSA/AML requirements.

47.     Instead, the Bank concealed its continuing violations from the regulators

and authorities in New York.  During that same 2004 period, internal documents obtained from

the Bank demonstrate that BNPP's most senior operations, compliance and legal staff knew of

the Bank's serous illegal conduct in violation of laws and regulations, and, rather than report the

conduct to the Bank's regulators, actively supported it.

16

48.     In 2004, BNPP executives from its Paris headquarters and its Geneva branch met on the subject of U.S. embargoes "against sensitive countries (Sudan, Libya, Syria...)" and their impact on BNPP's business.  To shield the New York Branch from potential regulatory enforcement actions, BNPP officials fashioned a solution whereby BNPP Geneva would use an unaffiliated U.S. bank to conduct illicit U.S. dollar-denominated transactions for Sanctioned Parties.  In this way, "the problem" of violating U.S. sanctions "shifted" to the unaffiliated U.S. bank.

49.     Although BNPP Geneva executives were warned by a BNPP Geneva compliance officer that clearing through an unaffiliated U.S. bank in this manner could be viewed as a "serious breach" and a "grave violation," the practice continued throughout the Review Period.

50.     On March 3, 2008, the Department and FRB-NY terminated the 2004 MOU finding the Bank compliant in all cited areas of concern.  The termination letter was addressed to, among others, BNPP's then-Group Head of Compliance.  The Bank was fully aware that the 2004 MOU's termination was based on falsified facts.  The then-Group Head of Compliance knew and remained silent about BNPP's continuing and longstanding efforts to conduct secret transactions for Sanctioned Parties, such as Cuba.  In September 2008, a more junior compliance officer emailed the then-Group Head of Compliance and other compliance staff that "[The Cuban Credit Facility], for which [BNPP had] for two years now been putting pressure on ECEP to have the USD reference abandoned, is more or less at a dead-end, and we know it will be impossible to modify without giving up something in exchange...[T]he subsistence of [the Cuban Credit Facility] in USD [ ] prevents [BNPP's] situation on Cuba from being totally 'compliant.'"

**Settlement Provisions**

**Monetary Payment:**

   51. BNP Paribas shall make payment of a civil monetary penalty to the Department pursuant to Banking Law § 44 in the amount of $2,243,400,000.00.  BNP Paribas shall pay the entire amount within thirty (30) days of executing the Consent Order.  BNP Paribas agrees that it will not claim, assert, or apply for a tax deduction or tax credit with regard to any U.S. federal, state or local tax, directly or indirectly, for any portion of the civil monetary penalty paid pursuant to this Consent Order.

   52. Additionally, BNPP shall make payment of reparations and restitution to the Department and the State of New York in the amount of $1,050,000,000.00 for injury caused by its wrongful conduct.  This amount will be satisfied by the Bank's payment to the New York County District Attorney ("DANY") pursuant to the June 30, 2014 plea agreement between the Bank and DANY.  The forfeiture of such funds is pursuant to CPLR § 1349 and any subsequent distribution of such funds shall be governed by the terms of the June 30, 2014 Agreement to Escrow and Distribute Forfeiture Funds entered into between DANY and the State of New York.

**Suspension of U.S. Dollar Clearing:**

   53. On the effective date of this Order, BNP Paribas shall begin taking steps to implement the one year-long suspension of U.S. Dollar clearing services through its New York Branch described in this section (the "Suspension").  The Suspension shall begin on January 1, 2015 and terminate on December 31, 2015 and shall encompass the following:

     A. Suspension of all U.S. dollar clearing by the New York Branch on behalf of BNPP Geneva, BNPP Paris and BNPP Singapore for the oil and gas Energy & Commodity Finance business;

        B.      Suspension of all U.S. dollar clearing by the New York Branch on behalf of BNPP Milan for its oil and gas Trade Finance business and for other Trade Finance business at BNPP Milan;

        C.      Suspension of all U.S. dollar clearing by the New York Branch on behalf of BNPP's Rome operation for oil and gas related clients; and

        D.      Suspension of all U.S. dollar clearing by the New York Branch of deposits by unaffiliated third-party banks at BNPP London.

54.     Additionally, the Bank agrees to a prohibition, for a period of twenty-four (24) months from the date of this Agreement, of U.S. dollar clearing as a correspondent bank for unaffiliated third party banks in New York and London.

55.     Avoidance of Suspension:

- BNPP shall not avoid or circumvent the Suspension by using any BNPP branch, affiliate, subsidiary or entity in which BNPP has a controlling interest in the United States for U.S. Dollar Clearing.

- BNPP shall not avoid or circumvent the Suspension by moving, or causing to be moved, any client relationship or business to any other business line, branch or affiliate of BNPP.

