**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **MARY OFISI, et al.,** |
| **Plaintiffs,** |
| **v.** |
| **BNP PARIBAS, S.A., et al.,** |
| **Defendants.** |

**Civil Action No. 15-2010 (JDB)**

## <u>MEMORANDUM OPINION</u>

Plaintiffs in this case are victims and family members of victims of the 1998 terrorist bombings of the U.S. embassies in Kenya and Tanzania, which killed 224 people and injured thousands more. The attacks were perpetrated by al Qaeda, with the assistance of the Republic of Sudan, which provided al Qaeda with safe harbor, as well as financial, military, and intelligence assistance throughout the 1990s. <u>See generally</u> <u>Owens v. Republic of Sudan</u>, 826 F. Supp. 2d 128 (D.D.C. 2011) (detailing findings of fact and conclusions of law as to Iran's and Sudan's liability for the bombings). Plaintiffs have already sought and obtained judgment against Sudan for its role in the terrorist bombings, in protracted litigation that began in 2001. <u>See</u> <u>Owens v. Republic of Sudan</u>, 174 F. Supp. 3d 242, 250–53 (D.D.C. 2016) (discussing the history of plaintiffs' litigation against Sudan). Earlier this year, the D.C. Circuit affirmed these judgments against Sudan in most respects, but vacated all punitive damages awards. <u>See</u> <u>Owens v. Republic of Sudan</u>, 864 F.3d 751, 769 (D.C. Cir. 2017). Plaintiffs now bring suit against defendant banks BNP Paribas, S.A. (BNPP) and Al Shamal Islamic Bank under the civil liability provision of the Anti-Terrorism Act (ATA), 18 U.S.C. § 2333, the Alien Tort Statute (ATS), 28 U.S.C. §1350, and various common law torts, for allegedly conspiring with Sudan, Sudanese banks, and al Qaeda to defeat U.S.

sanctions against Sudan.  BNPP has moved to dismiss all of plaintiffs' claims.  See Def.'s Mot. to Dismiss [ECF No. 13] at 1.[1]  For the reasons described below, BNPP's motion will be granted and the complaint will be dismissed.

## I.    BACKGROUND

The following facts are drawn from plaintiffs' complaint.  Plaintiffs are U.S. citizens or foreign national employees or contractors of the U.S. government who were killed or injured in the 1998 embassy bombings, or their immediate family members.  Compl. [ECF No. 1] ¶ 31. Plaintiffs were awarded judgments against Sudan for its role in the bombings in prior litigation in this Court.  Id. ¶¶ 32, 85.  The defendants are two banks, BNPP and Al Shamal.  BNPP is a multinational bank, incorporated under the laws of France, and headquartered in Paris, France.  Id. ¶ 18.  During the time period relevant to the complaint, BNPP operated affiliates, branch offices, and subsidiaries in the U.S.  Id.  Al Shamal is a Sudanese bank established in 1990, funded in part through a $50 million capital contribution from Osama Bin Laden.  Id. ¶ 154.  Al Shamal allegedly maintained bank accounts for al Qaeda, and provided financial and material support to al Qaeda prior to, and after, the 1998 embassy bombings.  Id. ¶ 69.

The complaint alleges a conspiracy among BNPP, Sudan, Sudanese banks (including Al Shamal), and al Qaeda to defeat the economic sanctions imposed by the U.S. on Sudan in

---

[1] Plaintiffs have not filed an affidavit of service establishing that Al Shamal has been served with the complaint in this action, which was filed nearly two years ago, and they have not informed the Court of any efforts they have taken to serve Al Shamal.  Al Shamal has not appeared and has not responded to the complaint.  Although the deadline for serving process within 90 days does not apply to service in a foreign country, see Fed. R. Civ. P. 4(m), "that does not mean there is no time limit for service," Quantum Color Graphics, LLC v. Fan Ass'n Event Photo GmbH, 185 F. Supp. 2d 897, 906 (N.D. Ill. 2002); see Ashraf-Hassan v. Embassy of France in U.S., 878 F. Supp. 2d 164, 174 (D.D.C. 2012).  Courts have found that the exemption from the 90-day time limit for service in a foreign country does not apply—and a case may be dismissed—when a plaintiff has made no attempt to serve a foreign defendant.  Nylok Corp. v. Fastener World Inc., 396 F.3d 805, 807 (7th Cir. 2005) ("[T]he amount of time allowed for foreign service is not unlimited. . . .  If, for example, a plaintiff made no attempt to begin the process of foreign service within 120 days, it might be proper for a court to dismiss the claim." (citations omitted)); USHA (India) Ltd. v. Honeywell Int'l, Inc., 421 F.3d 129, 134 (2d Cir. 2005) ("Rule 4(m)'s exception does not apply if, as here, the plaintiff did not attempt to serve the defendant in the foreign country.")).  The Court will therefore dismiss the claims against Al Shamal, without prejudice.

November 1997.  The complaint alleges that BNPP provided access to the U.S. financial system to Sudan, Sudanese banks, and their agents, who in turn provided material support to al Qaeda which it used to carry out the terrorist attacks on the U.S. embassies.  Id. ¶¶ 1–2.  According to the complaint, the embassy bombings were carried out, in part, to defeat U.S. sanctions against Sudan.  Id. ¶¶ 12, 108.

## A.  SUDAN, AL QAEDA, AND THE EMBASSY BOMBINGS

In 1991, Sudan invited al Qaeda—an international terrorist network founded and led by Osama bin Laden—to establish operations in Sudan.  Id. ¶ 126.  Sudan and al Qaeda allegedly formed a mutually beneficial relationship.  For its part, Sudan provided al Qaeda with safe harbor, the ability to operate with impunity, and access to the U.S. financial system.  Sudan also provided military and intelligence assistance to al Qaeda and an airliner to transport weapons, and facilitated travel for members of al Qaeda by providing Sudanese passports, Sudanese citizenship, and unregulated passage over the Sudan-Kenya border.  Id. ¶¶ 126, 134–36, 138, 140, 144, 151; see Owens, 864 F.3d at 782–83.  In return, al Qaeda agreed to support the government in its war in southern Sudan against Christians, and invested in Sudan's economy and infrastructure, for example, by building roads, a major highway, and an airport.  Id. ¶¶ 126–127, 137; see Owens, 826 F. Supp. 2d at 140.

The U.S. designated Sudan as a state sponsor of terrorism in 1993, and has maintained that designation ever since.  Compl. ¶ 131.  A 1993 report by the U.S. State Department noted that Sudan actively harbored international terrorist groups and maintained relations with a wide range of Islamic extremists.  Id. ¶ 132.  Also in 1993, Bin Laden ordered an al Qaeda operative to Nairobi, Kenya to survey U.S. targets, including the U.S. embassy.  Id. ¶ 133.  The Sudanese intelligence service facilitated the transport of al Qaeda operatives and funds from Sudan to a terrorist cell

operating in Nairobi.  Id. ¶ 134.  Al Qaeda was present in Sudan in 1997 and 1998 leading up to

the embassy bombings and, according to the complaint, the support that al Qaeda received from

Sudan and the access Sudan provided to its banking system was integral to al Qaeda's plan to carry

out the attacks.  Id. ¶ 152.  On August 7, 1998, al Qaeda attacked the U.S. embassies in Kenya and

Tanzania, killing 224 people and injuring thousands more.  Id. ¶ 118.

### B.  U.S. SANCTIONS AGAINST SUDAN AND BNPP

Prior to the terrorist bombings of the U.S. embassies, but as a result of Sudan's designation

as a state sponsor of terrorism, the U.S. imposed various sanctions against the Sudanese

government in the early 1990s.  In 1997, the U.S. government imposed a complete trade embargo

on Sudan due to Sudan's continued support for terrorism, which made it unlawful to export goods

and services, including financial services, to Sudan without a license from the U.S. Treasury

Department's Office of Foreign Assets Control (OFAC).  Id. ¶¶ 5, 103, 105.  As a result of these

sanctions, virtually all trade and investment activities involving the U.S. financial system,

including the processing of U.S. dollar transactions through the U.S., were prohibited as to Sudan,

its agencies, or instrumentalities.  Id. ¶ 105.

The complaint alleges that BNPP did not comply with the U.S. sanctions regime against

Sudan and that, had it done so, al Qaeda would not have been able to receive the assistance from

Sudan necessary to carry out the 1998 embassy bombings.  In July 2014, BNPP pled guilty in

federal court to one count of conspiring to violate the International Emergency Economic Powers

Act (IEEPA) and the Trading with the Enemy Act (TWEA).  Compl. ¶ 86; see 50 U.S.C. § 1705.[2]

BNPP admitted to violating U.S. sanctions imposed on Sudan (as well as on Cuba and Iran) by

conducting and concealing U.S. dollar-denominated transactions on behalf of sanctioned entities

---

[2] Section 1705 makes it a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of regulations issued pursuant to IEEPA, which includes U.S. sanctions against Sudan.  50 U.S.C. § 1705 (a), (c).

associated with those countries. See Compl. ¶ 86; see also BNPP Plea Agreement Statement of Facts (SOF) [ECF No. 13-2] ¶¶ 14–16. BNPP stipulated in its plea agreement that this conspiracy took place between 2002 and 2012, based on banking relationships BNPP had established with Sudanese financial institutions as early as 1997. SOF ¶¶ 14, 17.

