## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARY OFISI, et al.,

    Plaintiffs,

       v.

BNP PARIBAS, S.A., et al.,

    Defendants.

**Civil Action No. 15-2010 (JDB)**

## AL SHAMAL ISLAMIC BANK'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS

COMES NOW Defendant Al Shamal Islamic Bank (ASB) by and through undersigned counsel and hereby files its Memorandum of Points and Authorities in Support of its Motion to Dismiss. The first part of this Memorandum is devoted to identifying the specific allegations made against ASB in the Complaint and why they are insufficient to impose liability on ASB. The second analyzes this Court's earlier opinion in this case, and the relevant case law pertaining to the need to establish a causal link between the alleged criminal activity engaged in by senior ASB personnel and the commission of an international terrorist attack like the embassy bombings.

As detailed herein, the allegations made against ASB do not establish any direct link between alleged activities engaged in by ASB personnel and the embassy attacks that occurred in 1998. The allegations are largely conclusory in nature, are repetitive, and focus on an irrelevant issue, i.e., the government of Sudan tried to defeat U.S. economic sanctions and succeeded in doing so. Finally, even if ASB personnel performed routine banking services for Al Qaeda, that is not sufficient to impose liability on the bank under either the ATS or the ATA. *See*, *e.g.*, *In re: Terrorist Attacks on September 11, 2001*, 349 F.Supp.2d 765, 833 (S.D.N.Y. Jan. 18, 2005) ("This

Court…has found no basis for a bank's liability for injuries funded by money passing through it on routine banking business") [hereinafter *In re: 9/11*].

I.     **Allegations Made in the Complaint Against ASB are Insufficient to Establish That This Court has Personal Jurisdiction over ASB.**

An allegation that is repeated throughout the Complaint is that the embassy bombings were "directly and proximately caused by BNPP's knowing and intentional participation in a conspiracy to help Sudan and help Sudanese financial institutions defeat U.S. economic sanctions". *See*, *e.g.*, Compl. ¶ 2. However, there is no allegation that ASB personnel caused the 1998 East African Embassy Attacks by participating in that conspiracy. It appears that BNPP was the major player, not ASB, in terms of defeating U.S. economic sanctions. Also, there is no allegation that identifies: a) ASB personnel who worked with Al Qaeda operatives; b) whether this activity occurred pre-1998; c) how much money was involved; or d) the specific ASB account used by ASB personnel to withdraw funds which were then sent on to Al Qaeda.

There is a reference on page 3 of the Complaint that "BNPP for its part bears responsibility for that tragic outcome", i.e., the attacks on the U.S. embassies. Compl. ¶ 4. It is alleged in that paragraph that BNPP "sought to defeat these same U.S. sanctions in order to enrich itself", while Al Qaeda's goal was to facilitate acts of terrorism. There is no similar statement that ASB personnel helped Al Qaeda in any manner to facilitate acts of terrorism. The Plaintiffs also do not make clear in this paragraph whether ASB leadership sought to defeat U.S. economic sanctions or defeat those sanctions to enrich itself.

There is a revealing paragraph on page 3 paragraph 6 explaining the rationale for the attack on the U.S. embassy in Nairobi, Kenya, i.e., "That there were embassy personnel in Nairobi who were responsible for work in the country of Sudan". As is obvious, there is no allegation pertaining to ASB senior personnel re their knowledge of the location of these embassy personnel or their

2

incentive to seek reprisal against them. And on page 4, paragraph 7, there is further proof that ASB senior leadership had nothing to do with U.S. embassy bombings.

The reason—one of the conspirators was identified in paragraph 7: Mohamed Rashed Daoud Al-'Owhali'. He apparently explained to FBI agents that "the East Embassy Bombings occurred, in part, in response to U.S. pressure upon Sudan and the U.S.'s use of its Kenyan embassy to carry out actions or pressures upon Sudan." There is no reference in that paragraph, however, to the role that ASB personnel played in terms of reacting similarly to U.S. pressure or their efforts to finance the embassy bombings in reprisal. This is significant because ASB is named as a co-conspirator in the conspiracy that the country of Sudan launched to defeat the efficacy of U.S. economic sanctions.

Another revealing allegation is made in paragraph 8—"The Sudanese sanctions, which BNP Paribas conspired to violate, were explicitly part of al-Qaeda's stated claim of responsibility for the August 1998 bombings." But there is no allegation in paragraph 8 that links up alleged activity engaged in by ASB personnel as to how they conspired to undermine the sanctions which had been imposed on the Sudanese government. Nor is there any allegation as to how these officials conspired to finance the embassy bombings. Moreover, there is no allegation that ASB leadership knew that some of its bank personnel were conspiring with Al Qaeda operatives pre-1998 to bomb U.S. embassies in East Africa.

