# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MARY OFISI, et al.,

     Plaintiffs,

     - against-

AL SHAMAL ISLAMIC BANK., et al.

     Defendants.

Civil No. 1:15-Civ-2010-JDB

## PLAINTIFFS' OPPOSITION TO DEFENDANT AL SHAMAL'S MOTION TO DISMISS

# TABLE OF CONTENTS

I.     BACKGROUND ............................................................................................2
       A.    Overview of Al Shamal's Direct Material Support to Al Qaeda and Role in
             Conspiracy with Sudan and BNP Paribas ...............................................2
       B.    The Complaint's Specific and Detailed Allegations Establishing Personal
             Jurisdiction Over Al Shamal and a Prima Facie Basis for Liability ........................7

II.    ARGUMENT ..............................................................................................12
       A.    Standards Governing Motion to Dismiss .................................................12
             1.    Standard Under 12(b)(2) ...........................................................12
             2.    Standard Under 12(b)(6) ...........................................................13
       B.    This Court Can Exercise Personal Jurisdiction Over Al Shamal ..........................13
             1.    Al Shamal is Subject to Personal Jurisdiction because Its Actions
                   and the Alleged Conspiracy Were Purposely Directed Toward the
                   United States and this Federal District .........................................15
             2.    Al Shamal's is Subject to Personal Jurisdiction Based on the Overt
                   Acts It and Its Co-Conspirators Committed and Caused in the
                   Forum ..................................................................................17
             3.    Al Shamal's is Also Subject to Personal Jurisdiction Under the
                   District of Columbia's Long Arm-Statute .....................................20
             4.    In the Alternative, Plaintiffs Request Jurisdictional Discovery .................21
       C.    Plaintiffs Have Properly Alleged Common Law Claims Under Theories of
             Conspiracy and Aiding and Abetting Liability ............................................23
             1.    Al Shamal is Vicariously Liable for Plaintiffs' Injuries as it
                   Conspired with Al Qaeda to Defeat United States Sanctions and
                   Facilitate Acts of Terrorism. ......................................................24
             2.    Al Shamal is Vicariously Liable for Plaintiffs' Injuries as it
                   Materially Aided and Abetted Al Qaeda. ......................................27
       D.    Al Shamal is Liable Under the ATA for Its Provision of Material Support
             to Al Qaeda .............................................................................31
             1.    Plaintiffs Satisfy the Scienter Elements Of The Predicate Criminal
                   Statutes ..............................................................................37
             2.    Al Shamal Proximately Caused Plaintiffs' Injuries by Directly
                   Financing the Terrorist Organization Responsible for the Embassy
                   Bombings ............................................................................38

III.   CONCLUSION ...........................................................................................41

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abecassis v. Wyatt*,
7 F. Supp. 3d 668 (S.D. Tex. 2014) ............................................................. 34

*Aetna Case. and Sur. Co. v. Leahey Const. Co*,
219 F.3d 519 (6th Cir. 2000) ...................................................................... 30

*Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*,
525 F.3d 8 (D.C. Cir. 2008) ........................................................ 13, 26, 27

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................ 13, 27

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ...................................................................... 13, 26, 27

*Boim v. Holy Land Found. for Relief & Dev.*,
549 F.3d 685 (7th Cir. 2008) (en banc) .................................................. passim

*Burger King v. Rudzewicz*,
471 U.S. 462 (1985) ..................................................................................... 17

*Camp v. Dema*,
948 F.2d 455 (8th Cir. 1991) ..................................................................... 30

*Caribbean Broad. Sys. Ltd. v. Cable & Wireless PLC*,
148 F.3d 1080 (D.C. Cir. 1998) ................................................................ 22

*Charles Schwab Corporation v. Bank of America Corporation*,
883 F.3d 68 (2d Cir. 2018) ................................................................. 15, 19

*Conley v. Gibson*,
355 U.S. 41 (1957) ...................................................................................... 13

*Crane v. N.Y. Zoological Soc'y*,
894 F.2d 454 (D.C. Cir. 1990) ................................................................... 13

*Diamond Chem. Co. v. Atofina Chems., Inc.*,
268 F.Supp.2d 1 (D.D.C.2003) ................................................................. 22

*Doe v. State of Israel*,
400 F. Supp. 2d 86 (D.D.C. 2005) ............................................................ 17

*Dooley v. United Techs. Corp.*,
786 F.Supp. 65 (D.D.C. 1992) ............................................................ 18, 19

*Edmond v. United States Postal Serv. Gen. Counsel*,
    949 F.2d 415 (D.C. Cir. 1991) ................................................................................. 21

*FC Inv. Grp. v. IFX Mkts., Ltd*.,
    529 F.3d 1087 (D.C. Cir. 2008) ................................................................. 13, 21, 22

*First Chi. Int'l v. United Exch. Co.*,
    836 F.2d 1375 (D.C. Cir. 1988) ....................................................................... 7, 18

*Freeman v. HSBC Holdings PLC*,
    No. 14-cv-6601, 2018 WL 3616845 (E.D.N.Y. July 27, 2018) ............................ 25

*Gill v. Arab Bank, PLC*,
    893 F. Supp. 2d 474 (E.D.N.Y. 2012) .................................................................. 36

*Gilmore, v. Palestinian Interim Self-Government Authority*,
    422 F. Supp. 2d 96 (D.D.C. 2006) ....................................................................... 35

*Goldberg v. UBS AG*,
    660 F. Supp. 2d 410 (E.D.N.Y. 2009) .................................................................. 36

*GTE New Media Servs., Inc. v. BellSouth Corp.*,
    199 F.3d 1343 (D.C. Cir. 2000) ........................................................................... 17

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ....................................................................... passim

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
    466 U.S. 408 (1984) ............................................................................................ 14

*In re Chiquita Brands Int'l, Inc.*,
    284 F. Supp. 3d 1284 ........................................................................................... 40

*In re Fort Totten Metrorail Cases*,
    756 F. Supp. 2d 132 (D.D.C. 2010) ..................................................................... 22

*Jung v. Association of American Medical Colleges*,
    300 F. Supp. 2d 119 (D.D.C. 2004) ..................................................................... 21

*Junquist v. Sheikh Sultan Bin Khalifa Al Nahyan*,
    115 F.3d 1020 (D.C. Cir. 1997) ..................................................................... 15, 19

*Keeton* v. *Hustler Magazine, Inc.*,
    465 U. S. 770 (1984) ........................................................................................... 17

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. ___, 134 S.Ct. 1377 (2014) .............................................................. 38, 39

*Linde v. Arab Bank*,
   882 F. 3d 314 (2d Cir. 2018) ................................................................. 35

*Linde v. Arab Bank, PLC*,
   384 F. Supp. 2d 571 (E.D.N.Y. 2005) ..................................................... 34

*Livnat v. Palestinian Authority*,
   851 F.3d 45 (D.C. Cir. 2017) ................................................................. 15

*Mandelkorn v. Patrick*,
   359 F.Supp. 692 (D.D.C. 1973) ............................................................. 18

*Mwani v. Osama Bin Laden*,
   417 F.3d 1 (D.C. Cir. 2005) ......................................................... 14, 16, 17

*Ofisi v. BNP Paribas*,
   278 F. Supp. 3d 84, 97 (D.D.C. 2017) .................................................... 33

*Ofisi v. BNP Paribas*,
   2018 WL 396234 (D.D.C. Jan. 11, 2018) ................................................ 25

*Owens v. Rep. of Sudan*,
   531 F.3d 884 (D.C. Cir. 2008) .......................................................... 37, 40

*Owens v. Rep. of Sudan*,
   864 F.3d 751 (D.C. Cir. 2017) .......................................................... 37, 38

*Owens v. Republic of Sudan*
   826 F. Supp. 2d 128 (D.D.C. 2011) ................................................. passim

*Paroline v. United States*,
   134 S. Ct. 1710 (2014) ................................................................... 37, 39

*Rothstein v. UBS AG*,
   708 F.3d 82 (2d Cir. 2013) .................................................................... 39

*Smith v. District of Columbia*,
   413 F.3d 86 (D.C. Cir. 2005) ................................................................. 37

*Smith v. Washington Post Co.*,
   962 F. Supp. 2d 79 (D.D.C. 2013) .......................................................... 27

*Triple Up Ltd. v. Youku Tudou Inc.*,
   235 F. Supp. 3d 15 (D.D.C. 2017) ..................................................... 17, 39

*United States v. Haipe*,
   769 F.3d 1189 (D.C. Cir. 2014) ............................................................. 35

*United States v. Osama bin Laden et al.*,
 98-CR-1023 (S.D.N.Y.) ............................................................................ 3

*United States v. Philip Morris, Inc.*,
 116 F.Supp.2d 116 (D.D.C. 2000) .......................................................... 22

*United States v. U.S. Gypsum Co.*,
 438 U.S. 422 (1978) ................................................................................ 34

*Walden v. Fiore*,
 571 U.S. 277 (2014) .......................................................................... 15, 17

*Weiss v. Nat'l Westminster Bank PLC*,
 768 F.3d 202 (2d Cir. 2014) ................................................................... 34

*Weiss v. National Westminster Bank*,
 278 F. Supp. 3d 636 (E.D.N.Y. 2017) ...................................... 32, 34, 40

*Wultz v. Islamic Republic of Sudan*,
 755 F. Supp. 2d 1 (D.D.C. 2010) ............................................... 13, 34, 35

## STATUTES AND RULES

18 U.S.C. § 2331(1) ...................................................................................... 25, 33

18 U.S.C. § 2331(1)(B) ...................................................................................... 33

18 U.S.C. § 2333 ................................................................................................ 36

18 U.S.C. § 2333(a) ........................................................................................... 32

18 U.S.C. § 2339A ....................................................................................... 33, 36

18 U.S.C. § 2339C ....................................................................................... 33, 36

D.C. Code Section 13-423(a) ......................................................................... 2, 21

Fed. R. Civ. P. 4(k) ............................................................................................ 14

Fed. R. Civ. P. 4(k)(2) ................................................................................. passim

Fed. R. Civ. P. 8 ................................................................................................. 27

Fed. R. Civ. P. 12(b)(2) ..................................................................................... 13

Fed. R. Civ. P. 12(b)(6) ............................................................................... 13, 26

Plaintiffs, the United States Government employee victims of the August 1998 bombings of the United States Embassies in Kenya and Tanzania and their families (the "Ofisi Plaintiffs" or "Plaintiffs"), respectfully submit this memorandum in opposition to Defendant Al Shamal Islamic Bank's Motion to Dismiss (Dkt. 57).  Defendant Al Shamal Islamic Bank ("Al Shamal") moves to dismiss the Complaint based on: (1) this Court's alleged lack of personal jurisdiction over Al Shamal; and (2) Plaintiffs' supposed failure to allege a sufficient causal link between the activity by senior Al Shamal officials and the August 7, 1998 East African Embassy Bombings.  For the following reasons, the motion should be denied and Plaintiffs should be permitted to pursue their claims and ultimately to present them to a jury.

First, this Court can assert personal jurisdiction over Al Shamal pursuant to Federal Rule of Civil Procedure 4(k)(2) because Al Shamal: (1) has sufficient contacts with the United States as a whole and is not more properly sued in another district; (2) purposely directed its malicious activities toward the forum, the United States, in connection with the conspiracy alleged in the Complaint; and (3) participated in a conspiracy involving overt acts in furtherance of that conspiracy within this federal district, both actions (i.e., the filing of false reports) and failures to act where the law imposed a duty to act (i.e., failure to submit or cause others to submit required reports to the U.S. Department of Treasury).

