UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARY OFISI, et al.,

    Plaintiffs,

    v.

AL SHAMAL ISLAMIC BANK,

    Defendant.

Civil Action No. 15-2010 (JDB)

## MEMORANDUM OPINION

Plaintiffs are victims of the 1998 terrorist bombings of the United States embassies in Kenya and Tanzania. The attacks were perpetrated by al Qaeda with the assistance of the Republic of Sudan. See generally Owens v. Republic of Sudan, 864 F.3d 751, 765–99 (D.C. Cir. 2017). In 2015, plaintiffs filed suit against BNP Paribas, S.A. ("BNPP") and Al Shamal Islamic Bank, alleging that the embassy attacks were part of a conspiracy among BNPP, Al Shamal, the Republic of Sudan, and al Qaeda to defeat economic sanctions the United States imposed on Sudan in 1997. The Court previously dismissed plaintiffs' complaint against BNPP for failure to state a claim under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, and various common law torts. See generally Ofisi v. BNP Paribas, S.A., 278 F. Supp. 3d 84 (D.D.C. 2017).[1] Currently before the Court is [57] Al Shamal's motion to dismiss plaintiffs' nearly identical claims against it for lack of personal jurisdiction and for failure to state a claim. For the reasons stated below, the Court will grant in part and deny in part the motion to dismiss and order limited jurisdictional discovery.

---

[1] The Court previously considered claims only against BNPP because plaintiffs failed to effect service on Al Shamal. Plaintiffs have since served Al Shamal.

1

## BACKGROUND

I.      Facts[2]

In 1997, the United States imposed economic sanctions on the Republic of Sudan in response to Sudan's continued material support of terrorism. Compl. [ECF No. 1] ¶¶ 5, 103, 105. Because of these sanctions, "virtually all trade and investment activities involving the U.S. financial system, including the processing of U.S. dollar transactions through the United States, were prohibited" as to Sudan, its agencies, or instrumentalities. Id. ¶ 105.

BNPP is a multinational bank headquartered and incorporated in France with branches all over the world. Id. ¶ 18. Shortly after the imposition of U.S. sanctions, BNPP Geneva became the sole correspondent bank in Europe for Sudan's central bank. Id. ¶ 22. Sudan's central bank subsequently directed all major Sudanese commercial banks to use BNPP Geneva as their primary correspondent bank in Europe. Id. ¶¶ 22–23. As a result, most major Sudanese banks eventually held U.S. dollar-denominated accounts with BNPP, which they ultimately used to evade U.S. sanctions. Id. ¶ 87. One of those Sudanese banks was Al Shamal Islamic Bank, which was originally capitalized in part through a $50 million contribution from Osama Bin Laden, and which knowingly maintained and serviced bank accounts used by al Qaeda operatives. Id. ¶¶ 25, 69, 154.

In 1998, al Qaeda bombed United States embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, killing 224 people and injuring thousands. Id. ¶ 118. Plaintiffs are American and Kenyan victims and family members of victims of the bombings who previously obtained a judgment against the Republic of Sudan for its role in providing financial and military support to al Qaeda throughout the 1990s. See Owens v. Republic of Sudan, 174 F. Supp. 3d 242, 250–53 (D.D.C. 2016); see generally Owens, 864 F.3d at 769.

---

[2] The facts, drawn from plaintiffs' complaint and assumed true at the motion to dismiss stage, are set out more fully in this Court's previous opinion granting BNPP's motion to dismiss. See Ofisi, 278 F. Supp. 3d at 92–95.

In 2014, BNPP pled guilty to violating federal law in connection with intentionally conducting and concealing U.S. dollar-denominated transactions on behalf of sanctioned entities, including Sudan and Sudanese banks. See Compl. ¶¶ 86–91. BNPP stipulated in its plea that it knowingly violated U.S. sanctions imposed on Sudan between 2002 and 2012, based on banking relationships it had earlier established. See BNPP Plea Agreement Statement of Facts ¶¶ 14–17, Ex. A to Notice of Def. BNP Paribas S.A.'s Mot. to Dismiss the Compl. [ECF No. 13-2].