**Extension of Independent Consultant:**

56.     The Bank, the New York Branch and the Department entered into a Memorandum of Understanding, dated August 19, 2013 (the "2013 MOU") to install an independent consultant ("IC") on site at the New York Branch to conduct a review of the

19

BSA/AML and OFAC compliance programs, policies and procedures in place at the Branch. The parties now agree to extend the IC's engagement for an additional two years. In addition to the terms and conditions of the 2013 MOU, the IC will oversee, evaluate and test BNPP's remediation efforts, the implementation of BNPP's efforts to streamline the global U.S. dollar clearing through the New York Branch and the U.S. dollar suspension requirements contained in this agreement.

**Discipline of BNP Paribas Employees:**

57.     At the direction of the Department, the following individuals were terminated by or separated from the Bank as a result of the investigation: (1) the former Group Head of Compliance; (2) the former Group Chief Operating Officer; (3) the former Head of Ethics and Compliance North America; (4) the former Group Head of Structured Finance for the Corporate Investment Bank ("CIB") and former Group Head of ECEP; (5) the former Group Head of Debt Capital Markets; (6) a former attorney of BNP Paribas's CIB Legal Department; (7) a former front office employee in Paris and Geneva with responsibility for an Iranian client; (8) a former relationship manager in Geneva with responsibility for a client engaged in Sudanese business; (9) a former front office supervisor in Geneva with responsibility for a client engaged in Sudanese business; (10) a former manager in Geneva with responsibility for a client engaged in Sudanese business; (11) a former senior employee in Geneva with responsibility for clients engaged in Iranian business; (12) a former employee of ECEP with responsibility for clients engaged in Sudanese business, and (13) a former account officer in Geneva with responsibility for a client engaged Sudanese business. In total, the Bank disciplined 45 employees in connection with this investigation, with levels of discipline ranging from termination, to cuts in compensation, demotion, mandatory training sessions and warnings.

58.     BNPP shall not in the future, directly or indirectly, retain any of the individuals referenced in the paragraph above, as either an officer, employee, agent, consultant, contractor of BNPP, or any affiliate of BNPP, or in any other capacity.   This restriction also applies to any current or former employee who is either separated from the Bank or whose employment is terminated by the Bank as a result of any future formal disciplinary action in connection with this investigation.

**Breach of the Consent Order:**

59.     In the event that the Department believes BNPP to be materially in breach of the Consent Order ("Breach"), the Department will provide written notice to BNPP of the Breach and BNPP must, within ten (10) business days from the date of receipt of said notice, or on a later date if so determined in the sole discretion of the Department, appear before the Department to demonstrate that no Breach has occurred or, to the extent pertinent, that the Breach is not material or has been cured.

60.     The Parties understand and agree that BNPP's failure to make the required demonstration within the specified period is presumptive evidence of BNPP's Breach.  Upon a finding of Breach, the Department has all the remedies available to it under New York Banking and Financial Services Law and may use any and all evidence available to the Department for all ensuing hearings, notices, orders and other remedies that may be available under the New York Banking and Financial Services Laws.

**Waiver of Rights:**

61.     The Parties further understand and agree that no provision of the Consent Order is subject to review in any court or tribunal outside the Department.

21

**Parties Bound by the Consent Order:**

      62.    It is further understood that the Consent Order is binding on the Department and BNPP, as well as their successors and assigns that are within the supervision of the Department, but it specifically does not bind any federal or other state agencies or any law enforcement authority.

      63.    No further action will be taken by the Department against BNPP for the conduct set forth in the Consent Order, provided that BNPP complies with the terms of the Consent Order.

      64.    Notwithstanding any other provision contained in the Consent Order, however, the Department may undertake action against BNPP for transactions of conduct that BNPP did not disclose to the Department in the written materials that BNPP submitted to the Department in connection with this matter.

**Notices:**

      65.    All communications regarding this Order shall be sent to:

        Elizabeth Nochlin
        Assistant Counsel
        Banking Division
        New York State Department of Financial Services
        One State Street
        New York, NY 10004

        Megan Prendergast
        Assistant Counsel
        Banking Division
        New York State Department of Financial Services
        One State Street
        New York, NY 10004

Georges Dirani
Group General Counsel
BNP Paribas S.A.
12 Rue Chauchat
75450 Paris CEDEX 09, France

**Miscellaneous:**

66.     Each provision of the Consent Order will remain effective and enforceable until stayed, modified, terminated or suspended in writing by the Department.

67.     No promise, assurance, representation, or understanding other than those contained in the Consent Order has been made to induce any party to agree to the provisions of the Consent Order.

IN WITNESS WHEREOF, the parties hereto have caused this Consent Order to be executed as of this 29 day of June, 2014.

BNP Paribas

By: _____
Jean-Laurent Bonnafé
Chief Executive Officer

New York State Department
of Financial Services

By: _____    6/30/14
Benjamin M. Lawsky
Superintendent

23