Shortly after the imposition of U.S. sanctions in 1997, BNPP agreed to become the sole correspondent bank in Europe for Sudan's central bank, which then directed all major Sudanese commercial banks to use BNPP as their primary correspondent bank in Europe. As a result, most major Sudanese banks eventually held U.S. dollar-denominated accounts with BNPP. Compl. ¶ 87; SOF ¶ 19. This included Al Shamal, which held an account at United European Bank, a subsidiary of BNPP. Compl. ¶ 26. In November 1997, BNPP established relationships with unaffiliated regional satellite banks located throughout Africa, Europe, and the Middle East. Id. ¶ 107; SOF ¶ 23. BNPP used these relationships to facilitate U.S. dollar payments for sanctioned Sudanese banks, essentially using the regional satellite banks as clearinghouses to disguise transactions with sanctioned entities. Compl. ¶¶ 107, 194. BNPP directed its employees to omit any references to Sudan in U.S. dollar payment messages, in order to disguise the source of the transactions from U.S. authorities. Id. ¶¶ 182, 188, 190.

Plaintiffs allege that BNPP's conduct violated: (1) the ATA, 18 U.S.C. §§ 2339A, 2339C and 2332d, entitling those plaintiffs who are U.S. citizens to damages under section 2333, see Compl. ¶¶ 293–318 (Counts V and VI); (2) the law of nations, thus entitling those plaintiffs who are not U.S. citizens to damages under the ATS, id. ¶¶ 255–292 (Counts III and IV); (3) common law principles of conspiracy and aiding and abetting various torts, id. ¶¶ 226–254 (Counts I and II); and (4) constituted a fraudulent conveyance that interfered with plaintiffs' ability to collect on the judgment they obtained against Sudan from prior litigation, id. ¶¶ 327–340 (Count VIII).

### C. OWENS V. BNP PARIBAS, S.A.

Earlier this year, this Court decided a case brought by a different group of plaintiffs who are victims of the 1998 embassy bombings against BNPP and two of its subsidiaries. Owens v. BNP Paribas S.A., 235 F. Supp. 3d 85 (D.D.C. 2017). Plaintiffs in that case made allegations similar to plaintiffs here, and asserted claims under the civil liability provision of the ATA and various state tort laws. This Court dismissed those claims based on plaintiffs' failure to plead the required elements to state a civil liability claim under the ATA. See id. at 98–100. The Owens plaintiffs have appealed this Court's judgment to the D.C. Circuit. See Owens v. BNP Paribas S.A., No. 17–7037 (D.C. Cir. appeal docketed Feb. 28, 2017).

## II.  LEGAL STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A complaint that "'pleads facts that are merely consistent with a defendant's liability'" falls short of showing plausible entitlement to relief. Atherton v. D.C. Office of the Mayor, 567 F.3d 672, 681 (D.C. Cir. 2009) (quoting Iqbal, 556 U.S. at 678). The Court must take all allegations in the complaint as true, and draw all reasonable inferences in the plaintiffs' favor. See Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans, Inc., 525 F.3d 8, 15 (D.C. Cir. 2008). However, "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s] devoid of further factual enhancement," do not satisfy the pleading standard. Iqbal, 556 U.S. at 678 (citation and internal quotation marks omitted). The Court need not accept legal conclusions or inferences drawn by the plaintiff which

are unsupported by facts alleged in the complaint.  <u>Food & Water Watch, Inc. v. Vilsack</u>, 808 F.3d 905, 913 (D.C. Cir. 2015).

## III.  <u>DISCUSSION</u>

### A.  SUBJECT MATTER JURISDICTION

BNPP initially argues that the Court lacks subject matter jurisdiction over plaintiffs' ATA and ATS claims because plaintiffs have failed to individually allege their nationalities.  Def.'s Mot. to Dismiss at 11.  The ATS and the ATA establish subject matter jurisdiction for certain plaintiffs. <u>Ali v. Rumsfeld</u>, 649 F.3d 762, 775 (D.C. Cir. 2011); <u>Gill v. Arab Bank, PLC</u>, 893 F. Supp. 2d 474, 495 (E.D.N.Y. 2012).  The ATS provides that "[t]he district courts shall have original jurisdiction of any civil action by <u>an alien</u> for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350 (emphasis added).  Conversely, the ATA provides that "[a]ny <u>national of the United States</u> injured in his or her person . . . may sue therefor in any appropriate district court of the United States . . . ."  18 U.S.C. § 2333(a) (emphasis added).  The term "national of the United States" means (a) a citizen of the U.S., or (b) a person who, though not a citizen, owes permanent allegiance to the U.S.  18 U.S.C. § 2331(2); 8 U.S.C. § 1101(a)(22).

The complaint alleges that lead plaintiff Mary Ofisi is a Kenyan national, Compl. ¶ 29; thus, she is an "alien" as required to bring a claim under the ATS.  The complaint does not specify the individual nationalities for the remaining 566 named plaintiffs; rather, it alleges that "[e]ach of the other named plaintiffs are either United States citizens or foreign national employees or contractors of the United States Government who were killed or injured in the 1998 East African Embassy Attacks, or their immediate family members."  <u>Id.</u> ¶ 31.  The question is whether, as BNPP argues, this is insufficient.

BNPP's argument must be considered in the context of Rule 8's requirement that the complaint provide "a short and plain statement of the grounds for the court's jurisdiction." Fed. R. Civ. P. 8(a)(1). In assessing whether a complaint sufficiently alleges subject matter jurisdiction, the Court accepts as true the complaint's allegations, see Iqbal, 556 U.S. at 678, and liberally construes the pleadings such that the plaintiff benefits from all inferences derived from the facts alleged, Barr v. Clinton, 370 F.3d 1196, 1199 (D.C. Cir. 2004). "'At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice.'" Attias v. Carefirst, Inc., 865 F.3d 620, 625–26 (D.C. Cir. 2017) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

In light of these authorities, the Court is satisfied that the complaint's allegation—that all of the named plaintiffs are "either U.S. citizens or foreign national employees or contractors of the United States government"—provides a short and plain statement of the court's jurisdiction, which is all that is required under Rule 8. Granting plaintiffs the benefit of liberal construction, the Court infers that the U.S. citizen plaintiffs are asserting claims under the ATA, while the other plaintiffs are asserting claims under the ATS. The Court will therefore move forward and evaluate whether plaintiffs have plausibly alleged the other elements required to state those claims.

## B. ATA CLAIMS

BNPP moves to dismiss the U.S. citizen plaintiffs' ATA claims for failure to state a claim. See Def.'s Mot. to Dismiss at 12–31. The ATA's civil liability provision, 18 U.S.C. § 2333(a), provides that "[a]ny national of the United States injured in his or her person . . . by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold . . . damages." On its face, the ATA appears to require: (1) injury to a U.S. national, (2) an act of international terrorism,

and (3) causation.  Section 2333 does not contain an express intent element, but courts have concluded that the statute requires some kind of deliberate misconduct by the defendant, i.e., more than mere negligence, although "deliberate disregard of the interests of others" may be sufficient. Boim v. Holy Land Found. for Relief & Dev., 549 F.3d 685, 692–93 (7th Cir. 2008) (en banc) (citation and internal quotation marks omitted); see also Gill, 893 F. Supp. 2d at 503; Wultz v. Islamic Republic of Iran, 755 F. Supp. 2d 1, 42 (D.D.C. 2010); Goldberg v. UBS AG, 660 F. Supp. 2d 410, 428 (E.D.N.Y. 2009).

The intent required under § 2333 is complicated by the meaning of "international terrorism," which is defined as activities that, inter alia, "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State." 18 U.S.C. § 2331(1)(A).  Section 2333 thus incorporates a range of state and federal crimes that may constitute "acts of international terrorism" if a plaintiff can show both that the defendant committed the criminal violation and that the crime satisfies the additional elements listed above, i.e., injury to a U.S. national and causation.  In other words, "while section 2333 itself requires at least reckless conduct, plaintiffs will also have to show varying levels of scienter depending on the underlying criminal violation alleged as constituting the requisite 'act of international terrorism.'" Owens, 235 F. Supp. 3d at 90–91; see also, e.g., Gill, 893 F. Supp. 2d at 504; Goldberg, 660 F. Supp. 2d at 427–28.