In paragraph 9, BNPP admitted in its guilty plea in New York Federal District Court that it "created and engaged in deceptive schemes and transactions designed to circumvent U.S. economic sanctions and conceal Sudanese transactions from U.S. authorities." This is a perfect example of the Plaintiffs' repeated use of conclusory allegations re ASB personnel's role in the 1998 embassy bombings. One allegation made against ASB in paragraph 10 is that "It began

3

requesting assistance from European banks to defeat the U.S. sanctions imposed on the Sudanese government." However, the Plaintiffs do not identify which European banks were solicited by whom, when this had occurred, and what this activity had to do with ASB personnel allegedly funding the embassy bombings.

In paragraph 11, there is another revealing allegation concerning BNPP's decision "to become the sole correspondent bank in Europe for [the] Sudanese government". This is an allegation, one of many, that after it is read one poses the question—so what? In paragraph 12 there is a repeated assertion that BNPP, not Al Shamal bank, "entered into an illegal scheme in November 1997 by which it provided concealed, fraudulent, and illegal access to the U.S. financial system for the Government of Sudan…and all leading Sudanese banks—including Al Shamal..." This is another allegation that warrants a "So what?" response in terms of Plaintiffs' claim that ASB personnel financed the embassy bombings.

In paragraph 14, to establish BNPP's complicity in the conspiracy, it is alleged that the bank was fully aware of Sudan's role in assisting Al Qaeda before it agreed to participate in this conspiracy. Even assuming, *arguendo*, this was the case, that would only amount to a similar allegation against ASB to the effect that it assisted Al Qaeda before it agreed to assist in the conspiracy to defeat U.S. economic sanctions. However, there is no explanation as to how or when these unidentified ASB personnel assisted Al Qaeda before these officials agreed to participate in this conspiracy. *See* Compl. ¶ 14. And there is no explanation as to what the term "assisted" means.

More importantly, BNPP or ASB officials who agreed to assist Al Qaeda are not identified anywhere. Nor is the process described of how they were able to do so. Throughout the Complaint, there are a number of conclusory allegations concerning this issue, but again, no specifics are

provided by the Plaintiffs, i.e, no dates, no account details, nothing about the money involved or the alleged withdrawals from a particular bank account.

Another revealing allegation is in paragraph 15: "[T]he 1998 East African Embassy Attacks were the reasonably foreseeable consequence of BNPP's illegal activities and a reasonably foreseeable action in furtherance of the conspiracy to defeat U.S. economic sanctions against the Sudan." There is no similar allegation to the effect that the attacks were the reasonably foreseeable consequence of ASB leadership encouraging bank personnel to engage in illegal activities. And of course, no BNPP executives are identified, nor are any identified from ASB. Nor are there are any allegations which afford the reader the dates, amount of the withdrawals, which branches, and the destination of the funds allegedly used to aid and abet bombing the U.S. embassies.

There is also a specific section that starts on page 10 of the Complaint which deals with ASB. In that section, sensational allegations are made about Bin Laden's investment in ASB, the same type of allegations that were also made against the Bank in the *In re: 9/11* case. The Honorable Judge Casey of the Southern District of New York granted multiple parties' (including ASB's) motion to dismiss in that case in 2005. Part of his rationale was the fact that a bank that services clients and renders normal banking services to people who are later deemed to be terrorists cannot be held responsible for the financing of an international terrorist act committed by those people. *See In re: 9/11*, 349 F.Supp.2d 765, 833 (S.D.N.Y. Jan. 18, 2005) ("This Court…has found no basis for a bank's liability for injuries funded by money passing through it on routine banking business"). It also appears that there were two active players that facilitated ASB's transactions, i.e., BNPP and United European Bank. There is no allegation, however, that ASB senior leadership knew and encouraged BNPP and United European Bank personnel to continue facilitating ASB transactions in order to secure the necessary financing to blow-up the embassies.

In paragraph 28, it is alleged that ASB "is the quintessential example of how the Sudanese government cooperated with Bin Laden and provided the organization with logistical help leading up to and beyond the 1998 East African Embassy Attacks." There is no reference in that paragraph, however, as to how ASB senior leadership assisted the Sudanese government in terms of cooperating with Bin Laden and helping his terrorist organization with logistical and financial help.