The Complaint alleges that Al Shamal knowingly engaged in a conspiracy with the Republic of Sudan ("Sudan"), Al Qaeda, BNP Paribas ("BNPP"), and others to defeat U.S. policy as carried out through anti-terrorism sanctions against Sudan.  The conspiracy resulted in, among other criminal activity, two attacks on United States embassies and the deaths and severe injuries of more than 200 U.S. citizens and U.S. Government employees.  The bombings specifically targeted the United States, that is, the United States embassies in Kenya and Tanzania.  Al Shamal and its co-

conspirators also committed or caused to be committed overt acts in furtherance of that same conspiracy in the United States itself, specifically through fraudulent financial transactions and false reporting to the U.S. Government.  Accordingly, these allegations are sufficient to establish personal jurisdiction over Al Shamal.

Similarly, personal jurisdiction is also proper under the District of Columbia's long-arm statute, D.C. Code Section 13-423(a) because the Complaint alleges that Al Shamal or its agent, BNP Paribas, transacted business in the District of Columbia, relating to the alleged conspiracy.

Second, Plaintiffs have alleged more than sufficient facts to sustain its claims against Al Shamal under the common law in Counts I and II and the Anti-Terrorism Act in Counts V, VI, and VII of the Complaint.[1]  The facts alleged as to Al Shamal's material support of Al Qaeda have the "directness" that this Court concluded was lacking in the allegations against BNP Paribas.  For example, the Complaint alleges that Al Shamal knowingly undertook direct cooperation with Al Qaeda, thereby providing direct material support to Al Qaeda allowing it to carry out the August 1998 bombings in violation of the Anti-Terrorism Act ("ATA") and to attempt to defeat U.S. anti-terrorism policy as reflected through economic sanctions.

Plaintiffs also request oral argument.

I.    **BACKGROUND**

   A.    **Overview of Al Shamal's Direct Material Support to Al Qaeda and Role in Conspiracy with Sudan and BNP Paribas**

The allegations in the Complaint with respect to Al Shamal are based in large part on (a) documentary and testimonial evidence presented by the U.S. Government in federal prosecutions of some of the individuals criminally responsible for the August 1998 bombings and (b) other U.S.

---

[1] Plaintiffs disagree with the Supreme Court's reasoning in *Jesner v. Arab Bank*, 138 S. Ct. 1386, 1435 (2018) (issued after their Complaint was filed) but concede that unless *Jesner* is overruled; their claims against Al Shamal under the ATS are foreclosed.

Government reporting.  For example, the Complaint relies on and cites trial testimony sponsored by the U.S. Government from Al Qaeda members or supporters, specifically "Jamal Al-Fadl, a former financial officer for bin Laden," Wadi el-Hage, a "former personal secretary for bin Laden convicted for his role in the bombing," and "Essam al Ridi, an Al Qaeda associate residing in Texas".  Those men all testified that Al Qaeda utilized and relied on Al Shamal "for operational purposes including providing terrorists and operatives compensation and expenses from accounts held at the bank" in connection with the attacks.  Compl. at ¶¶ 65, 163-168 (citing to trial testimony from *United States v. Osama bin Laden et al.*, 98-CR-1023 (S.D.N.Y.)).  The Complaint also relies on reporting by the U.S. State Department and U.S. Congressional testimony and reporting that Osama bin Laden funded or invested in Al Shamal and had direct involvement in the bank.  Compl. at ¶¶ 153, 158 (citing U.S. State Department Report, a U.S. Congressional Report, and a U.S. Congressional hearing).

In addition to allegations about Al Qaeda's reliance on Al Shamal for material support, the Complaint also includes numerous specific allegations that Al Shamal's senior leadership and shareholders knowingly provided this material support.  For instance, the Complaint includes numerous allegations of Al Shamal's knowing support of Al Qaeda by its Chairman during this period, Adel Abdul Jalil Batterjee.  Compl. at ¶¶ 67-68, 171-176.  These allegations regarding the former Chairman of Al Shamal, Mr. Batterjee - who was also Osama bin Laden's brother-in-law, are based upon and cite the U.S. Department of the Treasury's 2004 designation of Mr. Batterjee as a Specially Designated Global Terrorist and accompanying public announcement of the basis for that designation.  Compl. at ¶ 171 (citing, U.S. Department of the Treasury Press Release, "U.S. Treasury Designates Two Individuals with Ties to al Qaida, UBL Former BIF Leader and al-Qaida Associate    Named    Under    E.O.    13224,"    (December    21,    2004),    available    at

https://www.treasury.gov/press-center/press-releases/Pages/js2164.aspx).  Mr. Batterjee, who was

described by the U.S. Government as "one of the world's foremost terrorist financiers" for conduct

during the time period he served as the Chairman of Al Shamal, remains a designated global terrorist

today.[2]

Much of this same evidence was presented to this Court in connection with the Plaintiffs'

separate prior action against Sudan under the Foreign Sovereign Immunities Act ("FSIA") for

Sudan's role in the conspiracy alleged in the current Complaint.  In its July 2011 opinion addressing

the Sudan's liability for the August 1998 attacks, this Court concluded based on the evidentiary

record presented through live and previously recorded testimony and documentary information

during a three-day bench trial held in October 2010 that:

> "Bin Laden and al Qaeda also invested in Sudanese banks. This
> access to the formal banking system was useful for 'laundering
> money and facilitating other financial transactions that stabilized and
> ultimately enlarged bin Laden's presence in the Sudan.'  **For
> example, Bin Laden invested $50 million in the Sudan's Al
> Shamal Islamic Bank, and these funds were used to finance al
> Qaeda operations**. **Al Shamal Islamic Bank was known for
> financing terrorist operations, and bin Laden remained a leading
> investor of the bank long after he was expelled from the Sudan**."

*Owens v. Republic of Sudan* 826 F. Supp. 2d 128, 144 (D.D.C. 2011) (internal citations omitted)

(emphasis added).

During that trial, the Court was presented with the sworn statement of Dr. Lorenzo Vidino,

which, in turn, summarized documentary and testimony evidence collected and offered by the U.S.

Government in the criminal prosecution relating to the attacks and relied upon by Plaintiffs in the

current Complaint.  *See Owens,* 826 F. Supp. 2d at 144 (citing to Exhibit V, the sworn statement of

---

[2] *See* OFAC SDN List, available at https://sanctionssearch.ofac.treas.gov/Details.aspx?id=1212.  The U.S. Government
described Mr. Batterjee as "one of the world's foremost terrorist financiers" in the above-referenced December 21,
2004 U.S. Treasury Department public report of his designation "for providing financial and material support to al
Qaeda and Usama bin Laden (UBL)." https://www.treasury.gov/press-center/press-releases/Pages/js2164.aspx

Dr. Lorenzo Vidino).   As Dr. Vidino testified, "Al Shamal Islamic Bank is the quintessential example of how the Sudanese government cooperated with Bin Laden and provided the organization with logistical help during its five years in Sudan.  It is important to note that the bank remained active for many years after bin Laden left the Sudan, at least until 2004." *Owens*, Trial Ex. V, Sworn Testimony of Dr. Vidino.  Based on his review of available documentary evidence, U.S. government reporting, and sworn testimony of members of Al Qaeda, Dr. Vidino testified regarding specific acts of material support for Al Qaeda by Al Shamal and by the bank's leadership which underlie the many specific allegations in the Complaint in this action:

> "When examining Bin Ladin's financial activities in the Sudan, the story of Al Shamal Islamic Bank is of particular note.  **According to the State Department Bin Ladin and wealthy NIF members capitalized Al Shamal Islamic Bank in Khartoum.**
>
> …
>
> Al Shamal Islamic bank was formed in Sudan on April 1983, and started operations on January 2, 1990 with a paid capital of $3.9 million.  **Shares for subscriptions were issued between 1997 and 2000.  According to State Department documents, Bin Ladin invested $50 million in the bank.**
>
> Bin Ladin's involvement in the Al Shamal Islamic Bank was confirmed by a 2002 Congressional Research Service report for Congress.
>
> …
>
> Al Shamal Islamic Bank Chairman and shareholder, Adil Abd el Aigl Botorgey (a.k.a. Adel Abdul Jalil Batterjee), is the Chairman of al-Bir Saudi Organization, whose U.S. branch, Benevolence International Foundation (BIF), is a front for al Qaeda and whose assets have been frozen by the U.S. Treasury Department.  **Al Shamal Islamic Bank General Manager, Mohammed S. Mohammad, acknowledged that Osama bin Ladin had two accounts at the bank, opened on March 30, 1992 for al-Hijrah Construction and Development Ltd., a company that the State Department says 'work[ed] directly with Sudanese military officials to transport and provision terrorists training camps in northern Sudan.'**

A third al Shamal account was opened in 1993 in the name of a holding company Osama bin Laden registered in Saudi Arabia Wadi al Aqiq.  Al Shamal Bank has repeatedly been used to fund criminal and terrorist activities.  **Jamal al-Fadl testified during the 2001 Africa Embassy trial that Bin Ladin and at least six al Qaeda operatives held bank accounts at al Shamal Islamic Bank under their real names, which demonstrate[es] the umbrella of safety that al Qaeda operated under at this time in Sudan.**

…

Jamal Ahmed al-Fadl testified that al Qaeda operatives received monthly checks of several hundred dollars from al Shamal Islamic Bank accounts.

. . .

**Al-Fadl also testified that he transferred $100,000 from al Shamal Islamic Bank to an al Qaeda representative in Jordan.**

. . .

**During the course of the Embassy bombing trial, another Bin Ladin associate, Essam al Ridi, testified that al Qaeda used al Shamal Bank for operational purposes.**  He stated '$250,000 was wired from Al Shamal Islamic Bank" in 1993 via Bank of New York to a Bank of America account held in Dallas, Texas where he used it to 'buy a plane delivered to bin Laden.

…

On September 26, 2001, Senator Carl Levin, then-Chairman of the Senate Armed Services Committee and Chairman of the Permanent Subcommittee on Investigation of the Governmental Affairs Committee, testified before the US Senate Committee on Banking, Housing, and Urban Affairs.  **He stated that al Shamal Islamic Bank operations continue to finance terror and that as recently as 2004, there were indications that Osama bin Ladin remained the leading shareholder of that bank**."

*Owens*, Trial Ex. V, Sworn Testimony of Dr. Vidino at 11-14 (citing various documentary evidence,

U.S. Government reports, and criminal trial testimony) (emphasis added).

As the Complaint alleges, Al Shamal was one of the co-conspirator Sudanese banks that

knowingly conspired with BNPP to defeat U.S. sanctions—a conspiracy BNPP has admitted to

under oath in a federal criminal guilty plea.  It has been publicly reported that BNPP and previously its subsidiary United European Bank was a correspondent bank for Al Shamal.[3]  Al Shamal used those banks and others to facilitate numerous transactions to further Al Shamal's agreement or conspiracy with Sudan and Al Qaeda to defeat U.S. anti-terrorism policies which were carried out through economic sanctions against Sudan.  Compl. at ¶ 26.

**B.**     **The Complaint's Specific and Detailed Allegations Establishing Personal Jurisdiction Over Al Shamal and a Prima Facie Basis for Liability**

All of the evidence relied upon by the Court in finding Sudan liable for the August 1998 bombings, along with substantial additional evidence developed by Plaintiffs, formed the basis of the detailed, specific allegations in the Complaint establishing both this Court's personal jurisdiction over Al Shamal and a *prima facie* case establishing its liability.