II.     **Procedural History**

Plaintiffs brought this suit in 2015 alleging that BNPP conspired with Sudan, the Central Bank of Sudan, and Sudanese banks, including Al Shamal, to provide Sudan access to the U.S. financial system in violation of the sanctions regime. Compl. ¶¶ 1–2. Sudan and these banks, plaintiffs allege, then used that access to provide material support to al Qaeda in connection with the embassy attacks. Id. ¶¶ 3, 33. Based on that alleged conduct, plaintiffs brought suit against Al Shamal and BNPP under (1) the civil liability provision of the ATA, id. ¶¶ 293–326; (2) the ATS, id. ¶¶ 255–292; and (3) for aiding and abetting and conspiracy to commit tortious acts in connection with the embassy bombings, id. ¶¶ 226–254.[3]

Because plaintiffs had failed to effect service on Al Shamal, the Court's previous opinion considered only claims against BNPP. See Ofisi, 278 F. Supp. 3d at 92 n.1.[4] The Court first narrowed plaintiffs' cognizable claims under the ATA to a violation of 18 U.S.C. § 2339A, which

---

[3] The complaint identifies various torts as giving rise to the conspiracy and aiding and abetting claims, including wrongful death, assault and battery, and intentional infliction of emotional distress. Compl. ¶¶ 242, 254.

[4] The Court originally dismissed without prejudice all claims against Al Shamal for failure to effect service. See id. Plaintiffs subsequently requested that the Court reinstate their complaint as to Al Shamal and provide them with an opportunity to complete service, explaining that, should their claims remain dismissed without prejudice, they would be time-barred from re-filing some of their claims even after serving Al Shamal. See Ofisi v. BNP Paribas, S.A., 285 F. Supp. 3d 240, 241–45 (D.D.C. 2018). The Court granted the request, vacating in part its prior order dismissing the claims against Al Shamal, and provided plaintiffs until April 12, 2018, to effect service. See id. at 245–46. Plaintiffs served Al Shamal in March 2018. See Joint Stipulation to Accept Serv. of Process & Extend Time to Resp. to Compl. [ECF No. 56] ¶ 1.

"makes it a crime to 'provide[] material support or resources [to terrorists] . . . knowing or intending that they are to be used in preparation for, or in carrying out, a violation of' various criminal statutes" prohibiting inter alia the "extraterritorial bombing of a . . . [U.S.] government facility." Ofisi, 278 F. Supp. 3d at 97–100 (citations omitted); see 18 U.S.C. § 2332f(a)(1). Plaintiffs nevertheless failed to state a claim under that section, the Court held, because "most of the facts alleged with respect to BNPP's conduct post-date the embassy bombings." Ofisi, 278 F. Supp. 3d at 100. This was "unsurprising," the Court observed, "because the complaint draws heavily from the contents of BNPP's guilty plea in 2014, where BNPP admitted to conspiring to violate U.S. sanctions against Sudan from 2002 to 2012," well after the 1998 attacks. Id. at 100 n.8 (emphasis added).

The Court next dismissed plaintiffs' claims against BNPP for conspiracy and aiding and abetting. See id. at 110–11. "[T]here is no private right of action for sanctions violations," the Court explained, and so any conspiracy must plausibly plead a nexus to the tortious acts underlying plaintiffs' claims—here, the 1998 bombings. Id. at 110. But no such nexus was pled because, as the Court found in dismissing the ATA claim, BNPP's only specifically alleged misconduct post-dated the bombings. See id. at 100. The Court therefore concluded that "the complaint does not plausibly allege that BNPP knew of the existence of any conspiracy between Sudan and al Qaeda to carry out the embassy bombings," "plaintiffs have not sufficiently pled that BNPP knowingly or substantially assisted the terrorist attacks," and plaintiffs' conspiracy and aiding and abetting claims "must be dismissed." Id. at 110–11.

Finally, the Court dismissed plaintiffs' remaining claims against BNPP, including under the ATS, on grounds not relevant here. See id. at 103–12.

In March 2018, plaintiffs successfully served Al Shamal with a copy of the summons and complaint. Al Shamal has moved to dismiss the complaint for lack of personal jurisdiction and, in the alternative, for failure to state a claim. See Al Shamal Islamic Bank's Mem. of P. & A. in Supp. of Its Mot. to Dismiss ("Def.'s Mot.") [ECF No. 57-1]. The motion is fully briefed and ripe for resolution.

## LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(2), a defendant may move to dismiss an action for lack of personal jurisdiction. When personal jurisdiction is challenged, it is plaintiffs' burden to make a prima facie showing that the Court has personal jurisdiction. Mwani v. bin Laden, 417 F.3d 1, 7 (D.C. Cir. 2005). "'Conclusory statements' or a 'bare allegation of conspiracy or agency' do not satisfy this burden." Livnat v. Palestinian Auth., 851 F.3d 45, 57 (D.C. Cir. 2017) (quoting First Chicago Int'l v. United Exch. Co., 836 F.2d 1375, 1378 (D.C. Cir. 1988)). "When deciding personal jurisdiction without an evidentiary hearing," the Court "must resolve factual disputes in favor of the plaintiff," but "need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts." Id. (citations omitted).