Plaintiffs allege that BNPP violated three criminal provisions of the ATA: 18 U.S.C. §§ 2332d, 2339A, and 2339C.  Section 2339A(a) makes it a crime to "provide[ ] material support or resources [to terrorists] . . . knowing or intending that they are to be used in preparation for, or in carrying out, a violation of" various criminal statutes that prohibit, for example, the

extraterritorial killing of a U.S. national (§ 2332(a)) or the extraterritorial bombing of a place of public use or a government facility (§ 2332f(a)(1)). Section 2339C(a)(1) makes it a crime to "by any means, directly or indirectly, unlawfully and willfully provide[ ] or collect[ ] funds . . . with the knowledge that such funds are to be used" to carry out an act intended to cause death or serious bodily injury, where "the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act." Finally, § 2332d(a) makes is a crime for any "United States person, knowing or having reasonable cause to know that a country is designated under section 6(j) of the Export Administration Act of 1979 . . . as a country supporting international terrorism," to "engage[] in a financial transaction with the government of that country."

Before proceeding any further, the Court will dismiss plaintiffs' claim for primary liability based on BNPP's alleged violation of § 2339C because that statute was enacted in 2002, four years after the relevant conduct in this case leading up to the embassy bombings. See Terrorist Bombings Convention Implementation Act of 2002, Pub. L. No. 107–197, § 202, 116 Stat. 721, 724; Owens, 235 F. Supp. 3d at 98 (dismissing civil claim against BNPP premised on § 2339C for same reason); see also Boim, 549 F.3d at 691 (holding civil liability may not be imposed under § 2333 because defendant did not render material support to terrorist group between the effective date of § 2339A and plaintiff's injury).

The parties have raised several issues of statutory interpretation related to plaintiffs' remaining claims under § 2339A and § 2332d. The first two issues—whether § 2333 provides for aiding and abetting liability and what standard of causation applies—are ones that the Court recently resolved in Owens, 235 F. Supp. 3d at 91–97. Hence, the Court will incorporate that portion of the Owens opinion here and only briefly summarize those issues below. The third—

whether BNPP is a "United States person" for purposes of § 2332d—was not raised in <u>Owens</u> and will thus be addressed fully below.

### 1. Aiding and Abetting Liability

The parties dispute whether section 2333 of the ATA permits secondary liability claims for aiding and abetting. <u>See</u> Mot. to Dismiss at 26–29; Pls.' Opp'n [ECF No. 19] at 23–25. The Court decided this issue in <u>Owens</u> where, after surveying the relevant case law, it concluded that the prior version of the ATA that is applicable to plaintiffs' claims in this case does not provide for civil aiding and abetting liability under § 2333. <u>See</u> 235 F. Supp. 3d at 91–95.[3] Plaintiffs argue here that the Court should follow an earlier decision by a court in this district, <u>see</u> <u>Wultz</u>, 755 F. Supp. 2d at 56–57,[4] that recognized aiding and abetting liability under the ATA, instead of decisions from the Second and Seventh Circuits[5] going the other way. This Court already considered and rejected this argument in <u>Owens</u>, 235 F. Supp. 3d at 93. Thus, to the extent that plaintiffs' ATA claims are based on an aiding and abetting theory, they will be dismissed.

### 2. Proximate Causation

The parties also dispute the applicable causation standard. Section 2333(a) requires that a plaintiff be injured "by reason of" an act of international terrorism. The parties agree that the "by reason of" language requires plaintiffs to show that BNPP's conduct proximately caused the attacks, but they appear to disagree about what that means. <u>See</u> Def.'s Mot. to Dismiss at 13–14; Pls.' Opp'n at 28–30. This Court also resolved this issue in <u>Owens</u>, concluding that § 2333 requires

---

[3] In 2016, Congress amended the ATA to specifically include aiding and abetting liability. <u>See</u> Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114–222, § 4, 130 Stat. 852, 854 (2016). The amended version of the statute does not apply to those injured before September 11, 2001, and hence does not apply here. <u>Id.</u> § 7, 130 Stat. 855.

[4] Another court in this district, <u>Burnett v. Al Baraka Inv. & Dev. Corp.</u>, 274 F. Supp. 2d 86, 107 (D.D.C. 2003), recognized aiding and abetting liability under the ATA by relying on <u>Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev.</u>, 291 F.3d 1000 (7th Cir. 2002). But the Seventh Circuit sitting en banc subsequently overruled that decision. <u>See</u> <u>Boim</u>, 549 F.3d 685 (en banc).

[5] <u>Rothstein v. UBS AG</u>, 708 F.3d 82, 97 (2d Cir. 2013); <u>Boim</u>, 549 F.3d at 691.

a showing of proximate cause as that "term is typically defined." 235 F. Supp. 3d at 97 (citing Burnett, 274 F. Supp. 2d at 105 ("Proximate cause is defined as a test of whether the injury is the natural and probable consequence of the negligent or wrongful act and ought to have been foreseen in light of the circumstances." (internal quotations omitted))); see Siegel v. SEC, 592 F.3d 147, 159 (D.C. Cir. 2010) ("[P]roximate causation . . . is normally understood to require a direct relation between conduct alleged and injury asserted." (citation and internal quotation marks omitted)). That is the standard that the Court will apply to plaintiffs' ATA claims here.

### 3. United States Person Under § 2332d

The final issue of statutory interpretation concerns whether BNPP qualifies as a "United States person" under § 2332d. BNPP argues that it does not and that plaintiffs' claim founded on BNPP's alleged violation of this statute should therefore be dismissed. Def.'s Mot. to Dismiss at 30–31.[6]

Section 2332d defines "United States person" to mean a: "(A) United States citizen or national; (B) permanent resident alien; (C) juridical person[7] organized under the laws of the United States; or (D) any person in the United States." Notwithstanding the complaint's conclusory allegations that BNPP is a "United States person" within the meaning of § 2332d, see Compl. ¶¶ 98, 312, the complaint acknowledges that BNPP is "a French multinational bank, incorporated under the laws of France, and headquartered in Paris, France," id. ¶ 18 (emphasis added). Hence, BNPP clearly does not qualify as a "juridical person organized under the laws of the United States." 18 U.S.C. § 2332d(b)(2)(C) (emphasis added); see also Abecassis v. Wyatt, 785 F. Supp.

---

[6] BNPP also contends that plaintiffs' claim under § 2332d should be dismissed for the independent reason that plaintiffs have failed to plead proximate causation. The Court addresses this argument below and concludes that plaintiffs have failed to sufficiently plead proximate causation for any of their ATA claims.

[7] A "juridical person" means "[a]n entity, such as a corporation, created by law and given certain legal rights and duties of a human being." Juridical Person, Black's Law Dictionary (10th ed. 2014).

2d 614, 648 (S.D. Tex. 2011) (finding liability under § 2332d "does not extend to [two companies] because they are foreign entities"); United States v. Chalmers, 474 F. Supp. 2d 555, 565–66 (S.D.N.Y. 2007) (dismissing criminal charges under § 2332d against a Bahamian corporation because it was not a "United States person"); cf. Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 379 (2000) (construing identical language in statute imposing sanctions on Burma and noting the statute did not apply to "foreign companies").

BNPP also does not qualify as a "United States person" under subparagraph (D), as that provision is only meant to apply to natural persons who are physically present in U.S. territory.  It would make little sense to accept plaintiffs' argument that subparagraph (D) extends beyond natural persons to reach juridical persons like BNPP.  First, subparagraph (C) uses the term "juridical" to qualify person, while subparagraph (D) does not.  "It is a well-established canon of statutory interpretation that the use of different words or terms within a statute demonstrates that Congress intended to convey a different meaning for those words."  SEC v. McCarthy, 322 F.3d 650, 656 (9th Cir. 2003).  Moreover, interpreting subparagraph (D) to apply to juridical persons would render subparagraph (C) superfluous because companies organized under the laws of the U.S. are by definition located in the U.S., as that is their place of incorporation.  See Corley v. United States, 556 U.S. 303, 314 (2009) ("[O]ne of the most basic interpretive canons, [is] that [a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (citation and internal quotation marks omitted)); Morales v. Trans World Airlines, Inc., 504 U.S. 374, 385–86 (1992) (rejecting proposed statutory interpretation that would give a subsection "no purpose").

Plaintiffs offer several arguments to the contrary, see Pls.' Opp'n at 25–27, none of which are persuasive.  Plaintiffs' argument that BNPP qualifies as a "United States person" as that term

is defined in 31 C.F.R. § 538.315 and Executive Order 13607 is inapposite because those provisions utilize different language than the definition in § 2332d. See, e.g., 31 C.F.R. § 538.315 ("United States person . . . means any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States.").  In any case, it is not clear that BNPP qualifies as a United States person under those definitions; the reference to foreign branches appears to refer to foreign branches of U.S. incorporated entities.  See OFAC, Frequently Asked Questions, U.S. Dep't of Treasury ("Who must comply with OFAC regulations? . . . all U.S. incorporated entities and their foreign branches." (emphasis added)), https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_general.aspx.   Moreover, plaintiffs are incorrect that BNPP admitted to being a "United States person" under § 2332d when it entered its guilty plea.  BNPP did not plead guilty to a violation of § 2332d, but instead pled guilty to regulations that apply to more than just "United States persons" and reach conduct by non-U.S. persons from within the U.S.  See Def.'s Reply [ECF No. 21] at 22 (identifying regulations).  These facts render plaintiffs' purported distinctions between this case and Chalmers unavailing and plaintiffs entirely ignore the other cases cited by BNPP.  See Pls.' Opp'n at 26–27. The Court concludes, then, that BNPP does not qualify as a "United States person" under 18 U.S.C. § 2332d and plaintiffs' claims founded on BNPP's violation of that statute will be dismissed.