There is a section in the Complaint which deals specifically with personal jurisdiction over ASB. In paragraph 63, it is alleged that ASB "maintained continuous and systematic contacts with the United States through correspondent banks", but it does not allege what these systematic and continuous contacts in this judicial district are all about. And then there is a conclusory allegation in paragraph 64 that ASB used these correspondent bank accounts to gain access to the U.S. financial system. There is no allegation, however, that ASB senior leadership directed bank personnel to use these correspondent bank relationships in an effort to assist in the financing of the embassy bombings. *See In re: 9/11*, 349 F.Supp. at 819-20 (citing to several cases where the existence of correspondent banking relationships for an international entity was not enough for courts to assert personal jurisdiction over those entities). There are references to the purchase of a plane, but no references as to how the purchase of that plane located in the U.S., even if its purchase came from ASB banking proceeds, was used to assist in the financing of the embassy attacks. Moreover, it is difficult to believe that Al Qaeda senior leadership had to resort to purchasing an airplane in Texas rather than simply purchase an airplane in Russia, for example, to avoid the scrutiny of the U.S. intelligence network.

The Plaintiffs also attempt to establish a causal linkage between ASB senior leadership and the embassy attacks by identifying certain individuals who had some involvement with ASB

personnel and who pled guilty in a U.S. federal courthouse based on criminal activity. One such individual was Mr. Batterjee who apparently pled guilty to supplying arms to militia entities in Bosnia. This allegation of course warrants a "So what?" response. And to the extent that Mr. Batterjee's organization, the Benevolence International Foundation, was designated by the Treasury Department (paragraph 68), that designation did not occur until 2002, years after the embassy bombings. Moreover, he was not designated because he assisted Al Qaeda in financing the destruction of the U.S. embassies in East Africa.

There is an allegation in paragraph 73 about establishing jurisdiction under the section of the D.C. Code dealing with transacting of business in the District of Columbia. However, there is no explanation as to what this continuous business activity was in the District. There is admittedly a conclusory paragraph, paragraph 79, which recites in part: "Plaintiffs' claims arise out of a common nucleus of operative facts stemming from Al Shamal's actions and omissions in the District of Columbia..." Obviously, it should be explained to this Court what the "common nucleus of operative facts" are re ASB's alleged criminal actions and omissions in this jurisdiction.

In paragraph 89, it is referenced therein that "BNPP admitted that one of its senior compliance officers reminded other high-level BNPP compliance and legal employees that certain Sudanese banks which BNPP dealt with played a pivotal role in the support of the Sudanese government..." There is no similar allegation in the lawsuit, however, about the role that ASB's senior compliance officers played in terms of financing the embassy bombings, e.g., the lack of oversight of bank employees who were allegedly working with Al Qaeda operatives. Also, this allegation references the pivotal role that BNPP compliance officers (not ASB officials) played in support of the Sudanese government. It is not illegal, of course, to support the government where

you are located unless you are engaging in criminal conduct. In other words, it is not enough as referenced in paragraph 89, that "the Sudanese government…ha[d] hosted Osama Bin Laden".

There is a lengthy allegation starting on page 25 that BNPP is subject to U.S. banking laws and regulations. In this section, Plaintiffs specifically recite that BNPP has representative offices in Washington, D.C., and New York. And Plaintiffs reference the fact that these representative offices are actually branches of the bank, so these offices are legal and operational extensions of the parent foreign bank. They then state an obvious conclusion that ASB's activities in the U.S. are subject to the National Bank Act of 1964 and the Office of the Comptroller of Currency, which supervises these bank branches and ensures that they must comply with all U.S. banking laws and regulations. Plaintiffs also reference the fact that Congress passed an International Banking Act, which applies to foreign bank branches, and then they state the evident conclusion that any branch located within the U.S. has to conduct all of its operations consistent with U.S. banking laws and regulations. Compl. ¶¶ 92-97.

There is no similar analysis in the Complaint, however, as to any branches that ASB has on U.S. soil. And therefore, there is no basis for this Court to exercise jurisdiction over ASB. There is a specific section starting on page 26 which specifically explains how BNPP—not ASB— knowingly violated U.S. banking laws and regulations. And there is a full explanation as to why the November 3, 1997 Executive Order signed by President Clinton and U.S. Treasury officials applied to activities engaged in by the Sudanese government and the Central Bank of Sudan. Compl. ¶ 103. Query: what does that allegation have to do with ASB's alleged involvement in financing the embassy bombings?