<u>**First,**</u> Plaintiffs in this case have alleged a single conspiracy involving the Government of Sudan, BNP Paribas, the Central Bank of Sudan, Al Shamal Bank, Al Qaeda, and others with the shared goal and purpose *to defeat U.S. anti-terrorism sanctions against Sudan*. *See, e.g.*, Compl. at ¶¶ 1–17, 226–42.  From at least November 1997 through in or around 2012, Al Shamal "which was used by, affiliated with, and invested in by Osama bin Laden and Al Qaeda" conspired with BNPP, Sudan, the Central Bank of Sudan, and Al Qaeda "to defeat the economic sanctions imposed by Executive Order of the President of the United States and administered and enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), which were designed to deter, disrupt, and defeat acts of international terrorism."  Compl. at ¶¶ 1, 12.  The August 7, 1998 attacks on the U.S. embassies in Nairobi, Kenya and Dar es Salaam, Tanzania were (1) a means of furthering the conspiracy to defeat the sanctions and (2) the foreseeable and, indeed, inevitable

---

[3] *See, e.g*, CNNMoney, "Banks Check Terrorist Links – Al Shamal Correspondent Banking Service Ties to Three U.S. Banks Cited," October 3, 2001, available at http://money.cnn.com/2001/10/03/news/alshamal.

consequence of it.  Al Shamal's co-conspirator BNP Paribas has already admitted to its role in this scheme, *see e.g.*, Compl. at ¶¶ 3, 9, and this Court has already found that Al Shamal's co-conspirator Sudan helped Al Qaeda carry out the Embassy bombings. *See Owens*, 825 F. Supp. 2d at 157.

**Second,** Plaintiffs have alleged specific and direct links between Al Shamal, Sudan, BNPP, and Al Qaeda.  The Complaint cites to this Court's prior findings regarding Al Shamal in the *Owens* trial.  Compl. at ¶ 28 (quoting *Owens*, 825 F. Supp. 2d at 144).  Most critically, it includes allegations of specific instances of Al Shamal's material support for Al Qaeda, often facilitated by BNP Paribas, including those detailed above in Dr. Vidino's testimony and the evidence supporting his testimony.  Compl. at ¶¶ 154-168.  For example, the Complaint includes the following specific allegations:

- "Al Shamal provided financial support and other forms of material support, Including maintaining and servicing bank accounts for the facilitating weapons and military equipment, to bin Laden and Al Qaeda prior to, and after, the 1998 Embassy Bombing attacks. Al Shamal conducted or participated, directly or indirectly, in the conduct of Al Qaeda's affairs and participated in the operation or management of Al Qaeda's operation." Compl. at ¶ 69.

- Al Shamal began operations in Sudan on January 2, 1990 and was capitalized, in part, with approximately $50 million from Osama bin Laden. BNPP provided correspondent banking services to Al Shamal through its subsidiary, United European Bank. In October 2001, a source confirmed to CNN Money that the United European Bank was still the correspondent banker for Al Shamal." Compl. at ¶ 154.

- "During the Relevant period, Al Shamal held a correspondent bank account at United European Bank, a subsidiary of BNPP. BNPP and/or United European Bank continued its facilitation of Al Shamal transactions even after public reporting of its ties to Al Qaeda following the 1998 East African Embassy Attacks."  Compl. at ¶ 26.

- "At a September 2001 Congressional hearing following the attacks on 9/11, Carl Levin publicly and specifically noted that Osama Bin Laden and Al Qaeda operatives used Al Shamal in the years leading to the 1998 East African Embassy Attacks."  Compl. at ¶ 27.

- "Upon Bin Laden's arrival in Sudan, the government opened its banking system to Al Qaeda. The Sudanese Banking system provided Bin Laden and Al Qaeda the means to launder money and facilitate financial transactions that stabilized and ultimately enlarged Bin Laden's presence in the Sudan." Compl. at ¶ 155.

- "Al Shamal knowingly and intentionally provided financial services to Al Qaeda including maintaining and servicing Al Qaeda bank accounts." Compl. at ¶ 156.

- "Bin Laden opened his first account in Al Shamal on or about March 30, 1992 on behalf of his company al-Hijrah and continued, from that point forward, to establish accounts at Al Shamal for Al Qaeda and his front companies including Wadi Al Aqiq, a holding company registered in Saudi Arabia." Compl. at ¶ 157.

- "In 1998, Governor Mutasim Abdul-Rahim, Secretary General of the National Congress Party in Khartoum, as well as a spokesman for, co-founder of and major shareholder in Al Shamal issued a statement promoting jihad urging "all those who are able to carry a gun to join the [military training] camps…Jihad has now become an obligation that comes before any other duty." Compl. at ¶ 159.

- "Mohammed S. Mohammed, General Manager of Al Shamal, acknowledged in a September 2001 press release that bin Laden held two accounts in the bank." Compl. at ¶ 160.

- "Jamal Ahmed Al-Fadl ("Al-Fadl"), a former financial officer for bin Laden, testified that at least six Al Qaeda operatives held accounts in their own names at Al Shamal." Compl. at ¶ 163

- "Wadi el-Hage ("El-Hage), former personal secretary for bin Laden convicted for his role in the bombings, also testified that bin Laden kept accounts at Al Shamal." Compl. at ¶ 164.

- "Al-Fadl transported cash payments from Al Qaeda to Abu Ali, an affiliated jihadist organizations in Jordan, through funds maintained at Al Shamal." Compl. at ¶ 165.

- "Al Qaeda used Al Shamal for operational purposes including providing terrorists and operatives compensation and expenses from accounts held at the bank . . .  During the planning of these 1998 East African Embassy Attacks, Al-Fadl received $250,000 from Al Shamal purchase a plane for Al Qaeda. The plane was used to coordinate Al Qaeda's efforts in preparation for the 1998 Embassy bombings, including flying bin Laden to a meeting in Teheran with the heads of the IRGC and Hizballah to plan the attacks on the

embassies and arrange training for Al Qaeda operatives in Iran and Beka Valley, Lebanon." Compl. at ¶¶ 166, 168.

**Third**, the Complaint alleges that Al Shamal committed overt acts in the United States which it used to further the conspiracy and purposely directed its activities toward the United States. Al Shamal and its co-conspirators sought directly to defeat U.S. anti-terrorism sanctions and strike back at U.S. foreign policy including by supporting attacks against United States embassies.  For example, the Complaint alleges that:

- "At the time of the 1998 East African Embassy Attacks, Al Shamal maintained continuous and systematic contacts with the United States through correspondent banks and shareholder relationships in the United States. Through at least 2001, Al Shamal held correspondent bank accounts at Arab American Bank, American Express Bank and Citibank." Compl. at ¶ 63

- "Al Shamal used the correspondent accounts of foreign banks such as BNPP and banks within the United States to gain access to the U.S. financial system." Compl. at ¶ 64.

- "Al Shamal shareholders maintained significant United States operations, Faisal Islamic Bank and DMI Trust.  Bin Laden himself remained a leading shareholder of Al Shamal as late as 2002."  Compl. at ¶ 66.

- "As a direct and proximate result of Al Shamal's material support of Al Qaeda, bin Laden and Al Qaeda orchestrated the bombing of the U.S. Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania—not only to kill U.S. citizens and employees of the United States Government but also to cause emotional distress and sow terror in the United States." Compl. at ¶ 70.

- "Al Shamal engaged in an ongoing conspiracy with Sudan and Al Qaeda to facilitate overt acts of terrorism against the United States in direct response to economic sanctions." Compl. at ¶ 71.

- "By knowingly financing bin Laden and Al Qaeda, Al Shamal purposefully directed their activities at residents of the United States and Plaintiffs' claims arise out of Al Shamal's activities."  Compl. at ¶ 72.

**Fourth**, the Complaint alleges that the Chairman of Al Shamal had close ties to Al Qaeda knowing its goals of international terrorism.  For example, it alleges that:

- "Al Shamal chairman Adel Abdul Jalil Batterjee ("Batterjee") established Benevolence International Foundation ("BIF") in the United States in 1992. BIF was incorporated in Illinois as a non-profit organization on or around March 30, 1992. BIF was used by bin Laden and Al Qaeda operatives to transfer money to bank accounts held at Al Shamal for the purpose of supporting Al Qaeda operations." Compl. at ¶ 67.

- "On December 21, 2004, the United States designated Adel Abdul Jalil Batterjee ("Batterjee") pursuant to E.O. 13224 as a Specially Designated Global Terrorist because of his provision of financial and material support to Al Qaeda and bin Laden. Batterjee was bin Laden's brother-in-law." Compl. at ¶ 171.

- "Batterjee was the appointed chairman of Al Shamal. He held that position as of at least 2002." Compl. at ¶ 174.

- "In October 2002 Batterjee was named as an un-indicted co-conspirator in an indictment against bin Laden confidant Enaam Arnaout arising from the operation of Benevolence International Foundation ("BIF") as a racketeering enterprise and provision of material support to organizations, including Al-Qaeda, that are engaged in violent activities.  Arnaout was sentenced on August 18, 2003 to more than 11 years in federal prison for defrauding donors. He pleaded guilty to a racketeering charge, admitting that he diverted thousands of dollars from his charity to support Islamic militants in Bosnia and Chechnya." Compl. at ¶ 176.

**Fifth,** the Complaint alleges that Al Shamal and its Co-Conspirators committed overt acts in furtherance of the conspiracy both within the forum (the United States) and within this federal district.  For example, the Complaint alleges that:

- "Al Shamal used a correspondent account in the United States to send money from bin Laden to Essam al Ridi, an Al Qaeda associate residing in Texas, for the purchase of a plane in the United States to be used by Al Qaeda." Compl. at ¶ 65.

- "Al Shamal conspired with BNPP in omitting all reference to the bank or Sanctioned Entities in SWIFT payment messages sent to the United States. The fraudulent cover payments and payment practices were made for the sole purpose of preventing financial institutions from appropriately reviewing and analyzing transactions." Compl. at ¶ 76.

- "Batterjee is the Chairmain of Al-Bir Saudi Organization, whose American branch, Benevolence International Foundation (BIF) held accounts at Al

11

Shamal from 1991 until 2002.  Batterjee used the Al Shamal accounts for the benefit and financing of Al Qaeda." Compl. at ¶ 175.

- "Al Shamal and BNPP defrauded OFAC in furtherance of its conspiracy to conceal transactions with Sudan in order to avoid U.S. sanctions by, among other actions, submitting and/or causing to be submitted false and misleading reports to OFAC in Washington, D.C." Compl. at ¶ 77.

- "OFAC relied on the fraudulent statements of the financial institutions that transactions were not being processed on behalf of Al Shamal, Sudan or its agents and instrumentalities. The fraudulent statements to OFAC were the direct and proximate result of the conspiracy entered into between BNPP, Sudan, Sudanese financial institutions including Al Shamal, and Al Qaeda." Compl. at ¶ 78.

To provide further context to the conspiracy, the Complaint also contains numerous detailed allegations about the reporting requirements implemented by and investigative powers of the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") and Financial Crimes Enforcement Network (FinCEN), that Al Shamal, BNPP, and the other co-conspirators sought to defeat.  Compl. at ¶¶ 41-62.  These detailed allegations outline precisely how Al Shamal and its co-conspirators were able to conceal their material support of Al Qaeda from the U.S. Government and why this assistance was so valuable in assisting Al Qaeda in carrying out the August 1998 attacks.