## DISCUSSION

Al Shamal raises both jurisdictional and merits objections to plaintiffs' complaint. See Def.'s Mot. at 2–15. The Court begins, as it must, with whether it has jurisdiction. See Broudy v. Mather, 460 F.3d 106, 111 (D.C. Cir. 2006).

### I. Personal Jurisdiction

The personal jurisdiction inquiry asks whether defendant, through its intentional acts, is subject "to the [forum's] coercive power." Bristol-Myers Squibb Co. v. Super. Ct. of Cal., 137 S. Ct. 1773, 1779 (2017) (citation omitted); see J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873,

879–881 (2011). "To establish personal jurisdiction over a non-resident [defendant] like [Al Shamal]," courts ordinarily "decide whether statutory jurisdiction exists under the [forum state's] long-arm statute and, if it does, then . . . whether an exercise of jurisdiction would comport with constitutional limitations." Forras v. Rauf, 812 F.3d 1102, 1105 (D.C. Cir. 2016).

Here, however, plaintiffs primarily contend that the Court may exercise personal jurisdiction through a different means: Federal Rule of Civil Procedure 4(k)(2). See Pls.' Opp'n to Def.' Al Shamal's Mot. to Dismiss ("Pls.' Opp'n") [ECF No. 64] at 13–18.[5] "Rule 4(k)(2) permits a federal court to exercise personal jurisdiction if [1] the claim arises under federal law, [2] process was properly served, [3] the defendant is not subject to jurisdiction in any state court of general jurisdiction, and . . . [4] jurisdiction 'is consistent with the United States Constitution and laws.'" Livnat, 851 F.3d at 47 (quoting Fed. R. Civ. P. 4(k)(2)).

There is no dispute that three of the four requirements are met: a subset of plaintiffs' claims arise under federal law, plaintiffs properly served a summons on Al Shamal, and Al Shamal is not subject to jurisdiction of any state court.[6] See Pls.' Opp'n at 14–15; Al Shamal Islamic Bank's Reply Mem. in Further Supp. of Its Mot. to Dismiss [ECF No. 66] at 3–6. Hence, the only question

---

[5] Plaintiffs summarily contend that they can separately establish personal jurisdiction under section 13-423(a)(1) of the District of Columbia's long-arm statute "for the same reasons" they relied on under Rule 4(k)(2). Pls.' Opp'n at 20–21. "Section 13-423(a)(1) authorizes the court to exercise personal jurisdiction over a defendant who, whether 'directly or by an agent' (in this case, a co-conspirator), 'transact[s] any business in the District of Columbia.'" FC Inv. Grp. LC v. IFX Markets, Ltd., 529 F.3d 1087, 1096 (D.C. Cir. 2008) (quoting D.C. Code § 13-423(a)(1)). Plaintiffs accordingly argue that the Court may assert jurisdiction under that provision because Al Shamal, through purported co-conspirator BNPP, "transact[ed]" in a manner that mislead "U.S. Government agencies" in the District of Columbia "in furtherance of the conspiracy to defeat U.S. sanctions." Pls.' Opp'n at 21. The Court will reject the identical argument in the context of Rule 4(k)(2), see infra Part I.A, however, and therefore rejects jurisdiction under the long-arm statute for the reasons described there—namely, that plaintiffs have insufficiently pled that Al Shamal and BNPP were involved in any conspiracy relevant to the injuries underlying this action.

[6] As the D.C. Circuit has explained, if a defendant "contends that [it] cannot be sued in the forum state and refuses to identify any other [state court] where suit is possible," then the requirement to establish that the defendant is not subject to any state's jurisdiction is met. Mwani, 417 F.3d at 11 (citation omitted). Al Shamal has not identified any state court where suit is possible, and the Court therefore finds that it is not subject to jurisdiction in any state court for purposes of Rule 4(k)(2).

that remains before the Court is whether asserting personal jurisdiction over Al Shamal is consistent with the Constitution.

The constitutional limit on personal jurisdiction under Rule 4(k)(2) is governed by the Due Process Clause of the Fifth Amendment. See Livnat, 851 F.3d at 54. For the exercise of personal jurisdiction to be consistent with due process, it has long been settled that a defendant must "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)); see also World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980) (due process mandates that a defendant's "conduct and connection with the forum . . . [be] such that he should reasonably anticipate being haled into court there"). For purposes of Rule 4(k)(2), the relevant "forum" is the United States as a whole. See Livnat, 851 F.3d at 54–55.