### 4.  Plaintiffs' Allegations

The Court now evaluates the allegations presented in the complaint to determine whether they sufficiently plead an underlying violation of § 2339A—which is the only predicate ATA violation that remains.  For the following reasons, however, plaintiffs have failed to state a claim for violation of that statute.

To begin with, most of the facts alleged with respect to BNPP's conduct post-date the embassy bombings. Critically, the detailed factual allegations concerning BNPP's violation of U.S. sanctions against Sudan involve BNPP's conduct between 2002—four years after the embassy bombings—and 2012.[8] See, e.g., Compl. ¶¶ 90, 119, 181. The few, non-conclusory allegations regarding the time period between the imposition of U.S. sanctions in November 1997 and the terrorist attacks in August 1998 assert the following facts: after the sanctions were imposed, BNPP agreed to become the sole correspondent bank for Sudan in Europe; Sudan's central bank then directed all major Sudanese commercial banks (including Al Shamal) to use BNPP as their primary correspondent bank in Europe; BNPP established relationships with unaffiliated regional banks in Africa, Europe, and the Middle East; Sudan's central bank requested that BNPP not channel transactions through any U.S. bank; and eventually—whether in 1997 or later is not clear—BNPP used these relationships to violate U.S. sanctions. Id. ¶¶ 13, 22, 87, 107, 178, 195.

Accepting that these allegations establish that BNPP was illegally processing U.S. dollar transactions for Sudan prior to the 1998 terrorist attacks, they only establish BNPP's connection to Sudan and Sudanese banks (including Al Shamal); they do not establish BNPP's connection to al Qaeda or any other terrorist or terrorist activity prior to the attacks—as required to show a violation of § 2339A. See 18 U.S.C. § 2339A(a) (plaintiffs must plausibly allege that BNPP provided financial services "knowing or intending" that the services "are to be used in preparation for, or in carrying out" a terrorist attack). BNPP is accused of providing financial services to Sudan and Sudanese banks, not directly to al Qaeda or any terrorist. See Compl. ¶ 13 (acknowledging BNPP did not provide any direct financial services to al Qaeda). In order to satisfy the requirements of § 2339A, plaintiffs must allege sufficient facts to show either that "(1) [BNPP]

---

[8] This is unsurprising because the complaint draws heavily from the contents of BNPP's guilty plea in 2014, where BNPP admitted to conspiring to violate U.S. sanctions against Sudan from 2002 to 2012. See SOF ¶¶ 14, 17.

knew Sudan [or Al Shamal] was acting as an agent of al Qaeda or of an individual terrorist[] or (2) [BNPP] knew the ultimate beneficiaries of the financial services would be a terrorist organization or terrorist." <u>Owens</u>, 235 F. Supp. 3d at 98–99 (citing <u>Goldberg</u>, 660 F. Supp. 2d at 432; <u>Strauss v. Credit Lyonnais, S.A.</u>, No. CV-06-0702 (CPS), 2006 WL 2862704, at *11, *14 (E.D.N.Y. Oct. 5, 2006)). Despite repeated conclusory allegations that BNPP "conspired" with Sudan and Al Shamal to "provide[] capital to finance the 1998 bombing[s]," <u>e.g.</u>, Compl. ¶ 110, and that BNPP processed transactions for Sudan and Al Shamal that it "knew or should have known" would end up with al Qaeda, <u>e.g.</u>, <u>id.</u> ¶ 248, plaintiffs have failed to sufficiently plead that BNPP had the requisite scienter under the statute.

With respect to Al Shamal, the complaint alleges it was established in part with a $50 million capital contribution from Bin Laden, <u>id.</u> ¶ 25, and maintained bank accounts for members of al Qaeda that were used to purchase weapons and military equipment prior to the embassy bombings, <u>id.</u> ¶ 69. But the complaint does not contain any detailed factual allegations that BNPP knew about these supposed connections to al Qaeda. For instance, the complaint does not even allege that BNPP was aware of the 1996 State Department Report documenting Bin Laden's relationship to Al Shamal, let alone assert any facts showing BNPP's knowledge of the report. <u>See id.</u> ¶ 158. Indeed, the only fact connecting BNPP to Al Shamal before the attacks is that Al Shamal held a correspondent bank account at a European subsidiary of BNPP. Notwithstanding several conclusory allegations that, "[f]rom at least November 1997, BNPP knew that Al Shamal maintained accounts and provided financial services to al Qaeda," <u>id.</u> ¶¶ 233, 269, it appears that the relationship between Al Shamal and Bin Laden was not widely reported until <u>after</u> the 1998 embassy bombings, <u>id.</u> ¶¶ 160 (2001 press release acknowledging Bin Laden held two accounts at

Al Shamal), 161 (2001 Senate testimony suggesting Bin Laden's ties to Al Shamal), 162 (same from 2002 Congressional Research Service Report).

Even assuming that BNPP processed U.S. dollar transactions for Al Shamal before the embassy bombings—and there are no detailed factual allegations to support this—plaintiffs have not plausibly alleged that BNPP knew that Al Shamal was acting as an agent of al Qaeda prior to the embassy bombings.[9] And plaintiffs' allegation that "upon information and belief, BNPP processed transaction[s] on behalf of Al Shamal, the proceeds of which were delivered to al Qaeda for . . . planning and perpetrating the embassy bombings," id. ¶ 167, is a naked assertion devoid of factual support, and need not be accepted by the Court.

Plaintiffs' allegations concerning BNPP's knowledge of Sudan's relationship with al Qaeda are likewise deficient. Plaintiffs "present no facts suggesting that Sudan and [BNPP] ever agreed to provide funds to al Qaeda, and no facts showing that [BNPP] knew what Sudan was doing with the funds BNPP processed." Owens, 235 F. Supp. 3d at 99 (emphasis added). Plaintiffs allege that it was "well-known by the early 1990s, and certainly by November 1997" that Sudan was a state sponsor of terrorism and was generally harboring, funding, and facilitating terrorists determined to attack the U.S. and its citizens. Id. ¶¶ 130–131, 139, 143 185–186. But those allegations do not establish that BNPP knew that Sudan was utilizing the transactions processed by BNPP to provide funding to terrorists, or "that Sudan was acting on al Qaeda's behalf in conducting financial transactions with BNPP." Owens, 235 F. Supp. 3d at 99.

---

[9] The complaint also alleges that al Qaeda purchased several farms throughout Sudan with funds (in U.S. dollars) drawn from Al Shamal, and that those farms provided al Qaeda with commercial income and space to train terrorists and test weapons. Id. ¶ 127. But the complaint does not allege that these purchases occurred prior to the bombings, that BNPP provided any funds for these purchases, or that the U.S. dollars withdrawn from Al Shamal to make these purchases were processed by BNPP. Similarly deficient are allegations that al Qaeda used funds at Al Shamal to transport cash payments to al Qaeda operatives to carry out its terrorist activities. Id. ¶¶ 165–66. The complaint does not indicate when this occurred, allege that BNPP processed or was otherwise connected to these transactions, or otherwise plead any facts showing BNPP had knowledge of this activity.

The complaint's most specific allegation in regard to BNPP's knowledge of the connection between Sudan and al Qaeda is that one of BNPP's "senior compliance officers reminded other high-level BNPP compliance and legal employees that certain Sudanese banks which BNPP dealt with play[ed] a pivotal role in the support of the Sudanese government which has hosted Osama Bin Laden." Id. ¶ 89; accord id. ¶ 120. But that allegation is drawn from BNPP's 2014 guilty plea, which shows that this reminder occurred in 2007, nine years after the embassy attacks. See SOF ¶ 20. It thus appears that, even in 2007, BNPP did not know whether Sudan was utilizing funds from transactions processed by BNPP to support al Qaeda. And there are no other similarly detailed factual allegations showing BNPP knew of the connection between Sudan and al Qaeda prior to the embassy bombings. While the complaint alleges that Sudan provided al Qaeda "access to the U.S. financial system," id. ¶ 126, it appears that Sudan's support to al Qaeda consisted principally of providing safe harbor and military and intelligence support, and of facilitating travel for agents of al Qaeda. It was al Qaeda, on the other hand, that appears to have provided money to Sudan to fund infrastructure projects. At bottom, plaintiffs present no facts showing that BNPP knew that "Sudan was using funds processed by BNPP—or was likely to use such funds—to support al Qaeda." Owens, 235 F. Supp. 3d at 99.