There is an allegation in paragraph 109 describing the fraudulent scheme engaged in by BNPP senior bank officials to defeat U.S. economic sanctions and the role that that scheme played

in terms of financing the embassy attacks. The conclusion that the Plaintiffs want this Court to reach in that paragraph is that "this fraudulent scheme [engaged in by BNPP officials] was a direct and proximate cause of the 1998 East African Embassy Attacks". However, there is no similar allegation that ASB had conducted a fraudulent scheme or orchestrated that scheme, which directly resulted in the embassy bombings. And although there is an allegation in paragraph 110 that BNPP officials provided ASB with American dollars to finance the embassy bombings, there is no explanation as to the amounts contributed by BNPP, which ASB bank account they were transferred into, which ASB official subsequently authorized the withdrawal of these funds, and who at ASB was the senior banking official who made sure that these funds ended up in the hands of Al Qaeda. Finally, there is no allegation in the Complaint which would suggest that without the specific funds provided by ASB that Al Qaeda would not have had the financial wherewithal to finance the U.S. embassy bombings.

There is a similar problem with the conclusory allegation made in paragraph 127 about U.S. dollars being withdrawn from ASB to provide financing for the embassy bombings. The allegation does not explain whether this occurred pre-1998, how many U.S. dollars were withdrawn, from what specific bank accounts, and authorized by which specific ASB official. So, this is a classic example of a conclusory paragraph devoid of factual detail which will not suffice to provide the necessary nexus between the alleged activities engaged in by senior ASB officials and Al Qaeda operatives planning the embassy attacks.

There are a number of irrelevant paragraphs in the Complaint dealing with U.S. State Department annual reports referencing and explaining "Global Patterns of Terrorism". *See*, *e.g.*, Compl. ¶ 146. The State Department explains in one study that "Sudan has enhanced its relations with international terrorist groups" and that it "has maintained ties with state sponsors of

terrorism". *Id.* Of course, there is no allegation as to how ASB senior leadership and bank personnel involved assisted the government of Sudan in enhancing its relationships with international terrorist groups or state sponsors of terrorism.

There is another allegation which seems to contradict the Plaintiffs' claim that ASB personnel were responsible for financing the embassy attacks. In paragraph 152, it is alleged that: "*The support of Al Qaeda by the Sudanese government and its banking system was integral to the planning, implementation, and success of the 1998 East African embassy attacks*" (emphasis added). The Plaintiffs seem to pinning the blame on Sudan's government here, not Defendant ASB. A more telling allegation in that paragraph is that "[w]ithout the support of Sudanese intelligence, safe haven provided by the Sudanese government to base Al Qaeda's leadership, training of Al Qaeda operatives and other material support including the provision of passports, weapons and explosives, Al Qaeda would not have been able to build its terrorist cells in Kenya and Tanzania."

The allegation not recited, of course, is that with direct assistance provided by ASB personnel, Al Qaeda was able to build up its terrorist cells in Kenya and Tanzania, and it was able to plan and carry out the embassy bombings. There is an additional State Department annual report referenced in the Complaint, but it really goes to prove the fact that the government of Sudan itself was the reason why the Al Qaeda organization was so successful in Africa, including planning terrorist attacks like the embassy bombings. *See* Compl. ¶ 153.

In paragraph 156, there is the oft repeated conclusory allegation that "Al Shamal knowingly and intentionally provided financial services to Al Qaeda including maintaining and servicing Al Qaeda bank accounts." The problem is that there is no documentation as to which bank accounts were used to finance the bombing of the embassies and there is no indication which, if any, ASB senior official authorized withdrawals of money from a specific ASB account to pay for explosives

used in the bombing attacks. While testimony provided by Mr. Al Fadl is disclosed in paragraph 163, that testimony simply establishes that there were bank accounts at ASB that Osama Bin Laden presumably used in 1992.

Another contradictory statement, however, is made in paragraph 165 as to what Mr. Al Fadl also testified to—"he transported cash payments from Al Qaeda to Abuali an affiliated jihadist organization in Jordan through funds maintained at Al Shamal." There is no allegation, however, that the $100,000 was used in any manner to finance the embassy bombings. And there is no allegation that an ASB official authorized the transfer of this cash payment. Moreover, no ASB official is identified who was working with jihadist organizations in Jordan to raise funds in order to finance the embassy attacks.