## II.    ARGUMENT

### A.    Standards Governing Motion to Dismiss

#### 1.    Standard Under 12(b)(2)

Under Federal Rule of Civil Procedure 12(b)(2), a defendant may move to dismiss a suit if the court lacks personal jurisdiction over it.  The plaintiff bears the burden of establishing personal jurisdiction. *See FC Inv. Grp. v. IFX Mkts*., *Ltd*., 529 F.3d 1087, 1091 (D.C. Cir. 2008). In deciding whether the plaintiff has shown a factual basis for personal jurisdiction over a defendant, the court

resolves all factual discrepancies in favor of the plaintiff. *See Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990).

### 2.      Standard Under 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, the Federal Rules of Civil Procedure require only that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief," to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (*quoting Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The complaint need only contain "sufficient factual matter, accepted as true, to 'state a claim of relief that is *plausible* on its face.'" *Wultz v. Islamic Republic of Sudan*, 755 F. Supp. 2d 1, 39 (D.D.C. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).

The "facial plausibility standard is satisfied when 'the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id*. "When considering whether dismissal of a complaint is appropriate for failure to state a claim upon which relief can be granted . . . a court must 'assume all the allegations in the complaint are true (even if doubtful in fact) . . . [and] must give the plaintiff the benefit of all reasonable inferences derived from the facts alleged.'" *Id*. (*quoting Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 18 (D.C. Cir. 2008) (internal quotations marks omitted)).

### B.      This Court Can Exercise Personal Jurisdiction Over Al Shamal

Fed. R. Civ. P. 4(k)(2) permits a federal court to exercise personal jurisdiction over a defendant (1) for a claim arising under federal law, (2) where a summons has been served, (3) if the defendant is not subject to the jurisdiction of any single state court, (4) provided that the exercise of federal jurisdiction is consistent with the Constitution (and laws) of the United States. *Mwani v. bin Laden*, 417 F. 3d 1, 11 (D.C. Cir. 2005) (holding that Kenyan victims of the East African embassy bombings could assert personal jurisdiction over Osama bin Laden and Al Qaeda).

"Whether the exercise of jurisdiction is 'consistent with the Constitution' for purposes of Rule 4(k)(2) depends on whether a defendant has sufficient contacts with the United States as a whole to justify the exercise of personal jurisdiction under the Due Process Clause of the Fifth Amendment." *Mwani*, 417 F. 3d at 11 (citing Fed. R. Civ. P. 4(k)(2)) (additional citations omitted).

The Clause "protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations,'" and "requir[es] that individuals have '**fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign**.'"  *Mwani*, 417 F. 3d at 11 (internal citations omitted and emphasis added).  "Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this 'fair warning' requirement is satisfied **if the defendant has 'purposefully directed' his activities at residents of the forum**," "**and the litigation results from alleged injuries that 'arise out of or relate to' those activities**," *Mwani*, 417 F. 3d at 11 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)) (emphasis added).  "[S]pecific jurisdiction, requires an 'affiliation between the forum and the underlying controversy.'" *Livnat v. Palestinian Authority,* 851 F.3d 45, 56 (D.C. Cir. 2017) (quoting *Walden v. Fiore*, 571 U.S. 277, 283 n.6  (2014)).  The D.C. Circuit also recognizes that personal jurisdiction over a defendant is proper based on the overt acts of a co-conspirator which are committed in the forum and are in furtherance of the conspiracy.  *See Junquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1031 (D.C. Cir. 1997); *accord Charles Schwab Corporation v. Bank of America Corporation*, 883 F.3d 68, 87 (2d Cir. 2018).

The facts alleged here meet the requirements set forth in Rule 4(k)(2).  First, Al Shamal agreed to accept service of process through their counsel.  *See* June 26, 2018 Joint Stipulation (Dkt. 56).  Second, Al Shamal does not contend that it may be properly sued in a different U.S. federal

district court—instead, it contests its amenability to suit in the U.S. at all.  Third, Plaintiffs have alleged that Al Shamal and its co-conspirators had continuous ties to the United States and purposely directed their activities toward the United States.  *See*, *e.g.*, Compl. at ¶¶ 63, 66.  Fourth, and most critically under the particular factual allegations presented here, the assertion of personal jurisdiction fully comports with due process under these circumstances as outlined in Rule 4(k)(2) and the applicable case law.

Plaintiffs have alleged that Al Shamal knowingly and intentionally helped process or facilitate repeated financial transactions before, during and after the bombings to and through the United States on behalf of Al Qaeda.  *See*, *e.g.*, Compl. at ¶¶ 64-65, 66-72.  Plaintiffs have also alleged that Al Shamal and its co-conspirators committed overt acts in furtherance of the conspiracy in both the United States generally and the District of Columbia specifically.  *See*, *e.g.*, Compl. at ¶¶ 74, 76-78.  These include both specific acts relating to efforts to defraud U.S. financial institutions and OFAC in Washington, D.C. and specific transactions facilitated by Al Shamal to fund operational activities in the United States such as the purchase of an airplane for Al Qaeda.  Thus, the facts alleged in the Complaint provide a compelling case for personal jurisdiction under Federal Rule of Civil Procedure 4(k)(2).  Finally, Plaintiffs have alleged both statements made and actions taken by senior Al Shamal officers, such as Chairman Batterjee and Governor Mutasim Abdul-Rahim, in support of Al Qaeda's war of international terrorism against the United States.  *See*, *e.g.*, Compl. at ¶¶ 67-68, 159-160, 171-176.

### 1.    Al Shamal is Subject to Personal Jurisdiction because Its Actions and the Alleged Conspiracy Were Purposely Directed Toward the United States and this Federal District

In *Mwani v. Osama Bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005), the D.C. Circuit stated that "[w]hether the exercise of jurisdiction is "consistent with the Constitution" for purposes of Rule 4(k)(2) depends on whether a defendant has sufficient contacts with the United States as a whole to

justify the exercise of personal jurisdiction under the Due Process Clause of the Fifth Amendment.").   Indeed, the Court found personal jurisdiction proper over Al Qaeda due to its execution of the same attacks at issue in this case based both on the fact that Al Qaeda had specifically targeted the United States, as well as Al Qaeda's associated criminal conduct within the United States in furtherance of that scheme:

> "the plaintiffs' allegations and evidence were that bin Laden and al Qaeda orchestrated the bombing of the American embassy in Nairobi, not only to kill both American and Kenyan employees inside the building, but to cause pain and sow terror in the embassy's home country, the United States. Nor were the plaintiffs' allegations and evidence of contacts with the United States limited to the Nairobi bombing. The plaintiffs described an ongoing conspiracy to attack the United States, with overt acts occurring within this country's borders."

417 F.3d at 13.

Similarly, this Court can assert specific personal jurisdiction over Al Shamal, as a nonresident defendant, due to its "unabashedly malignant actions" directed toward the forum. *See Doe v. State of Israel*, 400 F. Supp. 2d 86, 110 (D.D.C. 2005) (quoting *GTE New Media Servs., Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349 (D.C. Cir. 2000)); *Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 24 (D.D.C. 2017).   Al Shamal engaged in a conspiracy with Sudan, Al Qaeda, and BNPP to defeat U.S. sanctions which were specifically designed to stop Sudan and Al Shamal from funneling money to Al Qaeda in support of its operations.   This involved a massive and widespread effort to defraud U.S. financial institutions and the U.S. Government including the U.S. Department of the Treasury's Office of Foreign Assets Control in Washington, D.C.   This conspiracy to conceal and avoid the scrutiny of U.S. authorities and channeled resources and support to Al Qaeda through banking transactions bore a substantial connection to the August 1998 bombings, and was executed with the purpose of intimidating the United States and bring about Al Qaeda's and Al Shamal's political goals.

"Jurisdiction in these circumstances may not be avoided merely because the defendant did not *physically* enter the forum." *Mwani*, 417 F.3d at 12 (emphasis added)(citing *Burger King v. Rudzewicz*, 471 U.S. 462, 477 (1985)). "'[S]o long as [an] actor's efforts are 'purposefully directed' toward residents of another [forum],' the Supreme Court has 'consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.'" *Id.* at 12-13 (quoting *Burger King*, 471 U.S. at 476). The focus is "on 'the relationship among the defendant, the forum, and the litigation.'" *Walden*, 571 U.S. at 283-84 (quoting *Keeton* v. *Hustler Magazine, Inc.*, 465 U. S. 770, 775 (1984)). If a federal court in the District of Columbia can assert personal jurisdiction over Al Qaeda regarding these same attacks, *see Mwani*, 417 F.3d at 13, then another federal court in this District can assert personal jurisdiction over its co-conspirator in those attacks.

### 2.   Al Shamal's is Subject to Personal Jurisdiction Based on the Overt Acts It and Its Co-Conspirators Committed and Caused in the Forum

The district court may also assert personal jurisdiction over Al Shamal on a conspiracy jurisdiction theory. Plaintiffs have alleged a criminal conspiracy where (1) the co-conspirators including Al Shamal, Sudan, BNPP, and Al Qaeda conspired to conceal information from U.S authorities to defeat anti-terrorism sanctions; (2) the money funneled to Al Qaeda was used to fund operational activities; and (3) those operational activities included efforts to "strike back" at the United States resulting in the August 1998 bombings. This conspiracy was not just purposely directed at the United States, it included numerous overt acts in the United States both by Al Shamal and its co-conspirators BNPP and Al Qaeda, which are sufficient to establish jurisdiction.

Al Shamal's first argument against the personal jurisdiction of the court collapses in view of conspiracy jurisdiction. Al Shamal complains that:

> "An allegation that is repeated throughout the Complaint is that the embassy bombings were "directly and proximately caused by BNPP's knowing and intentional participation in a conspiracy to help Sudan and help Sudanese financial institutions defeat U.S. economic

sanctions". *See*, *e.g.*, Compl. ¶ 2. However, there is no allegation that ASB personnel caused the 1998 East African Embassy Attacks by participating in that conspiracy. It appears that BNPP was the major player, not ASB, in terms of defeating U.S. economic sanctions."

MTD at 2.

However, the "acts within the forum of one co-conspirator, in furtherance of an alleged conspiracy" explicitly, "subject a nonresident co-conspirator to personal jurisdiction." *Dooley v. United Techs. Corp.*, 786 F.Supp. 65, 78 (D.D.C. 1992) (citing *Mandelkorn v. Patrick*, 359 F.Supp. 692, 695 (D.D.C. 1973)); *First Chi. Int'l v. United Exch. Co.*, 836 F.2d 1375, 1379 n. 4 (D.C. Cir. 1988).  Where a co-conspirator acted, or failed to act where it had a duty to act, in the District of Columbia or where Al Shamal caused another party to so act in the District of Columbia, Plaintiffs' allegations of a conspiracy between Al Shamal, Sudan, Al Qaeda, and BNPP and the overt acts taken within the forum both by BNPP and Al Shamal are more than sufficient to establish conspiracy jurisdiction over Al Shamal.  *See Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1031 (D.C. Cir. 1997); *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 86-87 (2d Cir. 2018).