Courts recognize two types of personal jurisdiction arising from a defendant's contacts with the relevant forum: general jurisdiction and specific jurisdiction. Bristol-Myers, 137 S. Ct. at 1779–80. Plaintiffs here contend only that the Court has specific jurisdiction over Al Shamal. See Pls.' Opp'n at 14, 16.[7] Courts may assert "specific or conduct-linked jurisdiction" over a defendant when the suit "arises out of or relates to the defendant's contacts with the forum."

---

[7] Courts have "general or all-purpose jurisdiction"—encompassing "any and all claims against" a defendant "wherever in the world the claims may arise"—only if defendant's contacts are "so 'continuous and systematic' as to render [defendant] essentially at home" in the forum. Daimler AG v. Bauman, 571 U.S. 117, 121–22, 127 (2014) (citation omitted). The complaint summarily states that Al Shamal had "continuous and systematic contacts" with the United States based on "correspondent banks and shareholder relationships in the United States," Compl. ¶ 63, but plaintiffs make no explicit argument in their opposition that the Court may assert general jurisdiction over Al Shamal. Even had plaintiffs argued that the Court has general jurisdiction, however, the Court would have rejected that contention. For a foreign company like Al Shamal, place of incorporation and principal place of business are the "paradig[matic] . . . bases for general jurisdiction." Daimler, 571 U.S. at 137. Al Shamal is a Sudanese bank that was established and principally operates in Sudan. See Compl. ¶ 25. And plaintiffs have not pled sufficient contacts for this to approach the "exceptional case" wherein "a corporation's operations [in the United States] . . . [are] so substantial . . .[so] as to render the corporation at home in that [forum]" even when "its formal place of incorporation or principal place of business" is elsewhere. Daimler, 571 U.S. at 139 n.19. Hence, the Court finds that it may not assert general jurisdiction over Al Shamal.

Daimler, 571 U.S. at 122, 127 (citation and alterations omitted). And as the Supreme Court has clarified, "to exercise [specific] jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum," and the relationship between the defendant, the forum, and the suit "must arise out of contacts that the 'defendant himself' creates with the forum state," rather than "contacts between . . . third parties[] and the forum." Walden v. Fiore, 571 U.S. 277, 284 (2014) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)). Those contacts need not be physical, however; due process will be satisfied so long as "defendant has 'purposefully directed' his activities" at the forum, and "the litigation results from alleged injuries that 'arise out of or relate to' those activities." Mwani, 417 F.3d at 12–14.

Plaintiffs argue that this Court may assert specific jurisdiction over Al Shamal because they have made a prima facie showing that Al Shamal "purposely directed . . . malicious activities toward the . . . United States" in connection with the 1998 embassy bombings. See Pls.' Opp'n at 1. These alleged "malicious activities" broadly fall into one of two groups. First, plaintiffs allege that Al Shamal committed or conspired to commit "specific acts" "to defraud" U.S. institutions and agencies, including the Department of the Treasury's Office of Foreign Assets Control ("OFAC") in Washington, D.C., in connection with a "conspiracy . . . to defeat U.S. sanctions," and that such acts had, as their "inevitable consequence," the 1998 attacks on the embassies. Id. at 7–8, 15–16. Second, plaintiffs allege that Al Shamal directly "facilitated" al Qaeda's "operational activities in the United States," including the 1998 bombings. Id. at 15; see

8

also id. at 17, 38 (arguing Al Shamal "caused" plaintiff's injuries by "[d]irectly [f]inancing" the bombings). The Court considers each theory in turn.

A. **Contacts in connection with the alleged conspiracy to defeat U.S. sanctions**

Plaintiffs fail sufficiently to allege that Al Shamal had the necessary minimum contacts with the United States in connection with any conspiracy to defeat U.S. sanctions. Putting aside whether the alleged evasion of sanctions had any nexus to the 1998 attacks, the complaint's only specific allegations concerning sanctions-related conduct are that BNPP, not Al Shamal, had contacts with the United States. Plaintiffs allege, for instance, that in furtherance of the purported conspiracy BNPP: "processed thousands of transactions to or through U.S. financial institutions that involved countries . . . subject to the sanctions programs administered by OFAC," Compl. ¶ 119; used a particular "bank in the United States" to avoid "problems . . . encountered with the U.S. authorities," id. ¶¶ 204–05; and "[employed] high-level business managers . . . [that] were aware of and supported" taking direct measures to "circumvent[] the US embargo on transactions in [dollars] by Sudan," id. ¶¶ 208–09 (citations omitted). Although the complaint contains a handful of broad, conclusory statements concerning Al Shamal's involvement in such activity—see, e.g., id. ¶ 75 (alleging "Al Shamal conspired with Sudan and BNPP to circumvent and defeat United States sanctions through financial fraud and money laundering")—notably absent are similar specific factual allegations that Al Shamal transacted with banks in the United States, or had any contact with agencies like OFAC or other U.S. institutions, in connection with sanctions-related misconduct. Instead, plaintiffs have established only "contacts between . . . [a] third part[y] and the forum." Walden, 571 U.S. at 284.