As this Court recognized when analyzing similar allegations in Owens, "the fact that money was transferred to or for a state sponsor of terrorism makes it more likely that the money was used for terrorism than if the transfers had been to a state that does not sponsor of terrorism." 235 F. Supp. 3d at 99 (citing Rothstein, 708 F.3d at 97). "But the fact remains that [Sudan] is a government, and as such it has many legitimate agencies, operations, and programs to fund." Rothstein, 708 F.3d at 97. "Processing funds for Sudan [or Sudanese commercial banks] is not the same as processing funds for a terrorist organization or a terrorist front." Owens, 235 F. Supp.

3d at 99. It is likewise insufficient for plaintiffs to allege that it was "foreseeable" that if BNPP processed transactions for Sudan and Sudanese banks, some of that money might end up in the hands of al Qaeda to carry out attacks. Plaintiffs' allegations simply do not satisfy the scienter element required by § 2339A and cannot serve as a predicate act of international terrorism for plaintiffs' ATA claims.

For similar reasons, plaintiffs fail sufficiently to allege that BNPP's conduct was the proximate cause of their injuries. As was true in Rothstein and Owens—both of which asserted similar indirect causation theories—plaintiffs have made no detailed factual allegations showing, for example, that BNPP participated in the attacks or provided money directly to any terrorist group, that any money BNPP processed for Sudan or Sudanese banks was transferred to al Qaeda prior to the attacks, or that Sudan would have been unable to assist al Qaeda without the funds that BNPP processed.[10] Rothstein, 708 F.3d at 97; Owens, 235 F. Supp. 3d at 99; see also In re Terrorist Attacks on September 11, 2001, 714 F.3d 118, 124–25 (2d Cir. 2013) (plaintiffs failed to allege that bank proximately caused 9/11 attacks by providing routine financial services to charity organizations alleged to provide funds to terrorist groups); Abecassis, 704 F. Supp. 2d at 666 (plaintiffs failed to allege that kickbacks given to Iraq proximately caused plaintiffs' injuries in a Hamas bombing in Israel). Based on the complaint's allegations, there is simply not enough to sustain a sufficiently direct causal connection between BNPP's conduct and the embassy bombings that allegedly injured plaintiffs.[11] The Court will therefore dismiss plaintiffs' ATA claims.

---

[10] Plaintiffs also allege that "[h]ad BNPP acted lawfully, the mechanisms described above would have assisted the U.S. Government and allied nations, detect, disrupt, and prevent the 1998 East African Embassy Attacks." Compl. ¶ 62; see also id. ¶¶ 109, 117 (similar). But this is a "naked assertion" that plaintiffs fail to support with any detailed factual allegations. It is thus insufficient to establish proximate cause. Moreover, according to the complaint, the U.S. Department of Treasury did not initiate the Terrorist Finance Tracking Program to identify, track, and pursue terrorists (including al Qaeda) until after the September 11, 2001 terrorist attacks. Id. ¶ 58.

[11] Plaintiffs also argue that "money is fungible," and that money used for non-terrorist activities frees up other resources that Sudan could have used to support al Qaeda. Pls. Opp'n at 2, 18, 34–35. This Court considered and rejected this argument in Owens. 235 F. Supp. at 100.

## C. ATS CLAIMS

Plaintiffs also bring claims against BNPP under the ATS.[12] The ATS provides district courts with "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The ATS is strictly jurisdictional; it does not create any cause of action itself. Sosa v. Alvarez-Machain, 542 U.S. 692, 714 (2004). The Supreme Court has held that "federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted" in 1789.[13] Id. at 732. Federal courts are limited to recognizing causes of action only for alleged violations of international law norms that are "'specific, universal, and obligatory.'" Kiobel v. Royal Dutch Petroleum Co., 569 U.S. 108, 117 (2013) (quoting Sosa, 542 U.S. at 732).

Plaintiffs seek to hold BNPP liable under the ATS for alleged violations of the law of nations solely on a theory of secondary liability, premised on the allegation that BNPP aided and abetted the embassy bombings. See, e.g., Compl. ¶¶ 266, 273–75, 284–85, 291. To do so, the complaint must contain (1) a well-pled allegation of a primary violation of the law of nations, i.e., that al Qaeda's perpetration of the attacks "represent[s] a violation of an international norm with at least as 'definite content and acceptance among civilized nations [as] the historical paradigms familiar' in 1789," Exxon Mobil Corp., 654 F.3d at 30 (quoting Sosa, 542 U.S. at 732); and (2) a

---

[12] There is a circuit-split regarding whether corporations can be held liable under the ATS. The Second Circuit does not recognize corporate liability, see Kiobel v. Royal Dutch Petroleum Co., 621 F.3d 111 (2d Cir. 2010), but the D.C. Circuit has—consistent with the Seventh, Ninth, and Eleventh Circuits—recognized corporate liability under the ATS. See Doe VIII v. Exxon Mobil Corp., 654 F.3d 11, 54–57 (D.C. Cir. 2011), vacated on other grounds 527 F. App'x 7 (mem.). The Supreme Court has been asked to resolve this circuit-split in Jesner v. Arab Bank,, PLC, No. 16-499 (U.S.) (petition for cert. granted Apr. 3, 2017).

[13] At that time, three violations of the law of nations were recognized at common law: (1) violation of safe conducts, (2) offenses against ambassadors, and (3) piracy. Id. at 720; see also 4 W. Blackstone, Commentaries on the Laws of England 68 (1769).

well-pled secondary violation of the law of nations, by pleading the requirements for aiding and abetting liability under customary international law, Doe v. Exxon Mobil Corp., No. CV 01-1357(RCL), 2015 WL 5042118, at *8–12 (D.D.C. July 6, 2015).[14]  BNPP argues that plaintiffs have failed to adequately plead both elements.  Def.'s Mot. to Dismiss at 32–37.

## 1.  Violation of the Law of Nations

Plaintiffs contend that they have pled three separate violations of the laws of nations: (1) a crime against humanity, (2) an infringement of the rights of ambassadors; and (3) an extrajudicial killing.  Pls.' Opp'n at 41–42.  BNPP responds that none of these norms apply to the attacks.[15] The Court addresses each purported violation below.

### a.  Crime Against Humanity

Plaintiffs first contend that the embassy bombings constitute a "crime against humanity" under international law.  Pls.' Opp'n at 43–44.  Crimes against humanity have longstanding recognition under customary international law and are actionable under the ATS.  See Flores v. Southern Peru Copper Corp., 414 F.3d 233, 244 n.18 (2d Cir. 2003) (noting that "customary international law rules proscribing crimes against humanity . . . have been enforceable against individuals since World War II"); Mehinovic v. Vuckovic, 198 F. Supp. 2d 1322, 1352 (N.D. Ga.

---

[14] The ATS is presumed not to apply extraterritorially.  Kiobel, 569 U.S. at 117.  For a court to have jurisdiction over claims arising under the ATS, "the presumption against extraterritoriality [must be] displaced or satisfied."  Exxon Mobil Corp., 2015 WL 5042118, at *5.  The parties do not address this issue in their briefing. However, in Mwani v. Bin Laden, 947 F. Supp. 2d 1 (D.D.C. 2013), this court evaluated whether the presumption foreclosed the court's jurisdiction to hear ATS claims relating to the 1998 embassy bombings in Kenya and concluded that the bombing "touched and concerned" the U.S. with sufficient force to displace the presumption against extraterritoriality.  Id. at 5.

[15] BNPP contends that acts of terrorism do not constitute violations of the law of nations because there is no universal norm against terrorism under customary international law.  See Def.'s Mot. to Dismiss at 34; see also, e.g., In re Terrorist Attacks on Sept. 11, 2001, 714 F.3d at 125 ("Plaintiffs fail to . . . plead a violation of the ATS because no universal norm against 'terrorism' existed under customary international law (i.e., the 'law of nations') as of September 11, 2001."); Mwani v. Bin Ladin, No. CIV A 99-125 CKK, 2006 WL 3422208, at *3 n.2 (D.D.C. Sept. 28, 2006) ("The law is seemingly unsettled with respect to defining terrorism as a violation of the law of nations."). Plaintiffs respond that they are not alleging that "terrorism in general should be recognized as a violation of international law"; rather, the Court must "look beyond the general category of the act and look at the specific act." Pls.' Opp'n at 40 n.21.