Plaintiffs do reference the fact in paragraph 171 that Mr. Batterjee (previously mentioned) was designated as a global terrorist and pled guilty to supplying military boots to Muslim organizations in Bosnia. It does not allege, however, that Mr. Batterjee, with the knowledge of Al Shamal senior leadership, cooperated with Al Qaeda operatives in terms of providing financing for the planning and implementation of the East African Embassy Bombings. The Plaintiffs recite that another colleague of Mr. Batterjee was Enaam Arnout. He pled guilty to a racketeering charge per paragraph 176 and admitted that he diverted funds from his charity to support Islamic militants in Bosnia and Chechnya. There is, of course, no allegation that he, working with ASB personnel, diverted any charitable funds in an effort to finance the embassy bombings.

There is also an allegation in paragraph 179 that the Sudanese government directed all major commercial banks, including Al Shamal, to use BNPP as their primary correspondent bank in Europe. That allegation warrants another "So what?" response in terms of relevancy to the financing of the embassy bombings and the senior Al Shamal leadership.

Paragraph 196 reveals how BNPP Geneva utilized satellite banks like ASB in a two-step process to enable its clients to evade U.S. sanctions. That allegation, of course, would also warrant a "So what?" response in terms of the issues raised herein, i.e., which Al Shamal official authorized the withdrawal of funds and transmission of those funds to Al Qaeda personnel to aid and abet the embassy bombings? Another allegation that warrants a "So what?" response is contained in paragraph 206—i.e., BNPP's transactions involving ASB were cleared via an unidentified and unaffiliated bank using a payment method that hid the transactions in order to defeat U.S. economic sanctions.

Another paragraph which tends to contradict the theory that ASB personnel conspired to provide funding for the embassy bombings is paragraph 218. That allegation is that "BNPP's willingness to engage in U.S. dollar transactions with Al Shamal and Sudan significantly undermined the U.S. embargo and provided Al Shamal, Al Qaeda and bin Laden access to the U.S. financial system..." The question that remains, however, is how did this alleged access to the U.S. financial system result in unidentified withdrawals flowing out of an ASB branch located in Sudan, which were authorized by senior ASB officials and which funds ended up being used to finance the embassy bombings?

Starting on page 57 of the Complaint, the different Counts are laid out. The first one is Count I – Civil Conspiracy to Violate and Defeat U.S. Policies and Sanctions Against Sudan. There is a conclusory paragraph (238) which explains why ASB is civilly liable to the Plaintiffs, i.e., the bank conspired to circumvent and oppose U.S. policies and sanctions imposed by the U.S. government on Sudan. But that does not serve as evidence of a direct link between alleged criminal activity engaged in by ASB executives and the financing necessary to plan and implement the embassy bombings. Of course, this Court has already found that the BNPP entity was not civilly

liable to the Plaintiffs for the actions of Al Qaeda re the bombings of the U.S. embassy. And Defendant ASB would respectfully request that this Court issue a similar ruling that Al Shamal Bank is not civilly liable to the Plaintiffs.

Count II starts on page 60, and it is <u>Civil Aiding and Abetting the Material Support of Al Qaeda</u>. The problem with this Count is that it is aimed at BNPP's criminal activity and what is alleged against ASB is that their officials *should have known that financial support provided to Al Qaeda would be used to plan and perform terrorist attacks like the U.S. embassy bombings.* No details are provided, of course, like which bank official in ASB's compliance department should have been monitoring employees' activities more carefully and/or issuing Suspicious Activity Reports (SARs) about their dealings with known Al Qaeda operatives. Again, the rationale articulated in this Count is seen in paragraph 254 that ASB was "acting in pursuit of the common criminal scheme of circumventing and opposing United States policies and sanctions", but this is simply a conclusory allegation.

Count III starts on page 62, and it is called <u>Conspiracy and Aiding and Abetting Crimes Against Humanity and Intentional Injury to Others in Violation of International Law and the Law of Nations</u>. In this cause of action, it is alleged in paragraph 172 that "BNPP officials knew or should have known that the millions of dollars in illegal transfers to Al Shamal and the Sudanese government were used to support, encourage, and make possible terrorist attacks like the embassy bombings." It is alleged that BNPP caused the Plaintiffs damages because it aided and abetted crimes and omissions constituting crimes against humanity. A similar conclusory statement is recited in paragraph 275 with respect to ASB and as already reiterated that is insufficient to impose liability on ASB.

Count IV is laid out in the Complaint starting on page 66 and references aiding and abetting attacks upon a foreign embassy. It appears to be against all Defendants, which means that ASB is named herein. The conclusory paragraph is found in paragraph 289, where it states that unidentified ASB officials knew that certain funds (unexplained where they came from) would be used to assist Al Qaeda. Again, these allegations are not enough to satisfy the burden of proving a nexus that exists between the conduct engaged in by ASB officials and the particular act of international terrorism at issue here, the embassy bombings.