Under conspiracy jurisdiction, even if Al Shamal had no contacts with the United States, the forum for purposes of Rule 4(k)(2), all of BNPP's contacts, and Al Qaeda's, inside the United States, in furtherance of their conspiracy, may be attributed to Al Shamal. *See Dooley v. United Techs. Corp.*, 786 F.Supp. 65, 78 (D.D.C. 1992).  There are specific, detailed allegations that: (1) a conspiracy existed; (2) Al Shamal participated in the conspiracy, and (3) BNPP committed many overt acts in the United States in furtherance of that conspiracy. *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 86-87 (2d Cir. 2018).

The purpose of this conspiracy was to defeat U.S. anti-terrorism sanctions and allow Sudan and Al Shamal access to the U.S. financial markets, Compl. ¶¶ 12, 13 ("without BNP acting

effectively as its US central banker, [the government of Sudan and entities tied to the government of Sudan] would not have had access to the US dollar markets.").  The importance to Al Qaeda of Sudan and Al Shamal's access to the U.S. financial markets cannot be overstated as this Court observed in *Owens*.  *Owens*, 826 F. Supp. 2d at 144.

Al Shamal provided banking services to Al Qaeda, and a front company created by the Al Shamal chairman at the time called Benevolence International Foundation "was used by bin Laden and Al Qaeda operatives to transfer money to bank accounts held at Al Shamal for the purpose of supporting Al Qaeda operations." Compl. at ¶¶ 67, 157.  Despite Al Shamal's contentions in their Motion, these were not routine banking activities.   Al Shamal actively participated in the conspiracy, the immediate goal of which was to defeat U.S. anti-terrorism sanctions by fraud and violence: "Al Shamal conspired with BNPP in omitting all reference to the bank or Sanctioned Entities in SWIFT payment messages sent to the United States.  The fraudulent cover payments and payment practices were made for the sole purpose of preventing financial institutions from appropriately reviewing and analyzing transactions." Compl. at ¶ 76.

The effect of the conspiracy to defeat sanctions was important because OFAC and FinCEN not only regulate financial transactions for anti-money laundering purposes, but also coordinate and channel their resources to fight terrorism financing. Compl. ¶¶ 60-62.  BNPP provided critically important and undetected access for Al Shamal, and therefore Al Qaeda, to the U.S. financial markets: "Al Shamal used the correspondent accounts of foreign banks such as BNPP and banks within the United States to gain access to the U.S. financial system." Compl. at ¶ 64. Al Shamal and Al Qaeda would not have had access to the U.S. financial markets without BNPP's provision of "correspondent banking services to Al Shamal through its subsidiary, United European Bank" and without that assistance it could not have funneled those monies to Al Qaeda to support its

operational activities.  Compl. at ¶ 154.  In sum, Al Shamal conspired with BNPP and Al Qaeda to allow Sudan illegal access to the U.S. banking system and to cover its support of Al Qaeda, which allowed Sudan to support Al Qaeda in the years leading up to the bombing of the U.S. embassies. *See* Compl. at ¶¶ 11-13, 64, 75-79, 82, 107-08, 110, 127, 154, 157, 159, 163-66.

As the Complaint alleges, "Al Shamal and BNPP defrauded OFAC in furtherance of its conspiracy to conceal transactions with Sudan in order to avoid U.S. sanctions by, among other actions, submitting and/or causing to be submitted false and misleading reports to OFAC in Washington, D.C." Compl. at ¶ 77.  The relevant U.S. financial investigator agencies all receive and process the relevant reports and documentation, which were altered by BNPP and in some cases Al Shamal, inside the United States.  Compl. at ¶¶ 76-78.  Al Shamal's wide scale defrauding of the U.S. financial investigatory apparatus through or with BNPP all occurred in the forum and are more than sufficient to establish personal jurisdiction over Al Shamal. Additionally, Al Qaeda's conspiracy to launch international terrorist attacks against the U.S. included many overt acts in the forum, *see Mwani*, 417 F.3d at 13, and Al Shamal's role in that conspiracy is more than sufficient to establish personal jurisdiction over Al Shamal.

### 3.    Al Shamal's is Also Subject to Personal Jurisdiction Under the District of Columbia's Long Arm-Statute

Plaintiffs have alleged and can also separately establish personal jurisdiction for the same reasons under the District of Columbia's long-arm statute, D.C. Code Section 13-423(a).  "Section 13–423(a)(1) authorizes the court to exercise personal jurisdiction over a defendant who, whether "directly or by an agent" (in this case, a co-conspirator), 'transact[s] any business in the District of Columbia.'" *FC Inv. Group LC v. IFX Markets, Ltd*., 529 F.3d 1087, 1096 (D.C. Cir. 2008) (quoting D.C. Code § 13–423(a)(1)) (additional citations omitted).  "Conspiracy jurisdiction under this subsection presumes that '[p]ersons who enter the forum and engage in conspiratorial acts are

deemed to 'transact business' there 'directly'; [and] coconspirators who never enter the forum are deemed to 'transact business' there 'by an agent.'" *Jung v. Association of American Medical Colleges*, 300 F. Supp. 2d 119, 141 (D.D.C. 2004) (citations omitted).  "So long as any one co-conspirator commits at least one overt act in furtherance of the conspiracy in the forum jurisdiction, there is personal jurisdiction over all members of the conspiracy." *Id*. (citation omitted).  Thus, plaintiffs must allege (1) the existence of a conspiracy; (2) the nonresident's participation in or agreement to join the conspiracy; and (3) an overt act taken in furtherance of the conspiracy within the forum's boundaries." *Id*. (citing *Edmond v. United States Postal Serv. Gen. Counsel*, 949 F.2d 415, 425 (D.C. Cir. 1991).

Plaintiffs have met that burden here based on the specific acts by Al Shamal's co-conspirators, BNP Paribas, to mislead the U.S. Government agencies, such as OFAC and FinCEN within the District of Columbia which were directly in furtherance of the conspiracy to defeat U.S. sanctions.

### 4.    In the Alternative, Plaintiffs Request Jurisdictional Discovery

As outlined above, Plaintiffs have made numerous specific and detailed allegations regarding the actions of Al Shamal, Al Shamal's leadership, and Al Shamal's co-conspirators that occurred in or were directed at the United States.  However, if uncertainty exists concerning personal jurisdiction in this matter, the Court should exercise its broad discretion to order jurisdictional discovery.  "In the District of Columbia Circuit, the standard for permitting jurisdictional discovery is 'quite liberal.'"  *In re Fort Totten Metrorail Cases*, 756 F. Supp. 2d 132, 134-135 (D.D.C. 2010) (quoting *Diamond Chem. Co. v. Atofina Chems., Inc*., 268 F.Supp.2d 1, 15 (D.D.C. 2003)).  A plaintiff "must have at least a good faith belief that such discovery will enable it to show that the court has personal jurisdiction over the defendant." *Id. Caribbean Broad. Sys. Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1090 (D.C. Cir. 1998).  "In addition, plaintiffs must

provide the Court with a 'detailed showing of what discovery it wishes to conduct or what result it thinks such discovery would produce.'" *Id*. (quoting *United States v. Philip Morris, Inc*., 116 F.Supp.2d 116, 130 n. 16 (D.D.C. 2000)).  "Ultimately, the trial court has broad discretion to allow or disallow the discovery sought." *Id*. (citing *FC Inv. Grp. LC v. IFX Markets. Ltd.*, 529 F.3d 1087, 1093 (D.C. Cir. 2008)).

Based on documentary and testimonial evidence presented by the United States Government and statements by the U.S. Government, such as the Treasury Department's designation of Al Shamal's Chairman as a global terrorist, Plaintiffs have much more than a good faith belief that Al Shamal and Al Shamal's leadership, such as its Chairman Adel Batterjee, conspired with Al Qaeda and directed their activities against the United States.  If the Court determines the current allegations are insufficient, Plaintiffs respectfully would request jurisdictional discovery to include all of the following items or information to further establish links between Al Shamal and the forum:

(1) records of all transactions conducted, directly or indirectly, by the Al Shamal through the United States or with U.S. persons (regardless whether Al Shamal's participation in the transactions was made known to the U.S. persons) during the period November 1997 through August 1998 (including transactions through, or with the assistance of, BNPP or its affiliates around the world);

(2) records of all correspondent accounts held by Al Shamal with financial institutions which facilitated transactions through or in the United States during the period leading to August 1998 bombings and in the immediate aftermath (i.e., 1992 through 1998);

(3) records of all transactions conducted by Al Shamal on behalf of Osama bin Laden, Al Qaeda, or its members during the period leading to the period prior to the August 1998 bombings and in the immediate aftermath;

(4) records of all accounts held by (i) Osama bin Laden, (ii) any business owned or operated by Osama bin Laden, or (iii) any other member of Al Qaeda at Al Shamal during the period leading to the August 1998 bombings and in the immediate aftermath;

(5) records of all accounts held by Al Shamal Chairman, Adel Batterjee, or any companies owned or controlled by Abdel Batterjee, including BIF, during the period November 1997 through August 1998;

(6) a listing of the names of all executive officers and shareholders in Al Shamal during the period November 1997 through August 1998 along with their positions and percentage ownership;

 (3) records of all transactions conducted by the Bank on behalf of Al Qaeda during the period prior to the August 1998 bombings (e.g. approximately 1992 through August 1998);

(4) records of all accounts held by members of Al Qaeda during period prior to August 1998 bombings;

(5) records of all accounts held by Al Shamal Chairman, Adel Batterjee, or any companies owned or controlled by Abdel Batterjee, including BIF during the period November 1997 through August 1998;

(6) a listing of the names of all executives and shareholders in Al Shamal during the period November 1997 through August 1998; and

(7) communications or correspondence from or to senior officers of Al Shamal regarding U.S. economic sanctions during the period November 1997 through August 1998.

Plaintiffs further request authorization to issue document requests and interrogatories for the information above as well as the opportunity to depose one or more Rule 30(b)(6) deponents or individuals with personal knowledge from Al Shamal.

### C.   Plaintiffs Have Properly Alleged Common Law Claims Under Theories of Conspiracy and Aiding and Abetting Liability

Counts One and Two of the Complaint allege that Al Shamal conspired with Sudan and aided and abetted Sudan in its efforts to defeat United States sanctions, in part through fraud by which Sudan and Al Qaeda obtained direct access to the U.S. financial system and in part through violence as demonstrated most directly by the Embassy Bombings carried out by Al Qaeda.  These claims against Al Shamal follow a straight forward application of the principles for vicarious liability set forth in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983).  Under the rule of *Halberstam*, Al Shamal is vicariously liable for the reasonably foreseeable conduct of Al Qaeda in the August 1998 bombings, which was in furtherance of a conspiracy to defeat the U.S. Government's anti-terrorism sanctions against the Government of Sudan.

1. **Al Shamal is Vicariously Liable for Plaintiffs' Injuries as it Conspired with Al Qaeda to Defeat United States Sanctions and Facilitate Acts of Terrorism.**

The D.C. Circuit's decision in *Halberstam* outlines the elements of a civil conspiracy as: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme. *Halberstam*, 705 F. 2d at 477.   Under these principles, a conspirator in a criminal or unlawful conspiracy is civilly liable for injuries arising from reasonably foreseeable tortious conduct taken by a co-conspirator in furtherance of the conspiracy:

> "[O]nce the conspiracy has been formed, all its members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy.   **A conspirator need not participate actively in or benefit from the wrongful action in order to be found liable.   He need not even have planned or known about the injurious action . . . so long as the purpose of the tortious action was to advance the overall object of the conspiracy**."

*Halberstam v. Welch*, 705 F.2d at 481 (emphasis added).