Perhaps recognizing that the complaint lacks allegations of direct sanctions-related contacts, plaintiffs contend in the alternative that the Court has jurisdiction over Al Shamal under

9

a "conspiracy jurisdiction" theory. Pls.' Opp'n at 17–18. Under such a theory, plaintiffs explain, the "acts within the forum of one co-conspirator, in furtherance of an alleged conspiracy . . . subject a nonresident co-conspirator to personal jurisdiction." Id. at 18 (quoting Dooley v. United Techs. Corp., 786 F. Supp. 65, 78 (D.D.C. 1992)). Accordingly, plaintiffs allege that "even if Al Shamal had no contacts with the United States," "all of BNPP's [forum] contacts . . . in furtherance of the[] conspiracy [to defeat U.S. sanctions] may be attributed to Al Shamal." Id.

The Court may not assert personal jurisdiction over Al Shamal based on BNPP's alleged forum contacts. Even assuming conspiracy jurisdiction is valid under Rule 4(k)(2),[8] plaintiffs' allegations are insufficient to attribute BNPP's contacts to Al Shamal. To establish personal jurisdiction based on a co-conspirator's contacts, plaintiffs must first "make a prima facie showing of civil conspiracy" between the defendant and the party with alleged forum contacts. Second Amendment Found., 274 F.3d at 241. But as the Court already held in its previous opinion, plaintiffs have failed sufficiently to plead BNPP's involvement in any conspiracy relevant to the injury upon which this suit is predicated—specifically, the 1998 embassy bombings. As the Court explained there, plaintiffs' allegations concerning BNPP's actions to evade U.S. sanctions are drawn almost entirely from BNPP's 2014 plea admitting to misconduct between 2002 and 2014, well after the 1998 attacks. See Ofisi, 278 F. Supp. 3d at 100–03, 110–11; see also Compl. ¶ 90.

---

[8] Plaintiffs offer no authority for the proposition that courts may assert conspiracy jurisdiction under Rule 4(k)(2). The cases upon which plaintiffs rely have permitted such a theory only under state long-arm statutes. See Dooley, 786 F. Supp. at 79 (explaining that the "conspiracy theory of jurisdiction does not itself provide a basis upon which the exercise of personal jurisdiction may rest" but "[r]ather . . . is an extension of the jurisdiction conferred upon a court by the enactment of a [state] long-arm statute" (emphasis added)); see also Second Amendment Found. v. U.S. Conference of Mayors, 274 F.3d 521, 523 (D.C. Cir. 2011) (noting that, in the District of Columbia, "the 'conspiracy theory' of personal jurisdiction[ is] an application of long-arm jurisdiction" frequently premised on D.C. Code § 13-423(a)(1), which permits courts to exercise personal jurisdiction over persons who transact business in the district either "directly or by an agent"). Indeed, as far as the Court is aware, no court to have considered the question has permitted the assertion of conspiracy jurisdiction under Rule 4(k)(2). See, e.g., In re Aluminum Warehousing Antitrust Litig., 90 F. Supp. 3d 219, 226–27 (S.D.N.Y. 2015) (rejecting the validity of conspiracy jurisdiction under Rule 4(k)(2) and finding that "[t]he concept of 'conspiracy jurisdiction' is better cast as an argument supporting general or long-arm jurisdiction"); Daventree Ltd. v. Republic of Azerbaijan, 349 F. Supp. 2d 736, 764 (S.D.N.Y. 2004) (declining to resolve the issue).

Thus, the Court held, BNPP's conduct could not have been part of any conspiracy to facilitate the 1998 embassy bombings, and plaintiffs' conspiracy claim "must be dismissed." Ofisi, 278 F. Supp. 3d at 110.

Because plaintiffs do not plausibly allege Al Shamal had any direct sanctions-related contacts with the United States, and BNPP's forum contacts may not be imputed to Al Shamal, the Court finds that plaintiffs have failed to make a prima facie showing that Al Shamal had sufficient contacts with the United States in connection with the alleged conspiracy to defeat U.S. sanctions.[9]

### B. Contacts in connection with the 1998 bombings

Plaintiffs separately contend that this Court has personal jurisdiction based on Al Shamal's direct involvement in planning, orchestrating, or otherwise participating in the 1998 embassy bombings. See Pls.' Opp'n at 20, 39 (arguing that Al Shamal "directly . . . financed Al Qaeda's terrorist attacks" and helped "launch international terrorist attacks against the [United States]"); see also Compl. ¶ 298 ("The 1998 Embassy Bombings that injured Plaintiffs . . . were supported[,] directed[,] and financed by Al Shamal.").