2002) ("Crimes against humanity have been recognized as a violation of customary international law since the Nuremberg trials and therefore are actionable under the ATCA."); <u>Sarei v. Rio Tinto PLC</u>, 221 F. Supp. 2d 1116, 1150 (C.D. Cal. 2002) ("It is well settled that a party who commits a crime against humanity violates international law and may be held liable under the ATCA."). Private actors, like state actors, "may be found liable for . . . crimes against humanity" under the ATS. <u>Kadic v. Karadzic</u>, 70 F.3d 232, 236 (2d Cir. 1995); <u>Exxon Mobil Corp.</u>, 2015 WL 5042118, at *2; <u>see</u> <u>Licci by Licci v. Lebanese Canadian Bank, SAL</u>, 834 F.3d 201, 213 (2d Cir. 2016) (recognizing that claims for crimes against humanity may be asserted against private actors but affirming the district court's dismissal of the plaintiffs' complaint against the defendant bank because the Second Circuit does not recognize corporate liability under the ATS).

Crimes against humanity were first prosecuted after World War II at the International Military Tribunal at Nuremberg. Under the Nuremberg Charter, crimes against humanity were defined as a number of inhumane acts "committed against any civilian population, before or during the war, or persecutions on political, racial, or religious grounds." Charter of the Int'l Military Trib., annexed to Agreement Respecting the Prosecution and Punishment of the Major War Criminals of the European Axis, Aug. 8, 1945, art. 6(c), 59 Stat. 1544, 82 U.N.T.S. 279. Since then, the meaning of crimes against humanity under international law has evolved. The most recent international law authorities recognizing crimes against humanity are the Statute of the International Criminal Tribunal for Rwanda (ICTR) and the Rome Statute of the International Criminal Court.[16] The ICTR Statute defines crimes against humanity as murder and other

---

[16] "Although the United States has not joined the International Criminal Court, U.S. law recognizes the definition of crimes against humanity as stated in the Rome Statute." <u>Almog v. Arab Bank, PLC</u>, 471 F. Supp. 2d 257, 275 n.23 (E.D.N.Y. 2007).

inhumane acts[17] "committed as part of a widespread or systematic attack against any civilian population on national, political, ethnic, racial or religious grounds." Statute of the International Criminal Tribunal for Rwanda, art. 3, S.C. Res. 955, U.N. Doc. S/RES/955 (Nov. 8, 1994) (ICTR Statute). The Rome Statute defines crimes against humanity as murder and other enumerated acts[18] "committed as part of a widespread or systematic attack directed against any civilian population, with knowledge of the attack." Rome Statute of the International Criminal Court (July 17, 1998), reprinted in 37 I.L.M. 999 (1998), art. 7 (Rome Statute).

In accordance with these authorities, courts have required plaintiffs to demonstrate the following elements with plausibility in order to state a viable claim for crimes against humanity: (1) commission of one of the enumerated acts (2) as part of a widespread or systematic attack (3) directed against a civilian population and (4) committed with knowledge of the attack. See, e.g., Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 257 (2d Cir. 2009); Bowoto v. Chevron Corp., No. C 99-02506 SI, 2007 WL 2349343, at *3 (N.D. Cal. Aug. 14, 2007); Wiwa v. Royal Dutch Petroleum Co., No. 96 CIV. 8386 (KMW), 2002 WL 319887, at *10 (S.D.N.Y. Feb. 28, 2002). Here, plaintiffs have plausibly alleged these elements.

The attacks committed by al Qaeda on the U.S. embassies in Kenya and Tanzania resulted in the murder of 224 people and serious injuries to thousands more, many of whom were civilian employees and contractors of the U.S. government. According to the complaint, al Qaeda targeted U.S. civilians and employees of the U.S. government in order to "intimidate and coerce the civilian population and employees of the United States," Compl. ¶ 303, cause the "evacuation of all

---

[17] The inhumane acts listed in the statute are murder, extermination, enslavement, deportation, imprisonment, torture, rape, persecutions on political, racial and religious grounds, and other inhumane acts. ICTR Statute art. 3.

[18] The other enumerated acts include extermination, enslavement, deportation or forcible transfer of population, imprisonment or severe deprivation of physical liberty, torture, rape and other forms of sexual violence, persecution against any identifiable group or collectivity on political, racial, national, ethnic, cultural, religious, gender, or other impermissible grounds that are universally recognized under international law, enforced disappearance, apartheid, and other inhumane acts. Rome Statute art. 7.

American and western forces [and] civilians from the lands of Muslims," id. ¶ 8, and "pursu[e] . . . its . . . policy of jihad," id. ¶ 232. The U.S. embassy in Kenya was specifically targeted based on national and political reasons, namely that "there was a large American presence" at the embassy and the embassy personnel were responsible for actions carried out against Sudan. See id. ¶ 7.

Plaintiffs have also plausibly established that the attacks were both widespread and systematic. They were "widespread" because they involved a "large scale action" that was directed against—and inflicted casualties upon—a "multiplicity of victims." Doe v. Qi, 349 F. Supp. 2d 1258, 1308 (N.D. Cal. 2004); see Wiwa, 2002 WL 319887, at *10; Prosecutor v. Limaj, Judgment, Case No. IT-03-66-T, ¶ 183 (ICTY Nov. 30, 2005). The attacks were "systematic" because they were "thoroughly organized," "methodical," and followed "a regular pattern on the basis of a common policy" by al Qaeda. Almog, 471 F. Supp. 2d at 275; Bowoto, 2007 WL 2349343, at *3; Wiwa, 2002 WL 319887, at *10; Prosecutor v. Rutaganda, Case No. IT–96–3–T, ¶ 69 (ICTR Dec. 6, 1999); see also Owens, 864 F.3d at 781–84 (summarizing this Court's findings of fact as to Sudan and al Qaeda's efforts to carry out the embassy bombings). Plaintiffs allege that al Qaeda began planning the attacks as early as 1993, when it sent a key operative to Kenya to survey U.S. targets, including the embassy. Compl. ¶ 133. Thereafter, al Qaeda continued to plan and prepare to carry out the attacks by coordinating with and funding a terrorist cell operating in Nairobi, obtaining and transporting weapons, and training terrorists. Id. ¶¶ 134, 264. According to the complaint, the embassy bombings were part of a larger campaign to target and kill U.S. civilians, which included the 1993 World Trade Center bombing and the thwarted attempt to bomb several targets in New York City including the United Nations, an FBI office, and the Holland and Lincoln tunnels. Id. ¶ 139.

BNPP argues that the attacks do not qualify as crimes against humanity because they targeted "a symbol of U.S. sovereignty." Def.'s Mot. to Dismiss at 35. That the attacks occurred at a location that may be considered a symbol of U.S. sovereignty does not mean that they did not target a civilian population on national and political grounds—those two things are not mutually exclusive. It makes little sense to let the location of the attacks dictate whether a crime against humanity occurred. Plaintiffs have plausibly alleged the elements necessary to state a viable primary violation of the law of nations.

### b. Infringement of the Rights of Ambassadors

Plaintiffs next contend that the embassy bombings infringed the rights of ambassadors in violation of the law of nations. Pls.' Opp'n at 44–45. It has long been recognized that assaults which interfere with the diplomatic mission of the U.S. and directly infringe the rights of ambassadors violate the law of nations. See 4 W. Blackstone, Commentaries on the Laws of England 68 (1769) (recognizing "infringement of the rights of ambassadors" as one of three specific offenses against the law of nations); Sosa, 542 U.S. at 715 (recognizing that when the ATS was adopted, causes of action based upon assaults against ambassadors were grounded in the notion that such breaches of the law of nations "impinged upon the sovereignty of [a] foreign nation and if not adequately redressed could rise to an issue of war"). Courts continue to recognize that attacks on embassies violate international law. See, e.g., Salazar v. Islamic Republic of Iran, 370 F. Supp. 2d 105, 113 (D.D.C. 2005) (describing the 1983 U.S. embassy bombings in Lebanon as "'clearly contrary to the precepts of humanity as recognized in both national and international law'"); Finzer v. Barry, 798 F.2d 1450, 1455 (D.C. Cir. 1986), aff'd in part, rev'd in part sub nom. Boos v. Barry, 485 U.S. 312 (1988) ("Since the days of Blackstone, 'infringement of the rights of ambassadors' have been regarded as one of 'the principal offenses against the law of nations[,]'

and for as long as the United States has been a nation, those rights have been recognized to include those that are implicated here—protection from intimidation and the potential of violence, and from assaults on the dignity and peace of the embassy as well.") (internal citation omitted).

In <u>Mwani v. Bin Ladin</u>, this court found subject matter jurisdiction over ATS claims brought by a proposed class of more than 5,000 Kenyan citizens who were allegedly victims, survivors, relatives, and businesses who had been harmed by the 1998 U.S. embassy bombing in Kenya. 2006 WL 3422208, at *1. Relying on the above precedents, along with international treaties signed by the U.S., the court held that the U.S. embassy bombing in Kenya "impinged the diplomatic mission of the United States and directly infringed on the rights of ambassadors, which was and has been a clear violation of the law of nations since the inception of the [ATS]." <u>Id.</u> at *4.