On page 74, Count VII is laid out and it details ASB's liability for committing acts of international terrorism. However, the problem with this Count is that contains a conclusory allegation re paragraph 320, which has no details re bank accounts, bank officers, dates of bank account withdrawals, that could educate this Court about how senior ASB leadership knew and encouraged the financing of the embassy bombings. Again, for some reason, the conspiracy is referenced re the conduct engaged in to purposely circumvent monitoring by U.S. regulators. Paragraph 322 is another conclusory paragraph that recites the idea that unknown bank officials provided services and material support to Al Qaeda. Again, where, who, when, and how, are not detailed in that paragraph.

The other causes of action do not name ASB. There are some references to the role that ASB played in denying the embassy attack victims access to funds and a State Department annual report is mentioned, but it makes no reference to ASB personnel. It also reveals as other paragraphs do, the significant role that *Sudanese intelligence agents played in terms of facilitating the transport of Al Qaeda operatives, the transfer of funds from Sudan, and the transfer of funds to a terrorist cell operating in Kenya*. It is obvious that the Plaintiffs believe that Sudanese intelligence operatives (not ASB senior leadership) played a rather significant role in terms of planning and

carrying out the embassy bombings. None of these allegations of course deal with the relevant issue raised by this Motion to Dismiss, i.e., who are the ASB officers who authorized withdrawals from a specific bank account, when did this take place, what was the amount of withdrawals, and how did they know that the funds would be delivered to Al Qaeda operatives to finance the embassy bombings. These allegations call for sheer speculation which has been rejected by this Court because such allegations are "devoid of factual support." Memo. Op. at 19.

II.     **THE MEMORANDUM OPINION ISSUED BY THIS COURT IN *OFISI V. BNPP, ET AL.*, SUPPORTS THE GRANTING OF DEFENDANT ASB'S MOTION TO DISMISS ON THE BASIS THAT PLAINTIFFS HAVE FAILED TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.**

As this Court knows, the Plaintiffs brought suit in 2015 against BNPP and ASB under provisions of the ATA, the ATS, and various common law torts. They alleged that the Defendants conspired with Sudan, Sudanese banks, and Al Qaeda to defeat economic sanctions imposed by the US on Sudan. In its Opinion dated September 29, 2017, this Court dismissed all claims alleged against BNPP with prejudice. The Court also dismissed ASB without prejudice. What this Court now has to decide is whether the case can go forward against ASB. The allegations made against ASB are that it maintained bank accounts and provided financial and material support to Al Qaeda prior to and after the 1998 embassy bombings. This is a classic example of a conclusory paragraph "devoid of factual support". *See* Memo. Op. at 19. As explained herein, there are no details as to which ASB officers conspired with unidentified Al Qaeda operatives, when they did that, or which bank account was used to withdraw funds that could be sent to al Qaeda to finance the embassy bombings. There are also serious issues arising from when certain statutory provisions were enacted. For example, the statutory provision of ATA § 2339C that the Plaintiffs cite as a basis for

15

at least one of their claims was enacted *four years after* the embassy bombings took place. *See* Memo. Op. at 10.

In Section A of its Background section in its Memorandum Opinion, this Court examined five particular allegations made by the Plaintiffs that are relevant to ASB. *See* Memo. Op. at 3-4. The first was that the government of Sudan purposely sheltered terrorist groups such as Al Qaeda. The second was that Bin Laden himself ordered a member of Al Qaeda to report on the Kenyan US embassy before the attacks. The Court observed that in paragraph 134, Sudanese intelligence agents facilitated the transport of members of Al Qaeda and sent funds from Sudan to a terrorist cell operating in Kenya. Then, the Court discussed the allegation that "Al Qaeda was present in Sudan in 1997 and 1998 leading up to the embassy bombings and, according to the complaint, the support that al Qaeda received from Sudan [(*not* from ASB)] and the access Sudan provided to its banking system was integral to al Qaeda's plan to carry out the attacks." Memo. Op. at 4. Finally, the Court discussed the perpetration of the embassy attacks in Kenya and Tanzania in August of 1998, where hundreds of people were killed and thousands were injured. *Id.* What is clearly missing from this timeline, though, is some assertion that ASB personnel actually conspired with Al Qaeda operatives to finance the embassy bombings.