Al Shamal was an active participant in a comprehensive, well-orchestrated conspiracy with Sudan to provide material support for terrorism by concealing transactions involving billions of dollars through the United States to avoid sanctions specifically intended to prevent terror financing, as well as providing direct support to Al Qaeda, as well as through BIF, as alleged in the Complaint.   Given the clear, repeated, and publicly declared purposes of the U.S. sanctions regime, the conspiracy to defeat those sanctions necessarily facilitated the financial network for terrorist organizations like Al Qaeda that the sanctions were expressly intended to impede.   *See Freeman v. HSBC Holdings PLC*, No. 14-cv-6601, 2018 WL 3616845 at *21 (E.D.N.Y. July 27, 2018) (denying motion to dismiss in finding that "each of the conspiracy's actions need not themselves constitute an act of international terrorism under Section 2331(1) . . . Instead, the acts of

international terrorism committed by another member of the conspiracy may be separate and distinct from the "overt acts" committed by the conspiring bank in support of the overarching conspiracy.").

In dismissing Plaintiffs' conspiracy claims against BNP Paribas, the Court found that "plaintiffs failed to plausibly allege that BNPP directly funded any terrorist group, had knowledge of Sudan's use of BNPP-provided funds to sponsor terrorist activities, or knew that BNPP's conduct actually enabled the attacks." *Ofisi v. BNP Paribas*, 2018 WL 396234 at *5 (D.D.C. Jan. 11, 2018). The same cannot be said of Al Shamal.

Plaintiffs' plausibly allege that not only did Al Shamal conspire with BNP Paribas, Al Qaeda and Sudan to defeat U.S. sanctions but that Al Shamal "engaged in an ongoing conspiracy with Sudan and Al Qaeda to facilitate overt acts of terrorism against the United States in direct response to economic sanctions." Complaint ¶ 71. The factual support for Al Shamal's material support of Al Qaeda for the purpose of attacking American interests is overwhelming and includes allegations presented by the U.S. Government at criminal trials and in official public statements and reports that:

- Al Shamal began operations on January 2, 1990 in part with a capital contribution of at least $50 million by Osama bin Laden. Complaint ¶ 25;

- Bin Laden maintained accounts at Al Shamal on behalf of himself and his companies from 1992 through, at least, 2001. Complaint ¶¶ 157, 160, 164;

- Al Shamal's chairman Batterjee was a member of Al Qaeda and used Al Shamal to transfer money to bin Laden and other Al Qaeda operatives. Complaint ¶ 67, 175;

- Al Qaeda operatives used Al Shamal in the years leading to the 1998 East African Embassy attacks for financing its operations, including facilitating weapons and military equipment. Complaint ¶¶ 27, 69;

- Al Qaeda used funds from Al Shamal to buy farms in Sudan for the purpose of providing income to the organization and to train Al Qaeda operatives. Complaint ¶ 127.

- Al Shamal conducted or participated, directly or indirectly, in the conduct of Al Qaeda's affairs and participated in the management of Al Qaeda's operation. Complaint ¶ 69;

- Shortly before the Embassy Bombings, the co-founder and spokesman for Al Shamal openly promoted jihad. Complaint ¶ 159.

These facts, and the reasonable inferences derived therefrom, clearly establish that Al Shamal directly funded Al Shamal with direct knowledge that the Al Shamal-provided funds would be used to support terrorism. If nothing else, Plaintiffs have sufficiently pled specific facts to establish "the plausibility of an inference of conspiracy." *Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 17 (D.C. Cir. 2008). As the Court of Appeals in *Fame Jeans Inc.* observed in reversing a district court's dismissal of claims under Rule 12(b)(6):

> "In sum, *Twombly* was concerned with the plausibility of an inference of conspiracy, not with the plausibility of a claim. A court deciding a motion to dismiss must not make any judgment about the probability of the plaintiff's success, for a complaint 'may proceed even if it appears that a recovery is very remote and unlikely'; a complaint 'may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations.'"

*Fame Jeans Inc.,* 525 F.3d at 17 (citations and quotations to *Twombly* omitted). As the D.C. Circuit recognized in *Fame Jeans Inc.*, 525 F.3d at 15, "*Twombly* leaves the long-standing fundamentals of notice pleading intact" under Federal Rule of Civil Procedure 8. *See also Smith v. Washington Post Co*., 962 F. Supp. 2d 79, 87-88 (D.D.C. 2013) (recognizing that Rule 8's requirement of "a short and plain statement of the claim showing that the pleader is entitled to relief" is still the governing standard for pleading after *Twombly* and *Iqbal*.).

### 2.   Al Shamal is Vicariously Liable for Plaintiffs' Injuries as it Materially Aided and Abetted Al Qaeda.

Defendant Al Shamal aided and abetted Al Qaeda by providing resources it used to fund the Embassy Bombings. *Halberstam* identifies three elements of aiding-and-abetting liability: (1) the principal violator must "perform a wrongful act," (2) "the defendant must be generally aware of his role in the "overall illegal or tortious activity," and (3) "the defendant must knowingly and substantially assist the principal violation." 705 F. 2d at 487-88.  Al Shamal does not dispute that Al Qaeda's activities satisfy the first element, and Plaintiffs properly allege facts supporting the other two elements.

*Halberstam* itself demonstrates that defendant Al Shamal's assistance was "substantial." There, the principal tort was a "long-running burglary enterprise" in which a man stole valuables from homes and, on one occasion, murdered a resident. 705 F.2d at 488.  The D.C. Circuit affirmed that the burglar's live-in companion was liable for aiding and abetting both the enterprise as a whole and the murder committed in the course of it. *Id.* at 475-76.  Her assistance was limited to clerical tasks and essentially the provision of financial services, such as keeping the books and processing payments from buyers, that helped convert "stolen goods into 'legitimate' wealth." *Id.* at 488; *see id.* at 474-76 (describing her role).  She neither directly assisted in nor knew about the murder itself. *See id.* at 475-76, 488.  But her financial acts were substantial assistance "in the context of the enterprise [she] aided." *Id.* at 488.  And because "violence and killing" was a "foreseeable risk" of the broader enterprise, she was liable for the murder even though she did not even "kn[o]w specifically that [her companion] was committing burglaries." *Id.*

Al Shamal's contribution to Al Qaeda's terrorist enterprise was more substantial than the woman's in *Halberstam*.  The D.C. Circuit determined that the woman's assistance to the burglary enterprise was "substantial" using six factors: (1) the nature of the act assisted; (2) the amount and

kind of assistance; (3) presence at the time of the tort; (4) the defendant's relation to the tortfeasor; (5) the defendant's state of mind; and (6) the duration of the assistance. *See Halberstam*, 705 F.2d at 483-84. Those factors support liability here.

      a)      **Al Shamal's Assistance Was Substantial in Kind and Amount**

*Halberstam*'s first factor explains that "the nature of the act involved dictates what aid might matter, i.e., be substantial." *Id*. at 484.   The relevant acts here include both Al Qaeda's terrorist attacks on Plaintiffs and its terrorist enterprise as a whole.   Financing of the type Al Shamal provided to Al Qaeda matters greatly to such activities. *See Boim*, 549 F.3d at 690-91 (explaining importance of "cut[ting] the terrorists' lifeline" by separating them from "their financial angels"). That is why courts regularly hold that providing general funding to a terrorist group aids and abets the group's attacks and, more broadly, that financial assistance – especially when involving illegally concealed payments – aids and abets the enterprise being funded.   Plaintiffs' allegations warrant the same conclusion. Just as the burglary enterprise in *Halberstam* benefited from laundering "stolen goods into 'legitimate' wealth," 705 F.2d at 488, so did Al Shamal's terrorist enterprise benefit from Al Shamal's access to the banking system.

*Halberstam*'s second factor concerns the "*amount [and kind] of assistance given* to the wrongdoer." 705 F.2d at 484 (brackets in original).   Here, Al Shamal conspired with BNPP and Sudan to obscure Sudanese financial transactions and support of terrorism from the investigatory gaze of the United States government, handled transactions on behalf of Al Qaeda, founded BIF which funneled money and support to Al Qaeda, and provided Al Qaeda the means to move millions of dollars freely through the banking system resulting in the purchase of weapons, land, and military equipment. *See* Complaint ¶¶ 27, 69, 127.  That assistance was greater than in *Halberstam*, where the assistance was not "overwhelming as to any given burglary." 705 F.2d at 488.  Regardless of whether Al Shamal was Al Qaeda's sole source of funds, its direct efforts provided Al Qaeda with

a necessary stream of revenue and access to U.S. dollars to further its terrorist activities. That is more than enough for liability.

        **b)**        **Defendant Al Shamal was closely related to Al Qaeda and knew that it was facilitating terrorism**

*Halberstam*'s fourth and fifth factors instruct that the defendant's "relation" to the direct tortfeasor and defendant's "the *state of mind* of the defendant may also be relevant." 705 F.2d at 484. As for the fourth factor, defendant Al Shamal's "*relation to the tortious actor*," *id.* at 488, is particularly strong. Defendant Al Shamal directly cooperated with Al Qaeda in structuring transactions to finance terrorism. Indeed, the allegations in this case portray an unusually close, substantial nexus between Al Shamal and Al Qaeda. Al Shamal began operations, in part, due to a substantial investment by bin Laden himself. Al Shamal's Chairman Batterjee had direct connections with Al Qaeda and used the bank to transfer payments to terrorists. And finally, Al Shamal's co-founder and spokesman openly shared Al Qaeda's call for jihad in June 1998—just shortly before the attacks on the U.S. embassies. *See* Compl. at ¶ 159.

      As for the fifth factor or "state of mind" of defendant Al Shamal, the only requirement is that the defendant "be generally aware of his role as part of an overall illegal or tortious activity." *Id.* at 477. To meet that standard, a co-conspirator or an aider-and-abettor need not "have a full understanding" nor "know all of the details of the primary party's scheme." *Aetna Case. and Sur. Co. v. Leahey Const. Co*, 219 F.3d 519, 535-36 (6th Cir. 2000). The "exact level" of knowledge required "remains flexible." *Camp v. Dema*, 948 F.2d 455, 459 (8th Cir. 1991).

      The Complaint sufficiently pleads Al Shamal's knowledge that Al Qaeda was using funds maintained at the bank for terrorism. That is true in part due to Al Shamal's direct connections to Usama Bin Laden, who was a funding contributor to the bank. Al Qaeda's well-publicized desire

to kill American citizens and their allies, and the corrupt structure of Al Shamal's transactions: the use of BNP Paribas to defeat U.S. sanctions.

Al Shamal' motion simply ignores plaintiffs' allegations of its direct connections to Al Qaeda in an attempt to re-focus the Court's attention on additional evidence that is not required to meet the requisite pleading standard  Here, Plaintiffs have relied on trial evidence presented by the U.S. Government in criminal prosecutions in New York for the East African Embassy Bombings that included direct testimony about Al Qaeda members maintaining accounts at defendant Al Shamal Bank and using defendant Al Shamal Bank to execute the conspiracy and bombings.  That is extremely strong, credible, and persuasive evidence.