Well-pled factual allegations that Al Shamal caused or directly participated in the embassy bombings or related terrorist attacks against the United States likely would suffice to establish this Court's jurisdiction. Indeed, as plaintiffs point out, the D.C. Circuit in Mwani found personal jurisdiction over bin Laden and al Qaeda based on their roles in the very same attacks. See Mwani, 417 F.3d at 13 (finding Rule 4(k)(2) jurisdiction where "plaintiffs' allegations and evidence were

---

[9] Plaintiffs also summarily claim that al Qaeda had direct contacts with the United States as part of BNPP's scheme to evade sanctions, and that such contacts may be imputed to Al Shamal. See Pls.' Opp'n at 18. But the complaint contains neither well-pled allegations that al Qaeda had sanctions-related contacts with the United States, nor well-pled allegations that Al Shamal and al Qaeda conspired to evade U.S. sanctions in connection with the 1998 attacks. As the D.C. Circuit has repeatedly held, "the 'bare allegation of conspiracy or agency is insufficient to establish personal jurisdiction.'" Second Amendment Found., 274 F.3d at 524 (quoting First Chicago, 836 F.2d at 1378).

that bin Laden and al Qaeda orchestrated the bombing of the American embassy in Nairobi . . . [for the express purpose of] kill[ing] both American and Kenyan employees . . . [and] to cause pain and sow terror in the . . . United States" (internal citations omitted)).

But the complaint includes no well-pled allegations that Al Shamal was directly involved in the 1998 attacks. The "purposefully directed" activities plaintiffs pled in connection with the bombing are al Qaeda's, not Al Shamal's. It was al Qaeda, plaintiffs say, that "selected Nairobi . . . to strike back at the [United States] for the [sanctions] against Sudan," Compl. ¶ 7; "carr[ied] out the . . . 1998 bombing attacks," id. ¶ 2; "claim[ed] responsibility for the . . . bombings," id. ¶ 8; and "justified the bombings" as retaliation against the United States, id. ¶ 6. Plaintiffs' only specific, non-conclusory allegations concerning Al Shamal, by contrast, are that the bank was "affiliated with, and invested in by Osama bin Laden and [a]l Qaeda," id. ¶ 12; that it "maintain[ed] and service[d] [al Qaeda] bank accounts," id. ¶ 25; and that operatives withdrew funds from Al Shamal accounts to "coordinate [a]l Qaeda's efforts in preparation for the 1998 Embassy bombings," id. ¶ 168. Supplementing these specific allegations with broad pronouncements that Al Shamal "directed" the attacks is not enough. Such conclusory allegations "merely state the plaintiffs' theory of specific jurisdiction," Livnat, 851 F.3d at 57, rather than set forth the required jurisdictional facts.

Nor is jurisdiction proper based on Al Shamal's alleged indirect forum contacts related to the embassy bombings. True, courts have in some cases asserted personal jurisdiction where a bank has "knowingly performed a wire transfer . . . [through] one of its U.S. branches" with "knowledge that it is funding terrorists." Wultz v. Islamic Republic of Iran, 755 F. Supp. 2d 1, 34 (D.D.C. 2010); see also Weiss v. Nat'l Westminster Bank PLC, 176 F. Supp. 3d 264, 286 (E.D.N.Y. 2016) (finding specific jurisdiction where defendant was alleged to have "deliberately

12

and repeatedly used a New York [bank] account allegedly to support the same terrorist organization accused of perpetrating the attacks in which the plaintiffs were injured"). But here plaintiffs do not allege that Al Shamal had any similar deliberate contacts or transactions with the United States in connection with the 1998 bombings or any related terrorist attacks. Instead, the complaint's only relevant allegations assert that Al Shamal had intentional contacts in Sudan—for instance, by knowingly maintaining al Qaeda bank accounts—and that the bombings were "the foreseeable . . . consequence" of such activities. Pls.' Opp'n at 7–8.[10]