Plaintiffs here—all foreign national employees or contractors of the U.S. government, or their family members, Compl. ¶¶ 29, 31—have at least as strong a claim as the plaintiffs in <u>Mwani</u>. BNPP argues that plaintiffs lack standing to bring their claims because they are not ambassadors or other diplomatic personnel. Def.'s Reply at 25. But the court in <u>Mwani</u> did not impose such a limitation, and found subject matter jurisdiction over the claims asserted by Kenyan nationals and businesses. BNPP also states that <u>Mwani</u> arose in the context of a default proceeding, without further explaining why this matters. <u>Id.</u> It does not; the court in <u>Mwani</u> stated that "[b]efore a default can be entered, the court must have jurisdiction over the party against whom the judgment is sought," 2006 WL 3422208, at *1 (quoting 10 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, <u>Federal Practice and Procedure</u> § 2682 (3d ed.1998)), and the court then analyzed whether it had subject matter jurisdiction under the ATS, <u>id.</u> at *3–5. Hence, plaintiffs have sufficiently pled another primary violation of the law of nations.

### c. Extrajudicial Killing

Plaintiffs also contend that the allegations in the complaint are sufficient to demonstrate that BNPP aided and abetted an extrajudicial killing, in violation of the law of nations. Pls.' Opp'n at 44. But unlike the other two theories (i.e., crime against humanity and infringement of the rights of ambassadors), the complaint does not plead this theory. See Compl. ¶¶ 255–292. "[P]laintiffs may not amend their complaint through their opposition papers." Doe I v. State of Israel, 400 F. Supp. 2d 86, 100 (D.D.C. 2005); Hajjar-Nejad v. George Washington Univ., 873 F. Supp. 2d 1, 11 (D.D.C. 2012) (citing "the well-established principle that a party cannot amend its pleadings by its briefs in opposition to a dispositive motion"). The Court will therefore not consider this argument.

### 2. Aiding and Abetting Liability

Having found that plaintiffs have satisfied their burden to assert a cause of action grounded in actions recognized as primary violations of the law of nations, the Court must next evaluate whether they have pled the requirements for aiding and abetting liability against BNPP under customary international law.[19]   The D.C. Circuit has stated that the standard of liability for aiding and abetting is based on customary international law as interpreted by "international tribunals mandated by their charter to apply only customary international law." Exxon Mobil Corp., 654 F.3d at 33. Two "authoritative" tribunals on this subject are the International Criminal Tribunal for the Former Yugoslavia (ICTY) and the ICTR. Id. Under customary international law, there

---

[19] The titles of Counts III and IV of the complaint also refer to "conspiracy," but the substance of the allegations is that BNPP aided and abetted violations of international law. See, e.g., Compl. ¶¶ 273, 291. To the extent that the complaint alleges conspiracy as a stand-alone offense, that claim fails because international law has only recognized conspiracy as a stand-alone offense in two circumstances—conspiracy to commit genocide and conspiracy to wage aggressive war. See Hamdan v. Rumsfeld, 548 U.S. 557, 610 (2006); Bahlul v. United States, 840 F.3d 757, 815 (D.C. Cir. 2016). If instead plaintiffs are alleging conspiracy as a theory of liability, this also fails for the reasons explained below, because "plaintiffs' conspiracy claims . . . require the same proof of mens rea as their claims for aiding and abetting." Presbyterian Church of Sudan, 582 F.3d at 260.

are two elements to aiding and abetting: actus reus and mens rea.  Id. at 34 (citing Prosecutor v. Furundzija, Case No. IT-95-17/1, Trial Chamber Judgment, ¶ 249 (ICTY Dec. 10, 1998)); Exxon Mobil Corp., 2015 WL 5042118, at *9–10.  The Court will briefly describe the standards for each of these two elements and then apply those standards to the complaint's allegations.

i. Actus reus

The actus reus for aiding and abetting under customary international law must consist of "practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime."  Exxon Mobil Corp., 2015 WL 5042118, at * 9 (quoting Prosecutor v. Šainović, Case No. IT–05–87–A, Appeal Judgement, ¶ 1649 (ICTY Jan. 23, 2014)).  Assistance is substantial when the underlying crime "probably would not have occurred in the same way had not someone acted in the role that the accused [aider and abettor] in fact assumed."  Id. (quoting Prosecutor v. Tadić, Case No. IT–94–1–T, Trial Opinion and Judgment, ¶ 688 (ICTY May 7, 1997)); see also Furundzija, Trial Chamber Judgment, ¶ 233 (accused must substantially assist through conduct that makes "a significant difference to the commission of the criminal act by the principal").  "[T]here must be a 'link' or 'connection' between the aider and abettor's actions and the underlying crime."  Exxon Mobil Corp., 2015 WL 5042118, at * 9 (quoting Nzahonimana v. Prosecutor, Case No. IT–98–44D–A, Appeal Judgement, ¶ 489 (ICTR Sept. 29, 2014)).  Aiding and abetting liability may be found only where assistance is provided to a criminal's human rights abuses, not simply to the criminal himself.  In re S. Afr. Apartheid Litig., 617 F. Supp. 2d 228, 257 (S.D.N.Y. 2009).  Although a defendant's assistance must be substantial, it is unnecessary to show a "cause-effect relationship" between the assistance and the primary violation.  Exxon Mobil Corp., 2015 WL 5042118, at * 9 (citing Ndahimana v. Prosecutor, Case No. IT–01–68–A, Appeal Judgement, ¶¶ 147, 149 (ICTR Dec. 16, 2013)).  Courts have found substantial assistance when a

defendant provides "the means by which a violation of the law is carried out." Id. (providing examples).

### ii. Mens rea

The mens rea element requires an evaluation of the defendant's state of mind. Defendants must "know that their acts assist the commission of the principal offense." Id. (citing Šainović ¶ 1649). A defendant need not have certain knowledge that a particular crime will be committed, so long as it is "aware that one of a number of crimes will probably be committed, and one of those crimes is committed." Prosecutor v. Popović, Case No. IT–05–88–A, Appeal Judgement, ¶ 1732 (ICTY Jan. 30, 2015); see also Karera v. Prosecutor, Case No. IT–01–74–A, Appeal Judgement, ¶ 321 (ICTR Feb. 2, 2009). A defendant "must be aware of the essential elements of the crime" to possess the mens rea required for aiding and abetting liability. Prosecutor v. Lukić & Lukić, Case No. IT–98–32/1–A, Appeal Judgement, ¶ 428 (ICTY Dec. 4, 2012) (citations omitted). "This includes a requirement that the defendant know the intent of the principal perpetrator." Exxon Mobil Corp., 2015 WL 5042118, at * 10 (citing  Popović ¶ 1732).

### iii.    Application to Plaintiffs' Allegations

Applying these standards to the complaint here, the Court concludes that plaintiffs' allegations are insufficient to establish either the actus reus or mens rea elements of aiding and abetting liability under customary international law.  Plaintiffs fail to sufficiently allege the requisite actus reus for many of the reasons discussed above, namely that BNPP did not itself participate in the attacks and did not provide any funds directly to al Qaeda or any of its agents, and there are no well-pled allegations that any funds processed by BNPP were used to carry out the embassy bombings.  BNPP's provision of banking services to a state sponsor of terrorism and its commercial banks—which is the only conduct pled in non-conclusory terms—is too tenuous to

establish aiding and abetting liability under the ATS. See Mastafa v. Austl. Wheat Bd., No. 07 Civ. 7955(GEL), 2008 WL 4378443, at *4 (S.D.N.Y. Sept. 25, 2008) (dismissing claims against BNPP for allegedly aiding and abetting Sadam Hussein's human rights abuses because "[i]it is not enough that a defendant provide substantial assistance to a tortfeasor; the substantial assistance must also advance the [tort's] commission" (quotations omitted)). Plaintiffs have not plausibly shown that the terrorist attacks on the U.S. embassies "probably would not have occurred" absent BNPP's conduct.[20]

Turning to the mens rea element, the complaint does not plausibly allege that BNPP actually knew that any transactions it was processing for Sudan or Sudanese banks (e.g., Al Shamal) were being used to fund al Qaeda generally, or the embassy bombings specifically. Allegations that BNPP "should have known" will not suffice in this context. Mastafa, 2008 WL 4378443, at *5 ("The knowledge element of aiding and abetting requires that a defendant have 'actual knowledge' that it is assisting in the tortious conduct," and "allegations . . . that a bank 'should have known,' will not suffice"). Because plaintiffs have not sufficiently pled that BNPP aided and abetted al Qaeda's attacks on the U.S. embassy as that theory is understood under customary international law, their ATS claims will be dismissed.[21]

---

[20] Plaintiffs' reliance on Almog v. Arab Bank, 471 F Supp. 2d 257 (E.D.N.Y. 2007), underscores the deficiency in the complaint's allegations. In Almog, defendant Arab Bank provided banking services directly to a terrorist organization (i.e., Hamas) and collected donations for that terrorist organization from supporters throughout the Middle East, which were then used to carry out terrorist attacks. 471 F. Supp. 2d at 290. Arab Bank allegedly provided these services with knowledge that the funds were being used to carry out terrorist attacks against the State of Israel. Id. The court found these allegations sufficiently stated a theory of aiding and abetting liability against Arab Bank. In contrast, the complaint here does not plausibly allege that BNPP knowingly maintained any accounts for al Qaeda or collected any funds for al Qaeda that were used to carry out any terrorist attacks, let alone the embassy bombings specifically.