As a result, the Plaintiffs had to assert much more tenuous connections to insert ASB into their story of events in order to try to make the Bank liable for the attacks. One of their major accusations is that ASB held a bank account at United European Bank. *See*, *e.g.*, Compl. ¶ 26. And they allege that BNPP established relationships with satellite banks and used those relationships to facilitate U.S. dollar payments for various Sudanese banks. *Id.* As part of this allegation, the Complaint details how BNPP directed its employees to omit references to Sudan in U.S. dollar payment messages. *Id.* ¶ 27. There are no similar allegations made against ASB senior leadership.

Yet, Plaintiffs allege that ASB's conduct violated the ATA provisions of 18 U.S.C. §§ 2339A, 2339C, and 2332d. Memo. Op. at 5. They also allege that BNPP's conduct violated the Law of Nations and common law principles of conspiracy and aiding and abiding the commission of torts in violation of the Law of Nations. *Id.*

As this Court observed in its Opinion, the Plaintiffs alleged that BNPP, much like allegations made against ASB personnel, violated 18 U.S.C. § 2339C. But this Court ruled that the Plaintiffs could not assert primary liability for an alleged violation of 2339C because that statute was enacted in 2002, four years after the bombings. Memo. Op. at 10. Thus, this Court should rule the same as it pertains to ASB, i.e., that ASB cannot be held liable under 2339C for acts that occurred 4 years before the enactment of § 2339C.

This Court then examined two issues—whether 18 U.S.C. § 2333 provided a basis for claiming that ASB personnel aided and abetted Al Qaeda operatives in blowing up the East African U.S. embassies and what standard of causation applies to that claim. Memo. Op. at 11. This Court concluded under the recent and related case of *Owens v. BNP Paribas S.A.*, that "the prior version of the ATA that is applicable to plaintiffs' claims in this case does not provide for civil aiding and abetting liability under § 2333." Memo. Op. 11; *See* 235 F.Supp.3d 85 (D.D.C. 2017), *aff'd*, No. 17-7037, 2018 WL 3595950 (D.C. Cir. July 27, 2018). Hence, the Court dismissed the Plaintiffs' ATA claims that related to aiding and abetting liability against BNPP. ASB, therefore, asks that this Court issue the same ruling on behalf of ASB.

This Court then went on to discuss proximate causation and the issue of BNPP being a "United States person" as that term is defined in § 2332d. Memo. Op. at 11-14. BNPP had argued that Plaintiffs' claims under § 2332d should be dismissed because it is not a "United States person" as required to properly assert a violation of that provision, and in any case, Plaintiffs failed to show

17

proximate cause. After discussing these issues, the Court readily accepted BNPP's argument that it did not qualify as a U.S. person under § 2332d and therefore ruled that any claims referring to it as a U.S. person under any subsections of that statute had to be dismissed. ASB similarly is not a U.S. person under any subsections of that statute in the same way BNPP is not, i.e., it is not a U.S. citizen, "permanent resident alien", "juridical person organized under the laws of the United States", or a person in the U.S. *See* Memo. Op. at 12. It is, as stated in the Complaint, a "Sudanese bank established in Khartoum, Sudan in 1983", and has no offices nor has any physical presence in the U.S. Compl. ¶ 25. Hence, Plaintiffs' 2332d claims against ASB should also be dismissed.

The Court eventually determined whether Plaintiffs had sufficiently pled an underlying violation of 2339A. And BNPP's argument that the Plaintiffs failed to state a claim for violation of the ATA statute under that provision and all of the other cited ATA provisions is identical to the argument that ASB makes as a basis for dismissal of this lawsuit. The Court found that even if "BNPP was illegally processing U.S. dollar transactions for Sudan prior to the 1998 terrorist attacks", that would "only establish BNPP's connection to Sudan and Sudanese banks…". Memo. Op. at 15. Furthermore, the Court found that the Plaintiffs' allegations concerning BNPP's conduct prior to the embassy bombings did not satisfy what § 2339A requires for a violation of that provision, i.e., that BNPP's alleged illegal activity had a sufficient nexus to Al Qaeda or other terrorist groups and the Embassy bombings. *Id.*

The test that this Court devised was that: "In order to satisfy the requirements of § 2339A, plaintiffs must allege sufficient facts to show either that '(1) [BNPP] knew Sudan [or Al Shamal] was acting as an agent of Al Qaeda or of an individual terrorist[] or (2) [BNPP] knew the ultimate beneficiaries of the financial services would be a terrorist organization or terrorist.' " Memo. Op. at 15-16 (citations omitted). In applying that test to the instant case, this Court cited the

Complaint's conclusory allegations that Sudan had provided capital to finance the 1998 bombings and ruled that they were not enough to prove BNPP's scienter to finance the bombings as needed to prove a violation of § 2339A. *Id.* at 16. This is the identical argument advanced by ASB in this legal memorandum and its motion to dismiss—the Complaint's conclusory allegations about ASB are insufficient to prove that Bank personnel actually intended to finance the embassy bombings.