The reasonable inferences from Plaintiffs' allegations supports a finding that Al Shamal clearly knew that Al Qaeda was using Al Shamal-provided funds and banking connections for its terrorist activities.  Based on the bench trial held before this Court in October 2010, this Court, in part, found sufficient evidence to make that very finding.  In response, Al Shamal suggests that it cannot be held liable for aiding and abetting the Embassy Bombings because there are no allegations that it specifically intended to commit acts of terrorism.  Under Defendant's interpretation, the D.C. Circuit would have reversed the finding of liability in *Halberstam* rather than affirming it, because the defendant did not even know about, much less intend, the murder.  *Id.* at 475-76.  But *Halberstam* affirmed the judgment, striking down any argument for the application of a specific-intent requirement and holding that an aider-and-abettor need only be "generally aware of his role" in the principal violation and need not "share the same purpose as the principal." 705 F. 2d at 487-88.  Al Shamal's argument in support of a specific-intent requirement is foreclosed by controlling precedent.  It also ignores the many statements made and actions taken by senior Al Shamal officials prior to the bombing outlined above.

### c) Factors 3 and 6: Presence and Duration

The remaining *Halberstam* factors either are neutral or cut in Plaintiffs' favor. The third factor asks whether a defendant was "*present at the time* of" the tort. 705 F.2d at 488. Defendant Al Shamal, as in most cases involving a conspiracy or the aiding and abetting of terrorist acts, assisted Al Qaeda by supplying access to financial markets and financing – not by showing up at the scene of the terrorist attacks. As in *Halberstam* itself, Defendant's' physical absence during the attacks is no bar to liability. *See id.* at 482 ("the aiding-abetting action may also be more distant in time and location and still be substantial enough to create liability").

Finally, the sixth factor – "the *duration of the assistance*" – confirms that Defendants' assistance was substantial. *Id.* at 488. Al Shamal supplied Al Qaeda with material support for over 8 years before the Embassy Bombings and continued beyond the Embassy Bombings. The longevity of Defendants' financing scheme well exceeds the "five years" at issue in *Halberstam*. 705 F.2d at 474. This factor thus supports liability even more "strongly" here than it did there. *Id.* at 488.

### D. Al Shamal is Liable Under the ATA for Its Provision of Material Support to Al Qaeda

Congress enacted the ATA in 1992 to "open[] the courthouse door to victims of international terrorism." S. Rep. No. 102-342, at 45 (1992). The ATA reflected Congress's dual objectives of "providing victims of terrorism with a remedy" and stopping "the flow of money" to terrorists. *Id.* at 22. Congress thus originally designed the statute's civil remedy to impose "liability at any point along the causal chain of terrorism." *Id.*; *see* 18 U.S.C. § 2333(a); *Weiss v. National Westminster Bank*, 278 F. Supp. 3d 636, 643 (E.D.N.Y. 2017) ("Congress crafted the ATA to cut off *all* money to terrorist organizations, finding that they are fundamentally tainted, even if they also have non-violent public welfare operations.") (emphasis in original). In the ensuing years, courts applied the

ATA to further Congress's purpose of "cut[ting] the terrorists' lifeline" by separating terrorists from "their financial angels." *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 690-91 (7th Cir. 2008) (en banc). The Complaint here attempts to put into action that precise aim of the United States Congress.

A defendant that undertakes financial transactions and funds conduct connected to terrorism also violates the ATA when its own conduct constitutes an "act of international terrorism." 18 U.S.C. § 2333(a). Direct liability works through a "chain of explicit statutory incorporations," under which a defendant that violates a predicate criminal statute (for example, by providing material support to terrorists) commits an act of "international terrorism" under the ATA. *Boim*, 549 F.3d at 690. Count Seven of the Complaint alleges direct-liability claims based on violations of 18 U.S.C. §§ 2339A and 2339C.[4] Under this theory of liability, Al Shamal's conduct in violation of those statutes (rather than Al Qaeda's) is the "act of international terrorism" that led directly and proximately to injure Plaintiffs and gives rise to ATA liability. Plaintiffs' Complaint includes numerous allegations that Al Shamal provided *direct* material support to Al Qaeda including holding assets for Usama bin Laden, maintaining accounts for bin Laden and other al Qaeda operatives, and conducting transactions on behalf of al Qaeda to and through the United States or causing U.S. persons to do so. *See*, *e.g.*, Complaint at ¶¶ 26-27, 69, Counts V-VII. Those allegations are not based on conjecture or supposition. They are based on the testimony and evidence presented in criminal trials by the U.S. Government against Al Qaeda members.

---

[4] The Court previously dismissed Plaintiffs' claim under Section 2339C against BNPP because the statute was enacted in 2002 – four years after the Embassy attacks. *See Ofisi v. BNP Paribas*, 278 F. Supp. 3d 84, 97 (D.D.C. 2017). The Court also dismissed Plaintiffs' claim under Section 2332d in Count VI because it concluded BNPP was not a "U.S. person" under the statute. *Id.* at 99-100. Plaintiffs repeat the arguments in their opposition brief to BNPP's motion to dismiss (Dkt. 19 at 25-27) for why BNPP is a United States person and assert that Al Shamal caused, aided, and abetted others and conspired with others to violate Section 2332d.

Al Shamal's material support of Al Qaeda were "act[s] of international terrorism" under the ATA because they involved dangerous acts under these circumstances, violated U.S. criminal law, occurred primarily outside U.S. territory, and "appear[ed] to be intended" to achieve all three of the aims set out in the statute: "(i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping." 18 U.S.C. § 2331(1).   The requirement that Defendant's conduct "appear to be intended" to achieve a terrorist aim, 18 U.S.C. § 2331(1)(B), "is not a state-of-mind requirement; it is a matter of external appearance," *Boim*, 549 F.3d at 694; *see Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 207 n.6 (2d Cir. 2014) (liability hinges on "an objective standard" pegged to "the apparent intentions of actions"); *Wultz* 755 F. Supp. 2d at 49 ("actual subjective intent is not what the ATA" requires).   The requirement is met when the "foreseeable consequences" of a defendant's conduct promote one of the three statutory aims. *Boim*, 549 F.3d at 694.   Courts thus routinely hold that providing material support to terrorists, without any other allegations of intent, raises a plausible inference that the defendant committed an "act of international terrorism."

The Supreme Court recognized 40 years ago that "a person who acts (or omits to act) intends a result of his act (or omission) … when he knows that the result is practically certain to follow from his conduct, whatever his desire may be as to that result." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 445 (1978).   The ATA's focus on the appearance of a defendant's intent is similar; whatever Defendant Al Shamal subjectively "desired", the law presumes that they intended the natural consequences of their actions. *See Boim*, 549 F.3d at 693-94.   Here, those consequences were plain, they included Al Qaeda's attacks that sought to (and did) achieve the three terrorist aims set out in the ATA.   A jury thus could find that Defendant Al Shamal intended those aims as well

– regardless of whether Al Shamal did not subjectively "desire" them or did not fully consider the true consequences of its actions. *See, e.g.*, *Wultz*, 755 F. Supp. 2d at 48-49; *Abecassis v. Wyatt*, 7 F. Supp. 3d 668, 675-76 (S.D. Tex. 2014).

Al Shamal's arguments that it was merely providing "banking services" misses the point under the circumstances here.  "A bank cannot routinely provide banking services, if they provide those services with knowledge of their assistance in funding terrorist activities."  *Weiss*, 278 F. Supp. 3d at 641 (citing *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 588 (E.D.N.Y. 2005)).  The Plaintiffs are NOT arguing that a banker who unknowingly facilitates a transaction which the bomb-thrower conducted is liable under the common law and the ATA.  Instead, Plaintiffs have reasonably and specifically alleged that Defendant Al Shamal knowingly and intentionally entered a conspiracy with Sudan and Al Qaeda and aided financial transactions by Sudan and Al Qaeda where facts were plain that such conspiracy and such transactions may result in violent terrorist attacks upon the United States and its employees.  This case is even stronger than the *Wultz* case, where the trial court rejected a bank's motion to dismiss.

The Bank of China, the defendant in *Wultz* and "an internationally respected financial institution with branches in this country," 755 F. Supp. 2d at 48, similarly argued that it wanted to make money rather than further terrorism.  But the court denied its motion to dismiss because "the law requires only that a defendant's acts '*appear* to be intended' to achieve one of the three enumerated items." *Id.* at 49; *United States v. Haipe*, 769 F.3d 1189, 1193 (D.C. Cir. 2014) (affirming sentencing enhancement based on 18 U.S.C. § 2331(1) because "money-raising goals obviously do not preclude a finding of intent to influence government policy"). At most, Al Shamal's argument that they appeared to be motivated solely by greed, rather than terrorism, just raises fact questions "for the jury." *Gilmore, v. Palestinian Interim Self-Government Authority*, 422

F. Supp. 2d 96, 102 (D.D.C. 2006); *Linde v. Arab Bank*, 882 F. 3d 314 (2d Cir. 2018). Moreover, the Complaint alleges that in addition to conspiring with BNP and Sudan, Al Shamal both conducted numerous transactions directly on behalf of Al Qaeda, key officers and shareholders made public statements in support of Al Qaeda, and had other direct ties to the organization. Complaint at ¶¶ 26-27, 69. For example, the Complaint also alleges that the Chairman of Al Shamal and shareholders had deep ties to Al Qaeda and international terrorism. Complaint at ¶¶ 171-176. These specific factual allegations and similar allegations through the Complaint support the inference that Al Shamal acted with knowledge of Al Qaeda's activities and a common purpose. In any event, the statements made and actions taken by senior Al Shamal officials prior to the bombing indicate a desire to assist Al Qaeda in its most nefarious goals.

At the trial of this matter and in addition to other admissible evidence in support of the above factual allegations, the Plaintiffs will present the following public statements and report by the United States Government concerning the Al Shamal Bank Chairman Adel Batterjee and his efforts on behalf of Al Qaeda as a "terrorist financier" which is described and cited in the Complaint:

> "The U.S Department of the Treasury today [December 21, 2004] announced the designation of Adel Abdul Jalil Batterjee . . . for providing financial and material support to al Qaida and Usama bin Laden (UBL).
>
> . . .
>
> Adel Abdul Jalil Batterjee served as the Executive Director and a member of the Board of Directors of Benevolence International Foundation (BIF), which was designated as a Specially Designated Global Terrorist (SDGT) by the Treasury in November 2002 for its support to al Qaida and UBL.
>
> 'Adel Batterjee has ranked as one of the world's foremost terrorist financiers, who employed his private wealth and a network of charitable fronts to bankroll the murderous agenda of al Qaida. A worldwide asset freeze, including in his home country of Saudi Arabia, will deal a serious blow to this key terrorist facilitator,' said Stuart Levey, Treasury's Under Secretary for the Office of Terrorism and Financial Intelligence (TFI).
>
> In the late 1980s, Batterjee founded the precursor to BIF, Lajnat al-Birr al-Islamiah (LBI), in Saudi Arabia and Pakistan. LBI provided financial and operational support to

mujahideen elements in Afghanistan and around the world, including fighters associated with UBL and Gulbuddin Hekmatyer, who was named a SDGT by the Treasury on February 18, 2003.   LBI was affiliated with Maktab Al-Khidamat (MK), which was co-founded and financed by UBL and is the precursor organization of al Qaida.   LBI later joined al Qaida upon the dissolution of MK.

In the early 1990s, LBI began operating under the name Benevolence International Foundation (BIF) in an effort to widen its appeal to the general public and increase its credibility with other governments.     BIF and LBI remained one organization with interchangeable assets under Batterjee's control.

In 1993, Batterjee incorporated BIF in the United States, where it also provided financial and operational support to mujahideen fighters worldwide, including members of al Qaida in Afghanistan, the Sudan, Bosnia-Herzegovina and Chechnya.     At one point, UBL confirmed to an associate that BIF was one of the non-governmental organizations providing funds to al Qaida.