Such indirect contacts are too attenuated to establish specific jurisdiction. As the Supreme Court recently emphasized in Walden, "the defendant [it]self" must create the "necessary relationship" with the forum "based on [its] intentional conduct," and "attenuated contacts . . . ma[de] by interacting with other persons affiliated with the [forum]" are insufficient. Walden, 571 U.S. at 284–86. There, the Court additionally rejected establishing specific jurisdiction based on the "foreseeability" of harm resulting from a defendant's non-forum contacts, explaining that such an approach "impermissibly allows" plaintiffs' or third-parties' contacts "to drive the jurisdictional analysis." Id. at 289. And in Bristol-Myers, an even more recent case, the Supreme Court once

---

[10] The complaint includes a handful of factual allegations concerning direct contacts with the United States, but those allegations fail to allege the requisite nexus to the embassy bombings or related terrorist attacks. For example, the complaint alleges, without additional detail, that "Al Shamal used a correspondent account in the United States to send money from [Osama] bin Laden to Essam al Ridi, an [a]l Qaeda associate residing in Texas, for the purchase of a plane in the United States to be used by [a]l Qaeda." Compl. ¶ 65. Plaintiffs fail to allege whether this transaction is related to the 1998 bombings or any other terrorist activity, when the purchase occurred, and, critically, whether it was facilitated by Al Shamal knowingly and intentionally.

Plaintiffs also allege that "Al Shamal chairman Adel Abdul Jalil Batterjee . . . established" an organization in the United States in 1992 that al Qaeda and bin Laden used "for the purpose of supporting [a]l Qaeda operations." Compl. ¶ 67. If Batterjee were acting on behalf of Al Shamal, such an allegation might establish relevant contacts with the United States. But the Court cannot make such an inference because, based on plaintiffs' own allegations, Batterjee was the chairman of Al Shamal "as of at least 2002," well after the 1998 bombings. See id. ¶ 174. Accordingly, Batterjee's alleged contacts with the United States, even if arguably connected to the attacks, cannot be attributed to Al Shamal. In these and like instances, plaintiffs repeatedly fail to draw a clear connection between Al Shamal's activities and intentional or knowing material support of al Qaeda or bin Laden relating to the embassy attacks.

13

again underscored that "[t]he primary focus of [the] personal jurisdiction inquiry is the <u>defendant's</u> relationship to the forum." Bristol-Myers, 137 S. Ct. at 1779 (emphasis added).

These decisions make plain that plaintiffs must rely on <u>Al Shamal's</u> intentional contacts with the United States, not on al Qaeda's. Indeed, when confronted with nearly identical allegations involving Al Shamal's alleged role in the 9/11 attacks, the Second Circuit found the assertion of personal jurisdiction improper. See <u>In re Terrorist Attacks on Sept. 11, 2001</u>, 714 F.3d 659, 668, 675–76 (2d Cir. 2013), <u>aff'g</u> 718 F. Supp. 2d 456, 486 (S.D.N.Y. 2010). Allegations that Al Shamal "knowingly maintained [al Qaeda] bank accounts" and "that those accounts were used for al Qaeda operations," the Second Circuit found, were "not enough" "for personal jurisdiction purposes." <u>Id.</u> As the district court further explained, allegations of indirect support—including that "Al Shamal . . . provid[ed] critical financial and logistical support to bin Laden" during the 1990s and offered al Qaeda "financial infrastructure"—simply were "too remote and attenuated to support the exercise of specific jurisdiction." <u>In re Terrorist Attacks</u>, 718 F. Supp. 2d at 486–87.

To impute al Qaeda's purposeful contacts with the United States to Al Shamal in the absence of the latter's own relevant forum contacts, then, plaintiffs must allege far more than that Al Shamal acted as a "passive conduit through which [al Qaeda] monies" were transferred, or even that it provided services "to an organization openly hostile to the United States." <u>Id.</u> at 489. Rather, plaintiffs must set forth specific, non-conclusory allegations tantamount to the assertion of direct participation in the bombings or related attacks—that Al Shamal, for instance, "personally and intentionally provided material support to al Qaeda in aid of al Qaeda's plan to commit an aggressive terrorist strike against the United States, with knowledge that the United States and its

residents would likely bear the brunt of the resulting injuries." Id. Because plaintiffs' complaint has no non-conclusory allegations of that kind, the Court may not properly assert jurisdiction here.

For the foregoing reasons, the Court finds that plaintiffs so far have failed to establish a prima facie case that the Court has sufficient minimum contacts to assert personal jurisdiction over Al Shamal.

### C. Jurisdictional discovery

Plaintiffs ask the Court, in the alternative, for jurisdictional discovery to help "further establish links between Al Shamal and the forum." Pls.' Opp'n at 21. Defendant offers no specific objection to this request.