[21] Because the ATS claims will be dismissed the Court need not resolve the parties' dispute about whether family members of victims can assert claims for emotional damages under the ATS. See Def.'s Mot. to Dismiss at 38; Pl.'s Opp'n at 48–50.

### D. COMMON LAW CONSPIRACY AND AIDING AND ABETTING

Plaintiffs also bring common law claims for conspiracy and aiding and abetting. Plaintiffs contend that the complaint identifies conspiracy and aiding and abetting as a means of establishing vicarious liability for the underlying tortious acts resulting in the embassy bombings.[22] Pls.' Opp'n at 37. The parties appear to agree that D.C. law applies to these claims.

Under D.C. law, a plaintiff must plead four elements to establish a civil conspiracy claim: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." United States v. Eisenberg, 149 F. Supp. 3d 71, 94 (D.D.C. 2015) (quoting Halberstam v. Welch, 705 F.2d 472, 477 (D.C. Cir. 1983)). Plaintiffs fail to plead that BNPP acted in furtherance of a "common scheme" with al Qaeda to cause tortious harm to plaintiffs, as required to state a claim. See Halberstam, 705 F.2d at 477. Quite the opposite, the complaint acknowledges that "BNPP did not share al Qaeda's desire to kill American citizens and citizens of their allies." Compl. ¶ 3. The only conspiracy alleged in the complaint is a conspiracy between BNPP, Sudan, Al Shamal, and al Qaeda to defeat U.S. sanctions, but there is no private right of action for sanctions violations.

"To demonstrate the existence of a 'chain' conspiracy in which conspirators are not all directly connected, the critical question is whether each conspirator knows of the existence of the larger conspiracy and of the necessity for the other participants, even if he or she does not know their identities." Ungar v. Islamic Republic of Iran, 211 F. Supp. 2d 91, 100 (D.D.C. 2002). The

---

[22] The complaint identifies the following underlying torts as giving rise to the conspiracy and aiding and abetting claims: wrongful death, assault and battery, survival, intentional infliction of emotional distress, loss of consortium, loss of solatium and/or loss of services. Compl. ¶¶ 242, 254.

complaint does not plausibly allege that BNPP knew of the existence of any conspiracy between Sudan and al Qaeda to carry out the embassy bombings.  See supra Section III.B.4.  Plaintiffs have thus failed to plausibly allege a common law conspiracy and this claim must be dismissed.  See Ungar, 211 F. Supp. 2d at 100 (finding that "[t]he absence of a clear link from the Iran-Hamas 'partnership'" to the perpetrator of an attack was fatal to plaintiffs' conspiracy theory).

Plaintiffs' common law aiding and abetting claim fares no better.  Aiding and abetting includes the following elements: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation."  Halberstam, 705 F.2d at 477.  "Simply stating that [a defendant] generally provided aid to a third party, who in turn purportedly engaged in tortious activity, is not enough; rather, the plaintiffs are required to plead a link between the aid rendered and the principal violation (or violations) alleged."  Acosta Orellana v. CropLife Int'l, 711 F. Supp. 2d 81, 110 (D.D.C. 2010).  As explained above, plaintiffs have not sufficiently pled that BNPP knowingly or substantially assisted the terrorist attacks on the U.S. embassies.  And there are no well-plead allegations that BNPP provided any funding, directly or indirectly, to al Qaeda that was used to carry out the attacks.[23]  This claim therefore will also be dismissed.

---

[23] Plaintiffs' comparison to Halberstam, see Pls.' Opp'n at 39-40, is off the mark.  In Halberstam, the D.C. Circuit held that a wife could be found civilly liable as an aider and abettor to a murder that her husband committed during the course of a burglary because the wife assisted her husband in laundering stolen goods knowing "he was involved in some type of personal property crime at night" and her "continuous participation reflected her intent and desire to make the [criminal] venture succeed."  Id. at 487–488.  Neither of those factors is present as to BNPP here.

## E. FRAUDULENT CONVEYANCE (OR TORTIOIUS INTEFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE)

Plaintiffs also assert a claim for fraudulent conveyance in the complaint. In their opposition, however, plaintiffs attempt to recast this as a claim for tortious interference with prospective economic advantage.[24] Pls.' Opp'n at 50.

The parties again agree that D.C. law applies to this claim. Id. at 50–51; Def.'s Reply at 31–32. Under D.C. law, a plaintiff must plead the following elements to state a claim for tortious interference with prospective advantage: "(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage." Jankovic v. Int'l Crisis Grp., 593 F.3d 22, 29 (D.C. Cir. 2010) (internal quotation marks omitted); accord McNamara v. Picken, 866 F. Supp. 2d 10, 15 (D.D.C. 2012). A plaintiff must allege a business expectancy, not grounded in a present contractual relationship, which is commercially reasonable to expect. McNamara, 866 F. Supp. 2d at 15. The D.C. Circuit has explained that "a valid business relationship or expectancy[] appears to require rather specific business opportunities." Jankovic, 593 F.3d at 29 (internal quotation marks omitted). Courts have found the following to constitute a valid business expectancy: a prospective book deal, Browning v. Clinton, 292 F.3d 235 (D.C. Cir. 2002); "three potential sources of prospective employment," Kimmel v. Gallaudet Univ., 639 F. Supp. 2d 34, 45 (D.D.C. 2009); development of a specific property, Carr v. Brown, 395 A.2d 79, 82–84 (D.C. 1978); the opportunity to represent a trustee in a specific litigation, Democratic State Comm. of D.C. v.

---

[24] Plaintiffs concede BNPP's argument that they have failed to state a claim for fraudulent conveyance. See Def.'s Mot. to Dismiss at 40 ("Count VIII of the Complaint, which purports to plead a fraudulent conveyance claim, fails to allege an actionable fraudulent transfer under any law."). "It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." Hopkins v. Women's Div., Gen. Bd. of Global Ministries, 238 F.Supp.2d 174, 178 (D.D.C.2002).

<u>Bebchick</u>, 706 A.2d 569 (D.C. 1998); and the opportunity to obtain new customers, <u>Parnigoni v. St. Columba's Nursery Sch.</u>, 681 F. Supp. 2d 1, 28 (D.D.C. 2010).

Plaintiffs allege that BNPP interfered with their "valid expectancy in receiving a money judgment against Sudan." Pls.' Opp'n at 51; <u>see</u> Compl. ¶¶ 125, 220. But this expectancy does not arise from a commercial relationship, it is unlike any of the commercial opportunities that courts in this Circuit have deemed a valid business expectancy, and it is simply not the type of expectancy that this tort protects. <u>See Carr</u>, 395 A.2d at 84 (expectation of profit contingent on decisions of two governmental bodies too remote to be a valid expectancy). Plaintiffs have not identified any cases where this tort has ever been asserted arising out of the expectation of a judgment between parties with no commercial or contractual relationship. The Court concludes that plaintiffs have failed to plead a valid business expectancy and their claim for interference with prospective economic advantage will be dismissed.[25]

### F.  PUNITIVE DAMAGES

Finally, the complaint contains a stand-alone claim for punitive damages. Compl. ¶¶ 341-351 (Count IX). Because plaintiffs' other claims will all be dismissed, the Court will also dismiss the claim for punitive damages. <u>See Park v. Hyatt Corp.</u>, 436 F. Supp. 2d 60, 66 (D.D.C. 2006) (noting that "punitive damages are not an independent cause of action" and treating claims for punitive damages "instead as part of an ad damnum clause").

---

[25] BNPP also argues that all of plaintiffs' claims are time-barred because the attacks occurred more than 17 years ago—well outside the applicable statute of limitations—and plaintiffs have not properly pled any grounds for tolling the statute of limitations. Def.'s Mot. to Dismiss at 1, 9–11. In light of the Court's conclusions that plaintiffs have failed to state any of these claims, it is not necessary to reach this argument. In addition, [25] plaintiffs' motion for hearing on BNPP's motion to dismiss will be denied as moot.

## **CONCLUSION**

For the reasons explained above, the Court concludes that plaintiffs have failed to state any viable claims against defendant BNPP. BNPP's motion to dismiss will be granted and all claims against BNPP will be dismissed. Plaintiffs' claims against Al Shamal will also be dismissed.

/s/
_____
JOHN D. BATES
United States District Judge

Dated:  September 29, 2017