The Court eventually pointed out that "the only fact connecting BNPP to Al Shamal before the [embassy] attacks is that Al Shamal held a correspondent bank account at a European subsidiary of BNPP." Memo. Op. at 16. That fact on its own does not explain, however, how ASB having a correspondent bank account with a BNPP subsidiary, if true, is somehow proof that ASB senior leadership conspired to blow-up the US embassies.

This Court then discussed another major problem that the allegations posed. Plaintiffs did not allege that BNPP knew that ASB was acting as Al Qaeda's agent before the bombings occurred. *Id.* at 17. Their allegation that tried to come close to this was that "BNPP processed transaction[s] on behalf of Al Shamal, the proceeds of which were delivered to al Qaeda for…planning and perpetrating the embassy bombings", but the Court rejected this as a "naked assertion devoid of factual support." *Id.* This is why ASB has consistently argued in this legal memorandum that there are no details alleged with respect to which ASB officials were involved, if funding occurred before 1998, how much money was involved, which bank accounts were involved, and how this money was transferred to Al Qaeda.

With respect to processing funds for the government of Sudan, this Court explained that such activity is not the same as processing funds for a terrorist organization. The Court specifically rejected the allegation made by the Plaintiffs that "some of that money <u>might</u> end up in the hands of al Qaeda to carry out attacks." *Id.* at 19. The Court's ultimate conclusion was that this

speculative allegation does not satisfy the scienter pleading requirements to make out a § 2339A violation.

This Court also made a significant observation about an important issue that was not addressed by the Plaintiffs, i.e., that the Sudanese government would have been able to assist Al Qaeda without the funds processed by BNP. ASB makes a duplicative argument that without the funds allegedly provided by ASB personnel, the government of Sudan still would have been able to finance the embassy bombings. ASB therefore reiterates the Court's finding that "there is simply not enough to sustain a sufficiently direct causal connection between BNPP's conduct and the embassy bombings that allegedly injured plaintiffs. *Id.* at 19. As a result of that finding, the Court concluded it had to dismiss all of the ATA claims advanced by the Plaintiffs. *Id.* ASB seeks an award of identical relief.

There is no need to address the adequacy of the allegations made against ASB arising under the ATS because of a recent U.S. Supreme Court holding that foreign corporations cannot be named in an ATS lawsuit. *See Jesner v. Arab Bank, PLC*, 138 S.Ct. 1386, 1403 (2018) ("[A]bsent further action from Congress it would be inappropriate for courts to extend ATS liability to foreign corporations.") ASB, in any case, in section 1 of this Memorandum of Points and Authorities, has detailed all of the problems that the allegations made in the Complaint pose in terms of providing a basis to impose liability on ASB.

## CONCLUSION

As evidenced in this legal memorandum, the Plaintiffs have failed to establish a link between any activity engaged in by senior ASB personnel and activity engaged in by Al Qaeda operatives to bring about the 1998 East African Embassy Bombings. As the Court already remarked in its earlier opinion in this case, "[N]aked assertion[s] devoid of factual support… need not be accepted by the Court." Memo. Op. at 17. Hence, an allegation that ASB personnel should

have known that funds withdrawn from an unknown and unidentified bank account would be used to finance the destruction of the US embassies is the type of allegation that this Court has already stated it would not give any credence to. Given what ASB is accused of herein, it is nothing short of amazing that: (a) there has been no finding by the Federal Borough of Investigation implicating ASB personnel in the U.S. embassy bombings; (b) ASB has not been designated by the Department of the Treasury's Office of Foreign Assets Control in connection with any activities that ASB personnel engaged in concerning the embassy bombings; and (c) no criminal indictment  was or has been handed down by a U.S. grand jury accusing ASB personnel of criminal conduct concerning the intentional destruction of the US embassies in East Africa in 1978.

Therefore, the Plaintiffs' Complaint should be dismissed with prejudice.


/s/   *Martin McMahon*
Martin McMahon, Esq.
1717 K Street, NW
Suite 900
Washington, DC 20006
mm@martinmcmahonlaw.com
(202) 862-4343