According to information available to the U.S. Government, it was around that time that a BIF employee in the Sudan traveled to Saudi Arabia attempting to meet Batterjee.   Instead, the employee reported he was detained and questioned by Saudi authorities regarding BIF links to UBL.   Once released, he returned to the Sudan where he met with UBL and informed him of his detainment.   As a result, BIF operations were curtailed for a period of time.

Batterjee subsequently resigned as Director of BIF and personally selected UBL confidant Enaam Arnaout to serve as the organization's head.   Documents obtained by the U.S. Government demonstrate that Arnaout, while employed with LBI and BIF, worked with members of al Qaida to procure weapons for use in al Qaida training camps.     While employed by Batterjee at LBI, Arnaout reported directly to Batterjee, which was outside the usual chain of command.

Batterjee remained active in BIF despite having officially resigned as Director.   Evidence shows that Arnaout made an effort to conceal Batterjee's continued involvement in BIF.   In 2002, when Arnaout learned that U.S. authorities were scrutinizing BIF's activities, he warned Batterjee through an intermediary against transferring funds to any BIF offices.

Evidence of BIF's ties to al Qaida surfaced in March 2002 searches by Bosnian authorities of the organization's Sarajevo offices.   These searches uncovered numerous handwritten documents detailing the origin and history of the al Qaida organization.   Among the recovered files was a copy of a 1988 handwritten draft listing wealthy financiers of UBL's mujahideen operations in Afghanistan, referred to within al Qaida as the 'Golden Chain.'

This list contains 20 names with a parenthetical after each name, likely indicating the person who received funds from the specified donor.   'Usama' appears after seven of the listings and 'Baterji' appears after an additional six listings.

. . .

In October 2002, Arnaout was indicted in the United States for operating BIF as a racketeering enterprise and providing material support to organizations, including al Qaida, that are engaged in violent activities.   Batterjee was named as an un-indicted co-conspirator in the indictment."

U.S. Treasury Department Public Release, "U.S. Treasury Designates Two Individuals with Ties to al Qaida, UBL Former BIF Leader and al-Qaida Associate Named Under E.O. 13224," (Dec. 21, 2004), https://www.treasury.gov/press-center/press-releases/Pages/js2164.aspx.

### 1.   Plaintiffs Satisfy the Scienter Elements Of The Predicate Criminal Statutes

Plaintiffs also adequately allege the state of mind required under 18 U.S.C. § 2339A.   Courts have held frequently that the ATA imposes liability for knowingly providing general funding to terrorist groups, without requiring plaintiffs to trace the specific attacks that injured them to any one monetary contribution.   Therefore, 2339A only requires a finding that Al Shamal knew or recklessly disregarded that their support of Al Qaeda would be used for terrorist purposes. *See Boim*, 549 F.3d at 693 ("To give a small child a loaded gun would be a case of *criminal* recklessness and therefore satisfy the state of mind requirement for liability under section 2333 and the statutes that it incorporates by reference."); *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 506 (E.D.N.Y. 2012) (mental state for §§ 2339A and 2339C is satisfied if "the defendant was reckless with regard to the substantial probability of injuries that would likely be suffered by Americans").

Plaintiffs' allegations meet that standard for the reasons explained above. Defendant Al Shamal knew or recklessly disregarded that its financing and material support of Al Qaeda supported terrorist attacks on Americans – both through direct knowledge and public *fatwas* and reports of bin Laden and Al Qaeda's terrorist goals.   That is sufficient.   *See Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 433 (E.D.N.Y. 2009) (sustaining ATA claim alleging knowledge based on "public sources of information").

2.   **Al Shamal Proximately Caused Plaintiffs' Injuries by Directly Financing the Terrorist Organization Responsible for the Embassy Bombings**

Plaintiffs' direct-liability claims require that Al Shamal have proximately caused their injuries. To plead "proximate cause," Plaintiffs must allege "some reasonable connection" between their injuries and Defendants' conduct. *Owens v. Rep. of Sudan*, 864 F.3d 751, 794 (D.C. Cir. 2017). Such a connection "contains two similar but distinct elements": that (1) Defendants' conduct was a "substantial factor in the sequence of events" that led to Plaintiffs' injuries, and (2) the injuries were "reasonably foreseeable or anticipated as a natural consequence." *Id.* Those elements foreclose liability only when the "'causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity.'" *Id.* (quoting *Paroline v. United States*, 134 S. Ct. 1710, 1719 (2014)). Whether the requisite link exists in any given case "is ordinarily a question for the jury." *Smith v. District of Columbia*, 413 F.3d 86, 102 (D.C. Cir. 2005).

Plaintiffs' causation allegations are legally sufficient. In upholding this Court's finding that the Government of Sudan was liable for the Embassy Bombings, the D.C. Circuit recently explained that providing material support to a terrorist group proximately causes the group's foreseeable attacks when the support "foster[s] the[] growth" of that group. *Owens,* 864 F.3d at 794. Thus, in *Owens,* the court upheld a finding that Sudan proximately caused al-Qaeda's U.S. Embassy bombings by providing al-Qaeda with general "tax exceptions and customs privileges" and by facilitating its "access to the formal banking system." *Id.* at 794-95. Plaintiffs were not required to "chart a direct and unbroken factual line between [the defendant's] actions and the terrorist act[s]" that injured them. *Owens v. Rep. of Sudan*, 531 F.3d 884, 895 (D.C. Cir. 2008) *see also Owens* 864 F.3d at 799 (affirming causation despite stating that no evidence was presented that Sudan "directly advanced the 1998 embassy bombings" in question). Rather, Plaintiffs needed only to show that

the defendant's "financial support" strengthened the capacity of al-Qaeda's "broader organization" to commit the type of attacks that injured them. *Id.* at 794-95.

The D.C. Circuit's proximate-cause standard, which is controlling here, accords with the ATA's purpose. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. ___, 134 S.Ct. 1377, 1390 (2014) ("Proximate-cause analysis is controlled by the nature of the statutory cause of action."). The ATA's founding goal was to "interrupt, or at least imperil, the flow of money" "at any point along the causal chain of terrorism," S. Rep. No. 102-342, at 22. Congress recently reaffirmed its intent to curtail the flow of "resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism." Justice Against State Sponsors of Terrorism Act § 2(a)(6) By making "financiers of terrorism" liable for attacks foreseeably committed by the groups they fund, the *Owens* standard fulfills that objective of "cut[ting] the terrorists' lifeline." *Boim*, 549 F.3d at 691; *see id.* at 697-98. Courts thus routinely sustain proximate-cause allegations when a defendant provides financing or access to financial markets to the terrorist group responsible for the attack at issue even though the allegations do not demonstrate that a specific transaction was used specifically to obtain the bomb or assault rifle used in the attack.

Plaintiffs' allegations are sufficient under the governing standard because Al Shamal directly and foreseeably financed Al Qaeda's terrorist attacks. Despite the notorious and direct nexus between Al Qaeda and terrorism, Al Shamal knowingly maintained bank accounts for the organization and structured the transactions to funnel illegal payments to bin Laden and Al Qaeda operatives. These payments, access to the U.S. financial market, and subterfuge and concealment employed in undertaking the financial transactions through the U.S. provided crucial funding for Al Qaeda's terrorist activities and materially restricted the ability of the U.S. intelligence

39

community and law enforcement to identify and disrupt the bombing attacks.  The connection between such payments and Al Qaeda's bombing of the Embassies was not some "mere fortuity," *Paroline*, 134 S. Ct. at 1719; it was the foreseeable result of the conspiracy and directly made possible by the conspiracy.

This Court's dismissal of Plaintiffs' claims against BNP Paribas does not require this Court to grant Al Shamal's motion to dismiss under the facts alleged.  The prior decision by the Court was heavily fact dependent and, at most, held that giving funds to a country like Sudan, standing alone, does not proximately cause all attacks "by a terrorist organization associated with that state." *Rothstein v. UBS AG*, 708 F.3d 82, 96 (2d Cir. 2013).  Here, Plaintiffs do not allege that Al Shamal was materially supporting an intermediary between the alleged financing and the terrorist group at issue. *Owens*, 235 F. Supp. 3d at 97 (citing *Rothstein*).  Instead, Al Shamal had deep ties to Al Qaeda and directly supported the organization with knowledge of its activities.

Moreover, this Court dismissed the claims against BNP Paribas on the basis of a lack of specific allegations suggesting that the moneys sent to the sovereign state were actually passed along to Al Qaeda.  The core inquiry is "whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Lexmark*, 134 S. Ct. at 1390.  With regard to Defendant Al Shamal which dealt directly with Osama bin Laden and Al Qaeda members, Plaintiffs' allegations are sufficient under that framework because Congress intended the ATA to combat terrorist financing.  *See In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284, 1315 (denying summary judgment of plaintiffs ATA claims under 2339A as there was evidence of direct payments to the terrorist organization responsible for plaintiffs injuries); *Weiss*, 278 F. Supp. 3d at 636 (distinguishing *Rothstein* as plaintiffs alleged that defendant provided funds directly to Hamas).  Terrorist attacks by the same group Al Shamal funded thus fall within the "first step" under the

statute Congress enacted. *See Owens I*, 531 F.3d at 895 (proximate cause does not require "direct and unbroken factual line" to terrorist attack); *Boim*, 549 F.3d at 700-02 (noting that Defendants' preferred "causal requirement" would "eviscerat[e]" "[d]onor liability" under the ATA).

## III.   CONCLUSION

For all the foregoing reasons, Al Shamal's Motion to Dismiss should be denied.  This Court can assert personal jurisdiction over Al Shamal pursuant to Federal Rule of Civil Procedure 4(k)(2) because Al Shamal: (1) has sufficient contacts with the United States as a whole and is not properly sued in another district; (2) purposely directed its activities toward the United States in connection with the conspiracy alleged in the Complaint; and (3) participated in a conspiracy involving overt acts in furtherance of that conspiracy both within this forum (the United States) and this federal district through the filing or causing the filing of false reports and the failure to submit required reports to the U.S. Department of Treasury and the many overt acts taken by Al Qaeda in the United States prior to the 1998 bombings.

Additionally, Plaintiffs have alleged more than sufficient facts to sustain its claims against Defendant Al Shamal Bank under the Common Law and ATA.  Here, based in large part upon testimony and evidence presented by the U.S. Government at federal criminal jury trials, the Plaintiffs have alleged that Defendant Al Shamal Bank participated knowingly, directly, and significantly in financial transactions by Usama bin Laden and Al Qaeda in the months and years leading to the August 1998 bombing attacks in Kenya and Tanzania which resulted in the murder and the injuries of Plaintiffs who served the People of the United States.  Under these particular facts, Plaintiffs should be allowed their day in court to demonstrate Defendant Al Shamal Bank's civil responsibility for causing their deaths, disfigurements, and permanent injuries.

Respectfully Submitted,

/s/ Michael J. Miller
Michael J. Miller, Esquire
D.C. Bar No. 397689
David J. Dickens, Esquire
DC Bar No. 1003499
THE MILLER FIRM, LLC
108 Railroad Avenue
Orange, VA 22960
Tel: (540) 672-4224
Fax: (540) 672-3055

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of December 2018, I electronically filed Plaintiffs' Reply Memorandum in Further Support of Plaintiffs' Opposition to Defendant Al Shamal's Motion to Dismiss with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

**/s/ Michael J. Miller**
Michael J. Miller, Esq.