"This Circuit's standard for permitting jurisdictional discovery is quite liberal," and such discovery is permissible even when plaintiffs have "not made out a prima facie case of jurisdiction." Diamond Chem. Co. v. Atofina Chems., Inc., 268 F. Supp. 2d 1, 15 (D.D.C. 2003); see also FC Inv. Grp., 529 F.3d at 1093 (noting district courts' "broad discretion" to order jurisdictional discovery). To engage in jurisdictional discovery, plaintiffs "must have at least a good faith belief that such discovery will enable it to show that the court has personal jurisdiction over the defendant." FC Inv. Grp., 529 F.3d at 1093–94 (citation omitted). "Mere conjecture or speculation" is not enough, however, to justify such discovery. Id. at 1094.

The Court concludes that limited jurisdictional discovery is warranted. Based on the numerous well-pled ties between Al Shamal and al Qaeda, the Court finds that plaintiffs have at least a good faith belief that Al Shamal and Al Shamal's leadership were involved in planning, executing, or otherwise knowingly facilitating or carrying out the 1998 bombings. Jurisdictional discovery therefore will be permitted concerning Al Shamal's activities in connection with the 1998 embassy bombings, and the extent to which Al Shamal acted in concert with, or at the

15

direction of, al Qaeda to facilitate, plan, or execute the attacks. Rather than a broad license for discovery concerning transactions with any bank, during any period, however, jurisdictional discovery shall narrowly be targeted to reveal relevant forum contacts in connection with the attacks.[11]

Accordingly, reasonable discovery requests will be permitted as to a modified list of some, but not all, of plaintiffs' requested categories of documents and records:

(1) records of all transactions conducted by Al Shamal directly through the United States or with U.S. persons between November 1997 and August 1998;

(2) records of all transactions conducted by Al Shamal on behalf of Osama bin Laden, al Qaeda, or its members between 1995 and 1998;

(3) records of all Al Shamal accounts held by (i) Osama bin Laden, (ii) any business owned or operated by Osama bin Laden, or (iii) any other member of al Qaeda between 1995 and 1998;

(4) records of all accounts held by Adel Abdul Jalil Batterjee, or any companies owned or controlled by him, between November 1997 and August 1998;

(5) a list of the names of all executive officers and shareholders in Al Shamal between November 1997 and August 1998 along with their positions and percentage ownership;

(6) any communications or correspondence from or to senior officers of Al Shamal regarding the 1998 embassy bombings or related terrorist attacks targeting the United States between November 1997 and August 1998.

In accordance with the foregoing, the parties shall, after meeting and conferring, file a joint statement and proposed order setting forth the scope and schedule of jurisdictional discovery. The parties shall make a good faith effort to resolve any areas of disagreement before submitting the

---

[11] The Court denies plaintiffs' requests for discovery to the extent they relate to plaintiffs' open-ended theory that Al Shamal had relevant forum contacts as part of a generalized international conspiracy to evade United States sanctions. That such discovery will yield relevant contacts connected to the injury giving rise to this litigation is "mere conjecture" and "speculation." FC Inv. Grp., 529 F.3d at 1094; see also Ofisi, 278 F. Supp. 3d at 99–100, 110 (finding plaintiffs' allegations that BNPP conspired with Al Shamal and others to defeat U.S. sanctions in connection with the 1998 bombings "conclusory").

16

joint statement and proposed order. Should any areas of disagreement remain, however, the parties shall briefly set forth their respective positions in the joint statement.

## II. ATS Claims

The Supreme Court recently held in Jesner v. Arab Bank, 138 S. Ct. 1386, 1407–08 (2018), that foreign corporations like Al Shamal are not subject to liability under the ATS. The parties therefore have agreed that plaintiffs' ATS claims are foreclosed. See Def.'s Mot. at 20; Pls.' Opp'n at 2 n.1. Normally, the Court may not reach merits issues without first satisfying itself that it has personal jurisdiction. See Forras, 812 F.3d at 1105. Here, however, the D.C. Circuit has explained that "Jesner's bar on foreign corporate liability under the ATS involves a non-merits disposition, such that [courts may] rely on it without first assuring the existence of personal jurisdiction." Kaplan v. Cent. Bank of the Islamic Republic of Iran, 896 F.3d 501, 515 (D.C. Cir. 2018). The Court therefore will dismiss plaintiffs' ATS claims.

## **CONCLUSION**

For the reasons explained above, the Court will dismiss the ATS claims (Counts III and IV), order jurisdictional discovery consistent with the limitations and instructions described herein, and at this time deny without prejudice [57] Al Shamal's motion to dismiss plaintiffs' other claims. A separate order will issue on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: March 19, 2019